No. 25-60348

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

NETCHOICE, L.L.C.,
*Plaintiff-Appellee,*

*v.*

LYNN FITCH, IN HER OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF MISSISSIPPI,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Mississippi
No. 1:24-cv-170-HSO-BWR

**OPPOSED MOTION TO STAY THE DISTRICT COURT'S
PRELIMINARY-INJUNCTION ORDER PENDING RESOLUTION OF APPEAL**

LYNN FITCH
  *Attorney General*
SCOTT G. STEWART
  *Solicitor General*
JUSTIN L. MATHENY
ANTHONY M. SHULTS
  *Deputy Solicitors General*
WILSON D. MINOR
  *Special Assistant Attorney General*
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
E-mail: scott.stewart@ago.ms.gov

*Counsel for Defendant-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

Under this Court's Rule 28.2.1, governmental parties need not furnish a certificate of interested persons.

*s/ Scott G. Stewart*
Scott G. Stewart
*Counsel for Defendant-Appellant*

**TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS ......................................... i

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ................................................................................ 1

BACKGROUND .................................................................................. 5

    Factual Background ...................................................................... 5

    Procedural Background .................................................................. 7

ARGUMENT ..................................................................................... 13

I.    This Court Is Likely To Reject The District Court's Injunction Blocking Mississippi's Act Regulating Social-Media Platforms .... 13

    A.    The Injunction Defies This Court's Mandate In The State's Successful First Appeal In This Case .................................. 13

    B.    The District Court Erred In Ruling That Any Part Of The Act Likely Violates The First Amendment ................................ 15

II.    The Equities Favor Staying The Injunction So That The Act Can Protect Minors From Harms That Proliferate Online .................. 21

CONCLUSION ................................................................................... 23

CERTIFICATE OF CONFERENCE ....................................................... 24

CERTIFICATE OF SERVICE ............................................................... 25

CERTIFICATE OF COMPLIANCE ....................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
585 U.S. 579 (2018)............................................................ 21

*Free Speech Coalition, Inc. v. Paxton,*
606 U.S. — (U.S. June 27, 2025) ........................................ 1, 4, 15-19

*M.D. v. Abbott,*
977 F.3d 479 (5th Cir. 2020) ............................................ 13, 14

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024)...................................... 2, 3, 8-14, 16, 21

*NetChoice, LLC v. Fitch,*
134 F.4th 799 (5th Cir. 2025) ............................... 2, 3, 5, 10-14, 21, 22

*NetChoice, LLC v. Paxton,*
121 F.4th 494 (5th Cir. 2024) ................................. 2, 3, 8-11, 13, 14

*Ohio v. EPA,*
603 U.S. 279 (2024)......................................................... 13

*Sable Communications of California, Inc. v. FCC,*
492 U.S. 115 (1989).................................................... 17, 21

**Constitutional Provision**

U.S. Const. amend. I ............................................ 2-4, 7-10, 12, 14-17, 19

**Statutes**

2024 H.B. 1126 .................................................... 1-8, 10-22

Ala. Code § 22-17A-2 ....................................................... 15

Haw. Code R. 11-17-7.................................................................15-16

Miss. Code Ann. § 75-24-19............................................................7

Miss. Code Ann. § 75-24-20............................................................7

Vt. Stat. Ann. tit. 26, § 4102.........................................................16

## INTRODUCTION

This Court should stay, pending resolution of this appeal, the district court's injunction blocking enforcement of the Walker Montgomery Protecting Children Online Act, H.B. 1126 (2024) (App. A), Mississippi's targeted effort to address life-altering harms to children inflicted on social-media platforms. Op. (Dkt. 59) (App. B). The order defies this Court's prior decision *in this case* and is manifestly wrong— indeed, it squarely conflicts with the Supreme Court's decision in *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. — (U.S. June 27, 2025), which rejected a challenge to a law similarly protecting children online.

Enacted after a sextortion scheme on Instagram led a 16-year-old Mississippian to take his own life, the Act imposes modest duties on the interactive online platforms that are especially attractive to predators. The Act requires covered platforms to take "commercially reasonable" actions to verify a user's age, obtain parental consent for child users, and adopt a strategy to mitigate the harms to children inflicted on those platforms—sex trafficking, child pornography, targeted harassment, incitement to suicide, and more. The Act requires what any responsible covered platform would already do: make "commercially reasonable" efforts to protect minors—not perfect, state-of-the-art, or cost-prohibitive efforts, but efforts reflecting reasonable care.

NetChoice—a group representing billion-dollar tech giants—brought a facial challenge claiming that the Act's age-verification, parental-consent, and strategy provisions violate the First Amendment.

A year ago, the district court agreed. Dkt. 30. It ruled that the Act likely facially violates the First Amendment and issued a preliminary injunction barring its enforcement against NetChoice's members—relief that benefited 7 members regulated by the Act.

In *NetChoice, LLC v. Fitch*, 134 F.4th 799 (5th Cir. 2025), this Court vacated that injunction and remanded with directions to apply the demanding analysis that governs facial claims, including by applying two decisions setting forth a plaintiff's fact-heavy facial burden: *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), and *NetChoice, LLC v. Paxton*, 121 F.4th 494 (5th Cir. 2024). This Court ruled that because NetChoice seeks facial relief—relief blocking the Act in all applications—it faces a steep climb. First, it must establish "the law's scope" by showing "what activities and what actors are regulated, and whether the law regulates or prohibits those actors from conducting those activities." 134 F.4th at 807. Second, it must establish "which of the law['s] applications" violate the Constitution and show that they "substantially outweigh" constitutional applications. *Id.* at 807-08. So for the Act here, NetChoice must—based on a "factual" presentation—show the "'commercially reasonable efforts'" the law requires of *each* covered platform and thus "each" platform's "unique regulatory burden," *id.* at 808-09, establish for

each platform which burdens "intru[de] on" First Amendment rights, *Paxton*, 121 F.4th at 499, and show—in light of "every hypothetical application" of the Act—that invalid applications dominate, *id.* at 498. This "heavy burden" (*id.* at 497) is the "price" of challenging the Act "as a whole" (*Moody*, 603 U.S. at 744).

On remand, NetChoice refused to do what this Court directed. Rather than develop the factual record or make the application-by-application showing that this Court directed, NetChoice amended its complaint to add as-applied claims, filed a preliminary-injunction motion recycling its prior arguments and prior factual submissions, and urged the district court to grant the same relief as before.

The district court *ruled for NetChoice* and granted *the same facial relief it granted before*. It again credited NetChoice's First Amendment claim and blocked the Act *in every application* to *the same platforms* that benefited from the first injunction. Op. 11-35. The court did not perform the facial analysis—or demand the factual showing—that this Court ordered in *Fitch*. The court thought it could reinstate its prior relief because NetChoice had added as-applied claims. Op. 32.

This Court should stay the preliminary-injunction order.

The order defies this Court's mandate in this case. *Fitch* vacated an injunction that blocked the Act in all applications to NetChoice members and directed the district court to hold NetChoice to the burden that such facial relief requires. The district court then reinstated that injunction.

Although the district court said it was ruling on NetChoice's "as-applied" claims, the injunction is every bit the facial injunction that this Court vacated—and was issued without doing what this Court required. The mandate rule prohibits that. The State should not have to endure another year of appellate proceedings to get out from under the injunction that this Court already rejected.

Even putting aside the mandate rule, this Court will likely reject NetChoice's First Amendment claim—the only merits basis for the injunction. The Act here is constitutional under *Free Speech Coalition* (*FSC*), which rejected a First Amendment challenge to a Texas law requiring pornographic websites to verify visitors' ages. *FSC* ruled that States may require age verification to protect children from harm, that such a requirement does not directly regulate speech and so faces only intermediate scrutiny, and that Texas's law "readily satisfie[d]" that standard. *FSC* Op. 32. The Act here likewise regulates certain websites to protect children, does not directly regulate speech, and advances the State's interest in protecting children from predators while imposing at most "modest burden[s]" on speech (*id.* at 33)—requiring only "commercially reasonable" efforts to verify age, obtain parental consent, and mitigate harm. So the Act comports with the First Amendment. The district court ruled otherwise by failing to apply the "deferential" review that *FSC* mandates. *Id.* at 31.

The equities demand a stay. The injunction blocks a law that protects children from predators. The district court's equitable assessment rests on its flawed merits rulings. And in seeking relief, NetChoice urged the district court to defy this Court's mandate rather than do what this Court directed in *Fitch*. Equity should not condone that tactic. This Court should issue a stay.

## BACKGROUND

**Factual Background.** The internet provides a forum for inflicting life-altering harms on children. Sophisticated online platforms host this conduct. To address these harms, Mississippi passed the Act, H.B. 1126. The Act took effect July 1, 2024. § 10.

The Act has a targeted scope. It "applies only to" online platforms that "[c]onnect[ ] users in a manner that allows users to socially interact with other users," "[a]llow[ ] a user to create a" profile that others may see, and "[a]llow[ ] a user to create or post content" that others can see. § 3(1)(a)-(c); *see* § 2(a)-(b). The Act thus regulates the interactive social-media platforms that let predators interact with children and feed those predators information about those children. The Act reaffirms this targeted aim by carving out many platforms, including those that mainly provide "access to news, sports, commerce, [or] online video games" and only "incidental[ly]" offer "interactive" ("chat") functions. § 3(2)(c).

The Act imposes on covered platforms three duties to address harms to children. *First*, platforms must register—and make

"commercially reasonable efforts to verify"—the age of those who create an account with the platform. § 4(1). *Second*, platforms must secure, through a "commercially reasonable" method, "express consent from a parent or guardian" before allowing a known minor to hold an account. § 4(2). The Act lists several "[a]cceptable methods" of consent, including filling out a form, making a phone call, or responding to an email, § 4(2)(a)-(e), and adds a catchall for "[a]ny other commercially reasonable method" "in light of available technology," § 4(2)(f). *Third*, platforms must make "commercially reasonable efforts" to adopt a strategy to address certain harms. § 6(1). A covered platform "shall make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate [a] known minor's exposure to harmful material and other content that promotes or facilitates" listed "harms to minors." § 6(1). Those harms are: "self-harm, eating disorders, substance use disorders, and suicidal behaviors"; "[p]atterns of use that indicate or encourage substance abuse or use of illegal drugs"; "[s]talking, physical violence, online bullying, or harassment"; "[g]rooming, trafficking, child pornography, or other sexual exploitation or abuse"; "[i]ncitement of violence"; or "[a]ny other illegal activity." § 6(1)(a)-(f). Nothing in this strategy provision "require[s]" a platform "to prevent or preclude": (a) "[a]ny minor" from "searching for" or "requesting" content; or (b) the platform or those on it "from providing resources for the prevention or mitigation of the" listed harms. § 6(2).

The Act also limits covered platforms' use and collection of minors' sensitive information. § 5. The Act provides for enforcement by an affected minor's parents, § 7(2), and by the Attorney General, § 8. State law allows, for knowing and willful violations, civil monetary penalties and criminal liability. Miss. Code Ann. §§ 75-24-19, -20.

**Procedural Background.** In June 2024, NetChoice filed this lawsuit challenging sections 1-8 of the Act. It claims that the Act's age-verification, parental-consent, and strategy provisions violate the First Amendment, that the Act is unconstitutionally vague, and that the strategy provision is preempted. Complaint ¶¶ 60-156 (Dkt. 1). NetChoice raised only "facial" claims. *Id.* ¶ 58. It alleged that, "[b]ased on the Act's definitions," the Act covers and regulates the following NetChoice members: Google (which operates YouTube), Meta (which operates Facebook and Instagram), X (formerly Twitter), Snap Inc. (which operates Snapchat), Pinterest, Nextdoor, and Dreamwidth. *Id.* ¶ 13. NetChoice moved for a preliminary injunction. Dkts. 3, 4. It submitted declarations from its then-general counsel and officials with YouTube, Nextdoor, and Dreamwidth describing covered members' practices for protecting minors. Szabo Dec. ¶¶ 11-19 (Dkt. 3-2) (addressing 7 members); Veitch Dec. ¶¶ 16-28 (Dkt. 3-3) (YouTube); Pai Dec. ¶¶ 5-19 (Dkt. 3-4) (Nextdoor); Paolucci Dec. ¶¶ 16-21 (Dkt. 3-5) (Dreamwidth). The declarations claim that complying with the Act would be hard, costly, and damaging. Szabo Dec. ¶¶ 28-33; Veitch Dec. ¶¶ 29-

7

42; Pai Dec. ¶¶ 20-33; Paolucci Dec. ¶¶ 9-15, 22-26, 33-37. One member (Dreamwidth) claims that the costs of complying with the Act may force it to shut down. Paolucci Dec. ¶¶ 34, 35, 37.

On July 1, 2024, the district court granted a preliminary injunction barring the Act's enforcement against "NetChoice ... and its members." Dkt. 30 at 39-40 (App. C). The injunction thus benefited the member platforms listed above. The court held that NetChoice will likely win on its facial First Amendment and facial vagueness claims. Dkt. 30 at 16-35. The court did not reach the preemption claim. Dkt. 30 at 38 n.7. Although the court ruled that the Act is likely facially unconstitutional, it did not assess the challenged provisions on an application-by-application basis or compare lawful to unlawful applications.

The same day, the Supreme Court decided *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). *Moody* vacated two lower-court decisions (including a Fifth Circuit decision in *NetChoice, LLC v. Paxton*) because, in addressing facial claims against social-media laws, the lower courts failed to "perform[ ]" the required "facial analysis." *Id.* at 726. *Moody* emphasized that facial claims are "hard to win" and that courts must undertake a rigorous "inquiry" to assess whether a plaintiff has "carr[ied]" the demanding "burden" that governs those claims. *Id.* at 723, 718, 744. First, a court must "assess the state law['s] scope" by "determin[ing]" the law's "full set of applications." *Id.* at 724, 718. Second, the court must "decide which of the law['s] applications" (if any) "violate"

8

the Constitution and "compare" the law's "constitutionally impermissible and permissible" applications. *Id.* at 725, 726. A facial First Amendment claim can succeed "only if the law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 724. A plaintiff must make the required showings for each challenged provision. *See id.* at 724-26, 727 n.3. And a court must hold the plaintiff to this burden rather than "disregard the requisite inquiry." *Id.* at 744.

The State appealed from the district court's order. After the appeal was briefed, this Court decided *NetChoice, LLC v. Paxton*, 121 F.4th 494 (5th Cir. 2024). In *Paxton*, as here, a district court granted NetChoice facial First Amendment injunctive relief against a state law regulating social-media platforms. After *Moody*, this Court ruled that NetChoice had not met its "heavy burden" "to develop a factual record" to support its facial claim and remanded for "thorough discovery." *Id.* at 497, 500. This Court explained that in a "First Amendment facial challenge" a district court must "determine every hypothetical application of the challenged law" and faulted NetChoice for not developing a factual record to allow that determination. *Id.* at 498; *see id.* at 498-99. Then, for "every hypothetical application," the district court must determine—based on "factual development" by NetChoice—"whether there is an intrusion on" First Amendment rights. *Id.* at 498, 499; *see id.* at 499-500.

On April 17, 2025, this Court vacated the preliminary-injunction order in this case and remanded for the district court to perform the

analysis required by *Moody* and *Paxton*. *NetChoice, LLC v. Fitch*, 134 F.4th 799, 807-09 (5th Cir. 2025). This Court ruled that the district court did "not determin[e] the full scope of actors regulated by the Act and the activities it regulates," as *Moody* requires. *Id.* at 809. On actors: The district court "did not determine" whether the Act applies to (for example) "Uber, Google Maps, DraftKings, Microsoft Teams, Reddit, Pinterest, or X," "among many other[ ]" actors. *Id.* at 808, 809. On activities: The district court "did not determine the 'commercially reasonable efforts,' as used in the Act, or the Act's requirements for each [covered platform], requirements likely to be different with each [covered platform] facing a unique regulatory burden." *Ibid.* This activities inquiry, this Court ruled, requires a factual assessment of each covered platform for each provision that NetChoice challenges. "Some" platforms "may not need to devote additional resources to prevent known minors from holding an account without express parental consent, verify the age of anyone seeking to create an account, or implement a strategy to mitigate minors' exposure to certain content." *Ibid.* "For other" platforms, "these requirements may reach beyond their resources." *Ibid.* But "[w]ithout a factual analysis determining the commercially reasonable effort demanded of each individual [covered platform]," the district court "could not 'decide which of the law['s] applications violate the First Amendment, and ... measure them against the rest'" or "determine whether 'the law's unconstitutional applications substantially outweigh its constitutional ones.'" *Ibid.*

(quoting *Moody*, 603 U.S. at 725, then *Paxton*, 121 F.4th at 498). Because the district court "did not" "determine" as a "factual" matter "to whom the Act applies" or "the activities it regulates" and "then weigh violative applications of the Act against non-violative applications," *Fitch* concluded, the district court's facial ruling "cannot now stand." *Ibid.*

On remand, NetChoice filed an amended complaint that brings the same claims as before, Amended Complaint ¶¶ 93-215 (Dkt. 48), and adds allegations that "the Act is unconstitutional as applied to NetChoice members and their services regulated by the Act," *id.* ¶ 3; *see id.* ¶¶ 86-87, 129. NetChoice identifies the same covered members as in the original complaint except it has added Reddit (a new member) and lists YouTube rather than Google as a member. *Id.* ¶ 15. NetChoice alleges that at "minimum" "the Act is invalid to the extent it regulates 'social media' websites, including as applied to Plaintiff's members' regulated services identified in ¶ 14." *Id.* ¶ 87. The amended complaint does not—in paragraph 14 or anywhere else—describe those services.

NetChoice again moved for an injunction. Mot. (Dkt. 49); Mem. (Dkt. 50). It relied on the three member declarations filed with its first injunction motion, Mot. 3, and a declaration from its current general counsel, Bartlett Cleland, Dkt. 49-1. The 26.5-page Cleland declaration largely repeats the 23.5-page declaration by Carl Szabo (NetChoice's previous general counsel) filed with the first injunction motion. The Cleland declaration adds bullet points describing how "users employ ...

covered websites to communicate" (Cleland Dec. ¶ 7), allegations about how Reddit protects minors on its platform (*see id.* ¶¶ 13-20), and more allegations on why the Act covers some members and not others (*compare id.* ¶¶ 28-41 *with* Szabo Dec. ¶¶ 25-27).

Despite *Fitch*, nothing in NetChoice's new complaint, new briefing, or declarations (new or old) says what any platform must in fact do under each challenged provision or what would constitute "commercially reasonable" actions to verify age, obtain parental consent, or adopt a harm-mitigation strategy for any platform. §§ 4(1), 4(2), 6.

On June 18, the district court granted a preliminary injunction barring the Act's enforcement—in all applications—against YouTube, Meta, X, Snap, Pinterest, Nextdoor, Dreamwidth, and Reddit. Op. 35. *First*, the court held that NetChoice will likely win on its "as-applied" First Amendment claim. Op. 30. The court ruled that the Act is a content-based regulation of speech that likely fails strict scrutiny (Op. 14-27) and also likely fails intermediate scrutiny (Op. 27-30). The court said that because on remand NetChoice "add[ed]" an "as-applied challenge," the court did not need "to address [NetChoice's] facial challenge under the framework announced in *Moody*." Op. 32. The court did not reach NetChoice's other claims. *Second*, the court ruled that the equities favor relief. The court emphasized its merits rulings and compliance costs that, according to Dreamwidth, "may threaten the very existence of its business." Op. 31; *see* Op. 30-32.

On June 25, the district court denied the State's motion (Dkt. 61) to stay the injunction pending this appeal. Dkt. 65 (App. D).

## ARGUMENT

This Court should stay the preliminary-injunction order pending appeal. The State will likely succeed on appeal, it will be irreparably injured without a stay, a stay will not unduly harm others, and the public interest supports a stay. *Ohio v. EPA*, 603 U.S. 279, 291 (2024).

## I. This Court Is Likely To Reject The District Court's Injunction Blocking Mississippi's Act Regulating Social-Media Platforms.

This Court is likely to reject the preliminary-injunction order.

### A. The Injunction Defies This Court's Mandate In The State's Successful First Appeal In This Case.

"[A] district court must comply with a mandate issued by an appellate court." *M.D. v. Abbott*, 977 F.3d 479, 482 (5th Cir. 2020). The preliminary-injunction order violates that rule.

In *Fitch*, this Court vacated an injunction blocking the Act's enforcement in all applications to NetChoice members and directed the district court to hold NetChoice to the burden that such facial relief requires. 134 F.4th at 807-09. *Fitch* gave the district court clear instructions on how to assess NetChoice's request for facial relief and directed the court to apply *Moody* and *Paxton*. *Ibid.*

On remand, NetChoice refused to make a "factual" showing of what "commercially reasonable efforts" the Act requires of *any member* on age

verification, parental consent, or harm mitigation and whether requiring those efforts would "violate the First Amendment." 134 F.4th at 809. NetChoice instead recycled its prior factual submissions and arguments.

Yet the district court *reinstated* the injunction that *Fitch* vacated: it blocked the Act in all applications to covered NetChoice members. Op. 34-35. The court (like NetChoice) ignored most of *Fitch* (*see* Op. 7, 10, 32), expressly declined to apply *Moody* (Op. 32-33), and cited *Paxton* once without applying it (Op. 7). Although the court said that it was ruling on NetChoice's "as-applied" claims rather than its facial claims, Op. 32, the injunction is every bit the facial injunction that *Fitch* vacated: it again bars the Act's enforcement *in any application* to *any* covered NetChoice member.

Violations of the mandate rule come no clearer than that. A district court may not reinstate a decision vacated by this Court without heeding this Court's "specific instruction[s]." *M.D.*, 977 F.3d at 482. In issuing the first injunction, the district court did not perform the "inquiry" that facial relief requires. *Moody*, 603 U.S. at 744. Doing so a second time—after *Moody*, *Paxton*, and *Fitch* made the inquiry triply clear—demands swift action. The State should not have to endure another year of appellate proceedings to get out from under an injunction that this Court already rejected. A stay is warranted on this ground alone.

**B.    The District Court Erred In Ruling That Any Part Of The Act Likely Violates The First Amendment.**

This Court will likely hold that the Act does not violate the First Amendment. Among other problems, the injunction cannot stand under *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. — (U.S. June 27, 2025).

1. The Act comports with the First Amendment.

a. Under *FSC*, the Act is subject at most to intermediate scrutiny. The Act is "an exercise of [Mississippi's] traditional power" to protect minors from predators. *FSC* Op. 13. "To the extent that it burdens" anyone's right to access or engage in speech, it has "only an incidental effect on protected speech." *Ibid.* So it is "subject to" no more than "intermediate scrutiny." *Ibid.*

To start, States have power to protect minors from predatory harm—including by adopting age-verification, parental-content, and harm-mitigation requirements. *Cf. FSC* Op. 13-18. States may (for example) bar people from sexually abusing, selling drugs to, sextorting, or harassing minors. States also may require businesses to pay for or otherwise mitigate the harms they impose on minors (and others). These powers to protect minors "necessarily include[ ] the power" "to employ the ordinary and appropriate means of" of achieving these ends. *Id.* at 13, 14. Requiring age verification and parental consent are common ways to protect minors from harms. *See*, *e.g.*, *id.* at 14-15; Ala. Code § 22-17A-2(a) (requiring "written" parental consent before tattooing a minor); Haw.

Code R. 11-17-7(b) (same); Vt. Stat. Ann. tit. 26, § 4102(c) (same). Requiring businesses to mitigate the harms they cause (to minors or others) is also common—States do this through tort law, property regulations, and more. And these are the requirements—age verification, parental consent, harm mitigation—that the Act imposes. §§ 4(1), 4(2), 6. So the Act is within the State's power.

Next, the Act "do[es] not directly regulate ... protected speech," so it is subject at most to intermediate scrutiny. *FSC* Op. 18; *see id.* at 18-19. "On its face," the Act regulates predatory conduct that occurs online. *Id.* at 18. To address that conduct, the Act requires covered platforms to make "commercially reasonable" efforts to verify age, obtain parental consent, and adopt a harm-mitigation strategy. §§ 4(1), 4(2), 6. And the Act "can easily be justified without reference to the protected content" of any "regulated speech." *FSC* Op. 18 (cleaned up). The Act's "apparent purpose" (*ibid.*) is to protect minors from predatory harms that occur on the interactive social-media platforms that let predators interact with children and feed those predators information about those children. NetChoice claims that the age-verification and parental-consent requirements burden a "right to access speech" (*ibid.*) on covered platforms. *See* Mem. 7-10. Even if that were true, there is "no First Amendment right to avoid" age verification or parental consent. *FSC* Op. 18. NetChoice also claims that the strategy provision intrudes on "expressive choices" (*Moody v. NetChoice, LLC*, 603 U.S. 707, 740 (2024))

16

by requiring covered platforms to block or alter content. *See* Mem. 10-13, 15. That is wrong. That provision requires platforms to make "commercially reasonable efforts" to adopt a "strategy" to address certain harms—by "prevent[ing] *or* mitigat[ing]" exposure to those harms. § 6 (emphasis added). A platform can satisfy that provision by making efforts to mitigate the damage to minors from listed harms. *Mitigation* can thus occur *after* a user is harmed. The provision thus does not regulate speech, restrict platforms' content choices, or require monitoring, blocking, altering, or removing any content. And there is "no First Amendment right" for a business to "avoid" taking steps to address the harms it imposes on minors. *FSC* Op. 18. For these reasons, "[a]ny burden" the Act imposes on speech is "only incidental to" the Act's "regulation of activity that is not protected by the First Amendment"—sexual abuse, sextortion, trafficking, and more. *Ibid.* "Intermediate scrutiny" (at most) is thus "the appropriate standard." *Ibid.*

b. The Act "readily satisfies" intermediate scrutiny. *FSC* Op. 32.

The Act "undoubtedly advances an important governmental interest." *FSC* Op. 32. As the district court "accept[ed]" (Op. 21, 28), States have "a compelling interest in protecting the physical and psychological well-being of minors." *Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 126 (1989). The Act "furthers that interest" (*FSC* Op. 32): the age-verification provision puts a guardrail in place before minors are exposed to predators, the parental-consent provision

provides an additional guardrail by promoting parental oversight and involvement, and the strategy provision promotes practices that may avert or mitigate a range of tragic harms. §§ 4(1), 4(2), 6.

The Act is also "sufficiently tailored" to the State's interest. *FSC* Op. 32. Requiring age verification, parental consent, and harm mitigation are common ways to protect minors or address harms inflicted on them. The State's aims "would be achieved less effectively" without these regulations (*ibid.*), which involve parents in minors' consequential activities and ameliorate life-altering dangers or damage to minors. And "it cannot be said that a substantial portion of" any "burden" the Act imposes "fails to advance" the State's goals. *Id.* at 34 (cleaned up). The Act merely "adapts" "traditional" methods of protecting minors "to the digital age." *Id.* at 33. *FSC* just ruled that requiring "established [age-]verification methods already in use" "does not impose excessive burdens." *Id.* at 33, 34 n.14. The parental-consent provision also does not impose excessive burdens. The Act *deems* parental consent to be given by any of several easy means—a phone call, an email response, or any other "commercially reasonable method"—without more. § 4(2). There is no need to verify the parental relationship. Op. 26 ("none of the options" "require[s] verifying" that relationship). And adopting a harm-mitigation strategy is not excessively burdensome either. The Act requires only "commercially reasonable"—not cost-prohibitive—efforts to adopt a harm-mitigation "strategy." § 6. NetChoice says that its members have

18

policies addressing online harms. Mem. 3-4; Cleland Dec. ¶¶ 12-20. All these "modest burden[s]" are sufficiently tied to the State's interests. *FSC* Op. 33. The Act does not abridge "the freedom of speech." U.S. Const. amend. I.

2. The district court erred in ruling that the Act likely violates the First Amendment. Op. 14-30.

The court ruled that the Act likely fails strict scrutiny. Op. 14-27. But the Act is not a "direct targeting of fully protected speech" or a flat "ban" on speech, so strict scrutiny does not apply. *FSC* Op. 20, 23; *see id.* at 19-27. Again, laws—like the Act—that do not directly regulate speech and at most "burden" it face only intermediate scrutiny. *Id.* at 21.

The court also claimed that the Act likely fails intermediate scrutiny, but its 2-paragraph analysis (Op. 28-29) is deeply flawed. The court said that the Act uses a "method" for protecting minors that "does not appear ... to be unrelated to the suppression of speech." Op. 28. But as *FSC* made clear, regulating access to websites to protect minors from harm does not target or seek to suppress speech. *FSC* Op. 18. Requiring age verification, parental consent, and mitigation of concrete harms "does not directly regulate ... protect speech" or aim at "protected" speech: it aims at protecting minors. *Ibid.* The court also said that the Act "burdens substantially more speech than is necessary for the State to accomplish its goals." Op. 28. But age verification and parental consent are "modest burden[s]" (*FSC* Op. 33) that are not "excessive" (*id.* at 34 n.14) to the

19

critical ends of protecting minors from the predatory conduct that proliferates online. *Contra* Op. 28-29. The court claimed that the strategy provision requires platforms to "prevent[ ] ... exposure" to protected speech. Op. 29. But again, all that provision requires is a "strategy" to "mitigate" listed harms. § 6. Last, the court pointed to "uncertainty" about the Act's breadth that could cause platforms to take an over-inclusive approach to blocking content. Op. 29. But that view rests on the erroneous NetChoice-peddled claim that the Act requires covered platforms to block content.

3. Last: The district court blocked sections 1-8 of the Act. Op. 35. The court—like NetChoice—gave no basis for blocking most of those sections. Section 1 states the Act's title, section 2 defines terms, and section 3 defines coverage: none is a substantive or enforcement provision and none plausibly violates anyone's rights. Section 5 limits platforms' use and collection of minors' sensitive information. NetChoice said below that the coverage definition renders section 5 "content-based," Mem. 16, but it developed no argument that section 5 regulates speech or infringes any right. Section 7 provides a limited private right of action. NetChoice has not sued anyone who could bring such an action, so there is no basis to block that provision. The relief ordered against these provisions underscores the flawed approach pervading the injunction. This fortifies the need for a stay—at least as to these provisions.

## II. The Equities Favor Staying The Injunction So That The Act Can Protect Minors From Harms That Proliferate Online.

The equities strongly support a stay. Enjoining enforcement of a "duly enacted [state law] clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). The harm is especially severe because the Act serves the powerful public interest in protecting children. *Sable Communications*, 492 U.S. at 126. The district court "accept[ed]" that "safeguarding the physical and psychological wellbeing of minors online is a compelling interest." Op. 21. And "[s]ocial-media platforms" create "unprecedented dangers," *Moody*, 603 U.S. at 716— particularly for minors. The injunction thwarts the State's efforts to protect minors from those dangers and undermines the public interest.

On the equities, the district court relied on its flawed merits ruling. Op. 30, 31. On irreparable harm, the court also relied on compliance costs. Op. 30-31. Dreamwidth claims that the costs of complying with the Act "threaten[] [its] ability to continue operating." Paolucci Dec. ¶ 35. But the Act requires only "commercially reasonable" efforts—not cost-prohibitive ones—based on the particular platform's resources. *NetChoice, LLC v. Fitch*, 134 F.4th 799, 809 (5th Cir. 2025). NetChoice's other declarations are shot through with similar errors and do not support the district court's equitable assessment. As examples, the declarations baselessly suggest that the age-verification and parental-consent provisions will require "comprehensive and foolproof systems"

and "cumbersome registration processes" (Cleland Dec. ¶¶ 45a, 45d), that the age-verification provision will require using facial recognition and demanding government IDs (Veitch Dec. ¶ 32), that the parental-consent provision will require expertise in family law (Paolucci Dec. ¶ 35), and that the strategy provision requires blocking content (Cleland Dec. ¶¶ 46a, 46b). All that is wrong. The Act requires only the reasonable efforts that any responsible platform would already make.

Notably, on remand NetChoice did not even try to do what *Fitch* directed. It instead urged the district court to defy *Fitch*. Equity should not condone that defiance. NetChoice members should not enjoy, for one day more, an injunction insulating them from taking reasonable steps to protect minors from predators.

## CONCLUSION

This Court should stay the district court's preliminary-injunction order pending resolution of this appeal.

Respectfully submitted,

LYNN FITCH
  *Attorney General*

*s/ Scott G. Stewart*

SCOTT G. STEWART
  *Solicitor General*
JUSTIN L. MATHENY
ANTHONY M. SHULTS
  *Deputy Solicitors General*
WILSON D. MINOR
  *Special Assistant Attorney General*
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
E-mail: scott.stewart@ago.ms.gov

*Counsel for Defendant-Appellant*

July 2, 2025

## CERTIFICATE OF CONFERENCE

On June 25, 2025, counsel for defendant-appellant contacted counsel for plaintiff-appellee and asked for plaintiff's position on this motion and whether plaintiff plans to file a response. Plaintiff's counsel advised that plaintiff opposes this motion and will file a response.

Dated: July 2, 2025

<u>*s/ Scott G. Stewart*</u>
Scott G. Stewart
*Counsel for Defendant-Appellant*

## CERTIFICATE OF SERVICE

I, Scott G. Stewart, hereby certify that this motion has been filed with the Clerk of Court using the Court's electronic filing system, which sent notification of such filing to all counsel of record.

Dated: July 2, 2025

*s/ Scott G. Stewart*
Scott G. Stewart
*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

This motion complies with the word limitations of Fed. R. App. P. 27(d)(2)(A) because it contains 5154 words, excluding parts exempted by Fed. R. App. P. 32. This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because its text has been prepared in proportionally spaced typeface, including serifs, using Microsoft Word 2016, in Century Schoolbook 14-point font.

Dated: July 2, 2025

*s/ Scott G. Stewart*
Scott G. Stewart
*Counsel for Defendant-Appellant*
