# APPENDIX

**TABLE OF CONTENTS**

Walker Montgomery Protecting Children Online Act,
H.B. 1126 (2024) ..........................................................App. A

Memorandum Opinion and Order,
*NetChoice, LLC v. Fitch*, Dkt. 59,
No. 1:24-cv-170-HSO-BWR
(S.D. Miss. June 18, 2025) ...........................................App. B

Memorandum Opinion and Order,
*NetChoice, LLC v. Fitch*, Dkt. 30,
No. 1:24-cv-170-HSO-BWR
(S.D. Miss. July 1, 2024) .............................................App. C

Order Denying Motion to Stay,
*NetChoice, LLC v. Fitch*, Dkt. 65,
No. 1:24-cv-170-HSO-BWR
(S.D. Miss. June 25, 2025) ..........................................App. D

**APPENDIX A**

# Exhibit 1 –
Mississippi House Bill 1126

MISSISSIPPI LEGISLATURE                          REGULAR SESSION 2024

By: Representatives Ford (73rd), Nelson,    To: Technology; Judiciary B
Byrd

HOUSE BILL NO. 1126
(As Sent to Governor)

1      AN ACT TO CREATE THE "WALKER MONTGOMERY PROTECTING CHILDREN
2  ONLINE ACT" FOR THE PURPOSE OF PROTECTING MINOR CHILDREN FROM
3  ONLINE HARMFUL MATERIAL AND ACCESS TO SUCH MATERIAL; TO REQUIRE
4  DIGITAL SERVICE USERS TO REGISTER THEIR AGE; TO LIMIT THE
5  COLLECTION AND USE OF MINOR USERS' PERSONAL IDENTIFYING
6  INFORMATION; TO REQUIRE DIGITAL SERVICES PROVIDERS TO DEVELOP AND
7  IMPLEMENT A STRATEGY TO PREVENT OR MITIGATE CERTAIN HARMS TO
8  MINORS; TO AMEND SECTION 75-24-5, MISSISSIPPI CODE OF 1972, TO
9  PROVIDE THAT A VIOLATION OF THIS ACT IS AN UNFAIR AND DECEPTIVE
10  TRADE PRACTICE THAT IS ENFORCEABLE BY THE OFFICE OF THE ATTORNEY
11  GENERAL; TO AMEND SECTION 97-5-31, MISSISSIPPI CODE OF 1972, TO
12  INCLUDE MORPHED IMAGES OF DEPICTING MINOR CHILDREN IN EXPLICIT
13  NATURE IN THE CRIME OF CHILD EXPLOITATION; AND FOR RELATED
14  PURPOSES.

15      BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MISSISSIPPI:

16      **SECTION 1.**  This act shall be known and may be cited as the

17  "Walker Montgomery Protecting Children Online Act."

18      **SECTION 2.**  For purposes of this act, the following words

19  shall have the meanings ascribed herein unless the context clearly

20  requires otherwise:

21           (a)  "Digital service" means a website, an application,

22  a program, or software that collects or processes personal

23  identifying information with Internet connectivity.

24           (b)  "Digital service provider" means a person who:

25                    (i)   Owns or operates a digital service;

26                    (ii)  Determines the purpose of collecting and

27      processing the personal identifying information of users of the

28      digital service; and

29                    (iii) Determines the means used to collect and

30      process the personal identifying information of users of the

31      digital service.

32            (c)  "Harmful material" means material that is harmful

33      to minors as defined by Section 11-77-3(d).

34            (d)  "Known minor" means a child who is younger than

35      eighteen (18) years of age who has not had the disabilities of

36      minority removed for general purposes, and who the digital service

37      provider knows to be a minor.

38            (e)  "Personal identifying information" means any

39      information, including sensitive information, that is linked or

40      reasonably linkable to an identified or identifiable individual.

41      The term includes pseudonymous information when the information is

42      used by a controller or processor in conjunction with additional

43      information that reasonably links the information to an identified

44      or identifiable individual.  The term does not include

45      deidentified information or publicly available information.

46            **SECTION 3.**  (1)  This act applies only to a digital service

47      provider who provides a digital service that:

48            (a)  Connects users in a manner that allows users to

49      socially interact with other users on the digital service;

H. B. No. 1126     *|||||||||||||||||||||||||||||*     **~ OFFICIAL ~**
24/HR26/R1627SG
PAGE 2 (DJ\KW)

50          (b)  Allows a user to create a public, semi-public or

51    private profile for purposes of signing into and using the digital

52    service; and

53          (c)  Allows a user to create or post content that can be

54    viewed by other users of the digital service, including sharing

55    content on:

56                (i)  A message board;

57                (ii)  A chat room; or

58                (iii)  A landing page, video channel or main feed

59    that presents to a user content created and posted by other users.

60    (2)  This act does not apply to:

61          (a)  A digital service provider who processes or

62    maintains user data in connection with the employment, promotion,

63    reassignment or retention of the user as an employee or

64    independent contractor, to the extent that the user's data is

65    processed or maintained for that purpose;

66          (b)  A digital service provider's provision of a digital

67    service that facilitates e-mail or direct messaging services, if

68    the digital service facilitates only those services;

69          (c)  A digital service provider's provision of a digital

70    service that:

71                (i)  Primarily functions to provide a user with

72    access to news, sports, commerce, online video games or content

73    primarily generated or selected by the digital service provider;

74    and

75                    (ii)  Allows chat, comment or other interactive

76    functionality that is incidental to the digital service; or

77            (d)  A digital service provider's provision of a digital

78    service that primarily functions to provide a user with access to

79    career development opportunities, including:

80                    (i)  Professional networking;

81                    (ii)  Job skills;

82                    (iii)  Learning certifications;

83                    (iv)  Job posting; and

84                    (v)  Application services.

85        (3)  The Internet service provider, Internet service

86    provider's affiliate or subsidiary, search engine or cloud service

87    provider is not considered to be a digital service provider or to

88    offer a digital service if the Internet service provider or

89    provider's affiliate or subsidiary, search engine or cloud service

90    provider solely provides access or connection, including through

91    transmission, download, intermediate storage, access software or

92    other service, to an Internet website or to other information or

93    content:

94            (a)  On the Internet; or

95            (b)  On a facility, system or network not under the

96    control of the Internet service provider, provider's affiliate or

97    subsidiary, search engine or cloud service provider.

98        **SECTION 4.**  (1)  A digital service provider may not enter

99    into an agreement with a person to create an account with a

100  digital service unless the person has registered the person's age
101  with the digital service provider.  A digital service provider
102  shall make commercially reasonable efforts to verify the age of
103  the person creating an account with a level of certainty
104  appropriate to the risks that arise from the information
105  management practices of the digital service provider.

106      (2)  A digital service provider shall not permit an account
107  holder who is a known minor to be an account holder unless the
108  known minor has the express consent from a parent or guardian.
109  Acceptable methods of obtaining express consent of a parent or
110  guardian include any of the following:

111          (a)  Providing a form for the minor's parent or guardian
112  to sign and return to the digital service provider by common
113  carrier, facsimile, or electronic scan;

114          (b)  Providing a toll-free telephone number for the
115  known minor's parent or guardian to call to consent;

116          (c)  Coordinating a call with a known minor's parent or
117  guardian over video conferencing technology;

118          (d)  Collecting information related to the
119  government-issued identification of the known minor's parent or
120  guardian and deleting that information after confirming the
121  identity of the known minor's parent or guardian;

122          (e)  Allowing the known minor's parent or guardian to
123  provide consent by responding to an email and taking additional

124  steps to verify the identity of the known minor's parent or

125  guardian; or

126         (f)  Any other commercially reasonable method of

127  obtaining consent in light of available technology.

128    **SECTION 5.**  (1)  A digital service provider that enters into

129  an agreement with a known minor for access to a digital service

130  shall:

131         (a)  Limit collection of the known minor's personal

132  identifying information to information reasonably necessary to

133  provide the digital service; and

134         (b)  Limit use of the known minor's personal identifying

135  information to the purpose for which the information was

136  collected.

137    (2)  A digital service provider that enters into an agreement

138  with a known minor for access to a digital service may not:

139         (a)  Use the digital service to collect the known

140  minor's precise geolocation data;

141         (b)  Use the digital service to display targeted

142  advertising involving harmful material to the known minor; or

143         (c)  Share, disclose or sell the known minor's personal

144  identifying information unless required to:

145             (i)  Comply with a civil, criminal or regulatory

146  inquiry, investigation, subpoena or summons by a governmental

147  entity;

148             (ii)  Comply with a law enforcement investigation;

149                     (iii)  Detect, block or prevent the distribution of
150     unlawful, obscene or other harmful material to a known minor;

151                     (iv)  Block or filter spam;

152                     (v)  Prevent criminal activity; or

153                     (vi)  Protect the security of a digital service.

154     **SECTION 6.**  (1)  In relation to a known minor's use of a
155     digital service, a digital service provider shall make
156     commercially reasonable efforts to develop and implement a
157     strategy to prevent or mitigate the known minor's exposure to
158     harmful material and other content that promotes or facilitates
159     the following harms to minors:

160                     (a)  Consistent with evidence-informed medical
161     information, the following:  self-harm, eating disorders,
162     substance use disorders, and suicidal behaviors;

163                     (b)  Patterns of use that indicate or encourage
164     substance abuse or use of illegal drugs;

165                     (c)  Stalking, physical violence, online bullying, or
166     harassment;

167                     (d)  Grooming, trafficking, child pornography, or other
168     sexual exploitation or abuse;

169                     (e)  Incitement of violence; or

170                     (f)  Any other illegal activity.

171     (2)  Nothing in subsection (1) shall be construed to require
172     a digital service provider to prevent or preclude:

173          (a)  Any minor from deliberately and independently
174 searching for, or specifically requesting, content; or
175          (b)  The digital service provider or individuals on the
176 digital service from providing resources for the prevention or
177 mitigation of the harms described in subsection (1), including
178 evidence-informed information and clinical resources.
179     **SECTION 7.**  (1)  Except as provided by subsection (2) of this
180 section, this act may not be construed as providing a basis for,
181 or being subject to, a private right of action for a violation of
182 this act.
183     (2)  If a digital service provider violates this act, the
184 parent or guardian of a known minor affected by that violation may
185 bring a cause of action seeking:
186          (a)  A declaratory judgment under Rule 57 of Mississippi
187 Rules of Civil Procedure; or
188          (b)  An injunction against the digital service provider.
189     (3)  A court may not certify an action brought under this
190 section as a class action.
191     **SECTION 8.**  Section 75-24-5, Mississippi Code of 1972, is
192 amended as follows:
193     75-24-5.  (1)  Unfair methods of competition affecting
194 commerce and unfair or deceptive trade practices in or affecting
195 commerce are prohibited.  Action may be brought under Section
196 75-24-5(1) only under the provisions of Section 75-24-9.

197          (2)  Without limiting the scope of subsection (1) of this
198    section, the following unfair methods of competition and unfair or
199    deceptive trade practices or acts in the conduct of any trade or
200    commerce are hereby prohibited:
201              (a)  Passing off goods or services as those of another;
202              (b)  Misrepresentation of the source, sponsorship,
203    approval, or certification of goods or services;
204              (c)  Misrepresentation of affiliation, connection, or
205    association with, or certification by another;
206              (d)  Misrepresentation of designations of geographic
207    origin in connection with goods or services;
208              (e)  Representing that goods or services have
209    sponsorship, approval, characteristics, ingredients, uses,
210    benefits, or quantities that they do not have or that a person has
211    a sponsorship, approval, status, affiliation, or connection that
212    he does not have;
213              (f)  Representing that goods are original or new if they
214    are reconditioned, reclaimed, used, or secondhand;
215              (g)  Representing that goods or services are of a
216    particular standard, quality, or grade, or that goods are of a
217    particular style or model, if they are of another;
218              (h)  Disparaging the goods, services, or business of
219    another by false or misleading representation of fact;
220              (i)  Advertising goods or services with intent not to
221    sell them as advertised;



222          (j)  Advertising goods or services with intent not to
223     supply reasonably expectable public demand, unless the
224     advertisement discloses a limitation of quantity;

225          (k)  Misrepresentations of fact concerning the reasons
226     for, existence of, or amounts of price reductions;

227          (l)  Advertising by or on behalf of any licensed or
228     regulated health care professional which does not specifically
229     describe the license or qualifications of the licensed or
230     regulated health care professional;

231          (m)  Charging an increased premium for reinstating a
232     motor vehicle insurance policy that was cancelled or suspended by
233     the insured solely for the reason that he was transferred out of
234     this state while serving in the United States Armed Forces or on
235     active duty in the National Guard or United States Armed Forces
236     Reserve.  It is also an unfair practice for an insurer to charge
237     an increased premium for a new motor vehicle insurance policy if
238     the applicant for coverage or his covered dependents were
239     previously insured with a different insurer and canceled that
240     policy solely for the reason that he was transferred out of this
241     state while serving in the United States Armed Forces or on active
242     duty in the National Guard or United States Armed Forces Reserve.
243     For purposes of determining premiums, an insurer shall consider
244     such persons as having maintained continuous coverage.  The
245     provisions of this paragraph (m) shall apply only to such

246 instances when the insured does not drive the vehicle during the
247 period of cancellation or suspension of his policy;
248           (n)  Violating the provisions of Section 75-24-8; * * *
249           (o)  Violating the provisions of Section 73-3-38 * * *;
250           (p)  Violating any of the provisions of Sections 1
251 through 6 of House Bill No. 728, 2024 Regular Session, as approved
252 by the Governor; and
253           (q)  Violating any of the provisions of Sections 1
254 through 7 of this act.
255      **SECTION 9.**  Section 97-5-31, Mississippi Code of 1972, is
256 amended as follows:
257      97-5-31.  As used in Sections 97-5-33 through 97-5-37, the
258 following words and phrases shall have the meanings given to them
259 in this section:
260           (a)  "Child" means any individual who has not attained
261 the age of eighteen (18) years and is an identifiable child.
262           (b)  "Sexually explicit conduct" means actual, morphed
263 or simulated:
264                (i)  Oral genital contact, oral anal contact, or
265 sexual intercourse as defined in Section 97-3-65, whether between
266 persons of the same or opposite sex;
267                (ii)  Bestiality;
268                (iii)  Masturbation;
269                (iv)  Sadistic or masochistic abuse;

270          (v)  Lascivious exhibition of the genitals or pubic
271  area of any person; or
272          (vi)  Fondling or other erotic touching of the
273  genitals, pubic area, buttocks, anus or breast.
274      (c)  "Producing" means producing, directing,
275  manufacturing, issuing, publishing, morphing or advertising.
276      (d)  "Visual depiction" includes, without limitation,
277  developed or undeveloped film and video tape or other visual
278  unaltered, altered or morphed reproductions by computer and
279  technology.
280      (e)  "Computer" has the meaning given in Title 18,
281  United States Code, Section 1030.
282      (f)  "Morphed image" means any visual depiction or
283  representation, including any photograph, film, video, picture, or
284  computer or computer-generated image or picture, whether made or
285  produced by electronic, mechanical, simulated or other means, of
286  sexually explicit conduct, where such visual depiction or
287  representation has been created, adapted, or modified to appear an
288  identifiable minor is engaging in sexual conduct or sexually
289  explicit activity to appearing in a state of sexually explicit
290  nudity.
291      ( * * *g)  "Simulated" means any depicting of the
292  genitals or rectal areas that gives the appearance of sexual
293  conduct or incipient sexual conduct.

294          (h)  "Identifiable child" means a child who was a minor
295     at the time the image was created, adapted, or modified or whose
296     image as a child was used in the creating, adapting or modifying
297     of the image; and is recognizable as an actual child by the
298     child's face, likeness, or other distinguishing characteristic,
299     such as a unique birthmark or other recognizable feature.  The
300     provisions of this paragraph (h) shall not be construed to require
301     proof of the actual identity of the identifiable child.
302          **SECTION 10.**  This act shall take effect and be in force from
303     and after July 1, 2024.

H. B. No. 1126
24/HR26/R1627SG
PAGE 13 (DJ\KW)
    ~ **OFFICIAL** ~
ST:  "Walker Montgomery Protecting Children
Online Act"; establish to protect minors from
harmful content.

**APPENDIX B**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **NETCHOICE, LLC** | § | **PLAINTIFF** |
| | § | |
| | § | |
| **v.** | § | **Civil No. 1:24-cv-170-HSO-BWR** |
| | § | |
| | § | |
| **LYNN FITCH,** | § | |
| *in her official capacity as* | § | |
| *Attorney General of Mississippi* | § | **DEFENDANT** |

<u>**MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART PLAINTIFF NETCHOICE, LLC'S
MOTION [49] FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**</u>

Plaintiff NetChoice, LLC seeks to enjoin Sections 1 through 8 of Mississippi House Bill 1126 ("H.B. 1126" or the "Act"), which was signed into law on April 30, 2024, and originally set to take effect on July 1, 2024. *See* Mot. [49]. NetChoice asks this Court to preliminarily enjoin Defendant Lynn Fitch, in her official capacity as Mississippi Attorney General, from taking any action to enforce the challenged portions of H.B. 1126. *See id.*; Mem. [50]. The Attorney General opposes the Motion [49]. *See* Resp. [54].

After consideration of the record and relevant legal authority, including the Fifth Circuit's prior opinion in this case and the United States Supreme Court's decision in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), and because the Court finds the Act unconstitutional as applied to certain of Plaintiff NetChoice, LLC's members, a preliminary injunction should issue pending final disposition of this

case on the merits.    Mississippi Attorney General Lynn Fitch and her agents,

employees, and all persons acting under her direction or control, will be

preliminarily enjoined from enforcing Sections 1-8 of Mississippi House Bill 1126

against Plaintiff NetChoice, LLC's eight covered members: (1) Dreamwidth; (2)

Meta, which owns and operates Facebook and Instagram; (3) Nextdoor; (4)

Pinterest; (5) Reddit; (6) Snap Inc., which owns and operates Snapchat; (7) X; and

(8) YouTube.

## I.  BACKGROUND

A.    NetChoice

Plaintiff NetChoice, LLC ("NetChoice" or "Plaintiff") is a nonprofit trade

association for internet companies.    Am. Compl. [48] at 5.    Its Amended

Complaint [48] asserts that H.B. 1126 regulates some services offered by the

following of its members: (1) Dreamwidth; (2) Meta, which owns and operates

Facebook and Instagram; (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) Snap Inc.,

which owns and operates Snapchat; (7) X; and (8) YouTube.    *Id.*    According to

NetChoice's General Counsel and Director of Strategic Initiatives Bartlett Cleland

("Cleland"), its members' websites "publish, disseminate, display, compile, create,

curate, and distribute a wide range of valuable and protected expression to their

users," and "disseminate content (text, audio, graphics, and video) that facilitates

their users' ability to practice their religious beliefs, engage in political discourse,

seek cross-cultural dialogue, supplement their education, learn new skills, and

simply interact socially."    Ex. [49-1] at 3.

Cleland's Declaration states that the Act covers at least eight of NetChoice's members which are known as "social media" websites whose "interactive functionality is the point of the service." *Id.* at 23.    Each allows its account holders to upload and publicly post content, which other account holders may then view and react to, comment on, or share with others.    *Id.* at 22.    According to Cleland, users of these social media websites "engage in protected speech activities, including speaking to others and viewing content created by others." *Id.*    He opines that the Act's burdensome requirements "will make it more difficult for NetChoice members to provide their websites to minors and adults, and will burden minors and adults' access to highly valuable and protected speech." *Id.* at 24.

B.    <u>Mississippi H.B. 1126</u>

Sections 1-8 of H.B. 1126 provide in relevant part as follows:

SECTION 3. (1) This act applies only to a digital service provider who provides a digital service that:
(a)    Connects users in a manner that allows users to socially interact with other users on the digital service;
(b)    Allows a user to create a public, semi-public or private profile for purposes of signing into and using the digital service; and
(c)    Allows a user to create or post content that can be viewed by other users of the digital service, including sharing content on:
    (i)    A message board;
    (ii)    A chat room; or
    (iii)    A landing page, video channel or main feed that presents to a user content created and posted by other users.

Ex. [1-1] at 3-4 (Miss. H.B. 1126, § 3(1)).

The Act does not apply to a digital service provider that "processes or maintains user data in connection with the employment, promotion, reassignment or retention of the user as an employee or independent contractor, to the extent that

the user's data is processed or maintained for that purpose." *Id.* at 4 (Miss. H.B. 1126, § 3(2)(a)). Nor does the Act apply to a provider's service that "facilitates e-mail or direct messaging services, if the digital service facilitates only those services," primarily functions to provide a user with access to certain career development opportunities, or primarily functions "to provide a user with access to news, sports, commerce, online video games or content primarily generated or selected by the digital service provider" and "[a]llows chat, comment or other interactive functionality that is incidental to the digital service." *Id.* at 4-5 (Miss. H.B. 1126, § 3(2)(b)-(c)).

> Under Section 4,
>
> (1) A digital service provider may not enter into an agreement with a person to create an account with a digital service unless the person has registered the person's age with the digital service provider. A digital service provider shall make commercially reasonable efforts to verify the age of the person creating an account . . . .
> (2) A digital service provider shall not permit an account holder who is a known minor to be an account holder unless the known minor has the express consent from a parent or guardian . . . .

*Id.* at 5-7 (Miss. H.B. 1126, § 4).

Section 6 states that for a "known minor's use of a digital service, a digital service provider shall make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate the known minor's exposure to harmful material and other content that promotes or facilitates" certain specified harms. *Id.* at 8 (Miss. H.B. 1126, § 6(1)). These harms are identified in subsection (1) and include self-harm, eating disorders, substance use disorders, suicidal behaviors, stalking, grooming, incitement of violence, and any other illegal activities. *Id.*

But

> [n]othing in subsection (1) shall be construed to require a digital service provider to prevent or preclude:
>
> (a)      Any minor from deliberately and independently searching for, or specifically requesting, content . . . .

*Id.* at 8-9 (Miss. H.B. 1126, § 6(2)(a)).

In sum, Section 4(1) of H.B. 1126 requires all users, adults and minors alike, to verify their age before they may open an account with a covered digital service provider (the "age-verification requirement"), while Section 4(2) requires consent from a parent before a known minor may create an account (the "parental-consent requirement").  *Id.*  Section 5 imposes a limitation on the collection of data by covered digital service providers that enter into an agreement with a known minor for access to a digital service (the "data-collection limitation"), and Section 6 requires those digital service providers to make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate the known minor's exposure to harmful material and other content that promotes or facilitates certain harms to minors (the "prevention-or-mitigation requirement").[1]  *See id.*  But Section 6(2) does not require digital service providers to prevent or preclude minors with accounts from "deliberately and independently searching for, or specifically requesting, content."  *Id.*

Section 7 of the Act sets forth civil remedies permitting a parent or guardian of a known minor affected by a violation of the Act to bring a cause of action for a

---

[1]  Plaintiff refers to this as a monitoring-and-censorship requirement, *see* Am. Compl. [48] at 19, while Defendant refers to it as the strategy provision, *see* Resp. [54] at 19-20.

declaratory judgment or an injunction, and Section 8 classifies violations of the Act

as unfair methods of competition and unfair or deceptive trade practices or acts

under Mississippi Code § 75-24-5, for which an action for injunctive relief may be

brought by the Mississippi Attorney General.   *See id.* at 9-12; Miss. Code Ann.

§§ 75-24-5, 75-24-9.   Finally, a knowing and willful violation of Section 75-24-5,

including a violation of H.B. 1126, can subject a person to criminal penalties.   *See*

Miss. Code Ann. § 75-24-20.

C.     Procedural History

NetChoice initiated this lawsuit on June 7, 2024, by filing a Complaint [1] for

Declaratory and Injunctive Relief, which raised First Amendment facial challenges

to the Act's central coverage definition (Count I), age-verification requirement

(Count III), parental-consent requirement (Count IV), and prevention-or-mitigation

requirement (Count V).   Alternatively, the Complaint alleged that the Act is

overbroad, *see* Compl. [1] at 18-22, 25-33 (Counts I, III, IV, V), and that its central

coverage definition of a digital service provider is unconstitutionally vague and

violates principles of free speech and due process, *id.* at 23-24, 33-34 (Count II, VI).

The Complaint [1] further claimed that 47 U.S.C. § 230 preempts the monitoring-

and-censorship requirements in Section 6.   Compl. [1] at 35-36 (Count VII).

NetChoice sought a preliminary injunction, *see* Mot. [3], which the Court

granted after a hearing on grounds that NetChoice had shown a substantial

likelihood of success on the merits of its claim that the Act was facially

unconstitutional under the First Amendment, *see* Order [30].   The Court

6

preliminarily enjoined Defendant from enforcing H.B. 1126 against NetChoice and its members, pending final disposition of the case.    *Id.* at 39-40.

On appeal, the Fifth Circuit determined that NetChoice had satisfied constitutional and prudential standing requirements.    *See* Op. [51] at 4-9; *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 804-807 (5th Cir. 2025).    On the merits, it noted that this Court had not been able to apply the framework recently announced by the Supreme Court in *Moody* to NetChoice's First Amendment facial challenge because of the timing of that opinion.    *See Fitch*, 134 F.4th at 807-09. Accordingly, the Court of Appeals vacated the injunction and remanded for this Court to determine "to whom the Act applies [and] the activities it regulates, and then weigh violative applications of the Act against non-violative applications," as required by *Moody* and a recent Fifth Circuit decision, *NetChoice, L.L.C. v. Paxton*, 121 F.4th 494 (5th Cir. 2024).    *Fitch*, 134 F.4th at 809.

D.    Plaintiff's Amended Complaint [48]

On remand, NetChoice opted to file an Amended Complaint [48], which reurges its First Amendment facial challenge to Sections 1 through 8 of the Act and adds a challenge to these provisions as applied to its regulated members and their services.    *See* Am. Compl. [48] at 5, 23-30, 32-42 (challenging all speech regulations relying on central coverage definition (Count I), the age-verification requirement (Count III), the parental-consent requirement (Count IV), and the prevention-or-mitigation requirement (Count V)).    Alternatively, the Amended Complaint [48] asserts that the Act's central coverage definition of a digital service provider and its

prevention-or-mitigation requirement are unconstitutionally vague and violate principles of free speech and due process.   *See id.* at 30-32, 42-43 (Counts II and VI).   The Amended Complaint [48] further alleges that 47 U.S.C. § 230 preempts the monitoring-and-censorship requirements in Section 6.   *See* Am. Compl. [48] at 43-45 (Count VII).   Plaintiff seeks to enjoin Defendant from enforcing the Act, *see id.* at 45 (Count VIII), and a declaration that each of its challenged provisions is unconstitutional, *see id.* at 45-46 (Count IX).

E.    Plaintiff's Motion [49] for Temporary Restraining Order and Preliminary Injunction

NetChoice's renewed Motion [49] for Temporary Restraining Order and Preliminary Injunction contends that "[u]nder either (1) the *Moody*-informed facial challenge analysis or (2) the added as-applied claims, NetChoice is entitled to immediate relief," Mot. [49] at 1, and that nothing has changed since the Court's earlier ruling to undermine its previous merits conclusions, *id.* at 2.   NetChoice supports its Motion [49] with the newly submitted Cleland Declaration [49-1] and previously-submitted Declarations from Alexandra Veitch [3-3], Gautham Pai, [3-4], and Denise Paolucci, [3-5].   *Id.* at 3.

The Attorney General responds that NetChoice has not made the required showing to obtain injunctive relief as to any claim.   Resp. [54] at 14.   First, she insists that NetChoice is likely to lose on the merits of its facial and as-applied First Amendment claims, as well as on its vagueness and preemption claims.   *See id.* at 14-33.   And the Attorney General contends that the remaining factors strongly disfavor injunctive relief.   *See id.* at 34-35.

8

NetChoice replies that the Attorney General misconstrues what the facial-challenge analysis requires, and that her suggested analysis would make facial challenges virtually impossible.   *See* Reply [56] at 3-5.   It contends that the Court can determine to whom the Act applies and which activities it regulates based on the face of the law and the facts in the record, and it attempts to distinguish the text of the Act from the laws at issue in *Moody* and prior Fifth Circuit caselaw.   *Id.* at 5-6.   NetChoice maintains that the challenged provisions discriminate based on content, triggering strict scrutiny, and that the Act has a substantial number of applications that abridge free speech when judged in relation to any hypothetical constitutional applications.   *Id.* at 7.   NetChoice also argues that the Act's speech regulations are unconstitutional as applied to its covered members, that its central coverage definition is unconstitutionally vague, and that Section 6 is preempted by 47 U.S.C. § 230.   *See id.* at 9-10.   Finally, NetChoice states that the other relevant factors under Federal Rule of Civil Procedure 65(a) also favor injunctive relief.   *Id.* at 10.[2]

## II.   <u>DISCUSSION</u>

This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. A preliminary injunction under Rule 65(a) requires the moving party to establish four factors:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that

---

[2]   The Court conferred with the parties, and all concurred that another hearing was unnecessary.   *See* Min. Entry, May 13, 2025.

will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023) (quotation omitted).    When the government is the opposing party, the last two factors merge.    *Id.* (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The movant bears the burden of persuasion on all requirements.    *Id.* at 587. The Supreme Court has noted that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."    *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (quotation omitted).

A.    <u>NetChoice's Standing</u>

The first question is whether NetChoice has standing to maintain its current claims.    As this Court originally determined, and the Fifth Circuit confirmed, NetChoice satisfied the requirements of associational and prudential standing to pursue the claims in its original Complaint [1].    *See Fitch*, 134 F.4th at 804-07. The Court finds that the filing of the Amended Complaint [48] has not changed this result.    *See id.*

As for the new, as-applied First Amendment claims, *see* Am. Compl. [48], "there must be some evidence that a rule would be applied to the plaintiff in order for that plaintiff to bring an as-applied challenge," *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020), *as revised* (Oct. 30, 2020) (quotation and alterations omitted).    NetChoice meets this requirement by presenting evidence that the Act covers at least eight of its members: (1) Dreamwidth; (2) Meta, which owns and

operates Facebook and Instagram; (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) Snap Inc., which owns and operates Snapchat; (7) X; and (8) YouTube.    Decl. [49-1] at 22. NetChoice has also submitted member declarations from YouTube (which is owned and operated by Google Inc.), Nextdoor, and Dreamwidth discussing how the Act applies to their respective services.    *See* Ex. [3-3]; Ex. [3-4]; Ex. [3-5].

NetChoice has therefore presented some evidence that the Act would apply to its members; this is sufficient to support its standing to pursue an as-applied challenge.    *See Speech First, Inc.*, 979 F.3d at 335.

B.    Relevant First Amendment Principles

"[T]he First Amendment provides in relevant part that 'Congress shall make no law . . . abridging the freedom of speech,'" and "the Fourteenth Amendment makes the First Amendment's Free Speech Clause applicable against the States." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019).    The First Amendment protects both freedom of speech as well as the "right to receive information and ideas, regardless of their social worth."    *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).    "[T]he right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them" and "is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom."    *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (plurality opinion) (emphasis in original).[3]    "As a general matter,

---

[3]  H.B. 1126's primary focus is minors.    But "minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212-13 (1975) (citation omitted).    "No doubt

11

the First Amendment means that government has no power to restrict expression

because of its message, its ideas, its subject matter, or its content." *United States*

*v. Stevens*, 559 U.S. 460, 468 (2010) (quotation and alteration omitted).

"The distinction between a facial and as applied challenge goes to the breadth

of the remedy employed by the Court." *Turtle Island Foods, S.P.C. v. Strain*, 65

F.4th 211, 218-19 (5th Cir. 2023) (quotation and alterations omitted).   Because a

facial challenge is "really just a claim that the law or policy at issue is

unconstitutional in all its applications," the Supreme Court has stated that

"classifying a lawsuit as facial or as-applied affects the extent to which the

invalidity of the challenged law must be demonstrated and the corresponding

breadth of the remedy." *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) (quotation

omitted).   But "it does not speak at all to the substantive rule of law necessary to

establish a constitutional violation." *Id.*   "When a litigant brings both as-applied

and facial challenges, [courts] generally decide the as-applied challenge first

because it is the narrower consideration." *Buchanan v. Alexander*, 919 F.3d 847,

852 (5th Cir. 2019).   "Although as-applied challenges are generally favored as a

matter of judicial restraint because they result in a narrow remedy, a developed

factual record is essential." *Justice v. Hosemann*, 771 F.3d 285, 292 (5th Cir.

---

a State possesses legitimate power to protect children from harm, but that does not include
a free-floating power to restrict the ideas to which children may be exposed." *Brown v.
Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011) (citations omitted).   "Speech that is neither
obscene as to youths nor subject to some other legitimate proscription cannot be suppressed
solely to protect the young from ideas or images that a legislative body thinks unsuitable
for them." *Id.* at 795 (quoting *Erznoznik*, 422 U.S. at 213-14).

2014).  "Particularized facts are what allow a court to issue a narrowly tailored and circumscribed remedy."  *Id.*

Accordingly, the Court turns first to NetChoice's challenge to Sections 1 through 8 of the Act, as applied to its eight covered members and their services. *See* Am. Compl. [48] at 5, 23-30, 32-42 (challenging all speech regulations relying on central coverage definition in Count I, the age-verification requirement in Count III, the parental-consent requirement in Count IV, and the prevention-or-mitigation requirement in Count V).

C.     NetChoice's As-Applied Challenge

1.     The Parties' Arguments

A threshold issue is whether the challenged provisions are subject to First Amendment scrutiny.   NetChoice maintains that "[t]he Act is unconstitutional as applied to covered members' services: Dreamwidth, Facebook, Instagram, Nextdoor, Pinterest, Reddit, Snapchat, X, and YouTube."   Mem. [50] at 32.   The Attorney General responds that "[t]he basic problem with this argument is the same as with its facial argument: NetChoice has not made a *factual* showing of how any provision applies to even one platform—let alone a showing that any application *in fact* intrudes on speech rights."   Mem. [54] at 28 (emphasis in original).   NetChoice replies that it "has provided three member declarations from Google, Nextdoor, and Dreamwidth discussing how the Act applies to their respective services" and "has also explained how the Act applies to its covered members, both in its own declaration, ECF 49-1, and its pleadings."   Reply [56] at 9.   The Court concurs

with NetChoice that, based on its evidentiary submissions at this stage of the case, it has made a sufficient factual showing that the Act applies to the aforementioned members.

2.    <u>Analysis</u>

a.    *Whether the Act is Subject to First Amendment Scrutiny*

"Laws that directly regulate expressive conduct can, but do not necessarily, trigger" First Amendment scrutiny.    *TikTok Inc. v. Garland*, 145 S. Ct. 57, 65 (2025).    The Supreme Court has also applied First Amendment scrutiny in cases involving governmental regulation of conduct that carries an expressive element, and to "some statutes which, although directed at activity with no expressive component, impose a disproportionate burden upon those engaged in protected First Amendment activities."    *Id.* (quotation omitted).

If a challenged provision is subject to the First Amendment, the Court must then determine the appropriate level of scrutiny to apply.    *See id.* at 66-67. Content-based laws, meaning those that target speech based on its communicative content, are subject to strict scrutiny, and "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."    *Id.* at 67 (quotation omitted).    "[T]he First Amendment, subject only to narrow and well-understood exceptions, does not countenance governmental control over the content of messages expressed by private individuals."    *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994).

Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message

> expressed.   This commonsense meaning of the phrase "content based" requires a court to consider whether a regulation of speech on its face draws distinctions based on the message a speaker conveys.   Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose.   Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny.

*Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015) (citations and quotations omitted).

"A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech."  *Id.* at 165 (quotation omitted).   Moreover, "[b]ecause speech restrictions based on the identity of the speaker are all too often simply a means to control content, [the Supreme Court has] insisted that laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference."   *Id.* at 170 (quotations omitted); *see also TikTok Inc.*, 145 S. Ct. at 67 (discussing the two forms of content-based speech regulation: (1) a law that is content-based on its face because it applies to particular speech because of the topic discussed or the idea or message expressed, and (2) a facially content-neutral law that is nonetheless treated as a content-based regulation of speech because it cannot be justified without reference to the content of the regulated speech or was adopted by the government because of disagreement with the message the speech conveys).

"Content-neutral laws, in contrast, are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain

15

ideas or viewpoints from the public dialogue." *TikTok Inc.*, 145 S. Ct. at 67 (quotation omitted).    Under this standard, a court will sustain a content-neutral law "if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Id.* (quotation omitted).

Here, at least some provisions of the Act, particularly Sections 4 and 5, limit access to the websites of NetChoice's covered members and directly regulate expressive conduct, implicating the First Amendment as to those covered members. *See id.*; Ex. [1-1] (Miss. H.B. 1126).[4]

H.B. 1126 applies to any service offered by the covered digital service provider that:

> (a)   Connects users in a manner that allows users to socially interact with other users on the digital service;
>
> (b)   Allows a user to create a public, semi-public or private profile for purposes of signing into and using the digital service; and
>
> (c)   Allows a user to create or post content that can be viewed by other users of the digital service, including sharing content on:
>
> > (i)    A message board;
> >
> > (ii)   A chat room; or
> >
> > (iii)  A landing page, video channel or main feed that presents to a user content created and posted by other users.

Ex. [1-1] at 3-4 (Miss. H.B. 1126, § 3).    But the Act does not apply to certain things, including a digital service that "[p]rimarily functions to provide a user with access

---

[4]   The Court recognizes that some sections of the Act may not be subject to First Amendment scrutiny.    For instance, Section 1 simply sets forth the title of the Act, and Section 2 defines certain terms.    But the parties have not addressed whether, for an as-applied challenge, the Court must consider each provision separately.    *But see, e.g., Space Expl. Techs. Corp. v. Nat'l Lab. Rels. Bd.,* 741 F. Supp. 3d 630, 638 (W.D. Tex. 2024) (holding that it was premature at preliminary injunction stage to consider whether severance of unconstitutional portions of the statute was possible).

to news, sports, commerce, online video games or content primarily generated or selected by the digital service provider."  *Id.* at 4 (Miss. H.B. 1126, § 3(2)(c)(i)).

In *Turner Broadcasting*, the Supreme Court considered statutory provisions that required all cable television systems to devote some of their channels to the transmission of local broadcast television stations, and found that because the provisions were "based only upon the manner in which speakers transmit their messages to viewers, and not upon the messages they carry," they were not content-based and were subject only to an intermediate level of scrutiny.  512 U.S. at 645; *see id.* at 626, 661-62.  But H.B. 1126 does not apply to all digital service providers, and specifically excludes from its reach certain providers based upon the primary purpose or subject matter of their service.  *See* Ex. [1-1] at 3-5 (Miss. H.B. 1126, §§ 3(1), 3(2)(c)).

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed," *Reed*, 576 U.S. at 163, which is precisely what H.B. 1126 does, *see* Ex. [1-1] at 3-5 (Miss. H.B. 1126, §§ 3(1), 3(2)(c)).  The Act's content-based distinction is inherent in its definition of "digital service provider," which outlines the scope of the Act's coverage.  *See id.*  The Act covers some digital service providers based upon their primary function or the content they convey, while specifically excluding others based upon the nature of the speech they communicate.  *See id.*  Essentially, H.B. 1126 treats or classifies digital service providers differently based upon the nature of the material they disseminate, whether it is "social interaction," *id.* at 3 (Miss.

H.B. 1126, § 3(1)(a)), as opposed to "news, sports, commerce, [or] online video games," *id.* at 4 (Sec. 3(2)(c)(i)).   Even if this could be considered a speaker-based distinction, the Supreme Court has held that "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference."   *Reed*, 576 U.S. at 170.

Section 3(2)(c)(i) can thus be viewed as either drawing a facial distinction based on the message the digital service provider conveys (i.e., news and sports versus social interaction), or a more subtle content-based restriction defining regulated speech by its function or purpose (i.e., providing news and sports as opposed to facilitating social interaction).   *See* Ex. [1-1] at 3 (Sec. 3(2)(c)(i)); *Reed*, 576 U.S. at 163.   Either way, "[b]oth are distinctions drawn based on the message a speaker conveys."   *Reed*, 576 U.S. at 163-64.   And it is of no moment that there is no express restriction on a particular viewpoint, as "[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic."   *Id.* at 169 (quotation omitted).   Nor is the State's motive relevant, as "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech."   *Id.* at 165 (quotation omitted).   The facial distinctions H.B. 1126 draws based on the message a particular digital service provider conveys, or the more subtle content-based restrictions based upon the

speech's function or purpose, render the Act content-based, and therefore subject to strict scrutiny.    *See id.*

The Attorney General argues that H.B. 1126 regulates not speech but non-expressive conduct, which the State may regulate if it has a rational basis for doing so.    *See* Resp. [54] at 15, 17-20, 26 (citing *City of Dallas v. Stanglin*, 490 U.S. 19, 23-25 (1989)).    The Court is not persuaded that H.B. 1126 merely regulates non-expressive conduct, and *Stanglin*, upon which the Attorney General relies, is distinguishable.    *See id.*    In *Stanglin*, the "city of Dallas adopted an ordinance restricting admission to certain dance halls to persons between the ages of 14 and 18," *Stanglin*, 490 U.S. at 20, and limiting their operating hours to 1 p.m. to midnight, when school was not in session, *id.* at 22.    "[T]he owner of one of these 'teenage' dance halls, sued to contest the constitutional validity of the ordinance."    *Id.* at 20.    "The Texas Court of Appeals held that the ordinance violated the First Amendment right of persons between the ages of 14 and 18 to associate with persons outside that age group."    *Id.* at 20-21.

The United States Supreme Court reversed.    *Id.* at 21.    It reasoned that the ordinance restricted attendance at teenage dance halls "to minors between the ages of 14 and 18 and certain excepted adults.    It thus limits the minors' ability to dance with adults who may not attend, and it limits the opportunity of such adults to dance with minors."    *Id.* at 24.    The Supreme Court recognized that such opportunities for dance-hall patrons "might be described as 'associational' in common parlance, but they simply [did] not involve the sort of expressive

association that the First Amendment has been held to protect." *Id.* at 24. "There [was] no suggestion that these patrons '[took] positions on public questions' or perform[ed] any of the other similar activities described in *Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537, 548, 107 S.Ct. 1940, 1947, 95 L.Ed.2d 474 (1987)," *id.* at 25, including the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends," *Duarte*, 481 U.S. at 548.

Unlike *Stanglin*, at this stage of the proceeding there is competent evidence in this case that NetChoice's covered members' websites include users who take positions on, and engage with others in pursuit of, the type of "political, social, economic, educational, religious, and cultural" activities described in *Duarte*. *Id.*; *see also, e.g.,* Ex. [49-1] at 3 ("NetChoice members' websites publish, disseminate, display, compile, create, curate, and distribute a wide range of valuable and protected expression to their users. They disseminate content (text, audio, graphics, and video) that facilitates their users' ability to practice their religious beliefs, engage in political discourse, seek cross-cultural dialogue, supplement their education, learn new skills, and simply interact socially."). The argument that the Act is conduct-based or that *Stanglin* somehow controls is not persuasive. Because H.B. 1126 regulates content, strict scrutiny applies. *See Reed*, 576 U.S. at 163-64.

b.    *Whether NetChoice Has Shown a Substantial Likelihood of Success on the Merits*

The Attorney General contends that the State has a compelling interest in safeguarding the physical and psychological wellbeing of minors online, and that

the Act is narrowly tailored to achieve that interest given "how easily" the age
verification requirement can be satisfied.   Resp. [54] at 27.   The Court accepts as
true the Attorney General's position that safeguarding the physical and
psychological wellbeing of minors online is a compelling interest.   *See id.*; *see also,
e.g., Sable Commc'ns of California, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989)
(recognizing that "there is a compelling interest in protecting the physical and
psychological well-being of minors").

The State "may serve this legitimate interest, but to withstand constitutional
scrutiny, it must do so by narrowly drawn regulations designed to serve those
interests without unnecessarily interfering with First Amendment freedoms."
*Sable Commc'ns of California, Inc.*, 492 U.S. at 126 (quotation omitted).   "It is not
enough to show that the Government's ends are compelling; the means must be
carefully tailored to achieve those ends."   *Id.*   When the ends "affect First
Amendment rights they must be pursued by means that are neither seriously
underinclusive nor seriously overinclusive."   *Brown v. Ent. Merchants Ass'n*, 564
U.S. 786, 805 (2011).   "If a less restrictive alternative would serve the
Government's purpose, the legislature must use that alternative."   *United States v.
Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000).

So, the question here is whether, as applied to NetChoice's covered members,
the Act is sufficiently narrowly tailored to promote the State's compelling interest.
*See id.*; *Sable Commc'ns of California, Inc.*, 492 U.S. at 126*; TikTok Inc.*, 145 S. Ct.
at 70.   NetChoice has carried its burden of showing that the Act, as applied to at

least eight of its members, is likely not narrowly tailored to achieve the interests identified by the Attorney General.   Based upon the definitions in Sections 2 and 3, including the definition of a covered digital service provider, Section 4 precludes such digital service providers which do not primarily provide certain content (career development opportunities, news, sports, commerce, and online video games) from allowing a user to create an account without registering his or her age, and it requires covered digital service providers to "make commercially reasonable efforts to verify the age of the person creating an account with a level of certainty appropriate to the risks that arise from the information management practices of the digital service provider."   Ex. [1-1] at 6 (Miss. H.B. 1126, § 4).   Any known minors must then obtain parental consent to open an account with a covered member.   *Id.* at 6-7.

NetChoice has presented evidence that minors' parents and guardians already have many tools at their disposal to monitor and control their children's online access, including network-, device-, browser-, and app-level restrictions.   *See* Decl. [49-1] at 5-8.   And Cleland's Declaration [49-1] reflects that NetChoice's members take measures to protect minors, including by prohibiting minors younger than 13 from accessing their main services, and by having minor-specific policies or practices.   *Id.* at 8-9.

The Southern District of Ohio has addressed a similar law and found that NetChoice had shown a likelihood of success on the merits of its claim that foreclosing minors under 18 years old from accessing all content on social media

websites, like the ones H.B. 1126 purports to cover, absent affirmative parental consent was overbroad and therefore unconstitutional.    *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539, 559 (S.D. Ohio 2024).    The district court there determined that such an approach was also "an untargeted one, as parents must only give one-time approval for the creation of an account . . . ."    *Id.*

In addressing legislation prohibiting minors from purchasing violent video games, the Supreme Court in *Brown* held that is doubtful that "punishing third parties for conveying protected speech to children just in case their parents disapprove of that speech is a proper governmental means of aiding parental authority."    *Brown*, 564 U.S. at 802.    In *Brown,* as here, there were already a series of preexisting protections offered by the plaintiffs to assist parents.    *Id.* at 803; *see also, e.g.,* Ex. [49-1] at 5-6 (averring that "there is much publicly accessible information about the many wireless routers that offer parental control settings parents can use to block specific online services, limit the time that their children spend on the Internet, set individualized content filters, and monitor the online services their children visit").    The Supreme Court concluded that the legislation at issue in *Brown* was "seriously underinclusive," not only because it excluded portrayals of violence other than video games, but also because it permitted a parental veto.    *Brown*, 564 U.S. at 805.    It further held the legislation was overinclusive because it enforced a governmental speech restriction, subject to parental veto.    *Id.* at 804.    "And the overbreadth in achieving one goal [was] not cured by the underbreadth in achieving the other."    *Id.* at 805.

23

Here, the Attorney General has not shown that the alternative suggested by NetChoice, the private tools currently available for parents to monitor their children online, *see* Mem. [50] at 25, would be insufficient to secure the State's objective of protecting children, *see, e.g., Brown*, 564 U.S. at 804-05; *see also United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000) (for content-based regulations subject to strict scrutiny, "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative"); Ex. [49-1] at 5-19 (discussing existing tools parents can use to oversee and control their minor children's online access and some NetChoice members' current policies that block or limit the publication to minors of content that the Act regulates).

In short, NetChoice has carried its burden of demonstrating that there are a number of supervisory technologies available for parents to monitor their children that the State could publicize.   *See* Ex. [49-1] at 5-7.   Yet, the Act requires all users (both adults and minors) to verify their ages before creating an account to access a broad range of protected speech on a broad range of covered websites. This burdens the First Amendment rights of adults using the websites of Netchoice's covered members, which makes it seriously overinclusive.[5]   But NetChoice has also presented persuasive evidence that "[u]ncertainty about how broadly the Act extends—and how Defendant will interpret the Act—may spur

---

[5]  Minors also have a "significant measure of First Amendment protection," and the State may bar public dissemination of protected materials to minors "only in relatively narrow and well-defined circumstances."  *Erznoznik*, 422 U.S. at 212-13.   The State does not have a "free-floating power to restrict the ideas to which children may be exposed."  *Brown*, 564 U.S. at 794.

members to engage in over-inclusive moderation that would block valuable content from all users," and that not all covered websites have the ability to "age-gate," meaning that "they are unable to separate the content available on adults' accounts from content available on minors' accounts."    Ex. [49-1] at 26.    This likewise renders H.B. 1126 overinclusive.

The Act also requires all minors under the age of eighteen, regardless of age and level of maturity, to secure parental consent to engage in protected speech activities on a broad range of covered websites, which represents a one-size-fits-all approach to all children from birth to age 17 years and 364-days old.    H.B. 1126 is thus overinclusive as to Netchoice's covered members to the extent it is intended as an aid to parental authority beyond the resources for monitoring children's internet activity NetChoice has already identified, because not all children forbidden by the Act to create accounts on their own have parents who will care whether they create such accounts.    *See Brown*, 564 U.S. at 789, 804 (holding the state act purporting to aid parental authority by prohibiting the sale or rental of "violent video games" to minors "vastly overinclusive" because "[n]ot all of the children who are forbidden to purchase violent video games on their own have parents who *care* whether they purchase violent video games" (emphasis in original)).

*Brown* found that the statute in that case was also underinclusive:

> [t]he Act is also seriously underinclusive in another respect . . . leav[ing] this dangerous, mind-altering material in the hands of children so long as one parent (or even an aunt or uncle) says it's OK.    And there are not even any requirements as to how this parental or avuncular relationship is to be verified; apparently the child's or putative parent's, aunt's, or uncle's say-so suffices.

*Brown*, 564 U.S. at 802.

H.B. 1126 similarly requires only one parent or guardian's consent to create an account with a covered member's website, and it does not explain how the parent or guardian relationship is to be verified.   *See* Ex. [1-1] at 5-7 (Miss. H.B. 1126, § 4).   Section 4(2) states that "[a]cceptable methods of obtaining express consent of a parent or guardian include any of the following" and references examples contained in subsections (a) through (f).   *See* Sec. 4(2) ("A digital service provider shall not permit an account holder who is a known minor to be an account holder unless the known minor has the express consent from a parent or guardian."). Only options (d) and (e) mention confirming the identity of the purported parent or guardian, but none of the options, not even options (d) and (e), require verifying that the person who represents himself or herself as the minor's parent or guardian is in fact the parent or guardian.   *See* Sec. 4(2)(d)-(e) (discussing collecting information and confirming the identity of the parent or guardian, but not how to verify parental relationship or guardian status).   This makes H.B. 1126 underinclusive as applied to NetChoice's covered members.   *See Brown*, 564 U.S. at 802.

Finally, Section 6 of H.B. 1126 requires covered Netchoice members "to develop and implement a strategy to prevent or mitigate the known minor's exposure to harmful material and other content that promotes or facilitates" certain harms to minors, Sec. 6(1), but then states that it shall not be construed to require a provider to prevent or preclude "[a]ny minor from deliberately and independently searching for, or specifically requesting, content," Sec. 6(2)(a).   Permitting minors

who have presumably obtained parental consent to view otherwise-proscribed content on covered websites, simply because they initiated it by "searching for" or "requesting" it, would not seem to serve the State's compelling interest in protecting minors from the predatory behavior online.   H.B. 1126 is underinclusive in this respect as well.

In summary, the record as a whole supports the conclusion that NetChoice has shown that the Act is not narrowly tailored to achieve the State's desired result. NetChoice has demonstrated a substantial likelihood of success on its claim that, as applied to its covered members, H.B. 1126 is either overinclusive or underinclusive, or both, for achieving the State's asserted interest in protecting minors from predatory behavior online.   *See Americans for Prosperity Found.*, 594 U.S. at 615; *Brown*, 564 U.S. at 805; *Moody,* 2024 WL 3237685, at *8.   As such, the Act is likely not sufficiently narrowly tailored to survive strict scrutiny as applied to at least eight of NetChoice's members: (1) Dreamwidth; (2) Meta, which owns and operates Facebook and Instagram; (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) Snap Inc., which owns and operates Snapchat; (7) X; and (8) YouTube.

Even if, as the Attorney General asserts, the Act were deemed content neutral and subject to intermediate scrutiny, the result would not change.   A court will sustain a content-neutral law "if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests."   *TikTok Inc.*, 145 S. Ct. at 67 (quotation omitted).   To be sufficiently tailored to survive intermediate scrutiny, "a

regulation need not be the least speech-restrictive means of advancing the Government's interests." *Id.* at 70 (quotation omitted). "Rather, the standard is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation and does not burden substantially more speech than is necessary to further that interest." *Id.* (quotations omitted); *see also Packingham v. North Carolina*, 582 U.S. 98, 105-06 (2017) (holding that "to survive intermediate scrutiny, a law must be narrowly tailored to serve a significant governmental interest" (quotation omitted)). "While not as exacting as strict scrutiny, intermediate scrutiny is no gimme for the government: Intermediate scrutiny is still tough scrutiny, not a judicial rubber stamp." *Hines v. Pardue*, 117 F.4th 769, 779 (5th Cir. 2024) (quotations and alteration omitted).

Again accepting as true the Attorney General's position that safeguarding the physical and psychological wellbeing of minors online is an important governmental interest, it does not appear that the chosen method for advancing this interest can be said to be unrelated to the suppression of speech, at least as it applies to NetChoice's covered members. *See id.*; *Moody*, 603 U.S. at 740. But even if it were found to be unrelated to suppression of speech, for the reasons the Court has already discussed, the Act nevertheless burdens substantially more speech than is necessary for the State to accomplish its goals. *See TikTok Inc.*, 145 S. Ct. at 70.

For example, Section 4 precludes minors under 18 years old from accessing all content on social media websites, absent affirmative parental consent, regardless

28

of whether the content concerns or negatively affects minors' physical and psychological wellbeing.  *See* Sec. 4(2).   Section 6 states that "a digital service provider shall make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate the known minor's exposure to harmful material and other content that promotes or facilitates" certain specified harms.  Sec. 6(1).   But NetChoice has presented evidence, including Cleland's Declaration [49-1], that the plain terms of the Act seem to require prevention of exposure "not only to protected speech, but also to valuable works of art, literature, and pop culture that are suitable for at least some minors," Ex. [49-1] at 26, as those works may be construed as promoting or facilitating some of the specified harms, such as self-harm, eating disorders, substance use disorders, suicidal behaviors, stalking, grooming, incitement of violence, and any other illegal activities, *see id.*; Sec. 6(1).   And Cleland opines that uncertainty about how broadly the Act extends and how the Attorney General will interpret and enforce it "may spur members to engage in over-inclusive moderation."   Ex. [49-1] at 26.   Thus, as applied to NetChoice's covered members, the Act likely burdens substantially more speech than is necessary for the State to safeguard the physical and psychological wellbeing of minors online.  *See id.*; *TikTok Inc.*, 145 S. Ct. at 70.

Simply put, the Act is not sufficiently narrowly tailored to serve the State's interests even under intermediate scrutiny.  *See Packingham*, 582 U.S. at 105-06.

NetChoice has shown a substantial likelihood of success on the merits of its as-applied claim.  *See id.*; *TikTok Inc.*, 145 S. Ct. at 70; *Moody*, 603 U.S. at 740.[6]

c.    *Irreparability of Harm*

The Court turns next to whether NetChoice's covered members or their users will suffer irreparable harm absent an injunction.   "In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011).   But the mere fact that monetary damages may be available does not always mean that a remedy is adequate.  *See id.*

"When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."  *Book People, Inc. v. Wong*, 91 F.4th 318, 340-41 (5th Cir. 2024) (quotation omitted).   And the Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).   Here, one potential consequence of knowingly violating the Act includes criminal liability, *see* Sec. 8(2)(q) (making violating the Act an unfair and deceptive trade practice under Section 75-24-5); Miss. Code Ann. § 75-24-20(a) ("Any person who, knowingly and willfully, violates any provision of Section 75-24-5, shall be guilty of a misdemeanor, and upon conviction shall be fined up to One Thousand Dollars ($1,000.00)."), and with respect to compliance

---

[6]   Because NetChoice has shown a substantial likelihood of success on the merits on at least some of its claims, the Court need not consider its remaining preemption claim.  *See* Am. Compl. [48] at 43-45.

costs, covered digital service providers may suffer irreparable harm by outlaying financial resources to comply "with no guarantee of eventual recovery" from the State if the Court ultimately enters judgment in their favor, *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 765 (2021). Indeed, at least one of NetChoice's members has presented evidence that the alleged financial injury may threaten the very existence of its business. *See* Ex. [3-5] at 22 (averring that "the Act threatens [Dreamwidth's] ability to continue operating"). The Fifth Circuit has found an injury to be irreparable when compliance costs were likely unrecoverable against a federal agency because it enjoyed sovereign immunity. *See Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021). The Court finds this factor weighs in favor of granting a preliminary injunction.

*d.     Balance of Equities and the Public Interest*

The last two factors merge where, as here, the government is the opposing party. *Nken*, 556 U.S. at 435. And "injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013). Because the Court has found that NetChoice has shown a substantial likelihood of success on the merits of its claims, the Court finds that an injunction is in the public interest. *See id.*; *see also, e.g., Book People, Inc.*, 91 F.4th at 341 ("Because Plaintiffs are likely to succeed on the merits of their First Amendment claim, the State and the public won't be injured by an injunction of a statute that likely violates the First Amendment."). In sum,

NetChoice has shown that all four factors under Rule 65 favor the entry of a preliminary injunction on its as-applied challenge to Sections 1 through 8 of the Act.

D.    NetChoice's Facial Challenge

Because NetChoice has shown a substantial likelihood of success on the merits of its as-applied claim, the Court need not reach its facial challenge to the constitutionality of the Act.    *See, e.g., United States v. Jubert*, No. 24-60199, 2025 WL 1577013, at *2 (5th Cir. June 4, 2025) (holding that a court turns to a facially overbroad challenge "only if it is determined that the statute would be valid as applied" (quoting *Buchanan*, 919 F.3d at 854)).    The Court is certainly mindful of the Fifth Circuit's mandate remanding this matter for this Court to address the facial challenge under the framework announced in *Moody*.    But the procedural posture of this case changed when, following remand, NetChoice filed an Amended Complaint [48] adding, for the first time, an as-applied challenge to the Act.    *See* Am. Compl. [48].    Earlier, before both this Court and the Fifth Circuit, and "[a]s in *Moody*, NetChoice chose to bring a facial challenge 'and that decision [came] at a cost.'"    *Fitch*, 134 F.4th at 807 (quoting *Moody*, 603 U.S. at 723).    NetChoice apparently heeded the Fifth Circuit's advice and added an as-applied challenge on remand.    *See* Am. Compl. [48].

Given this altered procedural posture, the Fifth Circuit has been clear that a district court should "generally decide the as-applied challenge first because it is the narrower consideration."    *Buchanan*, 919 F.3d at 852.    And the Supreme Court has explained that, "although the occasional case requires us to entertain a facial

challenge in order to vindicate a party's right not to be bound by an unconstitutional statute, we neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477-78 (1995). Given the foregoing guidance from the Supreme Court and the Fifth Circuit, and because the Court has determined NetChoice has a substantial likelihood of success on the merits of its newly-added as-applied challenge to the Act, it need not reach the facial challenge in order to fully protect the litigants, and it will refrain from doing so in order to avoid "unnecessary adjudication of constitutional issues." *Id.* at 478.

E.    Whether the Court Should Require Security

Rule 65(c) states that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "[T]he amount of security required pursuant to Rule 65(c) is a matter for the discretion of the trial court," and the district court "may elect to require no security at all." *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).

In this case, neither party has raised the issue of security, and Defendant likely will not incur any significant monetary damage as a result of a preliminary injunction, which ensures that the constitutional rights of NetChoice's covered members are protected. Therefore, the Court finds that security is not necessary in this case. *See id.* Other courts have reached the same conclusion under similar

33

circumstances.    *See, e.g., Thomas v. Varnado*, 511 F. Supp. 3d 761, 766 (E.D. La.

2020) (holding that, because neither the school board nor superintendent was likely

to incur any significant monetary damages as a result of the preliminary injunction

and because the plaintiff was a minor student, it would issue an injunction without

security); *Gbalazeh v. City of Dallas*, No. 3:18-CV-0076-N, 2019 WL 2616668, at *2

(N.D. Tex. June 25, 2019) ("The Court exercises its discretion under Federal Rule of

Civil Procedure 65(c) to waive the bond requirement, as Plaintiffs are engaged in

'public-interest litigation' to protect their constitutional rights." (quoting *City of

Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084 (5th Cir. 1981)).

## III.   CONCLUSION

Because Plaintiff NetChoice, LLC, has carried its burden of demonstrating a

substantial likelihood of success on the merits of its claim that the Act is

unconstitutional under a First Amendment as-applied challenge as to certain of its

members, the Court will grant the Motion for a Preliminary Injunction without

requiring security.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Plaintiff

NetChoice, LLC's Motion [49] for Temporary Restraining Order and Preliminary

Injunction is **GRANTED IN PART**, to the extent it seeks a preliminary injunction

as to its eight covered members: (1) Dreamwidth; (2) Meta, which owns and

operates Facebook and Instagram; (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) Snap

Inc., which owns and operates Snapchat; (7) X; and (8) YouTube.   The Motion [49] is **DENIED IN PART** as moot, to the extent it seeks a temporary restraining order.

   **IT IS, FURTHER, ORDERED AND ADJUDGED** that, Defendant Mississippi Attorney General Lynn Fitch and her agents, employees, and all persons acting under her direction or control, are **PRELIMINARILY ENJOINED** under Federal Rule of Civil Procedure 65(a) from enforcing Sections 1 through 8 of Mississippi House Bill 1126 against Plaintiff NetChoice, LLC's eight covered members: (1) Dreamwidth; (2) Meta, which owns and operates Facebook and Instagram; (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) Snap Inc., which owns and operates Snapchat; (7) X; and (8) YouTube, pending a final disposition of this case on its merits.

   **SO ORDERED AND ADJUDGED**, this the 18th day of June, 2025.

     *s/ Halil Suleyman Ozerden*
     HALIL SULEYMAN OZERDEN
     CHIEF UNITED STATES DISTRICT JUDGE

**APPENDIX C**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **NETCHOICE, LLC** | § | **PLAINTIFF** |
| | § | |
| | § | |
| **v.** | § | **Civil No. 1:24-cv-170-HSO-BWR** |
| | § | |
| | § | |
| **LYNN FITCH,** | § | |
| *in her official capacity as* | § | |
| *Attorney General of Mississippi* | § | **DEFENDANT** |

<u>**MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART PLAINTIFF NETCHOICE, LLC'S
MOTION [3] FOR PRELIMINARY INJUNCTION AND TEMPORARY
RESTRAINING ORDER, AND PRELIMINARILY ENJOINING
ENFORCEMENT OF MISSISSIPPI HOUSE BILL 1126**</u>

BEFORE THE COURT is Plaintiff NetChoice, LLC's Motion [3] for

Preliminary Injunction and Temporary Restraining Order, seeking to enjoin

Mississippi House Bill 1126 ("H.B. 1126" or the "Act") which was signed into law on

April 30, 2024, and is set to take effect on July 1, 2024.   Plaintiff asks this Court

for an order preliminarily enjoining Defendant Lynn Fitch, in her official capacity

as Mississippi Attorney General—and her agents, employees, and all persons acting

under her direction or control—from taking any action to enforce H.B. 1126 or the

challenged portions of H.B. 1126 before its July 1, 2024, effective date.   *See* Mot.

[3].   *Amicus Curiae* Electronic Frontier Foundation has filed a Brief in support of

Plaintiff's Motion, *see* Br. [25], and Attorney General Fitch has filed a Response in

opposition, *see* Resp. [26].   After consideration of the record in this case, relevant

legal authority, and the record of the hearing held on June 26, 2024, the Court finds

that a preliminary injunction should issue.   Plaintiff's request for a temporary

restraining order will be denied as moot.

## I.   BACKGROUND

A.   Mississippi H.B. 1126

Plaintiff challenges Sections 1-8 of H.B. 1126, which provide in relevant part

as follows:

> SECTION 3. (1) This act applies only to a digital service provider who
> provides a digital service that:
> (a)   Connects users in a manner that allows users to socially interact
>       with other users on the digital service;
> (b)   Allows a user to create a public, semi-public or private profile for
>       purposes of signing into and using the digital service; and
> (c)   Allows a user to create or post content that can be viewed by other
>       users of the digital service, including sharing content on:
>       (i)    A message board;
>       (ii)   A chat room; or
>       (iii)  A landing page, video channel or main feed that presents
>              to a user content created and posted by other users.
> (2)   This act does not apply to:
> (a)   A digital service provider who processes or maintains user data
>       in connection with the employment, promotion, reassignment or
>       retention of the user as an employee or independent contractor,
>       to the extent that the user's data is processed or maintained for
>       that purpose;
> (b)   A digital service provider's provision of a digital service that
>       facilitates e-mail or direct messaging services, if the digital
>       service facilitates only those services;
> (c)   A digital service provider's provision of a digital service that:
>       (i)    Primarily functions to provide a user with access to news,
>              sports, commerce, online video games or content primarily
>              generated or selected by the digital service provider; and
>       (ii)   Allows chat, comment or other interactive functionality
>              that is incidental to the digital service; or
> (d)   A digital service provider's provision of a digital service that
>       primarily functions to provide a user with access to career
>       development opportunities, including:
>       (i)    Professional networking;
>       (ii)   Job skills;

(iii)    Learning certifications;
(iv)    Job posting; and
(v)     Application services.

\*     \*     \*

SECTION 4. (1) A digital service provider may not enter into an agreement with a person to create an account with a digital service unless the person has registered the person's age with the digital service provider.   A digital service provider shall make commercially reasonable efforts to verify the age of the person creating an account . . . .

(2)     A digital service provider shall not permit an account holder who is a known minor to be an account holder unless the known minor has the express consent from a parent or guardian . . . .

\*     \*     \*

SECTION 6. (1) In relation to a known minor's use of a digital service, a digital service provider shall make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate the known minor's exposure to harmful material and other content that promotes or facilitates the following harms to minors:

(a)     Consistent with evidence-informed medical information, the following: self-harm, eating disorders, substance use disorders, and suicidal behaviors;
(b)     Patterns of use that indicate or encourage substance abuse or use of illegal drugs;
(c)     Stalking, physical violence, online bullying, or harassment;
(d)     Grooming, trafficking, child pornography, or other sexual exploitation or abuse;
(e)     Incitement of violence; or
(f)     Any other illegal activity.

(2) Nothing in subsection (1) shall be construed to require a digital service provider to prevent or preclude:

(a)     Any minor from deliberately and independently searching for, or specifically requesting, content . . . .

Ex. [1-1] at 3-9 (Miss. H.B. 1126, §§ 3-4, 6).

In summary, Section 4(1) of H.B. 1126 requires all users, adults and minors alike, to verify their age before they may open an account with non-excluded digital service providers (the "age-verification requirement"), while Section 4(2) requires parental consent before a known minor may create an account (the "parental-

3

consent requirement").   *Id.*   Section 5 contains a limitation for collection of data by

non-excluded digital service providers that enter into an agreement with a known

minor for access to a digital service (the "data-collection limitation"),[1]  and Section 6

requires those digital service providers to make commercially reasonable efforts to

develop and implement a strategy to prevent or mitigate the known minor's

exposure to harmful material and other content that promotes or facilitates certain

harms to minors (the "prevention-or-mitigation requirement").[2]  *See id.*   But

Section 6(2) does not require digital service providers to prevent or preclude minors

with accounts from "deliberately and independently searching for, or specifically

requesting, content."   *Id.*   Sections 7 and 8 of the Act provide civil remedies and

criminal penalties for its violation.   *See id.* at 9-12.

B.   NetChoice

        Plaintiff NetChoice, LLC ("NetChoice" or "Plaintiff") is a nonprofit trade

association for internet companies.   Compl. [1] at 4.   Its Complaint [1] asserts that

H.B. 1126 regulates some services offered by the following of NetChoice's members:

(1) Dreamwidth; (2) Google, which owns and operates YouTube; (3) Meta, which

owns and operates Facebook and Instagram; (4) Nextdoor; (5) Pinterest; (6) Snap,

---

[1]  Plaintiff does not appear to challenge the data-collection limitation specifically.  *Amicus curiae* Electronic Frontier Foundation notes that, "while the data privacy provisions of this law are not severable from the unconstitutional age-verification regime Mississippi House Bill 1126 imposes, that does not render those provisions independently unconstitutional. Should the law's data privacy provisions appear in a well-crafted comprehensive privacy law that did not require age verification, they would be subject to a different standard and could likely satisfy First Amendment scrutiny."   Br. [25] at 8-9.
[2]  Plaintiff refers to this as a monitoring-and-censorship requirement, *see* Compl. [1] at 27-28, while Defendant refers to it as the strategy provision, *see* Resp. [26] at 9-10.

Inc., which owns and operates Snapchat; and (7) X.   Compl. [1] at 4.   Some of
these "members operate websites that are among the Internet's most popular
destinations, disseminating billions of user-generated posts," and, according to
NetChoice's Vice President and General Counsel Carl Szabo ("Szabo"), its members'
"websites are full of a wide range of valuable expression and communities."   Ex. [3-
2] at 4.   "Whether it is to practice their religious beliefs, engage in political
discourse, seek cross-cultural dialogue, supplement their education, or learn new
skills, people across the nation and world (minors and adults alike) use these
websites every day to explore protected speech."   *Id.*

Szabo's Declaration states that "[i]n general, members' websites publish,
disseminate, create, curate, or distribute protected speech, or all of the above . . . by
displaying text, audio, graphics, or video to users."   *Id.* at 5.   NetChoice members'
websites "disseminate different expressive content in different ways to serve
different user bases"; some of the content is generated by the websites themselves,
some of it by advertisements, and much of the content is generated by users, "who
sometimes use these websites to share content with a website-specific list of 'friends'
(or 'connections') and sometimes use these websites to share with the world at
large."   *Id.*

C.   Plaintiff's Complaint [1]

NetChoice filed its Complaint [1] for Declaratory and Injunctive Relief in this
Court on June 7, 2024, raising First Amendment facial challenges to the Act's
central coverage definition (Count I), age-verification requirement (Count III),

parental-consent requirement (Count IV), and the prevention-or-mitigation requirement[3] (Count V).   Alternatively, the Complaint alleges that the Act is overbroad, *see* Compl. [1] at 18-22, 25-33 (Counts I, III, IV, V); Mem. [4] at 15-30, and that its central coverage definition of "digital service provider" is unconstitutionally vague and violates principles of free speech and due process, Compl. [1] at 23-24, 33-34 (Count II, VI); Mem. [4] at 30-31.   The Complaint [1] further alleges that 47 U.S.C. § 230 preempts the monitoring-and-censorship requirements in Section 6.   Compl. [1] at 35-36 (Count VII).   Plaintiff seeks equitable relief enjoining Defendant from enforcing the Act, *see id.* at 36 (Count VIII), and a declaration that each of the Act's challenged provisions is unconstitutional and otherwise unlawful, *see id.* at 36-37 (Count IX).

D.   Plaintiff's Motion [3] for Preliminary Injunction and Temporary Restraining Order

NetChoice's Motion [3] contends that H.B. 1126 "will unconstitutionally impede both adults and minors' access to vast amounts of constitutionally protected speech on a broad range of websites."   Mot. [3] at 1.   It argues that the First Amendment "does not permit the Act's requirements for covered websites to verify the ages of their users or to secure parental consent before allowing minors to access the websites," and "[s]imilarly, the First Amendment and 47 U.S.C. § 230 do not allow the government to choose what content- and viewpoint-based categories of users' speech websites cannot disseminate."   *Id.*   NetChoice maintains that "[t]he

---

[3]  The Complaint refers to this as the monitoring-and-censorship requirement.   Compl. [1] at 27-28.

entire Act is also unconstitutionally vague, and sections 1-8 . . . likewise violate both the First Amendment and the Due Process Clause of the Fourteenth Amendment." *Id.*

*Amicus Curiae* Electronic Frontier Foundation ("EFF") has filed a Brief [25] in support of Plaintiff's Motion [3] "to emphasize how online age restrictions significantly burden the speech and privacy rights of all internet users, not just minors." Br. [25] at 8. EFF contends that "age verification imposes significant burdens on adults' access to constitutional speech and 'discourage[s] users from accessing' the online services that require that verification." *Id.* at 9 (quoting *Reno v. ACLU*, 521 U.S. 844, 856 (1997)). EFF posits that, because "[i]nternet users are highly sensitive to website access barriers, . . . age verification is likely to notably reduce adult users' willingness to consume or create protected content on a site," *id.*, and is much more privacy-invasive and carries with it security risks, *id.* at 11. Moreover, unlike other in-person ID checks where adults face less difficulty before purchasing products and are only precluded from buying adult content if their age cannot be verified, "the inability to verify an adult's age online will block their access to *all* content on the given platform—a much more significant and damaging First Amendment burden." *Id.* at 10 (emphasis in original).

Even if an adult's age can be reliably and non-intrusively verified, EFF argues that the online age verification requirement chills users from accessing protected speech by impermissibly burdening the right to be anonymous online and by putting users' most sensitive data at risk of inadvertent disclosure or data

breach.  *See id.* at 14-18.   EFF contends that the burden placed on adult user

rights is significant, *see id.* at 18-20, and that "[w]hile Mississippi may have an

interest in protecting children from harms, its efforts to accomplish that goal cannot

be at the expense of the rights of adults to access constitutionally protected speech,"

*id.* at 20.

The Attorney General responds that "NetChoice fails to establish standing to

bring a First Amendment claim against any of the provisions on which it seeks

injunctive relief."   Resp. [26] at 8; *see id.* at 8-11.   To the extent NetChoice has

standing, the Attorney General contends that H.B. 1126 permissibly regulates

conduct, not speech, and is not subject to heightened First Amendment scrutiny;

rather, rational-basis review applies.   *See id.* at 11-15.   As for Plaintiff's

overbreadth argument concerning what the Court refers to as the Act's prevention-

or-mitigation requirement, the Attorney General asserts that "NetChoice cannot

show that a statute that reaches and regulates so much harmful, unprotected, and

illegal conduct lacks a sufficiently 'lawful sweep.'"   *Id.* at 15.

The Attorney General further contends that Plaintiff's arguments that the

three challenged provisions are subject to strict scrutiny because they are content-

based, speaker-based, or viewpoint-based fail because they are in fact based on

conduct and harm, not speech and expression.   *See id.* at 16-17.   Even if the Act

could be said to regulate to some extent based on content such that intermediate

scrutiny applies, the Attorney General insists that the Act satisfies it.   *See id.* at

17-19.   To the extent the Court finds that strict scrutiny applies, the Attorney

General also argues that it is satisfied.   *See id.* at 19-23.   "[T]he State has a compelling interest in protecting minors from the predatory behavior that is commonplace on the interactive social-media platforms that the Act covers," *id.* at 20, and "the Act is narrowly tailored to protect minors from the harms inflicted by online predators," *id.* at 21; *see id.* at 21-22.   Next, the Attorney General states that NetChoice is likely to lose on its vagueness claim because "[t]he Act is clear about who and what it covers," *id.* at 23, and it gives fair notice, *see id.* at 23-27.   Finally, Plaintiff likely will not succeed on its preemption claim because 47 U.S.C. § 230 does not excuse platforms from complying with state laws that require the platforms "to take steps to help protect children from harmful interactive online conduct."   *Id.* at 27; *see id.* at 27-29.

NetChoice replies that it has associational standing and standing to invoke users' rights.   *See* Reply [27] at 3-5.   It maintains that the challenged provisions violate the First Amendment, as they regulate protected speech—not just conduct— triggering strict scrutiny, *see id.* at 5-8, and that "the Act is not remotely tailored" to the one interest the Attorney General invokes, protecting children from online predatory harm, and "certainly is not the least restrictive means of doing so," *id.* at 8 (quotation omitted).   Plaintiff argues that the entire Act is also underinclusive and that its vagueness claims are likely to succeed.   *See id.* at 9-10.

II.  DISCUSSION

This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

A preliminary injunction under Federal Rule of Civil Procedure 65(a) is an

extraordinary remedy, requiring the moving party to establish four factors:

> (1) a substantial likelihood of success on the merits, (2) a substantial
> threat of irreparable injury if the injunction is not issued, (3) that the
> threatened injury if the injunction is denied outweighs any harm that
> will result if the injunction is granted, and (4) that the grant of an
> injunction will not disserve the public interest.

*Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023) (quotation omitted).   When the

government is the opposing party, the last two factors merge.   *Nken v. Holder*, 556

U.S. 418, 435 (2009).    Movant bears the burden of persuasion on all requirements.

*Mock*, 75 F.4th at 587.

A.   NetChoice's standing to maintain this suit

This Court must first determine whether NetChoice has standing to bring

these claims.   "In essence the question of standing is whether the litigant is

entitled to have the court decide the merits of the dispute or of particular issues.

This inquiry involves both constitutional limitations on federal-court jurisdiction

and prudential limitations on its exercise."   *Warth v. Seldin*, 422 U.S. 490, 498

(1975).

NetChoice advances claims not only on its members' behalf but also on behalf

of its members' users.   *See* Compl. [1].   "A party ordinarily may assert only 'his

own legal rights and interests, and cannot rest his claim to relief on the legal rights

or interests of third parties.'"   *Vote.Org v. Callanen*, 89 F.4th 459, 472 (5th Cir.

10

2023) (quoting *Warth*, 422 U.S. at 499).   But this is a prudential rule, not a

constitutional one.   *Id.*   "Third-party standing often turns on categorized

relationships — e.g., vendor-vendee, doctor-patient, employer-employee."   *Id.*

(quotation omitted).   "Vendors are routinely accorded standing to assert the

constitutional rights of customers and prospective customers."   *Id.* (quotation

omitted).

1.   Constitutional standing

To establish Article III constitutional standing, "a plaintiff must demonstrate

(i) that [it] has suffered or likely will suffer an injury in fact, (ii) that the injury

likely was caused or will be caused by the defendant, and (iii) that the injury likely

would be redressed by the requested judicial relief."   *Food & Drug Admin. v. All.*

*for Hippocratic Med.*, 144 S. Ct. 1540, 1555 (2024).

According to the Complaint [1], Plaintiff NetChoice is a nonprofit trade

association for internet companies.   *See* Compl. [1] at 4.   It asserts both

associational standing and organizational standing to challenge the Act in its own

right.   *See id.* at 4-5.   NetChoice also claims that it may assert a violation of the

First Amendment rights of its members' current and prospective users.   *See id.* at 5

(citing *Virginia v. Am. Booksellers Ass'n, Inc.,* 484 U.S. 383, 392-93 (1988)); Mem.

[4] at 15.

The Court first considers whether NetChoice has associational standing.

Associational standing derives from an association's members, and an association

> has standing to bring claims on behalf of its members when (1)
> individual members would have standing, (2) the association seeks to

> vindicate interests germane to its purpose, and (3) neither the claim
> asserted nor the relief requested requires the individual members'
> participation.

*Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*, 37 F.4th 1078, 1084

(5th Cir. 2022) (footnote omitted).   Individuals have standing to sue if they "(1)

have suffered an injury in fact, (2) that is fairly traceable to the challenged action of

the defendant, and (3) that will likely be redressed by a favorable decision."   *Ass'n*

*of Am. Physicians & Surgeons Educ. Found. v. Am. Bd. of Internal Med.,* 103 F.4th

383, 390 (5th Cir. 2024) (quotation omitted).   "[S]tanding rules are relaxed for First

Amendment cases so that citizens whose speech might otherwise be chilled by fear

of sanction can prospectively seek relief."   *Id.*

The Attorney General argues that NetChoice does not have associational

standing because it has not shown that its members would have standing to sue in

their own right, as NetChoice "presses the claims not of its members but of its

members' *users*."   Resp. [26] at 9 (emphasis in original).   The Attorney General

argues that NetChoice members' harms are merely financial, *see id.* at 9-10, but

such harm does not preclude a finding of standing.   "An increased regulatory

burden typically satisfies the injury in fact requirement."   *Contender Farms, L.L.P.*

*v. U.S. Department of Agriculture*, 779 F.3d 258, 266 (5th Cir. 2015).   The Supreme

Court has held that plaintiffs have standing to bring a pre-enforcement facial

challenge when "the law is aimed directly at plaintiffs, who, if their interpretation

of the statute is correct, will have to take significant and costly compliance

measures or risk criminal prosecution." *American Booksellers Association, Inc.*, 484 U.S. at 392.

That is the situation here.   The record reflects that many of NetChoice's members would incur substantial compliance costs should the Act go into effect. *See, e.g.,* Ex. [3-2] at 24 ("Any website that even attempts to comply with the Act will incur substantial, unrecoverable costs in reconfiguring their service."); Ex. [3-3] at 20 ("Developing and maintaining systems to verify the ages of teenagers to the level of certainty that could be required by the Act is highly complex, human-resource intensive, and time consuming—resulting in unrecoverable compliance costs.").

Those members that believe they would be covered by the Act aver they would need to develop protocols for complying with its requirements; otherwise, they face the risk of civil or criminal penalties.   NetChoice argues that the economic risk is particularly acute because the Act is vague, insufficiently apprising its members as to whether they must comply, which may result in members spending even more funds when they err on the side of caution in attempting to comply.   *See* Ex. [3-3] at 20; Ex. [3-5] at 23.   For at least one member, "the Act will force [it] . . . to spend money far in excess of [its] available budget" and "will jeopardize [its] ability to continue offering the service at all."   Ex. [3-5] at 23.

A compliance cost injury alone is sufficient, *see American Booksellers Association, Inc.*, 484 U.S. at 392, but NetChoice also argues that its members' First and Fourteenth Amendment rights will be violated, *see* Mem. [4] at 15-31.   "[A]

13

plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quotation omitted).   Specifically, NetChoice maintains that its members have a well-established First Amendment right to "disseminate" protected speech by and to minors and adults alike, and a Fourteenth Amendment right to have laws be reasonably clear about the entities to which they apply.   *See* Mem. [4] at 15-23. This is sufficient to establish the first prong of associational standing.

The second and third prongs of the associational standing test are also satisfied.   NetChoice presents evidence that its purpose is "to make the Internet safe for free enterprise and free expression."   Ex. [3-2] at 3.   This lawsuit, which is centered on protecting these interests, is germane to that purpose.   Nor would this case require each member of the association to participate because the nature of the suit is unlikely to require fact-intensive inquiry of each member.   *See, e.g., NetChoice, LLC v. Yost*, No. 2:24-CV-00047, 2024 WL 555904, at *5 (S.D. Ohio Feb. 12, 2024) (reaching the same conclusion with respect to a similar lawsuit brought by NetChoice challenging a parental notification law in Ohio).   Having concluded that NetChoice has associational standing to bring this lawsuit, the Court need not resolve whether it has organizational standing.

2.    <u>Prudential standing</u>

The Court next considers whether NetChoice is entitled to bring its specific claims, meaning whether it has prudential standing.   The Supreme Court has "adhered to the rule that a party generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."   *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quotation omitted).   "The alleged injury must be within the 'zone of interests' protected by the constitutional guarantee invoked."   *Moore as next friend to Moore v. Tangipahoa Parish School Board*, 771 F. App'x 540, 543 (5th Cir. 2019) (per curiam) (quoting *Barlow v. Collins*, 397 U.S. 159, 164 (1970)).

"This rule assumes that the party with the right has the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation."   *Kowalski*, 543 U.S. at 129.   But the Supreme Court has also acknowledged that there are circumstances where it might be necessary to recognize a third party's standing to assert the rights of another.   *See id.* at 129-30.   The Supreme Court has "limited this exception by requiring that a party seeking third-party standing make two additional showings" – (1) "whether the party asserting the right has a close relationship with the person who possesses the right," and (2) "whether there is a hindrance to the possessor's ability to protect his own interests."   *Id.* at 130 (quotations omitted).

The Attorney General does not dispute that NetChoice, a member-based organization, has prudential standing to bring a claim on behalf of its members.

*See* Resp. [26] at 10-11.   But she challenges NetChoice's attempt to vindicate the First Amendment rights of users of the members' websites.   *See id.*

Two district courts have recently conducted thorough analyses of NetChoice's prudential standing to challenge similar state laws imposing age-verification requirements on many of its members.   *See NetChoice, LLC v. Yost*, No. 2:24-CV-00047, 2024 WL 555904, at *5 (S.D. Ohio Feb. 12, 2024); *NetChoice, LLC v. Griffin*, No. 5:23-CV-05105, 2023 WL 5660155, at *12 (W.D. Ark. Aug. 31, 2023).   The Court finds this authority persuasive and that NetChoice "is in a unique position to advocate for the rights of [Mississippi] users and may appropriately do so here." *Griffin*, 2023 WL 5660155, at *12.   In sum, based upon the record before the Court, NetChoice has demonstrated its associational standing to bring claims on behalf of both its members and its members' Mississippi users.

B.   <u>Likelihood of success on the merits</u>

Having concluded that NetChoice has standing to advance its claims, the Court considers the first factor for obtaining a preliminary injunction, whether NetChoice has a substantial likelihood of success on the merits of its claims.

1.   <u>Whether H.B. 1126 regulates content</u>

"[T]he First Amendment provides in relevant part that 'Congress shall make no law . . . abridging the freedom of speech,'" and "the Fourteenth Amendment makes the First Amendment's Free Speech Clause applicable against the States." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019).   The First Amendment protects both freedom of speech as well as the "right to receive

information and ideas, regardless of their social worth."   *Stanley v. Georgia*, 394

U.S. 557, 564 (1969).   "[T]he right to receive ideas follows ineluctably from the

*sender's* First Amendment right to send them" and "is a necessary predicate to the

*recipient's* meaningful exercise of his own rights of speech, press, and political

freedom."   *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S.

853, 867 (1982) (plurality opinion) (emphasis in original).[4]

In this case, NetChoice raises a traditional facial challenge and,

alternatively, an overbreadth challenge to H.B. 1126.   *See* Compl. [1] at 18-22, 25-

33 (Counts I, III, IV, V); Mem. [4] at 15-30.   NetChoice also contends that the Act's

central coverage definition of a "digital service provider" is unconstitutionally vague

and violates principles of free speech and due process.   Compl. [1] at 23-24, 33-34

(Count II, VI); Mem. [4] at 30-31.   Finally, NetChoice asserts that 47 U.S.C. § 230

preempts the so-called "monitoring-and-censorship requirements" in Section 6.

Compl. [1] at 35-36 (Count VII).

"Normally, a plaintiff bringing a facial challenge must establish that no set of

circumstances exists under which the law would be valid, or show that the law lacks

a plainly legitimate sweep."   *Americans for Prosperity Found. v. Bonta*, 594 U.S.

---

[4]  H.B. 1126's primary focus is minors.   But "minors are entitled to a significant measure
of First Amendment protection, and only in relatively narrow and well-defined
circumstances may government bar public dissemination of protected materials to them."
*Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212-13 (1975) (citation omitted).   "No doubt
a State possesses legitimate power to protect children from harm, but that does not include
a free-floating power to restrict the ideas to which children may be exposed."   *Brown v.
Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011) (citations omitted).   "Speech that is neither
obscene as to youths nor subject to some other legitimate proscription cannot be suppressed
solely to protect the young from ideas or images that a legislative body thinks unsuitable
for them."   *Id.* at 795 (quoting *Erznoznik*, 422 U.S. at 213-214).

595, 615 (2021) (quotations omitted).   In the First Amendment context, however, the Supreme Court has "recognized a second type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."   *Id.* (quotation omitted); *see Moody v. NetChoice, LLC*, No. 22-277, 2024 WL 3237685, at *8 (U.S. July 1, 2024).

"[T]he First Amendment, subject only to narrow and well-understood exceptions, does not countenance governmental control over the content of messages expressed by private individuals."   *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994).   "[T]he most exacting scrutiny" is applied "to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content."   *Id.* at 642.   A state "has no power to restrict expression because of its message, its ideas, its subject matter, or its content," and "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."   *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quotation omitted).

> Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.   This commonsense meaning of the phrase "content based" requires a court to consider whether a regulation of speech on its face draws distinctions based on the message a speaker conveys.   Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose.   Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny.

18

*Id.* at 163-64 (citations and quotations omitted).   "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech."   *Id.* at 165 (quotation omitted).   Moreover, "[b]ecause speech restrictions based on the identity of the speaker are all too often simply a means to control content, [the Supreme Court has] insisted that laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference."   *Id.* at 170 (quotations omitted).

In this case, each of the challenged sections of the Act relies upon the definition of a "digital service provider."   H.B. 1126 applies to any digital service that:

> (a)   Connects users in a manner that allows users to socially interact with other users on the digital service;
> (b)   Allows a user to create a public, semi-public or private profile for purposes of signing into and using the digital service; and
> (c)   Allows a user to create or post content that can be viewed by other users of the digital service, including sharing content on:
>> (i)   A message board;
>> (ii)   A chat room; or
>> (iii)   A landing page, video channel or main feed that presents to a user content created and posted by other users.

Sec. 3(1).   But the Act does not apply to certain things, including a digital service that "[p]rimarily functions to provide a user with access to news, sports, commerce, online video games or content primarily generated or selected by the digital service provider."   Sec. 3(2)(c)(i).

In *Turner Broadcasting System*, the Supreme Court considered must-carry provisions of a regulation that extended to all cable programmers, and found that because the provisions were "based only upon the manner in which speakers transmit their messages to viewers, and not upon the messages they carry," they were not content based.   512 U.S. at 645.   But H.B. 1126 does not apply to all digital service providers, specifically excluding from its reach certain providers based upon the primary purpose or subject matter of their service.   *See* Sec. 2(c); Sec. 3.

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed," *Reed*, 576 U.S. at 163, which is precisely what H.B. 1126 does, *see* Sec. 3(1); Sec. 3(2)(c)(i).   The law's content-based distinction is inherent in the definition of "digital service provider," which is at the core of defining the Act's coverage.   *See* Sec. 3.   Even if this were considered a speaker-based distinction, the Supreme Court has held that "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Reed*, 576 U.S. at 170.   In essence, H.B. 1126 treats or classifies digital service providers differently based upon the nature of the material that is disseminated, whether it is "social interaction," *see* Sec. 3(1)(a), as opposed to "news, sports, commerce, [or] online video games," Sec. 3(2)(c)(i).

Section 3(2)(c)(i) can thus be viewed as either drawing a facial distinction based on the message the digital service provider conveys (i.e., news and sports), or

based on a more subtle content-based restriction defining regulated speech by its

function or purpose (i.e., providing news and sports).   *See* Sec. 3(2)(c)(i); *Reed*, 576

U.S. at 163.   Either way, "[b]oth are distinctions drawn based on the message a

speaker conveys."   *Reed*, 576 U.S. at 163-64.   It is of no moment that there is no

express restriction on a particular viewpoint, as "[t]he First Amendment's hostility

to content-based regulation extends not only to restrictions on particular

viewpoints, but also to prohibition of public discussion of an entire topic."   *Id.* at

169 (quotation omitted).   Nor is the State's motive considered, as "[a] law that is

content based on its face is subject to strict scrutiny regardless of the government's

benign motive, content-neutral justification, or lack of animus toward the ideas

contained in the regulated speech."   *Id.* at 165 (quotation omitted).   The facial

distinction in H.B. 1126 based on the message the digital service provider conveys,

or the more subtle content-based restriction based upon the speech's function or

purpose, makes the Act content-based, and therefore subject to strict scrutiny.   *See*

*id.*

   The Attorney General argues that H.B. 1126 does not regulate speech, but

non-expressive conduct, which the State may regulate if it has a rational basis for

doing so.   *See* Resp. [26] at 11-12 (citing *City of Dallas v. Stanglin*, 490 U.S. 19, 23-

25 (1989)).   But the Court is not persuaded that H.B. 1126 merely regulates non-

expressive conduct, and *Stanglin*, upon which the Attorney General relies, is

distinguishable.   *See id.*   In *Stanglin*, the "city of Dallas adopted an ordinance

restricting admission to certain dance halls to persons between the ages of 14 and

18," *Stanglin*, 490 U.S. at 20, and limiting their operating hours to 1 p.m. to midnight when school was not in session, *id.* at 22.   "[T]he owner of one of these 'teenage' dance halls, sued to contest the constitutional validity of the ordinance." *Id.* at 20.   "The Texas Court of Appeals held that the ordinance violated the First Amendment right of persons between the ages of 14 and 18 to associate with persons outside that age group."   *Id.* at 20-21.

The United States Supreme Court reversed.   *Id.* at 21.   It reasoned that the ordinance restricted attendance at teenage dance halls "to minors between the ages of 14 and 18 and certain excepted adults.   It thus limits the minors' ability to dance with adults who may not attend, and it limits the opportunity of such adults to dance with minors."   *Id.* at 24.   The Supreme Court recognized that these opportunities for dance-hall patrons "might be described as 'associational' in common parlance, but they simply [did] not involve the sort of expressive association that the First Amendment has been held to protect."   *Id.* at 24.   "There [was] no suggestion that these patrons '[took] positions on public questions' or perform[ed] any of the other similar activities described in *Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537, 548, 107 S.Ct. 1940, 1947, 95 L.Ed.2d 474 (1987)," *id.* at 25, which includes the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends," *Duarte*, 481 U.S. at 548.

This case is distinguishable, as there is competent evidence in the record that NetChoice's members' websites consist of users who take positions on and engage

with others in pursuit of the type of "political, social, economic, educational, religious, and cultural" activities described in *Duarte*.   *Id.*; *see also, e.g.,* Ex. [3-2] at 2 ("NetChoice members' websites are full of a wide range of valuable expression and communities. Whether it is to practice their religious beliefs, engage in political discourse, seek cross-cultural dialogue, supplement their education, or learn new skills, people across the nation and world (minors and adults alike) use these websites every day to explore protected speech.").   The Attorney General's argument that the Act is conduct-based or that *Stanglin* somehow controls is not persuasive.   Because H.B. 1126 regulates content, strict scrutiny applies.   *See Reed*, 576 U.S. at 163-64.

2.   <u>Whether the Act is likely to fail strict scrutiny</u>

Because the Court concludes that NetChoice is likely to succeed on its argument that the Act imposes content-based restrictions on speech, it next considers whether NetChoice has shown that the Act is likely to fail strict scrutiny. Courts "generally review content-based regulations of speech under strict scrutiny unless they come within an exception such as the commercial speech exceptions of *Zauderer* or *Central Hudson*," *R.J. Reynolds Tobacco Co. v. Food & Drug Admin.*, 96 F.4th 863, 876 (5th Cir. 2024),[5] but those exceptions are not relevant here.

Strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."

---

[5]   *See also Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio,* 471 U.S. 626 (1985); *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980).

*Reed*, 576 U.S. at 171 (quotation omitted).   Thus, it is Defendant's burden to demonstrate that the Act's differentiation among digital service providers and the content they convey, along with the age and parental-consent requirements, further a compelling governmental interest and are narrowly tailored to that end.   *Id.*

To show a compelling interest, "[t]he State must specifically identify an actual problem in need of solving, and the curtailment of free speech must be actually necessary to the solution.   That is a demanding standard."   *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011) (quotations and citations omitted). According to the Supreme Court, "[i]t is rare that a regulation restricting speech because of its content will ever be permissible."   *Id.* (quotation omitted).

The Attorney General contends that "the State has a compelling interest in protecting minors from the predatory behavior that is commonplace on the interactive social-media platforms that the Act covers," and that "[t]he interest in 'safeguarding the physical and psychological wellbeing of a minor' is manifest and well-settled."   Resp. [26] at 20 (quoting *Maryland v. Craig*, 497 U.S. 836, 852-53 (1990) (internal quotation omitted)).   She maintains that "the Act is narrowly tailored to protect minors from the harms inflicted by online predators," as its "age-verification and parental-consent provisions achieve compelling interests in a narrowly tailored way."   *Id.* at 21.

NetChoice replies that, while protecting children from online predatory harm is a "worthy goal" which its own members already do much to advance, "the Act is not remotely tailored to that interest and certainly is not 'the least restrictive

24

means' of doing so."   Reply [27] at 8 (quoting *Americans for Prosperity Found.*, 594 U.S. at 607).   NetChoice faults the Attorney General for dismissing private alternatives, even if not perfect, and argues that "[r]egardless, the entire Act is vastly overinclusive as to this interest."   *Id.* at 8-9.

The Court accepts as true the Attorney General's position that safeguarding the physical and psychological wellbeing of minors online is a compelling interest. *See* Resp. [26] at 20; *see also, e.g., Sable Commc'ns of California, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989) (recognizing that "there is a compelling interest in protecting the physical and psychological well-being of minors").   "The Government may serve this legitimate interest, but to withstand constitutional scrutiny, it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms."   *Sable Commc'ns of California, Inc.*, 492 U.S. at 126 (quotation omitted).   "It is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends."   *Id.*   Here, Plaintiff has carried its burden of showing that the Act is likely not narrowly tailored to achieve the interests identified by the Attorney General.

The Southern District of Ohio recently addressed a similar law and found that NetChoice had shown a likelihood of success on the merits of its claim that foreclosing minors under eighteen years old from accessing all content on websites, like the ones H.B. 1126 purports to cover, absent affirmative parental consent was overbroad and therefore unconstitutional.   *Yost*, 2024 WL 555904, at *12.   The

district court there determined that such an approach also was "an untargeted one, as parents must only give one-time approval for the creation of an account . . . ." *Id.*

In addressing legislation prohibiting minors from purchasing violent video games, the Supreme Court in *Brown* held that is doubtful that "punishing third parties for conveying protected speech to children just in case their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Brown*, 564 U.S. at 802.   In *Brown,* as here, there were already a series of preexisting protections to help parents.   *Id*. at 803; *see also, e.g.,* Ex. [3-2] at 6 (averring that "there is much publicly accessible information about the many wireless routers that offer parental control settings that parents can use to block specific online services, allow only the specific online services that a parent specifies, limit the time that their children spend on the Internet, set individualized content filters, and monitor the online services that their children visit").   The Supreme Court concluded that the legislation at issue in *Brown* was "seriously underinclusive," not only because it excluded portrayals of violence other than video games, but also because it permitted a parental veto.   *Brown*, 564 U.S. at 805.   It further held the legislation was also overinclusive because it enforced a governmental speech restriction, subject to parental veto.   *Id*. at 804.   "And the overbreadth in achieving one goal [was] not cured by the underbreadth in achieving the other."   *Id*. at 805.

26

Here, the Attorney General has not shown that the alternative suggested by NetChoice, a regime of providing parents additional information or mechanisms needed to engage in active supervision over children's internet access, *see* Mem. [4] at 28, would be insufficient to secure the State's objective of protecting children, *see, e.g., Brown*, 564 U.S. at 804-05; *see also United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000) (for content-based regulations subject to strict scrutiny, "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative"); Ex. [3-2] at 7 ("Some NetChoice members have developed their own tools that allow parents to set further restrictions on their minor children's use of the websites.   For example, Meta has developed its 'Family Center,' which provides for parental supervision on Instagram.").

NetChoice has carried its burden of showing that there are a number of supervisory technologies available for parents to monitor their children that the State could publicize.   *See* Mem. [4] at 28; Ex. [3-2] at 6.   Yet, the Act requires all users (both adults and minors) to verify their ages before creating an account to access a broad range of protected speech on a broad range of covered websites. This burdens adults' First Amendment rights, and that alone makes it overinclusive.[6]   But NetChoice has also presented evidence that "[u]ncertainty about how broadly the Act extends—and how Defendant will interpret the Act—

---

[6]  Minors also have a "significant measure of First Amendment protection," and the State may bar public dissemination of protected materials to minors "only in relatively narrow and well-defined circumstances."   *Erznoznik*, 422 U.S. at 212-13.   The State does not have a "free-floating power to restrict the ideas to which children may be exposed."   *Brown*, 564 U.S. at 794.

may spur members to engage in over-inclusive moderation that would block valuable content from all users," and that not all covered websites have the ability to "age-gate," meaning that "they are unable to separate the content available on adults' accounts from content available on minors' accounts."   Ex. [3-2] at 23.   This also renders H.B. 1126 overinclusive.

The Act also requires all minors under the age of eighteen, regardless of age and level of maturity, to secure parental consent to engage in protected speech activities on a broad range of covered websites, which represents a one-size-fits-all approach to all children from birth to 17 years and 364-days old.   H.B. 1126 is thus overinclusive to the extent it is intended as an aid to parental authority beyond the resources for monitoring children's internet use that NetChoice has identified, because not all children forbidden by the Act to create accounts on their own have parents who will care whether they create such accounts.   *See Brown*, 564 U.S. at 789, 804 (holding the state act purporting to aid parental authority by prohibiting the sale or rental of "violent video games" to minors "vastly overinclusive" because "[n]ot all of the children who are forbidden to purchase violent video games on their own have parents who *care* whether they purchase violent video games" (emphasis in original)).

Next, H.B. 1126 is underinclusive because it permits a child to create an account with certain websites, but not others.   For example, if the digital service "[*p*]*rimarily* functions to provide a user with access to news, sports, commerce, online video games or content primarily generated or selected by the digital service

28

provider," and it "[a]llows chat, comment or other interactive functionality that is *incidental* to the digital service," a minor may create an account without age verification or parental consent (because the Act simply does not apply).   Sec. 3(2)(c) (emphasis added).   "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint."   *Brown*, 564 U.S. at 802.

In *Brown,* the Supreme Court found another reason the statute there was underinclusive, stating that:

> The Act is also seriously underinclusive in another respect . . . leav[ing] this dangerous, mind-altering material in the hands of children so long as one parent (or even an aunt or uncle) says it's OK.   And there are not even any requirements as to how this parental or avuncular relationship is to be verified; apparently the child's or putative parent's, aunt's, or uncle's say-so suffices.

*Id.*

H.B. 1126 similarly requires only one parent or guardian's consent, and it does not explain how the parent or guardian relationship is to be confirmed. Section 4(2) states that "[a]cceptable methods of obtaining express consent of a parent or guardian include any of the following" and references examples in subsections (a) through (f).   *See* Sec. 4(2) ("A digital service provider shall not permit an account holder who is a known minor to be an account holder unless the known minor has the express consent from a parent or guardian.").   Only options (d) and (e) mention confirming or verifying the identity of the purported parent or guardian, but none of the options, not even options (d) and (e), require verifying that the person who is representing himself as the minor's parent or guardian is in fact

the parent or guardian of the minor.   *See* Sec. 4(2)(d)-(e) (discussing collecting

information and confirming the identity of the parent or guardian, but not how to

verify parental relationship or guardian status).   This makes H.B. 1126

underinclusive.   *See Brown*, 564 U.S. at 802.

The Act is also underinclusive based upon the definition of digital service

providers.   In support of her argument that the Act is narrowly tailored to advance

the State's compelling interest, the Attorney General argues that "interactive social-

media platforms that the Act covers . . . host predators who target minors and

sexually exploit them, extort them, sell drugs to them, and more," citing the

Surgeon General's Advisory on Social Media and Youth Mental Health as well as

CyberTipline 2023 Report.   Resp. [26] at 20.   If the State believes that access to

the platforms identified in those reports should be restricted to achieve its

compelling interest of protecting children from predators online, then it appears

that the Act is underinclusive because at least some of the "electronic service

providers" ("ESPs") identified in the CyberTipline 2023 Report cited by the Attorney

General were companies that are arguably excluded from the definition of a covered

digital service provider under H.B. 1126.   For example, according to the "2023

CyberTipline Reports by Electronic Service Providers," the public and ESPs

reported numerous instances of suspected child sexual exploitation on Amazon and

Roblox, which Plaintiff cited at the hearing as websites that are carved out of H.B.

1126.   *See* CyberTipline 2023 Report, https://www.missingkids.org/cybertiplinedata

(last accessed June 28, 2024) (linking to 2023 CyberTipline Reports by ESPs,

https://www.missingkids.org/content/dam/missingkids/pdfs/2023-reports-by-esp.pdf); CyberTipline Reports by ESPs, https://www.missingkids.org/content/dam/missingkids/pdfs/2023-reports-by-esp.pdf (last accessed June 28, 2024) (stating that Amazon had 197 reports, Amazon Photos had 25,497 reports, and Roblox had 13,316 reports).   By carving such websites, which have experienced instances of alleged child sexual exploitation, out from the Act, H.B. 1126 is underinclusive in pursuing the stated compelling interest.

Finally, Section 6 of H.B. 1126 requires covered digital service providers "to develop and implement a strategy to prevent or mitigate the known minor's exposure to harmful material and other content that promotes or facilitates" certain harms to minors, Sec. 6(1), but then states that it shall not be construed to require a provider to prevent or preclude "[a]ny minor from deliberately and independently searching for, or specifically requesting, content," Sec. 6(2)(a).   Permitting minors who have presumably obtained parental consent to view otherwise-prohibited content simply because they initiated it by "searching for" or "requesting" it would not serve the State's compelling interest in protecting minors from the predatory behavior online.   H.B. 1126 is underinclusive in this respect as well.

In summary, NetChoice has demonstrated a substantial likelihood of success on its claim that H.B. 1126 is either overinclusive or underinclusive, or both, for achieving the asserted governmental interest – protecting minors from predatory behavior online – and that a substantial number, if not all, of H.B. 1126's applications are unconstitutional judged in relation to its legitimate sweep.   *See*

31

*Americans for Prosperity Found.*, 594 U.S. at 615; *Moody,* 2024 WL 3237685, at *8.
As such, it likely is not sufficiently narrowly tailored to survive strict scrutiny.

3.    Due Process claim

Alternatively, NetChoice argues that the Act is void for vagueness under the
First and Fourteenth Amendments.    *See* Compl. [1] at 23-24 (Count II); *id.* 33-34
(Count VI).    Specifically, it contends that the central coverage definition of "digital
service provider," *id.* at 23-24, and the so-called monitoring-and-censorship
requirements in Section 6, *see id.* at 33-34, are unconstitutionally vague and violate
principles of free speech and due process, *id.*

"A fundamental principle in our legal system is that laws which regulate
persons or entities must give fair notice of conduct that is forbidden or required."
*F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

> It is a basic principle of due process that an enactment is void for
> vagueness if its prohibitions are not clearly defined.    Vague laws offend
> several important values.    First, because we assume that man is free to
> steer between lawful and unlawful conduct, we insist that laws give the
> person of ordinary intelligence a reasonable opportunity to know what
> is prohibited, so that he may act accordingly.    Vague laws may trap the
> innocent by not providing fair warning.    Second, if arbitrary and
> discriminatory enforcement is to be prevented, laws must provide
> explicit standards for those who apply them.    A vague law
> impermissibly delegates basic policy matters to policemen, judges, and
> juries for resolution on an ad hoc and subjective basis, with the
> attendant dangers of arbitrary and discriminatory application.    Third,
> but related, where a vague statute abuts upon sensitive areas of basic
> First Amendment freedoms, it operates to inhibit the exercise of those
> freedoms.    Uncertain meanings inevitably lead citizens to steer far
> wider of the unlawful zone than if the boundaries of the forbidden areas
> were clearly marked.

*Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) (quotations and footnotes omitted).

In sum, "[a] law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement."  *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir.), *cert. denied*, 144 S. Ct. 348 (2023), *reh'g denied*, 144 S. Ct. 629 (2024) (quotation omitted).  "A regulation is void for vagueness when it is so unclear that people 'of common intelligence must necessarily guess at its meaning and differ as to its application.'"  *Id.* (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).

The Supreme Court has stated that "[t]hese standards should not, of course, be mechanically applied.   The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment."  *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982).   For example, the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."  *Id.* at 498-99; *see also United States v. Rafoi*, 60 F.4th 982, 996 (5th Cir. 2023) (holding that the vagueness doctrine requires that statutes define a criminal offense "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement").

33

> [P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights.   If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.

*Vill. of Hoffman Ests.*, 455 U.S. at 499.   Such is the case here.

NetChoice has shown that at least one core part of the Act is vague and deprives it of a constitutionally-protected liberty interest, making it impermissibly vague in all of its applications.   *See McClelland*, 63 F.4th at 1013 (holding that "a facial challenge may only be sustained "if the enactment is impermissibly vague in all of its applications," and that "[s]ince a void-for-vagueness challenge is ultimately a due-process claim, a plaintiff must allege that he was deprived of a constitutionally-protected property or liberty interest" (quotation and footnote omitted)).   Specifically, H.B. 1126 purports to define a "digital service provider" as one that owns or operates a digital service, which is defined as a "website, an application, a program, or software that collects or processes personal identifying information with Internet connectivity," Sec. 2(a), subject to some additional limitations, Sec. 2(b).

But the Act does not apply to certain things, including:

> [a] digital service provider's provision of a digital service that:
> (i)   *Primarily functions* to provide a user with access to news, sports, commerce, online video games or content primarily generated or selected by the digital service provider; and
> (ii)   Allows chat, comment or other interactive functionality that is *incidental* to the digital service . . . .

Sec. 2(c) (emphasis added).

34

First, it is unclear what test one uses to determine how a digital service "primarily" functions.   *See id.*   Nor does the Act provide any guidance as to when a website permits chat, comment, or other interactive functionality that is merely "incidental" to its purpose, as opposed to being a primary or integral function.   *See id.*   NetChoice has carried its preliminary burden at this stage of the case of demonstrating that this definition is overly indefinite, leaving it open for potential arbitrary and discriminatory enforcement.   *See id.*; *McClelland*, 63 F.4th at 1013.

In addition, H.B. 1126 only applies to a digital service provider who provides a digital service that "[c]onnects users in a manner that allows users to *socially interact* with other users on the digital service."   Sec. 3(1)(a) (emphasis added). But it does not explicate what constitutes "social" interaction on a digital service, as opposed to other interactions between users on websites.   *See id.*   Websites are thus left to guess as to whether the Act applies at all to them, and NetChoice has shown that the coverage definition is so indefinite that it presents a concern over potential arbitrary and discriminatory enforcement.   *See McClelland*, 63 F.4th at 1013.   Because the Court finds that H.B. 1126 is vague in its coverage definition, the Court need not reach the other terms Plaintiff claims are vague.

In sum, NetChoice has demonstrated a substantial likelihood of success on the merits of its claim that some of H.B. 1126's terms are unconstitutionally vague.

C.    Irreparability of harm

This Court next turns to whether NetChoice's members or its members' users will suffer irreparable harm absent an injunction.   "In general, a harm is

35

irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). But the mere fact that monetary damages may be available does not always mean that a remedy is adequate. *See id.*

"When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Book People, Inc. v. Wong*, 91 F.4th 318, 340-41 (5th Cir. 2024) (quotation omitted). The Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Here, the potential penalty for knowingly violating the Act includes criminal liability, *see* Sec. 8(2)(q) (making violating the Act an unfair and deceptive trade practice under Section 75-24-5); Miss. Code Ann. § 75-24-20(a) ("Any person who, knowingly and willfully, violates any provision of Section 75-24-5, shall be guilty of a misdemeanor, and upon conviction shall be fined up to One Thousand Dollars ($1,000.00)."), and with respect to compliance costs, covered digital service providers are at risk of irreparable harm by outlaying financial resources to comply "with no guarantee of eventual recovery" from the State if the Court ultimately enters judgment in their favor, *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 765 (2021). Indeed, at least one of NetChoice's members has presented evidence that the alleged financial injury may threaten the very existence of its business. *See* Ex. [3-5] at 22 (averring that "the Act threatens [Dreamwidth's] ability to continue operating"). The Fifth

36

Circuit has found an injury to be irreparable when compliance costs were likely unrecoverable against a federal agency because it enjoyed sovereign immunity. *See Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021).   The Court finds this factor weighs in favor of granting a preliminary injunction.

D.    <u>Balance of equities and the public interest</u>

The last two factors merge when the government is the opposing party. *Nken*, 556 U.S. at 435.   "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013).   Because the Court has found that NetChoice has shown a substantial likelihood of success on the merits of its claims, the Court finds that an injunction is in the public interest. *See id.*; *see also, e.g., Book People, Inc.*, 91 F.4th at 341 ("Because Plaintiffs are likely to succeed on the merits of their First Amendment claim, the State and the public won't be injured by an injunction of a statute that likely violates the First Amendment.").   Based upon the record, NetChoice has shown that all four Rule 65 factors favor a preliminary injunction. NetChoice's Motion [3] should be granted to the extent it seeks a preliminary injunction.

E.    <u>Whether the Court should require security</u>

Rule 65(c) states that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or

restrained."    Fed. R. Civ. P. 65(c).    "[T]he amount of security required pursuant to Rule 65(c) is a matter for the discretion of the trial court," and the district court "may elect to require no security at all."    *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).

In this case, neither party has raised the issue of security, and Defendant likely will not incur any significant monetary damage as a result of a preliminary injunction, which ensures that Plaintiff's constitutional rights are protected. Therefore, the Court finds that security is not necessary in this case.    *See id.* Other courts have reached the same conclusion under similar circumstances.    *See, e.g., Thomas v. Varnado*, 511 F. Supp. 3d 761, 766 (E.D. La. 2020) (holding that, because neither the school board or superintendent was likely to incur any significant monetary damages as a result of the preliminary injunction and because the plaintiff was a minor student, it would issue an injunction without security); *Gbalazeh v. City of Dallas*, No. 3:18-CV-0076-N, 2019 WL 2616668, at *2 (N.D. Tex. June 25, 2019) ("The Court exercises its discretion under Federal Rule of Civil Procedure 65(c) to waive the bond requirement, as Plaintiffs are engaged in 'public-interest litigation' to protect their constitutional rights." (quoting *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084 (5th Cir. 1981)).[7]

---

[7]    Because Plaintiff has shown a likelihood of success on the merits on at least some of its claims, the Court need not consider Plaintiff's remaining preemption claim.    *See* Compl. [1] at 35-36.

III.   <u>CONCLUSION</u>

It is not lost on the Court the seriousness of the issue the legislature was attempting to address, nor does the Court doubt the good intentions behind the enactment of H.B. 1126.   But as the Supreme Court has held, "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive . . . ."  *Reed*, 576 U.S. at 165.    That is a high bar, which at this preliminary stage of the proceedings, Plaintiff has shown the Act likely does not meet.

In sum, because the Court finds that Plaintiff NetChoice, LLC has carried its burden of showing a substantial likelihood of success on the merits of its claim that the Act is unconstitutional under a First Amendment facial challenge and, alternatively, a Fourteenth Amendment vagueness challenge, it will grant the Motion for a Preliminary Injunction without requiring security.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Plaintiff NetChoice, LLC's Motion [3] for Preliminary Injunction and Temporary Restraining Order is **GRANTED IN PART**, to the extent it seeks an unsecured preliminary injunction, **and DENIED IN PART** as moot, to the extent it seeks a temporary restraining order.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Defendant Mississippi Attorney General Lynn Fitch, and her agents, employees, and all persons acting under her direction or control, are **PRELIMINARILY ENJOINED** under Federal Rule of Civil Procedure 65(a) from enforcing Mississippi House Bill

39

1126 against Plaintiff NetChoice, LLC and its members, pending final disposition of the issues in this case on their merits.

**SO ORDERED AND ADJUDGED**, this the 1st day of July, 2024.

*s/ Halil Suleyman Ozerden*

HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE

40

**APPENDIX D**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **NETCHOICE, LLC** | § | **PLAINTIFF** |
| | § | |
| | § | |
| **v.** | § | **Civil No. 1:24-cv-170-HSO-BWR** |
| | § | |
| | § | |
| **LYNN FITCH,** | § | |
| *in her official capacity as* | § | |
| *Attorney General of Mississippi* | § | **DEFENDANT** |

## ORDER DENYING DEFENDANT'S MOTION [61] TO STAY

Defendant Lynn Fitch, in her official capacity as Attorney General of Mississippi ("Defendant" or "Attorney General"), seeks a stay pending appeal of the Court's June 18, 2025, Memorandum Opinion and Order [59], which preliminarily enjoined enforcement of Mississippi House Bill 1126 (2024) against eight of Plaintiff NetChoice, LLC's members. *See* Mot. [61]; Mem. [62]. The Court finds that Defendant's Motion [61] to Stay should be denied.

## I. BACKGROUND

Plaintiff NetChoice, LLC ("Plaintiff" or "NetChoice") challenges Sections 1-8 of Mississippi House Bill 1126 (2024) ("H.B. 1126" or the "Act"), which requires in part that certain digital service providers verify the age of all persons creating accounts, obtain express consent of a known minor's parent or guardian before allowing the minor to be an account holder, and "make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate the known

minor's exposure to harmful material and other content that promotes or facilitates" certain harms to minors.    Ex. [1-1] at 3-9 (Miss. H.B. 1126, §§ 3-4, 6).

Plaintiff is a nonprofit trade association for internet companies.    Am. Compl. [48] at 5.    It asserts that H.B. 1126 regulates some services offered by certain of its members, *id.*, and raises a First Amendment facial challenge to Sections 1 through 8 of the Act and a challenge to these provisions as applied to its regulated members and their services, *see id.* at 5, 23-30, 32-42 (challenging all speech regulations relying on central coverage definition (Count I), the age-verification requirement (Count III), the parental-consent requirement (Count IV), and the prevention-or-mitigation requirement (Count V)).    Alternatively, the Amended Complaint [48] claims that the Act's central coverage definition of a digital service provider and its prevention-or-mitigation requirement are unconstitutionally vague and violate principles of free speech and due process.    *See id.* at 30-32, 42-43 (Counts II and VI).    The Amended Complaint [48] further alleges that 47 U.S.C. § 230 preempts the monitoring-and-censorship requirements in Section 6.    *See id.* at 43-45 (Count VII).    Plaintiff seeks to enjoin Defendant from enforcing the Act, *see id.* at 45 (Count VIII), and a declaration that each of its challenged provisions is unconstitutional, *see id.* at 45-46 (Count IX).

NetChoice filed a Motion [49] for Preliminary Injunction and Temporary Restraining Order, *see* Mot. [49]; Mem. [50], which the Attorney General opposed, *see* Resp. [54].    On June 18, 2025, the Court entered a Memorandum Opinion and Order [59] granting in part Plaintiff's Motion [49] and preliminarily enjoined the

Attorney General and her agents, employees, and all persons acting under her direction or control from enforcing H.B. 1126 as to Plaintiff's eight covered members: (1) Dreamwidth; (2) Meta, which owns and operates Facebook and Instagram; (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) Snap, Inc., which owns and operates Snapchat; (7) X; and (8) YouTube.   *See* Order [59] at 34-35.   The Court denied as moot the Motion [49] to the extent it sought a temporary restraining order.   *See id.* at 35.

The Attorney General has now appealed that Order [59] and has filed a Motion [61] to Stay, asking the Court to stay its preliminary injunction pending resolution of the appeal.   *See* Mot. [61]; Mem. [62]; *see also* Reply [64].   The Attorney General argues that each pertinent factor supports the entry of a stay because she is likely to succeed on the appeal, and the balance of harms and the public interest strongly favor a stay.   *See* Mem. [62] at 2-4.

NetChoice opposes the Motion [61].   *See* Resp. [63].   It argues that Defendant is unlikely to succeed on appeal, as she "does not offer any new—let alone persuasive—merits arguments," *id.* at 2, and has not explained why the Court's conclusions are incorrect "beyond briefly rehashing the arguments that this Court already rejected," *id.* at 3.   NetChoice further maintains that the balance of harms and the public interest weigh against a stay, because the Act will cause its members and their users irreparable harm, *id.* at 4, and "[e]njoining enforcement of the Act's unconstitutional speech restrictions will not 'hinder' the State's—or anyone else's—ability 'to protect children,'" *id.* at 5 (quoting Mem. [62] at 3-4).

II.  <u>DISCUSSION</u>

In deciding whether to stay an order pending appeal, a court asks:

(1) whether the applicant is likely to succeed on the merits, (2) whether it will suffer irreparable injury without a stay, (3) whether the stay will substantially injure the other parties interested in the proceedings, and (4) where the public interest lies.

*Ohio v. Env't Prot. Agency*, 603 U.S. 279, 291 (2024) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)).   "The first two factors of the traditional standard are the most critical."   *Nken*, 556 U.S. at 434.   And once a movant "satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest.   These factors merge when the Government is the opposing party."   *Id.* at 435.

The United States Supreme Court has recognized that

[t]here is substantial overlap between these and the factors governing preliminary injunctions, not because the two are one and the same, but because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined.

*Id.* (citation omitted).[1]

For the same reasons it granted preliminary injunctive relief, the Court finds that the Attorney General is not likely to succeed on the merits of the appeal.   *See*

---

[1]  A preliminary injunction under Federal Rule of Civil Procedure 65(a) requires the moving party to show:

(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023) (quotation omitted).

4

Order [59]; *Ohio*, 603 U.S. at 291.   As for any irreparable injury to the State, "[w]hen a state is seeking to stay a preliminary injunction, it is generally enough to say that 'any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'"   *United States v. Texas*, 97 F.4th 268, 295 (5th Cir. 2024) (quoting *New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)); *see Ohio*, 603 U.S. at 291.   But that is not dispositive, as the Court must also consider the third and fourth *Nken* factors.   *See Nken*, 556 U.S. at 435. In this case, as the Court has previously explained in more detail, *see* Order [59] at 30-31, issuance of a stay would "substantially injure the other parties interested in the proceedings*," Ohio*, 603 U.S. at 291, as their "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976).   In sum, based upon the record here, the Court finds that the factors weigh against a stay.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, the Motion [61] to Stay filed on June 19, 2025, by Defendant Lynn Fitch, in her official capacity as Attorney General of Mississippi, is **DENIED**.

**SO ORDERED AND ADJUDGED**, this the 25th day of June, 2025.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
CHIEF UNITED STATES DISTRICT JUDGE

5