No. 25-60348

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

NETCHOICE, L.L.C.,
*Plaintiff-Appellee,*

*v.*

LYNN FITCH, IN HER OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF MISSISSIPPI,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Mississippi
No. 1:24-cv-170-HSO-BWR

## DEFENDANT-APPELLANT'S OPENING BRIEF

LYNN FITCH
  *Attorney General*
SCOTT G. STEWART
  *Solicitor General*
JUSTIN L. MATHENY
ANTHONY M. SHULTS
  *Deputy Solicitors General*
WILSON D. MINOR
  *Special Assistant Attorney General*
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
Email: scott.stewart@ago.ms.gov

*Counsel for Defendant-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

Under this Court's Rule 28.2.1, governmental parties need not furnish a certificate of interested persons.

<u>*s/ Scott G. Stewart*</u>
Scott G. Stewart
*Counsel for Defendant-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

The district court issued a preliminary injunction blocking Mississippi's law targeting predators on social-media platforms. The district court entered that relief just weeks after this Court, in a published decision, vacated an injunction that granted the same relief. This case raises significant questions about district-court compliance with this Court's mandates and States' authority to address the predatory harms that proliferate online. Oral argument would aid the Court in resolving the issues presented in this appeal.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ..........................................i

STATEMENT REGARDING ORAL ARGUMENT .................................ii

TABLE OF AUTHORITIES ......................................................................v

INTRODUCTION ....................................................................................1

STATEMENT OF JURISDICTION .........................................................6

STATEMENT OF THE ISSUES ..............................................................6

STATEMENT OF THE CASE ..................................................................7

    Factual Background ...........................................................................7

    Procedural Background ...................................................................10

SUMMARY OF ARGUMENT ...............................................................22

STANDARD OF REVIEW.....................................................................23

ARGUMENT ..........................................................................................23

I.    This Court Should Reverse The Preliminary-Injunction Order Because It Rests On Serious Errors Of Law .................................23

    A.    The Injunction Defies This Court's Mandate In The State's Successful First Appeal In This Case ....................................23

    B.    The Injunction Rests On A Profoundly Flawed First Amendment Ruling ...............................................................29

        1.    The Act Triggers At Most Intermediate Scrutiny ......30

        2.    The Act Satisfies Intermediate Scrutiny.....................38

    C.    NetChoice's Other Claims Cannot Save The Injunction ..... 46

          1.    NetChoice's Vagueness Claims Fail ............................ 47

          2.    NetChoice's Preemption Claim Fails........................... 50

II.    The  Remaining  Factors  Strongly  Support  Rejecting  The Preliminary-Injunction Order....................................................... 52

CONCLUSION .................................................................................. 56

CERTIFICATE OF SERVICE................................................................ 57

CERTIFICATE OF COMPLIANCE......................................................... 57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
    585 U.S. 579 (2018)................................................................52

*Baggett v. Bullitt,*
    377 U.S. 360 (1964)................................................................50

*Brown v. Entertainment Merchants Ass'n,*
    564 U.S. 786 (2011)..........................................................35, 37

*City of Dallas v. Delta Air Lines, Inc.,*
    847 F.3d 279 (5th Cir. 2017)..............................................23

*City of Dallas v. Stanglin,*
    490 U.S. 19 (1989)............................................................33, 39

*City of Renton v. Playtime Theatres, Inc.,*
    475 U.S. 41 (1986)..........................................32, 37, 40, 41

*DHS v. D.V.D.,*
    145 S. Ct. 2627 (2025)........................................4, 23-24, 55

*Doe I v. Landry,*
    909 F.3d 99 (5th Cir. 2018)................................................49

*Doe v. MySpace, Inc.,*
    528 F.3d 413 (5th Cir. 2008)..............................................51

*Free Speech Coalition, Inc. v. Paxton,*
    95 F.4th 263 (5th Cir. 2024)..............................................51

*Free Speech Coalition, Inc. v. Paxton,*
    145 S. Ct. 2291 (2025)........................4, 5, 20, 29-34, 36-40, 42, 44, 51

*McClelland v. Katy Independent School District*,
    63 F.4th 996 (5th Cir. 2023) ...................................................... 47, 49

*M.D. v. Abbott*,
    977 F.3d 479 (5th Cir. 2020)...................................................... 24, 26

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024)............... 2, 11-15, 17, 24-27, 29-31, 33, 35, 52, 54

*NetChoice, LLC v. Fitch*,
    134 F.4th 799 (5th Cir. 2025) ............. 2-4, 14-16, 20, 24-28, 47, 53, 54

*NetChoice, LLC v. Fitch*,
    No. 25A97, 2025 WL 2350189 (U.S. Aug. 14, 2025).......................... 21

*NetChoice, LLC v. Paxton*,
    573 F. Supp. 3d 1092 (W.D. Tex. 2021) ........................................... 27

*NetChoice, LLC v. Paxton*,
    49 F.4th 439 (5th Cir. 2022) ........................................................... 11

*NetChoice, LLC v. Paxton*,
    121 F.4th 494 (5th Cir. 2024) ...................... 2, 13-15, 24-26, 28, 33, 54

*Packingham v. North Carolina*,
    582 U.S. 98 (2017)........................................................................... 42

*Planned Parenthood of Greater Texas v. Kauffman*,
    981 F.3d 347 (5th Cir. 2020) (en banc).............................................. 23

*Sable Communications of California, Inc. v. FCC*,
    492 U.S. 115 (1989)................................................................... 39, 52

*United States v. Conlan*,
    786 F.3d 380 (5th Cir. 2015)........................................................... 48

*United States v. Williams*,
    553 U.S. 285 (2008)........................................................... 47, 48, 50

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989).......................................... 32, 33, 37, 41

*Willey v. Harris County District Attorney,*
  27 F.4th 1125 (5th Cir. 2022) ......................................... 23

*Young v. American Mini Theatres, Inc.,*
  427 U.S. 50 (1976)................................................. 49

## Constitutional Provisions

U.S. Const. amend. I .............................. 1-6, 10-13, 15, 17-22, 24, 25, 27,
                                          29, 30, 32, 33, 36, 41, 44, 46

U.S. Const. amend. XIV ....................................................... 47

## Statutes

28 U.S.C. § 1292 ................................................................6

28 U.S.C. § 1331 ................................................................6

28 U.S.C. § 1343 ................................................................6

47 U.S.C. § 230 .................................................. 10, 46, 50, 51

2024 H.B. 1126 ................................................1-11, 14-19, 21, 22, 24-53

Ala. Code § 22-17A-2 ......................................................... 31

Haw. Code R. § 11-17-7 ...................................................... 31

Miss. Code Ann. § 75-24-19 ....................................................9

Miss. Code Ann. § 75-24-20 ....................................................9

Vt. Stat. Ann. tit. 26, § 4102 .................................................. 31

**Rule**

Fed. R. App. P. 31 ...................................................................... 21

**Other Authorities**

Instagram,
    Confirming your age on Instagram ............................................ 27, 42

Social Media and Youth Mental Health:
    The U.S. Surgeon General's Advisory (2023) ...................................... 7

Ross Reily,
    Starkville father speaks out on 'sextortion' and his son's suicide,
    Mississippi Clarion Ledger (Feb. 22, 2023) ........................................ 7

# INTRODUCTION

This Court should reject the district court's preliminary injunction blocking Mississippi's law targeting predators on social-media platforms. The injunction defies this Court's prior published decision in this very case, rests on a deeply flawed First Amendment ruling, and—if left to stand—will inflict profound harm on the State and its citizens.

Enacted after a sextortion scheme on Instagram led a 16-year-old to take his own life, Mississippi's Walker Montgomery Protecting Children Online Act, H.B. 1126 (2024), imposes modest duties on interactive online platforms that are especially attractive to predators. The Act requires covered platforms to take "commercially reasonable" actions to verify a user's age, obtain parental consent for child users, and adopt a strategy to mitigate the harms to children inflicted on those platforms—sex trafficking, physical violence, incitement to suicide, and more. §§ 4(1), 4(2), 6. The Act requires what any responsible covered platform would already do: make "commercially reasonable" efforts to protect minors—not perfect or cost-prohibitive efforts, but efforts of reasonable care based on a platform's resources.

NetChoice—a trade group that represents tech giants—brought a pre-enforcement facial challenge claiming that the Act's age-verification, parental-consent, and strategy provisions violate the First Amendment.

A year ago, the district court agreed. It ruled that the Act likely facially violates the First Amendment and issued a preliminary

injunction barring its enforcement in all applications against NetChoice members—relief that benefited 8 platforms.

In *NetChoice, LLC v. Fitch*, 134 F.4th 799 (5th Cir. 2025), this Court vacated that injunction and remanded with directions to apply two decisions setting forth a plaintiff's fact-heavy facial burden: *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), and *NetChoice, LLC v. Paxton*, 121 F.4th 494 (5th Cir. 2024). In *Moody* the Supreme Court reaffirmed that facial claims are "hard to win," emphasized that courts must undertake a rigorous "inquiry" to assess whether a plaintiff has "carr[ied]" the demanding "burden" that governs those claims, and vacated two lower-court decisions that, in addressing facial claims against social-media laws, failed to "perform[ ]" the required "facial analysis." 603 U.S. at 723, 744, 726. In *Paxton* this Court explained that in a "First Amendment facial challenge" a district court must "determine every hypothetical application of the challenged law" and then, for "every" one of those "application[s]," the court must determine—based on "factual development" by the plaintiff—"whether there is an intrusion on" First Amendment rights. 121 F.4th at 498, 499. In line with *Moody* and *Paxton*, this Court ruled in *Fitch* that because NetChoice seeks facial relief, it faces a steep climb: NetChoice must—based on a "factual" presentation— show the "'commercially reasonable efforts'" the Act requires of each covered platform and thus each platform's "unique regulatory burden," establish for each platform which of those burdens (if any) "violate the

First Amendment," and show (in light of all the Act's possible "applications") that invalid applications "substantially outweigh" valid applications. 134 F.4th at 809. NetChoice did not make that showing and the district court did not "resolve" that facial "factual inquiry," so, this Court ruled, the injunction "cannot ... stand." *Ibid.*

NetChoice did not seek rehearing en banc or petition for certiorari in *Fitch.* Yet on remand, NetChoice refused to do what this Court directed. Rather than develop the factual record or make the application-by-application showing that *Fitch* ordered, NetChoice amended its complaint to add as-applied claims, filed a preliminary-injunction motion recycling its prior arguments and prior factual submissions, and urged the district court to grant the same relief as before.

The district court ruled for NetChoice and granted the same facial relief it granted before. It again credited NetChoice's First Amendment claim and blocked the Act in all applications to the same platforms that benefited from the first injunction. ROA.924-945. The court did not perform the facial analysis—or demand the factual showing—that this Court ordered in *Fitch.* The district court thought it could reinstate its prior relief because NetChoice had added as-applied claims. ROA.942.

This Court stayed the injunction pending appeal. The Supreme Court denied NetChoice's request to vacate that stay.

This Court should now reject the injunction.

*First*, the district court manifestly erred on the merits. There are two independent merits grounds for rejecting the injunction.

One: The injunction defies this Court's mandate in the State's successful first appeal in this case. A litigant that wins in the appellate process "should not be required to go through that entire process again to obtain execution of the judgment" it won on appeal. *DHS v. D.V.D.*, 145 S. Ct. 2627, 2630 (2025). This Court accordingly requires district courts to follow its mandates. In *Fitch* this Court vacated an injunction that blocked the Act in all applications to NetChoice members and directed the district court to hold NetChoice to the burden that such facial relief requires. The district court then—at NetChoice's urging—reinstated that injunction. Although the court said it was ruling on NetChoice's "as-applied" claims, the injunction is every bit the facial injunction that this Court vacated—it grants the same relief—and was issued without doing what this Court required. The mandate rule forbids that. For good reason: our legal system depends on lower courts and litigants following the orders of appellate courts.

Two: Even putting aside the mandate rule, NetChoice's First Amendment claim—the only merits basis for the injunction—fails. That is especially clear after *Free Speech Coalition, Inc. v. Paxton*, 145 S. Ct. 2291 (2025), which rejected a First Amendment challenge to a law requiring pornographic websites to verify visitors' ages. *FSC* ruled that States may regulate websites to protect children from harms that the

4

State has power to regulate (there, material that is obscene for minors), that such a requirement does not directly regulate fully protected speech and so triggers only intermediate scrutiny, and that Texas's law satisfied that standard. *Id.* at 2306-19. The Act here likewise regulates certain websites to protect children from harms that the State has power to regulate (here, harms that predators inflict on children), does not directly regulate fully protected speech, and advances the State's interest in protecting children while imposing at most "modest burden[s]" on speech (*id.* at 2317)—requiring only "commercially reasonable" efforts to verify age, obtain parental consent, and mitigate harm. So the Act comports with the First Amendment. In ruling otherwise, the district court failed to apply the "deferential" review that *FSC* mandates for laws that do not directly regulate protected speech. *Id.* at 2316. NetChoice claims that the Act triggers strict scrutiny. But *FSC* rejected strict scrutiny for a law that matches the Act in all ways that matter. Indeed, the case for lower scrutiny is stronger here than in *FSC*: the law in *FSC* "target[ed] speech" (material "obscene for minors") that is protected for adults, *id.* at 2314; the Act here targets conduct—like sexual abuse and child trafficking—that is protected for no one.

*Second*, the equitable factors independently require reversal. The injunction blocks an important state law that protects children from predators. In assessing the equities the district court relied on its flawed merits ruling and on a misreading of the Act. NetChoice's equitable case

rests on similar errors. And NetChoice is unworthy of equitable relief. It urged the district court to defy this Court's mandate. That tactic is not an aberration: for years NetChoice has urged courts to defy binding precedent—announced in cases where NetChoice was a party. Equity should not condone that tactic. This Court should not either.

This Court should reject the preliminary-injunction order.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. On June 18, 2025, the district court issued an order preliminarily enjoining the Act's enforcement. ROA.911-945. On June 19, 2025, the Attorney General filed a timely notice of appeal. ROA.946-947. This Court has jurisdiction under 28 U.S.C. § 1292.

## STATEMENT OF THE ISSUES

I. Should this Court reject the preliminary-injunction order because: (A) the district court defied the mandate in this Court's prior published decision in this case; (B) the Act does not violate the First Amendment because it targets unprotected conduct, only incidentally affects speech, and is narrowly tailored to the compelling interest in protecting children from predators; and (C) NetChoice's vagueness and preemption claims—not reached below—cannot support the injunction?

II. Should this Court reject the preliminary-injunction order because: the equities weigh against blocking the Act, which protects

children from predators; the district court's equitable assessment rests on its flawed merits ruling; and NetChoice's litigating conduct makes it unworthy of equitable relief?

## STATEMENT OF THE CASE

**Factual Background.** The internet provides a forum for inflicting life-altering harms on children—sex trafficking, sexual abuse, physical violence, grooming, targeted harassment, and more. Sophisticated online platforms host this conduct. And some of those platforms offer features— like the ability to interact with minors and learn extensive information about them—that enable predators to destroy children's lives. *See* Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory 9 (2023), https://bit.ly/471Daz1 (describing minor-targeting "predatory behaviors and interactions" on "social media platforms").

Recognizing these harms, the State of Mississippi acted last year to address them. The Legislature was moved by the case of Walker Montgomery, a 16-year-old Mississippian who in 2022 fell prey to sextortion on Instagram. After a predator "catfished" Walker and "demanded money to keep from outing him," the Starkville Academy sophomore took his own life. Ross Reily, Starkville father speaks out on 'sextortion' and his son's suicide, Mississippi Clarion Ledger (Feb. 22, 2023). Spurred by Walker's plight and by the harms that proliferate online, the Legislature passed and the Governor signed the Walker

Montgomery Protecting Children Online Act, H.B. 1126 (2024) (ROA.52-64). The Act took effect July 1, 2024. § 10.

The Act "applies only to" online platforms that "[c]onnect[ ] users in a manner that allows users to socially interact with other users," "[a]llow[ ] a user to create a" profile that others may see, and "[a]llow[ ] a user to create or post content" that others can see. § 3(1)(a)-(c); *see* § 2(a)-(b). The Act thus regulates the social-media platforms that let predators interact with children and feed those predators information that can be used to exploit those children. The Act reaffirms this targeted aim by carving out platforms that, in the Legislature's judgment, do not present the same dangers. Excluded platforms include those that mainly provide "access to news, sports, commerce, [or] online video games" and only "incidental[ly]" offer "interactive" ("chat") functions, § 3(2)(c), and those that mainly provide "access to career development opportunities," § 3(2)(d).

The Act imposes on covered platforms three duties to address harms to children. *First*, a platform must register—and make "commercially reasonable efforts to verify"—the age of those who create an account with the platform. § 4(1). *Second*, platforms must secure, through a "commercially reasonable" method, "express consent from a parent or guardian" before allowing a known minor to hold an account. § 4(2). The Act lists several "[a]cceptable methods" of consent, including filling out a form, making a phone call, or responding to an email,

§ 4(2)(a)-(e), and adds a catchall for "[a]ny other commercially reasonable method" "in light of available technology," § 4(2)(f). *Third*, platforms must make "commercially reasonable efforts" to adopt a strategy to address certain harms. § 6(1). A platform "shall make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate [a] known minor's exposure to harmful material and other content that promotes or facilitates" listed "harms to minors." § 6(1). Those harms are: "self-harm, eating disorders, substance use disorders, and suicidal behaviors"; "[p]atterns of use that indicate or encourage substance abuse or use of illegal drugs"; "[s]talking, physical violence, online bullying, or harassment"; "[g]rooming, trafficking, child pornography, or other sexual exploitation or abuse"; "[i]ncitement of violence"; or "[a]ny other illegal activity." § 6(1)(a)-(f). "Nothing" in this strategy provision "require[s]" a platform "to prevent or preclude": (a) "[a]ny minor" from "searching for" or "requesting" content; or (b) the platform or those on it "from providing resources for the prevention or mitigation of the" listed harms. § 6(2).

The Act also limits the use and collection of minors' sensitive information. § 5. The Act provides for enforcement by an affected minor's parents, § 7(2), and by the Attorney General, § 8. State law allows, for knowing and willful violations, civil monetary penalties and criminal liability. Miss. Code Ann. §§ 75-24-19, -20.

**Procedural Background.** In June 2024, NetChoice filed this lawsuit challenging sections 1-8 of the Act. NetChoice is a "trade association for Internet companies." Complaint ¶ 10 (ROA.16). It claimed that the Act's age-verification, parental-consent, and strategy provisions violate the First Amendment, that the Act is unconstitutionally vague, and that the strategy provision is preempted by 47 U.S.C. § 230. *Id.* ¶¶ 60-156 (ROA.30-48). NetChoice raised only "facial" claims. *Id.* ¶ 58 (ROA.30). It alleged that, "[b]ased on the Act's definitions," the Act covers and regulates the following NetChoice members: Google (which operates YouTube), Meta (which operates Facebook and Instagram), X (formerly Twitter), Snap Inc. (which operates Snapchat), Pinterest, Nextdoor, and Dreamwidth. *Id.* ¶ 13 (ROA.16). NetChoice moved for a preliminary injunction. ROA.67-68, 170-204. It submitted declarations from its then-general counsel and officials with YouTube, Nextdoor, and Dreamwidth describing covered members' content-moderation policies. Szabo Dec. ¶¶ 11-19 (ROA.91-100) (addressing 8 member platforms); Veitch Dec. ¶¶ 16-28 (ROA.117-126) (YouTube); Pai Dec. ¶¶ 5-15 (ROA.136-139) (Nextdoor); Paolucci Dec. ¶¶ 16-21 (ROA.155-159) (Dreamwidth). The declarations claim that complying with the Act would be hard, costly, and damaging. Szabo Dec. ¶¶ 28-33 (ROA.103-106); Veitch Dec. ¶¶ 29-42 (ROA.126-131); Pai Dec. ¶¶ 20-33 (ROA.140-145); Paolucci Dec. ¶¶ 9-15, 22-26, 33-37 (ROA.152-155, 159-162, 165-168). One member

10

(Dreamwidth) claims that the costs of complying with the Act may force it to shut down. Paolucci Dec. ¶¶ 34, 35, 37 (ROA.166-168).

On July 1, 2024, the district court granted a preliminary injunction barring the Act's enforcement against "NetChoice ... and its members." ROA.427-428. The injunction thus benefited the 8 member platforms listed above: YouTube, Facebook, Instagram, X, Snapchat, Pinterest, Nextdoor, and Dreamwidth. The court held that NetChoice will likely win on its facial First Amendment and facial vagueness claims. ROA.404-423. On the First Amendment claim, the court ruled that strict scrutiny applies because the Act regulates the content of speech and that the Act likely fails that standard. ROA.404-420. On the vagueness claim, the court ruled that the Act's coverage definition—which asks how a platform "primarily functions" and whether it allows users to "socially interact," § 3(1)(a), (2)(c)-(d)—is "overly indefinite." ROA.423; *see* ROA.420-423. The court did not reach the preemption claim. ROA.426 n.7. Although the court ruled that the Act is likely facially invalid, it did not assess the challenged provisions application by application or compare valid to invalid applications.

The same day, the Supreme Court decided *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). *Moody* vacated two decisions (including this Court's decision in *NetChoice, LLC v. Paxton*, 49 F.4th 439 (5th Cir. 2022)) because, in addressing facial claims against social-media laws, the lower courts did not "perform[ ]" the required "facial analysis." 603 U.S.

at 726. *Moody* emphasized that facial claims are "hard to win" and that courts must undertake a rigorous "inquiry" to assess whether a plaintiff has "carr[ied]" the demanding "burden" that governs those claims. *Id.* at 723, 744. First, a court must "assess the state law['s] scope" by "determin[ing]" the law's "full set of applications." *Id.* at 724, 718. Second, the court must "decide which of the law['s] applications" violate the Constitution and "compare" the law's "constitutionally impermissible and permissible" applications. *Id.* at 725, 726. A facial First Amendment claim can succeed "only if the law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 724. A plaintiff must make the required showings for each challenged provision. *See id.* at 724-26, 727 n.3. And a court must hold the plaintiff to this burden rather than "disregard the requisite inquiry." *Id.* at 744.

After *Moody* was decided, NetChoice filed a notice with the district court in this case, claiming that *Moody* "confirms" that "facial relief is appropriate" here. Notice 2 (ROA.430).

The State appealed from the preliminary-injunction order. It argued that the injunction should be vacated because the district court did not perform the facial analysis that *Moody* requires. State Br. 31-34 (CA5 No. 24-60341 Dkt. 42). NetChoice maintained that the injunction "complied with *Moody*'s facial-challenge framework." NetChoice Br. 22 (CA5 No. 24-60341 Dkt. 46); *see id.* at 22-27.

After the appeal was briefed, this Court decided *NetChoice, LLC v. Paxton*, 121 F.4th 494 (5th Cir. 2024), on remand from the Supreme Court in *Moody*. In *Paxton*, as here, a district court granted NetChoice facial First Amendment injunctive relief against a state law regulating social-media platforms. This Court vacated the injunction. The Supreme Court vacated that decision because (as noted) this Court did not "properly consider[ ] the facial nature of NetChoice's challenge." *Moody*, 603 U.S. at 717. On remand, this Court ruled in *Paxton* that NetChoice had not met its "heavy burden" "to develop a factual record" to support its facial claim and remanded for "thorough discovery." 121 F.4th at 497, 500. *Paxton* explained that in a "First Amendment facial challenge" a court must "determine every hypothetical application of the challenged law" and faulted NetChoice for not developing a factual record to allow that determination. *Id.* at 498; *see id.* at 498-99. Then, for "every hypothetical application," the court must determine—based on "factual development" by NetChoice—"whether there is an intrusion on" First Amendment rights. *Id.* at 498, 499; *see id.* at 499-500.

Although NetChoice is a party in *Paxton*, it did not bring *Paxton* to the panel's attention in the first appeal in this case. The State had to do so. The State filed a letter advising this Court that "*Paxton* confirms that the preliminary injunction in this case cannot stand and that NetChoice cannot obtain such relief without developing an extensive factual record." State Letter 1 (CA5 No. 24-60341 Dkt. 89-1). NetChoice responded that

*Paxton* "provides no support for reversing th[e] preliminary injunction" and that "[n]o record development" could "change" the facial analysis. NetChoice Letter 1-2 (CA5 No. 24-60341 Dkt. 91).

On April 17, 2025, this Court vacated the preliminary-injunction order in this case and remanded for the district court to perform the analysis required by *Moody* and *Paxton*. *NetChoice, LLC v. Fitch*, 134 F.4th 799, 807-09 (5th Cir. 2025). This Court ruled that the district court did "not determin[e] the full scope of actors regulated by the Act and the activities it regulates," as *Moody* requires. *Id.* at 809. On actors: The district court "did not determine" whether the Act applies to (for example) "Uber, Google Maps, DraftKings, Microsoft Teams, Reddit, Pinterest, or X," "among many other[ ]" actors. *Id.* at 808, 809. On activities: The district court "did not determine the 'commercially reasonable efforts,' as used in the Act, or the Act's requirements for each [covered platform], requirements likely to be different with each [covered platform] facing a unique regulatory burden." *Id.* at 809. This activities inquiry, this Court ruled, requires a factual assessment of each covered platform for each challenged provision. "Some" platforms "may not need to devote additional resources to prevent known minors from holding an account without express parental consent, verify the age of anyone seeking to create an account, or implement a strategy to mitigate minors' exposure to certain content." *Ibid.* "For other" platforms, "these requirements may reach beyond their resources." *Ibid.* But "[w]ithout a factual analysis

determining the commercially reasonable effort demanded of each" covered platform, the district court "could not 'decide which of the law['s] applications violate the First Amendment'" or "determine whether 'the law's unconstitutional applications substantially outweigh its constitutional ones.'" *Ibid.* (quoting *Moody*, 603 U.S. at 725, then *Paxton*, 121 F.4th at 498). Because the district court "did not" "determine" as a "factual" matter "to whom the Act applies" or "the activities it regulates" and "then weigh violative applications of the Act against non-violative applications," this Court held, the injunction "cannot now stand." *Ibid.* NetChoice did not petition for rehearing en banc or for certiorari.

On remand, NetChoice filed an amended complaint that largely mirrors its original complaint. The new complaint brings the same claims, Amended Complaint ¶¶ 93-215 (ROA.661-682), and adds allegations that "the Act is unconstitutional as applied to NetChoice members and their services regulated by the Act," *id.* ¶ 3 (ROA.640); *see id.* ¶¶ 86-87, 129 (ROA.660, 667). NetChoice identifies the same covered members as in the original complaint except it has added Reddit (a new member) and lists YouTube rather than Google as a member. *Id.* ¶ 15 (ROA.642). NetChoice alleges that at "minimum" "the Act is invalid to the extent it regulates 'social media' websites, including as applied to Plaintiff['s] members' regulated services identified in ¶ 14." *Id.* ¶ 87 (ROA.660). The amended complaint does not—in paragraph 14 or anywhere else—describe those services.

NetChoice again moved for an injunction. Mot. (ROA.686-690); Mem. (ROA.719-755). It relied on the three member declarations filed with its first injunction motion, Mot. 3 (ROA.688), and a declaration from its current general counsel, Bartlett Cleland (ROA.691-718). The 26.5-page Cleland declaration largely repeats the 22.5-page declaration by Carl Szabo (NetChoice's previous general counsel) filed with the first injunction motion. The Cleland declaration adds bullet points describing how "users employ ... covered websites to communicate" (Cleland Dec. ¶ 7 (ROA.693-694)), allegations about Reddit's content-moderation policy (*id.* ¶¶ 12-20 (ROA.699-709)), and more allegations on why the Act covers some members and not others (*compare id.* ¶¶ 28-41 (ROA.711-714) *with* Szabo Dec. ¶¶ 25-27 (ROA.102-103)). NetChoice now admits that, based on "the Act's definitions," it knows whether the Act covers each of its 40 members: it says that 8 are covered and 32 are not. Cleland Dec. ¶¶ 30, 40, 41 (ROA.712, 713-714) (addressing 39 members); Mem. 22 (ROA.748) (addressing Google).

Despite this Court's decision in *Fitch*, nothing in NetChoice's new complaint, new briefing, or declarations (new or old) says what any platform must in fact do under each challenged provision or what would constitute "'commercially reasonable'" actions to verify age, obtain parental consent, or adopt a harm-mitigation strategy for any platform. *Fitch*, 134 F.4th at 809 (quoting the Act).

Yet on June 18, 2025, the district court again granted a preliminary injunction blocking the Act, in all applications, for covered NetChoice members. ROA.945; *see* ROA.911-945. The injunction thus benefits nine member platforms: YouTube, Facebook, Instagram, X, Snapchat, Pinterest, Nextdoor, Dreamwidth, and Reddit. *See* ROA.945.

*First*, the court held that NetChoice will likely win on its "as-applied" First Amendment claim. ROA.940. The court ruled that the Act is a content-based regulation of speech that likely fails both strict scrutiny (ROA.924-937) and intermediate scrutiny (ROA.937-940). The court said that it did not need "to address [NetChoice's] facial challenge under the framework announced in *Moody*" because on remand NetChoice added an "as-applied challenge." ROA.942; *see* ROA.942-943.

On strict scrutiny: The court ruled that the Act's coverage definition "render[s] the Act content-based, and therefore subject to strict scrutiny." ROA.929; *see* ROA.924-930. The Act covers platforms that allow users to "socially interact," but excludes platforms that "[p]rimarily function[ ]" to provide users with access to "news, sports, commerce, [or] online video games." § 3(1)(a), (2)(c)(i). According to the district court, this coverage definition draws a "content-based distinction" based on "the message a speaker conveys" ("i.e., news and sports versus social interaction") or the speech's "function or purpose" ("i.e., providing news and sports as opposed to facilitating social interaction"). ROA.927-928. The court ruled that the Act likely fails strict scrutiny because it "is likely not narrowly

tailored" to protecting minors online. ROA.932; *see* ROA.930-937. The court "accept[ed] as true the Attorney General's position that safeguarding the physical and psychological wellbeing of minors online is a compelling interest." ROA.931. But the court ruled that for covered NetChoice platforms the Act is likely "overinclusive or underinclusive, or both, for achieving" that interest. ROA.937. The Act is likely overinclusive, the court said, because: the age-verification provision aims to protect minors yet it applies to all users and so "burdens the First Amendment rights of adults" (ROA.934); the parental-consent provision requires all minors to obtain consent even though not all parents will "care whether" their children create accounts (ROA.935); and the strategy provision could, by spurring overly broad content-blocking, prevent all users from accessing "valuable content" (ROA.934-935). The Act is likely underinclusive, the court said, because the parental-consent provision "requires only one parent or guardian's consent" and does not "require verifying" the parental or guardian relationship (ROA.936) and the strategy provision permits minors to view "otherwise-proscribed content ... simply because they initiated it by 'searching for' or 'requesting' it" (ROA.937). The court also said that the State had not shown that "the private tools currently available for parents to monitor their children online" would be "insufficient to secure the State's objective of protecting children," and so the State had failed to adopt the "le[ast] restrictive" means for pursuing its interest. ROA.934.

On intermediate scrutiny: The court again "accept[ed] as true the Attorney General's position that safeguarding the physical and psychological wellbeing of minors online is an important governmental interest." ROA.938. But the court said that "it does not appear that the chosen method for advancing this interest can be said to be unrelated to the suppression of speech" for covered NetChoice members. ROA.938. And even if the Act were "unrelated to suppression of speech," the court ruled, it "burdens substantially more speech than is necessary for the State to accomplish its goals" "for the reasons ... already discussed." ROA.938. On that last point: The court said that the Act "precludes minors under 18 years old from accessing all content on social media websites, absent affirmative parental consent, regardless of whether the content concerns or negatively affects minors' physical and psychological wellbeing." ROA.938-939. And the strategy provision "seem[s] to require prevention of exposure" to protected speech, including literature, art, and cultural works that minors are entitled to access. ROA.939. The court added that "uncertainty about how broadly the Act extends" and how it will be enforced "may spur members to engage in over-inclusive [content] moderation." ROA.939. The court did not reach the other claims.

*Second*, the court ruled that the other injunctive factors favor relief. ROA.940-942. On irreparable harm, the court said that the Act will cause a "loss" of "First Amendment freedoms" and put members at risk of unrecoverable compliance costs—which, according to NetChoice member

Dreamwidth, "may threaten the very existence of its business." ROA.940-941 (citing Paolucci Dec. p. 20 (ROA.167)). And after observing that "[i]njunctions protecting First Amendment freedoms are always in the public interest," the court ruled that, given its First Amendment merits ruling, an injunction "is in the public interest" here. ROA.941.

On June 27, the Supreme Court decided *Free Speech Coalition, Inc. v. Paxton*, 145 S. Ct. 2291 (2025), which rejected a First Amendment challenge to a Texas law requiring commercial pornographic websites to verify visitors' ages. *FSC* ruled that States may require age verification to protect children from the harms stemming from material that is obscene for them, *id.* at 2306-09, that such a requirement does not directly regulate protected speech and so faces only intermediate scrutiny, *id.* at 2309-17, and that Texas's law satisfied that standard, *id.* at 2317-19.

On July 2, the State moved this Court to stay the injunction in this case pending this appeal. The State made two merits arguments for why this Court would likely reject the injunction: (1) it defies the mandate in *Fitch*; and (2) it rests on a flawed First Amendment ruling that cannot stand under *Free Speech Coalition*. Stay Mot. 13-20 (CA5 Dkt. 8-1). In opposing a stay, NetChoice made no argument disputing that the district court reinstated the injunction that *Fitch* vacated.

On July 17, after receiving full stay briefing, this Court granted the State's stay motion. CA5 Dkt. 25-1.

NetChoice filed an "emergency application" asking the Supreme Court to vacate that stay. In its 40-page application, NetChoice never mentioned the mandate-rule basis for rejecting the injunction—even though it was the State's lead argument for a stay. *See* Application, No. 25A97 (S. Ct. July 21, 2025) (App'n).

On August 14, the Supreme Court denied NetChoice's application without noted dissent. *NetChoice, LLC v. Fitch*, No. 25A97, 2025 WL 2350189 (U.S. Aug. 14, 2025). Justice Kavanaugh wrote a concurring opinion stating his view that NetChoice had "demonstrated that it is likely to succeed on the merits" under current First Amendment precedents, but concluding that the application should be denied "because NetChoice has not sufficiently demonstrated that the balance of harms and equities favors it at this time." *Id.* at *1.

That day, NetChoice asked the State for its position on a motion to expedite this appeal and proposed a schedule that cut the State's reply-brief window from 21 days to 7 days. *See* Fed. R. App. P. 31(a)(1). Although the State had no need for expedition (it secured a stay pending appeal, so the Act is in full effect) and although NetChoice filed an "emergency application" with the Supreme Court that went nowhere but burdened the State with disruptive, resource-intensive, and expedited opposition briefing, the State offered not to oppose expedition if NetChoice left the State's reply-brief window at 21 days. That offer would have allowed an unopposed expedition request and avoided motions

practice. NetChoice rejected that offer and on August 15 filed a motion to expedite—8 weeks after the State noticed this appeal and 4 weeks after this Court stayed the injunction. CA5 Dkt. 30.

On August 19, without waiting for the State to file a response, this Court denied NetChoice's motion to expedite. CA5 Dkt. 37-1.

## SUMMARY OF ARGUMENT

This Court should reject the preliminary-injunction order.

I. The injunction rests on serious errors of law. There are two compelling merits grounds for rejecting the injunction. First, the injunction defies this Court's mandate in the State's successful first appeal in this case. The district court reinstated the injunction that this Court vacated—without doing what this Court ordered. Second, the Act comports with the First Amendment. The Act does not target protected speech, it only incidentally burdens speech, and it is narrowly tailored to the State's powerful interest in protecting children from predators. None of NetChoice's other claims can save the injunction.

II. The equities independently require rejecting the injunction. The injunction blocks an important state law that protects children from predators. In assessing the equities the district court relied on its flawed merits ruling and misread the Act. NetChoice—which urged the district court to defy this Court's mandate—is unworthy of equitable relief.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy." *Planned Parenthood of Greater Texas v. Kauffman*, 981 F.3d 347, 353 (5th Cir. 2020) (en banc) (cleaned up). A movant must show: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Willey v. Harris County District Attorney*, 27 F.4th 1125, 1129 (5th Cir. 2022). This Court "review[s] the district court's ultimate decision to grant or deny a preliminary injunction for abuse of discretion," but it reviews "a decision grounded in erroneous legal principles de novo." *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 286 (5th Cir. 2017) (cleaned up).

## ARGUMENT

This Court should reject the preliminary-injunction order.

## I.   This Court Should Reverse The Preliminary-Injunction Order Because It Rests On Serious Errors Of Law.

There are two compelling, alternative merits grounds for rejecting the injunction. This Court should adopt both those grounds.

### A.   The Injunction Defies This Court's Mandate In The State's Successful First Appeal In This Case.

1. A litigant that has prevailed in the appellate process "should not be required to go through that entire process again to obtain execution of the judgment" it won on appeal. *DHS v. D.V.D.*, 145 S. Ct. 2627, 2630

(2025). This Court accordingly applies a strict mandate rule. The rule is simple: "a district court must comply with a mandate issued by an appellate court." *M.D. v. Abbott*, 977 F.3d 479, 482 (5th Cir. 2020). The injunction defies that rule.

In *NetChoice, LLC v. Fitch*, 134 F.4th 799 (5th Cir. 2025), this Court vacated an injunction blocking the Act in all applications to NetChoice members and directed the district court to hold NetChoice to the burden that facial relief requires. *Id.* at 807-09. This Court gave the district court clear instructions on how to assess NetChoice's request for facial relief and directed the district court to apply the Supreme Court's decision in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), and this Court's decision (on remand from *Moody*) in *NetChoice, LLC v. Paxton*, 121 F.4th 494 (5th Cir. 2024). 134 F.4th at 807-09. To grant facial relief, *Fitch* declared, the district court must "determine" "the 'commercially reasonable efforts'" and "the Act's requirements" for each covered platform. *Id.* at 809. That determination requires a "factual analysis"—and thus a "factual" presentation by NetChoice. *Ibid.* NetChoice must establish for each platform which burdens "intru[de] on" First Amendment rights, *Paxton*, 121 F.4th at 499, and show—in light of "every hypothetical application" of the Act—that invalid applications dominate, *id.* at 498. Without that presentation on each platform's "unique regulatory burden," *Fitch* ruled, "the district court could not 'decide'" which of the Act's "'applications'" (if

any) "'violate the First Amendment.'" 134 F.4th at 809 (quoting *Moody*, 603 U.S. at 725).

NetChoice did not petition for rehearing or for certiorari. Yet on remand, it refused to make a "factual" showing of what "commercially reasonable" efforts the Act requires of any member on age verification, parental consent, or harm mitigation and whether requiring those efforts would impose a "burden" on any member that would "violate the First Amendment." 134 F.4th at 809. NetChoice instead recycled its prior factual submissions, rehashed its prior arguments, and asked the district court to grant the same relief it granted before. *See supra* pp. 15-16. NetChoice claimed to seek both facial and as-applied relief. Mem. 21-25 (ROA.747-751). Yet in its injunction brief, NetChoice made only a $1/3$-page argument for "as applied" relief. Mem. 24-25 (ROA.750-751). Even there, it asked for the same facial relief that *Fitch* vacated—not relief against particular applications to particular members based on a showing that those applications are invalid, but instead an injunction blocking the Act in all applications to all covered members. *See ibid.*

Despite all this, the district court reinstated the injunction that *Fitch* vacated: it blocked the Act in all applications to covered NetChoice members. ROA.944-945. The court (like NetChoice) ignored most of *Fitch* (*see* ROA.917, 920, 942), expressly declined to apply *Moody* (ROA.942-943), and cited *Paxton* once without applying it (ROA.917). Although the court said that it was ruling on NetChoice's "as-applied" claims rather

than its facial claims, ROA.942, the injunction is every bit the facial injunction that *Fitch* vacated: it blocks the Act in all applications to covered NetChoice members.

Violations of the mandate rule come no clearer than that. A district court may not reinstate an order vacated by an appellate court without heeding the appellate court's "specific instruction[s]." *M.D.*, 977 F.3d at 482. In issuing the first injunction, the district court did not perform the "inquiry" that facial relief requires. *Moody*, 603 U.S. at 744. Then it did that a second time—after *Moody*, *Paxton*, and *Fitch* made the inquiry triply clear.

That cannot stand. Our legal system depends on lower courts and litigants following the orders of appellate courts. Allowing NetChoice—a sophisticated, high-profile litigant that regularly appears in this Court— to get away with defying an appellate mandate would be profoundly damaging. Reversal is warranted on this ground alone.

2. In opposing a stay before this Court, NetChoice made no argument disputing that the district court reinstated the injunction that *Fitch* vacated. But it claimed that the district court ruled properly because NetChoice "add[ed] as-applied claims" and "provide[d] more information about whether the Act applies to" other platforms. Stay Opp. 17, 18 (CA5 Dkt. 15-1) (cleaned up). Neither point withstands scrutiny.

First, although NetChoice added "as-applied claims," the district court granted the same *facial* relief that *Fitch* vacated—an injunction

blocking the Act in *all applications* to *all* covered members—without determining what those applications are. That is the "facial" relief that this Court rejected. 134 F.4th at 803, 807-09. Indeed, that is the facial relief granted in *Paxton* that the Supreme Court addressed in *Moody*. *See NetChoice, LLC v. Paxton*, 573 F. Supp. 3d 1092, 1117 (W.D. Tex. 2021) (blocking law's enforcement "against Plaintiffs and their members").

Second, in seeking that facial relief NetChoice did not provide the information that *Fitch* required—and in issuing that relief the district court did not do what *Fitch* ordered. *Fitch* ordered the district court to "determine" "the 'commercially reasonable efforts'" and "the Act's requirements" for each covered platform. 134 F.4th at 809. The district court could not rule that the Act violates the First Amendment without knowing what the Act requires each platform to do and how (if at all) those actions will affect speech rights on that platform. *See ibid.*

Consider: How could a court grant relief benefiting Instagram on the age-verification provision when Instagram *already* verifies age and NetChoice has not shown how that provision would burden speech? *See* Instagram, Confirming your age on Instagram, https://bit.ly/4keM2H0. How could a court grant relief benefiting Nextdoor on the parental-consent provision when NetChoice has not shown a burden on speech from requiring parents (of Nextdoor's relatively few minor users, Pai Dec. ¶¶ 16-19 (ROA.139-140)) to make a phone call or respond to an email, § 4(2)? How could a court grant relief benefiting *any* NetChoice member

27

on the strategy provision when NetChoice has not shown whether it would be "commercially reasonable," § 6(1)—and a violation of speech rights—for *any* member to adopt (among countless possible harm-mitigation strategies) a strategy of alerting (or connecting) minors to support groups for victims of sex trafficking and other listed harms, a strategy of assisting organizations that treat children harmed online, or a strategy of helping to identify and locate online predators so that victims can hold them accountable?

NetChoice provided none of this information. Instead, on remand it added more information on why 8 of its members (representing 9 covered platforms) are covered and the rest are not. *Supra* p. 16. But (aside from new member Reddit) the district court already knew which NetChoice platforms the Act covers. NetChoice named them the day it filed this case. Complaint ¶ 13 (ROA.16). What that court did not know—and still does not know, because NetChoice refused to make the "factual" showing that *Fitch* required, 134 F.4th at 809—is what would constitute "commercially reasonable" actions to verify age, obtain parental consent, or adopt a harm-mitigation strategy for any NetChoice member. NetChoice does not want to make that showing. But that is the showing that this Court required in *Fitch*—a decision from which NetChoice did not seek further review. Its view—embraced below—defies this Court's mandate.

In opposing a stay, NetChoice said that requiring the application-by-application factual showing demanded by *Paxton* and *Fitch* would lead

to "absurdities." Stay Opp. 19-20. All it pointed to was a hypothetical law "requiring websites to use 'commercially reasonable' measures to avoid publishing speech critical of politicians": a plaintiff should not, NetChoice says, have to "catalog every website on the Internet" to win a facial claim against such a law. *Id.* at 19. But that law *directly regulates protected speech* based on its *political content*—an easy First Amendment case. The Act here is nothing like that: it targets predatory conduct, not protected speech. *See infra* Part I-B. NetChoice has also said that *Free Speech Coalition, Inc. v. Paxton*, 145 S. Ct. 2291 (2025), shows that "courts can rule on the constitutionality of state laws requiring 'commercially reasonable method[s]' without an exhaustive inventory of what is 'commercially reasonable' for every website." Stay Opp. 19. But *FSC rejected* a facial claim. 145 S. Ct. at 2301, 2308 n.7. Because a plaintiff can win such a claim only if it carries a heavy "burden," *Moody*, 603 U.S. at 744, *rejecting* a facial claim without "an exhaustive inventory" can be easy. *Crediting* such a claim requires much more and is much harder. *Supra* pp. 11-15.

This Court was right to issue a mandate-reinforcing stay. It should now reject the injunction for defying this Court's mandate.

## B. The Injunction Rests On A Profoundly Flawed First Amendment Ruling.

Although the mandate rule alone requires rejecting the injunction, this Court should go further. The district court has twice seriously erred

in applying the First Amendment to the Act. If this Court just vacates and remands again, there is a serious risk that the district court will do so a third time. It is "necessary" for this Court "to say more" to "prevent" the district court from "repeating its errors." *Moody*, 603 U.S. at 726-27 (taking that approach to avoid further lower-court error). This Court should hold that the Act comports with the First Amendment. As *Free Speech Coalition, Inc. v. Paxton*, 145 S. Ct. 2291 (2025), confirms, the Act triggers at most intermediate scrutiny and it satisfies that standard. The district court's contrary ruling is deeply flawed.

### 1. The Act Triggers At Most Intermediate Scrutiny.

a. When a law exercises a State's "traditional power" to protect minors and has "only an incidental effect on protected speech," it is subject to "intermediate scrutiny" at most. *FSC*, 145 S. Ct. at 2306; *see id.* at 2306-09. Both points are true for the Act.

First, States have "traditional power" to protect minors from predators and the harms that they inflict—including by adopting age-verification, parental-content, and harm-mitigation requirements. 145 S. Ct. at 2309. States may (for example) bar people from sexually abusing, physically assaulting, selling drugs to, sextorting, or harassing minors. States also may require businesses to pay for (or otherwise mitigate) the harms that they impose on minors (and others). This power to protect minors "necessarily includes the power" "to employ the ordinary and appropriate means of" achieving that end. *Id.* at 2306, 2307.

Requiring age verification and parental consent are common ways for States to protect minors. *See*, *e.g.*, *id.* at 2307 (examples for age verification); Ala. Code § 22-17A-2(a) (requiring parental consent before tattooing or body-piercing a minor); Vt. Stat. Ann. tit. 26, § 4102(c) (same for tattoos); Haw. Code R. § 11-17-7(b) (same). Requiring businesses to mitigate and account for the harms they cause is also a common way to protect minors (and others) from harm or make them whole. States do this through tort law, property regulations, and licensing regimes. So the Act's age-verification, parental-consent, and harm-mitigation requirements (§§ 4(1), 4(2), 6) are within the State's power.

Second, the Act "does not directly regulate ... protected speech." 145 S. Ct. at 2309. "On its face," the Act regulates predatory conduct online. *Ibid.* To address that conduct, the Act requires covered platforms to make "commercially reasonable" efforts to verify age, obtain parental consent, and adopt a harm-mitigation strategy. §§ 4(1), 4(2), 6. And the Act "can easily be justified without reference to the protected content" of any "regulated speech." 145 S. Ct. at 2309 (cleaned up). The Act's "apparent purpose" (*ibid.*) is to protect minors from predatory harms that occur on the interactive social-media platforms that let predators interact with children and feed those predators information about those children that can be used to exploit them. None of the Act's provisions intrudes on anyone's "expressive choices." *Moody*, 603 U.S. at 740. Even if the age-verification and parental-consent provisions "burden" a "right to access

speech" on covered platforms, any burden is "only incidental to" the Act's regulation of predatory conduct. 145 S. Ct. at 2309. And although the strategy provision requires platforms to address harms, a business has "no First Amendment right to avoid" addressing the harms it imposes on minors. *Ibid.*

*FSC* confirms that (at most) intermediate scrutiny applies here. And *FSC* is of a piece with the Supreme Court's other decisions applying intermediate scrutiny. In *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), the Supreme Court ruled that intermediate scrutiny applied to an ordinance that barred adult movie theaters from locating in residential and other sensitive areas. *Id.* at 43, 47-50. Although that ordinance regulated theaters based on the films (the speech) they offered, the ordinance "aimed not at the content of the films" but at the negative "secondary effects" of adult theaters "on the surrounding community." *Id.* at 47 (emphases omitted). As *Renton* explained, in reasoning that *FSC* echoes, States have the power to combat those effects—to "prevent crime, protect the city's retail trade, maintain property values," preserve "the quality of urban life," and pursue other valid ends—and laws pursuing those ends do not trigger strict scrutiny where, as here, they do not "aim[ ] at the *content*" of speech. *Id.* at 47-48. And in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989), the Supreme Court applied intermediate scrutiny to a city's regulation of sound volume in a city park. *Id.* at 784, 791-93. The regulation "serve[d] purposes unrelated to the content of

expression"—it "control[led] noise levels" and ensured sound quality at local concerts—and so triggered only intermediate scrutiny "even if it ha[d] an incidental effect on some speakers or messages." *Id.* at 791, 792. In protecting children from predators, the Act here also serves purposes "unrelated to the content of expression" and has at most "an incidental effect" on speech. *Id.* at 791.

Because "[a]ny burden" the Act imposes on protected speech is "only incidental to" the Act's "regulation of activity that is not protected by the First Amendment"—sexual abuse, trafficking, physical violence, sextortion, and more—intermediate scrutiny (at most) is "the appropriate standard." *FSC*, 145 S. Ct. at 2309.

b. The points above show that *at most* intermediate scrutiny applies. But because each challenged provision on its face regulates non-expressive conduct—and NetChoice has offered no "factual development" to provide a basis for concluding that those provisions do otherwise, *NetChoice, LLC v. Paxton*, 121 F.4th 494, 499 (5th Cir. 2024)—rational-basis review applies. *City of Dallas v. Stanglin*, 490 U.S. 19, 23, 25 (1989) (rational-basis review applies when a law "implicates no suspect class and impinges on no constitutionally protected right"). Again, none of the challenged provisions intrudes on anyone's "expressive choices." *Moody*, 603 U.S. at 740. And even if this Court concludes that the age-verification and parental-consent provisions impose an "incidental" "burden" on a "right to access speech" that triggers intermediate scrutiny, *FSC*, 145

S. Ct. at 2309, that logic does not apply to the strategy provision: it does not burden anyone's right to access speech.

c. The district court ruled that the Act's coverage definition "render[s] the Act content-based" and thus "subject to strict scrutiny." ROA.929; *see* ROA.924-930. The Act covers platforms that (among other things) allow users to "socially interact," but excludes platforms that "[p]rimarily function[ ]" to provide users with access to "news, sports, commerce, [or] online video games." § 3(1)(a), (2)(c)(i). So (according to the district court) the Act draws a "content-based distinction" based on "the message a speaker conveys" ("i.e., news and sports versus social interaction") or the speech's "function or purpose" ("i.e., providing news and sports as opposed to facilitating social interaction"). ROA.927-928.

The district court erred. First, the Act does not "direct[ly] target[ ]" "fully protected speech"—or "outright ban[ ]" access to speech—so strict scrutiny does not apply. *FSC*, 145 S. Ct. at 2310, 2313. Indeed, if a content-based coverage definition automatically triggered strict scrutiny, *FSC* would have applied strict scrutiny. *But see id.* at 2315 (H.B. 1181's "content-based restriction does not require strict scrutiny"). Second, and independently, the coverage definition is not content-based. Coverage turns on where *harmful conduct* toward minors online is most likely: the interactive social-media platforms that allow predators to interact with and harm children—something the Legislature thought less likely on (for example) LinkedIn and certain news sites. § 3(2)(c)-(d). Coverage does

not turn on the ideas discussed, the messages conveyed, or who speaks. In *Moody*'s companion case, NetChoice argued that a similar coverage definition rendered a Texas law's operative provisions content-based. Brief for Petitioners 7-8, 16, 37, 46, *NetChoice, LLC v. Paxton*, No. 22-555 (S. Ct.); *see Moody*, 603 U.S. at 721 n.2. The Supreme Court did not credit that argument—even though, if it had, the case would have been much easier: the Court could have just ruled that Texas's law triggered strict scrutiny in all applications. *But see Moody*, 603 U.S. at 740 (not deciding "whether to apply strict or intermediate scrutiny").

NetChoice has claimed that the coverage definition is content-based for other reasons that the district court did not adopt. NetChoice has suggested that the coverage definition is content-based because it covers websites that (among other things) allow users to "socially interact" (§ 3(1)) and thus "excludes websites that allow users to interact 'professionally.'" Mem. 15 (ROA.741). That is wrong. The phrase *socially interact* means communication between two or more "users on [a] digital service." § 3(1)(a). The word *socially* does not distinguish non-professional from professional interactions. § 3(1)(a). Rather, the word distinguishes interactions *between users* (covered) from interactions *with content* (not covered). "[A]ll literature" (for example) "is interactive." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 798 (2011). The phrase *socially interact* ensures that the Act does not cover mere interactions with content. This is reinforced by the Act's structure, which

shows that the Act's focus is on platforms with a dominant "interactive" feature. *E.g.*, § 3(1), (2)(c)(ii). NetChoice has also suggested that excluding websites "that do not allow interaction" presents a First Amendment problem. Mem. 15 (ROA.741). It cited no support for that view. And the Act focuses on interactive platforms because of the predatory harms that they present to minors—harms the State may regulate. *See FSC*, 145 S. Ct. at 2318 (crediting as "reasonable" Texas's decision to "exclud[e]" from coverage websites that do not present the same dangers as covered websites).

d. NetChoice has made other arguments—not adopted by the district court—for why strict scrutiny applies. App'n 18-21, 24-27, 28-33. Each fails.

*First*, NetChoice claims that the age-verification provision triggers strict scrutiny because it "directly targets" "fully protected speech." App'n 26 (cleaned up); *see* App'n 24-27. But the Act directly targets what NetChoice concedes is "unlawful conduct" (App'n 34)—like sexual abuse, harassment, and trafficking. Sexually abusing, harassing, and trafficking children are not "fully protected speech." The Act does not directly target "creative writing" on Dreamwidth, "petitioning ... elected representatives" on X, or "shar[ing] vacation photos" on Facebook, App'n 6: the Act leaves people free to do all those things however they wish.

NetChoice has suggested that *FSC*'s analysis is limited to "pornography"—material that is "protected for adults but unprotected for

minors." App'n 26; *see* App'n 21 (same for parental-consent provision). But, as *Renton* and *Ward* show, *FSC* applied bedrock, "basic principles of freedom of speech" (145 S. Ct. at 2308) to a law that matches the Act in all ways that matter: both laws address platforms that host both protected speech and unprotected speech or conduct—and both laws target what is unprotected. Indeed, the case for lower scrutiny is stronger here: the law in *FSC* "target[ed] speech" (material "obscene for minors") that is protected for adults, *id.* at 2314; the Act here targets conduct— like sexual abuse and child trafficking—that is protected for no one.

*Second*, NetChoice has claimed that the parental-consent provision triggers strict scrutiny under *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011). App'n 18-21. *Brown* does not help NetChoice. *Brown* struck down a law that barred selling or renting video games (speech) to minors because of the games' violent content. 564 U.S. at 789, 799-805. That law thus directly targeted and regulated lawful, protected speech. *Id.* at 790-99. That is why the Court applied strict scrutiny—because the law "impose[d] a restriction on the content of protected speech." *Id.* at 799. The parental-consent provision here does not target or regulate protected speech. Far from targeting "ideas or images," *id.* at 795, it targets illegal and unprotected conduct that States may regulate. *Brown* does not bar that.

*Third*, NetChoice claims that the strategy provision triggers strict scrutiny because it is "a prior restraint" (App'n 28-30) or "restrict[s]"

platforms' expressive choices about the speech they host (App'n 30-33). That is wrong. That provision requires platforms to "make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate" a known minor's "exposure to harmful material and other content that promotes or facilitates" certain "harms to minors." § 6(1). Nothing in that text requires platforms to "monitor," "censor," "block," not "publish[ ]," or "restrict" speech. App'n 28, 29, 30, 31, 32, 33. That text does not require platforms to alter their "content moderation" policies. App'n 32-33. The provision allows (for example) a strategy of alerting or connecting minors to resources (like support groups) for persons victimized by sex trafficking, sexual abuse, harassment, and other listed harms. Or a platform could have a strategy of helping organizations that treat children harmed online. Or a platform could have a strategy of helping to identify and locate online predators so that victims can hold them accountable. Or a platform could have a strategy of repairing its website's flaws when those flaws are shown to enable predators. These strategies could "prevent" or "mitigate" minors' exposure to listed harms without restricting or regulating any speech.

## 2. The Act Satisfies Intermediate Scrutiny.

a. The Act "readily satisfies" intermediate scrutiny. *FSC*, 145 S. Ct. at 2317.

The Act "undoubtedly advances an important governmental interest." 145 S. Ct. at 2317. As the district court "accept[ed]" (ROA.931,

938), States have "a compelling interest in protecting the physical and psychological well-being of minors." *Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 126 (1989). The Act "furthers that interest." 145 S. Ct. at 2317. The age-verification provision puts a guardrail in place before minors are exposed to predators; the parental-consent provision provides an additional guardrail by promoting parental oversight and involvement before children may be harmed by predators; and the strategy provision promotes practices that may avert or mitigate tragic harms inflicted by predators. §§ 4(1), 4(2), 6. These provisions "prevent[ ] minors from easily" being preyed upon and damaged online. 145 S. Ct. at 2317. (These points also show that the Act's regulations have "a rational relationship" to the State's legitimate interest and so—as NetChoice has never disputed—satisfy rational-basis review. *City of Dallas v. Stanglin*, 490 U.S. 19, 28 (1989).)

The Act is also "sufficiently tailored" to the State's interest. 145 S. Ct. at 2317. Requiring age verification, parental consent, and harm mitigation are common ways to protect minors or address harms that may be inflicted on them. The State's aims "would be achieved less effectively" without these regulations (*ibid.*), which involve parents in minors' consequential activities and ameliorate (or avert) life-altering damage to minors. And these regulations "do[ ] not burden substantially more speech than is necessary to further" these aims. *Ibid.* "[I]t cannot be said that a substantial portion of" any "burden" the Act imposes "fails

to advance" the State's goals. *Id.* at 2318 (cleaned up). The Act simply "adapts" "traditional" methods of protecting minors "to the digital age." *Id.* at 2317. *FSC* ruled that requiring "established [age-]verification methods already in use" "does not impose excessive burdens." *Id.* at 2318 & n.14. The parental-consent provision also does not impose excessive burdens. The Act *deems* parental consent to be given by any of several easy means—like a phone call or an email response—without more. § 4(2). There is no need to verify the parental relationship. ROA.936 ("none of the options" "require[s] verifying" that relationship). And the strategy provision is not excessively burdensome either. It requires only "commercially reasonable"—not cost-prohibitive—efforts to adopt a harm-mitigation "strategy." § 6(1). NetChoice says that its members have policies addressing online harms. Cleland Dec. ¶¶ 12-20 (ROA.699-709). All these "modest burden[s]" are sufficiently tied to the State's interest. 145 S. Ct. at 2317.

The Supreme Court's other decisions upholding laws under intermediate scrutiny confirm these points. Again take *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), which upheld an ordinance that barred adult movie theaters from locating in sensitive areas, even though the ordinance limited protected speech by limiting where theaters could offer their films. *Id.* at 43, 47, 54-55. The ordinance was "designed to serve a substantial governmental interest" unrelated to speech: to "prevent crime, protect the city's retail trade, maintain property values,"

and preserve "the quality of urban life." *Id.* at 48, 50. And the ordinance "allow[ed] for reasonable alternative avenues of communication" by leaving adult theaters with "a reasonable opportunity" to operate. *Id.* at 50, 54. The Act here also "serve[s] a substantial governmental interest" unrelated to speech, *id.* at 50: it protects minors from predators online. And it leaves all involved with "reasonable alternative avenues of communication." *Ibid.* Indeed, far from cutting off avenues for covered platforms or others to communicate or access speech, the Act requires only modest steps—on age verification, parental consent, and harm mitigation—before allowing access to those same avenues where people may communicate freely. The Act's modest burdens do not regulate "in such a manner that a substantial portion of the burden on speech" fails "to advance" the State's legitimate "goals." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). If (as *Ward* held) the First Amendment permits a State to protect people from noise despite an incidental effect on speech, *id.* at 791-803, it permits a State to protect children from predators despite an incidental effect on speech.

The Act does not abridge "the freedom of speech." U.S. Const. amend. I.

b. The district court ruled that the Act likely fails intermediate scrutiny. ROA.937-940. The court erred.

The district court said that the Act uses a "method" for protecting minors that "does not appear ... to be unrelated to the suppression of

speech." ROA.938. That is wrong. Protecting children from predators is "unrelated to the suppression of free speech." *FSC*, 145 S. Ct. at 2317. Requiring age verification, parental consent, and a harm-mitigation strategy to address predatory harms to minors on online platforms also "does not directly regulate" or aim at "protected speech": it aims at protecting minors from harms that the State is entitled to regulate and prohibit. *Id.* at 2309.

The district court also said that the Act "burdens substantially more speech than is necessary for the State to accomplish its goals." ROA.938; *see* ROA.938-939. Start with age verification and parental consent. Both are "traditional," "common[ ]," and "modest burden[s]" that are not "excessive" to protecting minors from predatory conduct online. 145 S. Ct. at 2317, 2318 n.14; *compare Packingham v. North Carolina*, 582 U.S. 98, 105, 108, 109 (2017) (holding that a "complete bar" that "foreclose[d] access to social media altogether" could not satisfy any form of heightened scrutiny). Indeed, some covered platforms already verify age. *E.g.*, Instagram, Confirming your age on Instagram, https://bit.ly/4keM2H0. Some platforms require far more to create an account than the phone call or email response that satisfies the Act's parental-consent provision. § 4(2); *see* Pai Dec. ¶¶ 4-5 (ROA.136) (Nextdoor requires "real names and addresses" and uses mailings to verify required information). The district court faulted the parental-consent provision for blocking minors "from accessing all content on

social media websites, absent affirmative parental consent, regardless of whether the content concerns or negatively affects minors' physical and psychological wellbeing." ROA.938-939. But the Act targets "social media websites" not because of content but because those websites are especially attractive to predators seeking to exploit minors. There is nothing overly burdensome about addressing—and focusing on—the special harms posed by those websites.

Now take the strategy provision. Harm-mitigation duties—like those the strategy provision imposes—are commonplace and not excessive. Tort law, property regulations, and licensing regimes routinely impose such duties. The district court claimed that the strategy provision requires platforms to "prevent[ ] ... exposure" to protected speech and that "uncertainty" about the Act's reach could cause platforms to take an overinclusive approach to blocking content. ROA.939. Both claims rest on the erroneous view that the Act requires platforms to block content.

The district court suggested that "the reasons" it gave for faulting the Act under strict scrutiny also show that the Act fails intermediate scrutiny. ROA.938. But those reasons concerned whether the Act is "overinclusive," "underinclusive," and the "le[ast] restrictive" means for achieving the State's interest. ROA.931, 933, 934, 935, 936, 937; *see* ROA.930-937. Those requirements do not apply under intermediate scrutiny. The Act is not "invalid simply because a court concludes that the government's interest could be adequately served by some less-

speech-restrictive alternative," 145 S. Ct. at 2318, *contra* ROA.931, 934, 935, 937; is not subject to a "freestanding underinclusiveness limitation," 145 S. Ct. at 2318; *contra* ROA.931, 935-937; and does not need to satisfy a "least restrictive means" standard, 145 S. Ct. at 2317 (cleaned up); *contra* ROA.931, 934. So these points do not support the injunction.

Errors pervade the district court's tailoring analysis anyway, so that analysis could not support the injunction even if strict scrutiny applied.

Start with the district court's reasons for concluding that the Act is likely overinclusive. ROA.934-935. One: The court said that the age-verification provision aims to protect minors yet it applies to all users and so "burdens the First Amendment rights of adults." ROA.934. The court did not explain how a platform could know whether a user is a minor or adult before verifying age—or how adult users could be carved out from that requirement. Age verification is necessary *to find out* whether someone is a minor or an adult. A modest age-verification "burden" on adults is thus necessary to pursue the State's interest. Two: The court said that the parental-consent provision requires all minors to obtain consent even though not all parents will "care whether" their children create accounts. ROA.935. But many parents *will* care whether their children create accounts that could expose them to predators. And the court did not explain how a platform can know which parents care or do not care without seeking consent. Here too, a modest burden is

44

necessary to achieve the State's interest. Three: The court said that the strategy provision could, by spurring overly broad content-blocking, prevent all users from accessing "valuable content." ROA.934-935. This claim rests on the erroneous view that the Act requires blocking content.

Now take the district court's reasons for concluding that the Act is likely underinclusive. One: The court said that the parental-consent provision "requires only one parent or guardian's consent." ROA.936. But that does not make the Act underinclusive. The State's interest is served by involving one parent in a child's consequential online activities. The court cited nothing to support the view that the State's interest can somehow be achieved only if both parents are involved. Two: The court said that the parental-consent provision does not "require verifying" the parental or guardian relationship. ROA.936. But again, the absence of a parental-verification requirement does not make the Act underinclusive. It makes the Act better tailored: it pursues the State's effort to involve parents without making that involvement overly burdensome. Three: The court said that the strategy provision permits minors to view "otherwise-proscribed content ... simply because they initiated it by 'searching for' or 'requesting' it." ROA.937. But the fact that minors can encounter the same content in that way confirms that the Act does not target content. The Act aims to avert harmful interactive encounters, not to block mere content. This too does not show a tailoring problem.

One last point: The district court blocked sections 1-8 of the Act. ROA.945. The court—like NetChoice—gave no basis for blocking most of those sections. Section 1 states the Act's title, section 2 defines terms, and section 3 defines coverage: none is a substantive or enforcement provision and none plausibly violates anyone's rights. Section 5 limits platforms' use and collection of minors' sensitive information. NetChoice said below that the coverage definition renders section 5 "content-based," Mem. 16 (ROA.742), but it developed no argument that section 5 regulates speech or infringes any right. Section 7 provides a limited private right of action. NetChoice has not sued anyone who could bring such an action, so there is no basis to block that provision. The relief ordered against these provisions underscores the flawed approach pervading the injunction and reinforces that this Court should reject it.

## C. NetChoice's Other Claims Cannot Save The Injunction.

Besides its First Amendment claims, NetChoice claims (1) that the Act (or at least the strategy provision) is unconstitutionally vague and (2) that 47 U.S.C. § 230 preempts the strategy provision. Amended Complaint ¶¶ 132-41, 198-215 (ROA.667-669, 679-682); Mem. 13-14, 25-27 (ROA.739-740, 751-753). The district court did not reach these claims. This Court need not either. Because the district court erred in its First Amendment ruling—and because the district court's equitable assessment rests on that ruling, *infra* Part II—the injunction cannot stand. NetChoice's vagueness and preemption claims fail anyway. (The

46

State addresses these claims because NetChoice has signaled that it may raise them. Stay Opp. 21-22 (raising preemption to try to avoid a stay); App'n 35 (raising vagueness to attack the stay).)

### 1. NetChoice's Vagueness Claims Fail.

Both of NetChoice's vagueness claims fail.

a. NetChoice claims that the Act's coverage definition renders the Act unduly vague because platforms cannot know whether the Act regulates them. Mem. 25 (ROA.751). The district court ruled in its first preliminary-injunction order that the Act's "central coverage definition" is "impermissibly vague in all of its applications." ROA.420, 422; *see* ROA.420-423. The court did not reinstate that ruling after this Court remanded in *Fitch*. That is for good reason. On remand NetChoice admitted that it knows whether the Act covers each of its members, which destroyed its claim that the coverage definition is vague.

A law is unduly vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" or "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); U.S. Const. amend. XIV, § 1 (guaranteeing "due process of law"). To be facially vague, a law must be "impermissibly vague in all of its applications." *McClelland v. Katy Independent School District*, 63 F.4th 996, 1013 (5th Cir. 2023).

The Act's coverage definition is not vague. The Act applies to certain platforms that "[c]onnect[ ] users in a manner that allows users to

*socially interact* with other users." § 3(1)(a) (emphasis added). And the Act does not apply to any platform that "*[p]rimarily functions* to provide a user with access to news, sports, commerce, online video games or content primarily generated or selected by the" platform itself and "[a]llows ... interactive functionality that is *incidental* to the digital service." § 3(2)(c)(i)-(ii) (emphases added). The coverage definition thus uses plain terms that are "readily understandable by most people." *United States v. Conlan*, 786 F.3d 380, 386 (5th Cir. 2015). The phrase *socially interact* means communication between two or more "users on [a] digital service." § 3(1)(a). The word *socially* does not distinguish social from (for example) professional interactions. § 3(1)(a). Rather, as explained above, the word distinguishes interactions *between users* (covered by the Act) from interactions *with content* (not covered). *Supra* pp. 35-36. The terms *primarily* and *incidental* also are plain, objective terms that do not involve "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Williams*, 553 U.S. at 306. Anyone can read the coverage definition, look at a platform's features, and know whether the Act applies. Indeed, NetChoice has done that and concedes that based on "the Act's definitions" it knows whether the Act applies to all 40 of its members. Cleland Dec. ¶¶ 30-31, 40-41 (ROA.712, 713-714); Mem. 2-3, 22 (ROA.728-729, 748).

These points doom any facial or as-applied vagueness claim. NetChoice's concessions about the Act's coverage (and non-coverage) of

its 40 members admit that the Act has clear and definite—*non-vague*—applications. So the Act is not "impermissibly vague in all of its applications." *McClelland*, 63 F.4th at 1013. Where, as here, a law's "application" to the challengers "is plain," a court must reject a facial vagueness challenge that relies on "uncertainty about" the law's application "in other situations." *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 61 (1976); *see Doe I v. Landry*, 909 F.3d 99, 117 (5th Cir. 2018). And NetChoice has not developed any as-applied claim. To the contrary, it admits that it knows whether the Act applies to *every one of its members* and has not identified one platform that presents a hard call. It has cited LinkedIn (which NetChoice does not claim to represent), but the Act excludes LinkedIn from coverage because it "primarily functions to provide a user with access to career development opportunities," § 3(2)(d)—even if some people "use it for social interaction," Mem. 25 (ROA.701). If there are edge cases where a platform is uncertain whether the Act applies, those cases should await an as-applied claim that a litigant (with standing to bring the claim) has properly developed.

b. NetChoice also claims that the strategy provision is unduly vague because it turns on the words "promotes" and "facilitates." Mem. 13-14 (ROA.739-740). This claim cannot support the injunction, which blocks much more than the strategy provision. The claim fails anyway. The strategy provision ties those words to specific harms that flow from targeted, interactive acts perpetrated online, § 6, so statutory "context"

49

provides the clarity that a word like "promotes" might lack "[w]hen taken in isolation." *Williams*, 553 U.S. at 294 (relying on "context" to construe the word "promotes"). The provision is thus unlike the hopelessly capacious statute condemned in *Baggett v. Bullitt*, 377 U.S. 360 (1964), which required taking an oath to "promote respect" for the flag and government institutions. *Id.* at 361-62, 371. And any edge cases requiring "context"-dependent analyses (Mem. 14 (ROA.740)) might support as-applied challenges, but not pre-enforcement facial invalidation. *See Williams*, 553 U.S. at 302-03; *id.* at 305-06 ("the mere fact that close cases can be envisioned," which is true under "virtually any statute," does not "render[ ] a statute vague"). Yet here too, NetChoice has never identified even one vague application for any identified member. So it cannot be granted any as-applied relief.

## 2. NetChoice's Preemption Claim Fails.

NetChoice claims that 47 U.S.C. § 230 preempts the strategy provision. Mem. 25-27 (ROA.751-753). This claim cannot support the injunction, which blocks much more than the strategy provision. The claim fails anyway.

The strategy provision does not "treat[ ]" any online platform "as the publisher or speaker of any information provided by" a third party—or impose "liab[ility]" for good-faith blocking or screening of material—and so it comports with section 230. 47 U.S.C. § 230(c). Although section 230 "immunize[s]" platforms from liability "for harm caused by

unremoved speech on their website[s]," it does not immunize platforms when liability is imposed "independently of whether the third-party speech that [platforms] host harms anybody." *Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263, 285 (5th Cir. 2024), *aff'd*, 145 S. Ct. 2291 (2025). This Court has accordingly held that section 230 does not preempt a Texas law requiring pornographic websites to use age-verification methods to prevent minors from accessing their sites. *Id.* at 266-67, 284-86. Liability under that law is based on "compl[iance] with" that age-verification provision, not on harm from third-party content. *Id.* at 285. Under that holding, section 230 does not preempt the strategy provision. That provision imposes liability based on whether a covered platform "compl[ies] with" the Act by making commercially reasonable efforts to adopt a harm-mitigation strategy—not based on whether third-party content "harms anybody." *Ibid.*

NetChoice has invoked language drawn from *Doe v. MySpace, Inc.*, 528 F.3d 413, 418-20 (5th Cir. 2008). Mem. 26 (ROA.752). But MySpace enjoyed immunity where a negligence claim sought to hold it liable for harm caused by third-party content it hosted. 95 F.4th at 285. The strategy provision imposes liability for failing to adopt a strategy—not for harm from third-party content. And again, the provision does not require platforms to "screen[ ]," "monitor," "delet[e]," or "block" content, Mem. 25-27 (ROA.751-753)—so NetChoice gets nothing from claims that it requires those things.

NetChoice has failed to show that there is "no set of circumstances" in which the strategy provision is valid. *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). It has not shown even one preempted application—again, its preemption claim rests on the erroneous pretense that the strategy provision imposes monitoring-and-censorship requirements—so it cannot be granted as-applied relief either.

## II. The Remaining Factors Strongly Support Rejecting The Preliminary-Injunction Order.

The district court ruled that the equitable factors support NetChoice and injunctive relief. ROA.940-942. The court erred.

The equities strongly weigh against the injunction. Enjoining enforcement of a "duly enacted [state law] clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). The harm is especially severe because the Act serves the powerful public interest in protecting children. *Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 126 (1989). The district court "accept[ed]" that "safeguarding the physical and psychological wellbeing of minors online is a compelling interest." ROA.931. And "[s]ocial-media platforms" create "unprecedented dangers," *Moody*, 603 U.S. at 716—particularly for minors. The injunction thwarts the State's efforts to protect minors from those dangers and undermines the public interest.

On the equities, the district court relied on its flawed merits assessment. ROA.940, 941. On irreparable harm, it also relied on

compliance costs. ROA.940-941. Dreamwidth claims that the costs of complying with the Act "threaten[ ] [its] ability to continue operating." Paolucci Dec. ¶ 35 (ROA.167). But as this Court already ruled, the Act requires only "commercially reasonable" efforts—not cost-prohibitive ones—based on a particular platform's resources. *NetChoice, LLC v. Fitch*, 134 F.4th 799, 809 (5th Cir. 2025). On remand NetChoice could have presented evidence on what is commercially reasonable for each covered member, *see ibid.* (calling for that showing), but it chose not to do so. NetChoice's other declarations are shot through with errors and do not support the district court's equitable assessment. As examples, the declarations suggest that the age-verification and parental-consent provisions will require "comprehensive and foolproof systems" and "cumbersome registration processes" (Cleland Dec. ¶¶ 45a, 45d (ROA.715)), that the age-verification provision will require using facial recognition and demanding government IDs (Veitch Dec. ¶ 32 (ROA.127)), that the parental-consent provision will demand expertise in family law (Paolucci Dec. ¶ 35 (ROA.167)), and that the strategy provision requires blocking content (Cleland Dec. ¶¶ 46a, 46b (ROA.716)). All that is wrong. The Act requires only the reasonable efforts that any responsible platform would already make.

On top of all this, NetChoice is unworthy of equitable relief. It urged the district court to defy this Court's mandate. That tactic was not an aberration: defiance is NetChoice's standard operating procedure. In

53

*Moody*, the Supreme Court rejected the view that a court can decide a facial claim based on a showing of only a law's "heartland applications": a plaintiff must instead show the law's "full set of applications." 603 U.S. at 718, 724; *see id.* at 726. On remand from that decision, NetChoice "urged" this Court "to ignore the Supreme Court's instructions" and consider only a law's "heartland applications." *NetChoice v. Paxton*, 121 F.4th 494, 498 (5th Cir. 2024) (citing NetChoice's supplemental brief "repeatedly arguing that 'heartland applications' are enough"). After *Moody* was decided, NetChoice told the district court in this case that *Moody* "*confirms*" that "facial relief is appropriate in this case." Notice 2 (ROA.430) (emphasis added). In the first appeal in this case, NetChoice told this Court that the first injunction "complied with *Moody*'s facial-challenge framework." NetChoice Br. 22 (CA5 No. 24-60341 Dkt. 46). After the State brought *Paxton* to the panel's attention in that appeal, NetChoice claimed that *Paxton* "provides no support for reversing th[e] preliminary injunction" and that "[n]o record development" could "change" the facial analysis. NetChoice Letter 1-2 (CA5 No. 24-60341 Dkt. 91). In *Fitch*, this Court rejected these arguments and ruled that the first injunction did not comport with *Moody* or *Paxton*. 134 F.4th at 807-09. On remand in *Fitch*, NetChoice urged the district court to defy this Court's mandate. *Supra* pp. 15-16, 24-25. After this Court stayed the second injunction, NetChoice went to the Supreme Court, where it tried to hide its defiance: its 40-page vacatur application never mentioned the

mandate-rule basis for this Court's stay order. The State disclosed NetChoice's defiance to the Supreme Court and emphasized (Vacatur Opp'n 3, 16) that a litigant that wins in the appellate process "should not be required to go through that entire process again to obtain execution of the judgment" it won on appeal. *DHS v. D.V.D.*, 145 S. Ct. 2627, 2630 (2025). NetChoice waved off *D.V.D.* on the ground that it addressed "lower court disobedience of *the Supreme Court's own orders*, *not circuit-level orders*," Vacatur Reply 6 n.2 (some emphases added)—NetChoice's plainest statement to date on how it regards this Court's orders.

This is a yearslong pattern of defiance by a sophisticated, strategic litigant. It will continue until the Judiciary puts a stop to it. This Court should do that now. NetChoice should not enjoy judicial relief insulating it from taking basic actions to protect children from predators.

## CONCLUSION

This Court should reverse—or at least vacate—the preliminary-injunction order.

Respectfully submitted,

LYNN FITCH
  *Attorney General*

*s/ Scott G. Stewart*

SCOTT G. STEWART
  *Solicitor General*
JUSTIN L. MATHENY
ANTHONY M. SHULTS
  *Deputy Solicitors General*
WILSON D. MINOR
  *Special Assistant Attorney General*
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
Email: scott.stewart@ago.ms.gov

*Counsel for Defendant-Appellant*

September 2, 2025

## CERTIFICATE OF SERVICE

I, Scott G. Stewart, hereby certify that this brief has been filed with the Clerk of Court using the Court's electronic filing system, which sent notification of such filing to all counsel of record.

Dated: September 2, 2025

*s/ Scott G. Stewart*
Scott G. Stewart
*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 12,985 words, excluding parts exempted by Fed. R. App. P. 32. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because its text has been prepared in proportionally spaced typeface, including serifs, using Microsoft Word 2016, in Century Schoolbook 14-point font.

Dated: September 2, 2025

*s/ Scott G. Stewart*
Scott G. Stewart
*Counsel for Defendant-Appellant*
