No. 25-60348

# In the United States Court of Appeals for the Fifth Circuit

NETCHOICE, L.L.C.,

*Plaintiff-Appellee,*

*v.*

LYNN FITCH, IN HER OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF MISSISSIPPI,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of Mississippi, Southern Division
Civil Action No. 1:24-cv-00170-HSO-BWR

## BRIEF OF PLAINTIFF-APPELLEE NETCHOICE

Steven P. Lehotsky
Jeremy Evan Maltz
Jonathan DeWitt
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW
Suite 700
Washington, DC 20001

Scott A. Keller
  *Counsel of Record*
Joshua P. Morrow
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
scott@lkcfirm.com

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF INTERESTED PERSONS

No. 25-60348
NetChoice, L.L.C.,
*Plaintiff-Appellee,*
*v.*
Lynn Fitch, in her official capacity as Attorney General of Mississippi,
*Defendant-Appellant.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. Plaintiff-Appellee NetChoice, LLC has no parent corporation, and no publicly held corporation owns 10% or more of its stock. These representations are made so that the Judges of this Court may evaluate possible disqualification or recusal.

**Plaintiff-Appellee:**
NetChoice, LLC

> **Counsel:**
> Scott A. Keller              J. William Manuel
> Steven P. Lehotsky           Stephen L. Thomas
> Jeremy Evan Maltz            BRADLEY ARANT BOULT
> Joshua P. Morrow             CUMMINGS LLP
> Jared B. Magnuson
> Jonathan DeWitt
> LEHOTSKY KELLER COHN LLP

**Defendant-Appellant:**
Lynn Fitch, in her official capacity as Attorney General of Mississippi

> **Counsel:**
> Lynn Fitch
> Scott G. Stewart
> Justin L. Matheny
> Anthony M. Shults
> Wilson D. Minor
> Clarence Lee Lott, III
> Elizabeth Claire Barker
> MISSISSIPPI ATTORNEY GENERAL'S OFFICE

DISTRICT COURT AMICI

**Amicus in Support of Plaintiff-Appellee:**
Electronic Frontier Foundation

> **Counsel:**
> Aaron David Mackey                    J. Cal Mayo, Jr.
> David Allen Greene                     MAYO MALLETTE PLLC
> ELECTRONIC FRONTIER FOUNDATION

FIFTH CIRCUIT AMICI (NO. 24-60341)

**Amicus in support of Plaintiff-Appellee:**
The Foundation for Individual Rights and Expression (FIRE)

> **Counsel:**
> Robert Lawrence Corn-Revere
> Arleigh P. Helfer
> FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION

**Amici in support of Plaintiff-Appellee:**

Chamber of Progress; The Coalition for Responsible Home Education; LGBT Tech; Woodhull Freedom Foundation

> **Counsel:**
>
> Kerry Maeve Sheehan              Carlos Gutierrez
> CHAMBER OF PROGRESS              LGBT TECH
>
> Lawrence Walters                 Mark W. Brennan
> WALTERS LAW GROUP                Sean Marotta
>                                  J. Ryan Thompson
>                                  Thomas B. Veitch
>                                  HOGAN LOVELLS US LLP

**Amicus in support of Plaintiff-Appellee:**

TechFreedom

> **Counsel:**
>
> Corbin K. Barthold
> TECHFREEDOM

**Amici in support of Plaintiff-Appellee:**

Electronic Frontier Foundation; American Civil Liberties Union; American Civil Liberties Union of Mississippi

> **Counsel:**
>
> Vera Eidelman
> American Civil Liberties Union Foundation
>
> Joshua Tom
> American Civil Liberties Union of Mississippi Foundation
>
> David Greene
> Molly Buckley
> Aaron Mackey
> ELECTRONIC FRONTIER FOUNDATION

SUPREME COURT AMICI (NO. 25A97)

**Amici in support of Plaintiff-Appellee:**
The Foundation for Individual Rights and Expression (FIRE); The Center for Democracy and Technology (CDT); Clay Calvert; Electronic Frontier Foundation (EFF); National Coalition Against Censorship (NCAC); Student Press Law Center (SPLC); Woodhull Freedom Foundation

> **Counsel:**
> Robert Lawrence Corn-Revere
> FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION

**Amici in support of Plaintiff-Appellee:**
LGBT Technology Institute; The Trevor Project; PFLAG, Inc.; Bay Area Lawyers for Individual Freedom; Hacking the Workforce; Fight for the Future

> **Counsel:**
> Katelyn Nichole Ringrose
> J. Jonathan Hawk
> Samantha J. Smart
> Doris L. Yuen
> Nathan W. Gray
> MCDERMOTT WILL & EMERY

**Amicus in support of Plaintiff-Appellee:**
Stop Child Predators

> **Counsel:**
> Joshua N. Mitchell
> Jeremy M. Bylund
> John B. Goerlich
> WILLKIE FARR & GALLAGHER LLP

**Amici in support of Plaintiff-Appellee:**
Technet; Chamber of Progress; Computer & Communications Industry Association (CCIA); Engine Advocacy; Internet Works; Software & Information

Industry Association (SIIA)

**Counsel**
Paul Alessio Mezzina
Nema Milaninia
Alicia O'Brien
Olivia Radin
Jamie Dycus
Rachel E. Craft
KING & SPALDING LLP

**Amici in support of Plaintiff-Appellee:**
American Booksellers for Free Expression (ABFE); Association of American Publishers (AAP); The Authors Guild, Inc.; Comic Book Legal Defense Fund (CBLDF); Freedom to Read Foundation (FTRF); Independent Book Publishers Association (IBPA)

**Counsel:**
Stephanie Schuster
Brian M. Ercole
James D. Nelson
MORGAN, LEWIS & BOCKIUS LLP

**Amicus in support of Plaintiff-Appellee:**
Center for Individual Rights

**Counsel:**
Kristin A. Linsley                    Darpana Sheth
Lee R. Crain                          Todd F. Gaziano
Christopher Chorba                    CENTER FOR INDIVIDUAL RIGHTS
Samuel Eckman
Jessica Wagner
Jeff Liu
GIBSON, DUNN & CRUTCHER LLP

**Amicus in support of Plaintiff-Appellee:**

Taxpayers Protection Alliance

**Counsel:**

Mark S. Davies

Adam B. Banks

Zach Williams

Kufere Laing

WHITE & CASE LLP

*/s/ Scott A. Keller*

Scott A. Keller

*Counsel of Record for Plaintiff-Appellee*

## STATEMENT REGARDING ORAL ARGUMENT

Appellee NetChoice agrees with Appellant that oral argument would aid the Court in resolving the issues presented in this appeal.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ........................................................................ i

Statement Regarding Oral Argument .............................................................. vii

Table of Authorities ........................................................................................... x

Introduction ....................................................................................................... 1

Statement of Jurisdiction .................................................................................. 5

Issues Presented ................................................................................................. 5

Statement of the Case ........................................................................................ 6

    A. Background. ............................................................................................ 6

        1. NetChoice members' nine covered websites disseminate speech protected by the First Amendment. .............................................................................. 6

        2. These nine websites' content-moderation policies prioritize user safety .................................................................. 7

        3. Parents have many options to oversee and control how their children use these nine websites and the internet. ............................................................................. 8

    B. Mississippi House Bill 1126 is a content-based law that restricts access to fully protected speech and overrides websites' content-moderation efforts. ........................................... 9

    C. Procedural history. ............................................................................... 13

Summary of the Argument ............................................................................... 15

Standard of Review .......................................................................................... 18

Argument ........................................................................................... 19

I.  NetChoice is likely to succeed on the merits ..................................... 19

    A.  The district court's *as-applied* ruling and relief for nine
        websites obeyed this Court's prior decision, which
        focused on the first step of *Moody*'s *facial*-challenge
        framework. ..................................................................................... 19

    B.  The Act's central coverage provisions make content-
        based distinctions, so all the Act's speech regulations
        trigger and fail strict scrutiny as applied to the nine
        NetChoice members' covered websites. ....................................... 27

    C.  The Act's parental-consent, age-verification, and
        monitoring-and-censorship requirements are each
        independently unlawful as applied to the nine
        NetChoice members' covered websites. ....................................... 33

        1.  The parental-consent requirement violates the First
            Amendment as applied to these nine websites. ................... 34

        2.  The age-verification requirement violates the First
            Amendment as applied to these nine websites. ................... 38

        3.  The monitoring-and-censorship requirements are
            unlawful as applied to these nine websites. ......................... 40

    D.  Defendant's counterarguments fail. ............................................. 48

II.  The other preliminary-injunction factors favor NetChoice. ............. 53

Conclusion ......................................................................................... 56

Certificate of Service ......................................................................... 58

Certificate of Compliance ................................................................. 58

# TABLE OF AUTHORITIES

Page(s)

## Cases

*303 Creative LLC v. Elenis,*
  600 U.S. 570 (2023) ......................................................... 42

*A.B. v. Salesforce, Inc.,*
  123 F.4th 788 (5th Cir. 2024) ........................................ 46

*ACLU v. Mukasey,*
  534 F.3d 181 (3d Cir. 2008)............................................ 40

*Alexander v. United States,*
  509 U.S. 544 (1993) ........................................................ 41

*Am. Booksellers Found. v. Dean,*
  342 F.3d 96 (2d Cir. 2003)............................................. 40

*Ark. Writers' Proj., Inc. v. Ragland,*
  481 U.S. 221 (1987) ........................................................ 28

*Ass'n of Club Execs. of Dallas v. City of Dallas,*
  83 F.4th 958 (5th Cir. 2023) .......................................... 29

*Baggett v. Bullitt,*
  377 U.S. 360 (1964) ................................................... 46, 50

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963) .......................................................... 45

*Bartnicki v. Vopper,*
  532 U.S. 514 (2001) ........................................................ 31

*Book People, Inc. v. Wong,*
  91 F.4th 318 (5th Cir. 2024) .................................... 19, 54

*Boos v. Barry,*
    485 U.S. 312 (1988) ........................................................ 29

*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973) ........................................................ 23

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011) ....................................1, 4, 16, 30, 31, 34-37, 43, 45, 48-50

*Buchanan v. Alexander,*
    919 F.3d 847 (5th Cir. 2019)........................................... 22

*Bucklew v. Precythe,*
    587 U.S. 119 (2019) ........................................................ 20

*Burnett Specialists v. Cowen,*
    140 F.4th 686 (5th Cir. 2025) ......................................... 26

*Cath. Leadership Coal. of Tex. v. Reisman,*
    764 F.3d 409 (5th Cir. 2014)........................................... 23

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ................................................... 48, 50

*City of Cincinnati v. Discovery Network, Inc.,*
    507 U.S. 410 (1993) ................................................... 28, 29

*City of Houston v. Hill,*
    482 U.S. 451 (1987) ........................................................ 42

*City of Lakewood v. Plain Dealer Publ'g Co.,*
    486 U.S. 750 (1988) ........................................................ 42

*City of Renton v. Playtime Theatres, Inc.,*
    475 U.S. 41 (1986) .......................................................... 29

*Comput. & Commc'ns Indus. Ass'n v. Paxton,*
    747 F. Supp. 3d 1011 (W.D. Tex. 2024) ............................ 2, 28, 40, 43, 46, 47

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier,*
  2025 WL 1570007 (N.D. Fla. June 3, 2025) ...................... 2, 31, 34, 35, 37, 38

*Counterman v. Colorado,*
  600 U.S. 66 (2023) ........................................................................ 43

*Doe v. MySpace, Inc.,*
  528 F.3d 413 (5th Cir. 2008) .................................................... 17, 47

*Erznoznik v. Jacksonville,*
  422 U.S. 205 (1975) ................................................................. 30, 36

*FCC v. Fox Television Stations, Inc.,*
  567 U.S. 239 (2012) ....................................................................... 32

*FEC v. Cruz,*
  596 U.S. 289 (2022) ............................................................... 33, 45

*Franklin v. Regions Bank,*
  125 F.4th 613 (5th Cir. 2025) ...................................................... 21

*Free Speech Coal., Inc. v. Paxton,*
  145 S. Ct. 2291 (2025) ..................1, 3, 4, 17, 18, 27, 30, 35, 37-39, 48, 50-52

*Hess v. Indiana,*
  414 U.S. 105 (1973) ....................................................................... 43

*Iancu v. Brunetti,*
  588 U.S. 388 (2019) ....................................................................... 23

*Jackson v. City of Houston,*
  143 F.4th 640 (5th Cir. 2025) ...................................................... 14

*Kolender v. Lawson,*
  461 U.S. 352 (1983) ....................................................................... 45

*McClelland v. Katy Indep. Sch. Dist.,*
  63 F.4th 996 (5th Cir. 2023) ........................................................ 33

*McIntyre v. Ohio Elections Comm'n,*
514 U.S. 334 (1995) ....................................... 40

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue,*
460 U.S. 575 (1983) ............................... 3, 18, 49

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024) ..................... 1, 6, 7, 13-15, 19-21, 23-25, 29, 44, 49, 55

*Moore v. City of Kilgore,*
877 F.2d 364 (5th Cir. 1989).............................. 41

*Morales v. Trans World Airlines, Inc.,*
504 U.S. 374 (1992) ..................................... 5, 54

*Nat'l Press Photographers Ass'n v. McCraw,*
90 F.4th 770 (5th Cir. 2024) ............................ 33

*Nat'l Rifle Ass'n of Am. v. Vullo,*
602 U.S. 175 (2024) ......................... 1, 17, 42, 44

*Near v. Minnesota ex rel. Olson,*
283 U.S. 697 (1931) ...................................... 41

*NetChoice v. Carr,*
2025 WL 1768621 (N.D. Ga. June 26, 2025)................ 2, 28, 35, 37-40, 50, 51

*NetChoice, L.L.C. v. Fitch,*
134 F.4th 799 (5th Cir. 2025) ..................... 2, 3, 13-15, 19, 20, 21, 24-27, 48

*NetChoice, L.L.C. v. Fitch,*
2025 WL 2078435 (5th Cir. July 17, 2025).................... 15

*NetChoice, LLC v. Bonta,*
113 F.4th 1101 (9th Cir. 2024) ................... 17, 37, 42, 44

*NetChoice, LLC v. Bonta,*
2025 WL 2600007 (9th Cir. Sept. 9, 2025) ................ 13, 14

*NetChoice, LLC v. Bonta,*
  770 F. Supp. 3d 1164 (N.D. Cal. 2025) .......................................... 13

*NetChoice, LLC v. Fitch,*
  145 S. Ct. 2658 (2025) (mem.)..................................................... 2, 15

*NetChoice, LLC v. Griffin,*
  2025 WL 978607 (W.D. Ark. Mar. 31, 2025)............... 2, 28, 32, 35, 37-39, 47

*NetChoice, LLC v. Reyes,*
  748 F. Supp. 3d 1105 (D. Utah 2024)................................... 2, 35, 38

*NetChoice, LLC v. Yost,*
  778 F. Supp. 3d 923 (S.D. Ohio Apr. 16, 2025) ..................... 2, 28, 35, 37, 48

*Netflix, Inc. v. Babin,*
  88 F.4th 1080 (5th Cir. 2023) .......................................................... 53

*Nken v. Holder,*
  556 U.S. 418 (2009) ..................................................................... 5, 55

*Opulent Life Church v. City of Holly Springs,*
  697 F.3d 279 (5th Cir. 2012)......................................................... 5, 55

*Packingham v. North Carolina,*
  582 U.S. 98 (2017) ..................... 1, 3, 4, 6, 17, 18, 29, 31, 32, 35, 38, 39, 48, 50

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) ................................................................27-29, 44

*Reno v. ACLU,*
  521 U.S. 844 (1997) ......................................................................... 29

*Roark & Hardee LP v. City of Austin,*
  522 F.3d 533 (5th Cir. 2008)............................................................ 32

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
  592 U.S. 14 (2020) ...................................................................... 4, 54

*Sable Commc'ns of Cal., Inc. v. FCC,*
   492 U.S. 115 (1989) ................................................................ 48

*Siders v. City of Brandon,*
   123 F.4th 293 (5th Cir. 2024) ............................................... 20

*Smith v. California,*
   361 U.S. 147 (1959) ......................................................... 33, 43

*Sorrell v. IMS Health Inc.,*
   564 U.S. 552 (2011) ................................................ 27, 42, 44

*Texas v. United States,*
   126 F.4th 392 (5th Cir. 2025) ............................................... 24

*United States v. Allam,*
   140 F.4th 289 (5th Cir. 2025) ........................................... 3, 22

*United States v. Jubert,*
   139 F.4th 484 (5th Cir. 2025 ................................................ 22

*United States v. Miselis,*
   972 F.3d 518 (4th Cir. 2020) ................................................. 44

*United States v. Nat'l Treasury Emps. Union*
   513 U.S. 454 (1995) ............................................................ 3, 23

*United States v. Playboy Ent. Grp., Inc.,*
   529 U.S. 803 (2000) ................................................ 31, 37, 48

*United States v. Williams,*
   553 U.S. 285 (2008) .............................................................. 32

*Virginia v. Am. Booksellers Ass'n, Inc.,*
   484 U.S. 383 (1988) ........................................................ 37, 54

## Statutes and Legislation

28 U.S.C. § 1292 ..................................................................... 5

28 U.S.C. § 1331 ................................................................................. 5

28 U.S.C. § 1343(a) ........................................................................... 5

47 U.S.C. § 230 ................................................................. 17, 46, 47

Miss. Code § 11-77-3(d) .................................................................. 12

Miss. Code § 75-24-9 ....................................................................... 13

Miss. Code § 75-24-19 ..................................................................... 13

Miss. Code § 75-24-20 ..................................................................... 13

Mississippi House Bill 1126 (2024) ........................................... *passim*

Mississippi House Bill 1196 (2024) ................................................ 31

Texas House Bill 18 (2023) .............................................................. 40

**Other Authorities**

The Bluesky Team, *Our Response to Mississippi's Age Assurance
    Law*, Bluesky Blog (Aug. 22, 2025) .................................................. 53

Brief for Plaintiffs-Appellees CCIA & NetChoice,
    *Comput. & Commc'ns Indus. Ass'n v. Paxton*, No. 24-50721 (5th
    Cir. July 3, 2025) ......................................................... 41, 43, 44, 46

Dreamwidth, *Mississippi legal challenge: beginning 1 September,
    we will need to geoblock Mississippi IPs* (Aug. 26, 2025) ............................... 53

Groups.io, *About* ............................................................................ 54

Groups.io, *Why access from Mississippi is currently blocked* ............................ 54

Nextdoor, *Member Agreement* (Aug. 15, 2025) ............................................ 53

## INTRODUCTION

Mississippi House Bill 1126 (2024) ("Act") violates the First Amendment by restricting online speech in multiple ways. It uses content-based distinctions to "target[]" protected speech on state-disfavored "social media websites." Br.43. It unconstitutionally prohibits minors from speaking and accessing the enormous amount of fully protected speech on these websites *"without their parent's prior consent." Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794, 795 n.3 (2011). It unlawfully imposes burdensome "age verification" requirements that "direct[ly] target[] . . . fully protected speech" for both adults and minors. *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2310 (2025) ("*FSC*"). The Act also violates the First Amendment by imposing monitoring-and-censorship requirements for protected speech, which "coerc[e] private part[ies] to punish or suppress disfavored speech on [Mississippi's] behalf." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024).

The district court correctly issued a preliminary injunction by holding that these provisions are likely unconstitutional "*as[] applied*" to nine specific websites operated by NetChoice members. ROA.944 (emphasis added). These websites are, for some, the "principal sources for . . . exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). They disseminate a "staggering amount" of fully protected speech, across "billions of posts or videos." *Moody v. NetChoice, LLC*, 603 U.S. 707, 719, 734 (2024). The district court faithfully applied Supreme

Court precedent in protecting access to this fully protected speech, joining seven other courts blocking enforcement of similar state laws.[1]

Because "the Mississippi law is likely unconstitutional," *NetChoice, LLC v. Fitch*, 145 S. Ct. 2658 (2025) (mem.) (Kavanaugh, J., concurring in the denial of application to vacate stay of preliminary injunction), this Court should immediately lift its stay of the injunction pending appeal. Dkt.25-1. Because of that stay, NetChoice member Dreamwidth was "forced to block access . . . from all IP addresses that geolocate to Mississippi." *Infra* p.53 n.15. Similarly, for NetChoice member Nextdoor, minors now "are not permitted to create an account . . . if they are residents of the State of Mississippi." *Infra* p.53 n.16. Some non-NetChoice member websites have also "made the difficult decision to block access from Mississippi IP addresses." *Infra* pp.53-54 nn.17-18.

The district court and NetChoice obeyed this Court's prior appellate mandate and opinion. The mandate did not forbid NetChoice from amending its complaint or prohibit the district court from adjudicating NetChoice's newly-added, *as-applied* challenges. *See NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 803-09 (5th Cir. 2025). And the opinion did not resolve any First

---

[1] *E.g.*, *NetChoice v. Carr*, 2025 WL 1768621 (N.D. Ga. June 26, 2025); *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 1570007 (N.D. Fla. June 3, 2025); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923 (S.D. Ohio Apr. 16, 2025); *NetChoice, LLC v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025); *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164 (N.D. Cal. 2025); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024) ("*CCIA*"); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024).

Amendment merits issues. *See id.* Instead, after finding standing, this Court addressed only issues with identifying the Act's "full range" of applications—the first step under *Moody*'s "*facial* challenge" standard. *Id.* at 807-09 (emphasis added). That analysis is not necessary for this "First Amendment *as-applied* challenge" for nine specific websites. ROA.944 (emphasis added).

The district court here thus properly "avoid[ed]" ruling on NetChoice's broader facial challenge, because NetChoice's successful as-applied challenge "'fully protect[s]'" NetChoice's nine covered member websites without addressing claims or relief for "'nonparties.'" ROA.943 (quoting *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 478 (1995)). Far from "defying" this Court's mandate or opinion, Br.29, the district court honored this Court's "rule that courts should address as-applied challenges before considering facial ones," *United States v. Allam*, 140 F.4th 289, 294 (5th Cir. 2025). *See* ROA.942.

Defendant's additional counterarguments fail. First, this Court's prior opinion already held that this Act regulates "protected speech," *Fitch*, 134 F.4th at 804, not mere "conduct," Br.29-33. Laws imposing threshold restrictions for disseminating or accessing online speech necessarily regulate speech. *E.g.*, *Packingham*, 582 U.S. at 107; *FSC*, 145 S. Ct. at 2310.

Second, the Act's governmental mandates restricting speech do not become constitutional just because they are "commercially reasonable." Br.5; *e.g.*, *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 592 (1983). *Brown* would not have come out differently had California imposed

only "commercially reasonable" restrictions on minors buying violent video games. *See* 564 U.S. at 795 & n.3. Besides, the Act unconstitutionally infringes *users'* "access" to protected speech, even if a website could implement these speech restrictions in a commercially reasonable way. *Packingham*, 582 U.S. at 107.

Third, *FSC*'s holding that governments can require age-verification for "pornography" websites, which triggers (but may pass) intermediate scrutiny, does not extend to laws restricting "fully protected speech" like this Act. *FSC*, 145 S. Ct. at 2310, 2312; *cf.* Br.5, 20. Pornography is a unique category of speech "obscene to minors," which is simultaneously protected for adults yet *unprotected* for minors. *FSC*, 145 S. Ct. at 2315. By contrast, this Act "direct[ly] target[s]" vast amounts of "fully protected speech" for both adults and minors, and *FSC* expressly recognized such laws require traditional First Amendment "strict scrutiny." *Id.* at 2310. In any case, all of this Act's much different and more sweeping burdens on protected speech fail intermediate scrutiny, too.

The Act has already imposed immediate, irreparable injury, which far outweighs any possible governmental interest in enforcing these unconstitutional speech restrictions. The websites that have blocked or limited Mississippi users' access have already experienced a "loss of First Amendment freedoms," which even for "minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). The covered websites still operating in

Mississippi likewise face irreparable harm from "a Hobson's choice: continually violate the [Act] and expose themselves to potentially huge liability; or . . . suffer the injury of obeying the law during the pendency of the proceedings and any further review." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).

These recent real-world effects of this Court's stay of the preliminary injunction demonstrate why the balance of equities and public interest also favor NetChoice. These two factors "merge" in lawsuits against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). And "[i]njunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 298 (5th Cir. 2012) (cleaned up). Without the injunction, these nine NetChoice members' covered websites, and their users, continue to suffer the loss of First Amendment rights to disseminate and access protected speech free from government restrictions and threatened substantial penalties. This Court should therefore affirm.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has jurisdiction under 28 U.S.C. § 1292.

## ISSUES PRESENTED

Whether the district court abused its discretion by preliminarily enjoining Defendant from enforcing the challenged provisions of the Act,

including its parental-consent, age-verification, and monitoring-and-censor-ship requirements, as-applied to nine specific NetChoice members' websites.

## STATEMENT OF THE CASE

### A. Background.

#### 1. NetChoice members' nine covered websites disseminate speech protected by the First Amendment.

NetChoice is a leading trade association for internet companies. ROA.692. The Act covers nine websites operated by NetChoice members: (1) Dreamwidth; (2) Facebook; (3) Instagram; (4) Nextdoor; (5) Pinterest; (6) Reddit, (7) Snapchat; (8) X; and (9) YouTube.[2] ROA.712, 728. Each of these websites "engage[s] in expression" by "curat[ing]" and "display[ing]" pro-tected "third-party speech." *Moody*, 603 U.S. at 716-17; *see* ROA.712-13.

These nine covered websites are the kinds of "social media" websites that people have a right to "access," because they allow users to engage with vast amounts of protected expression. *Packingham*, 582 U.S. at 108; *see* ROA.693-95. They "allow users to upload content . . . to share [it] with oth-ers." *Moody*, 603 U.S. at 719; *see* ROA.693, 712-13. Consequently, they

---

[2] This brief uses "websites" to refer to both web-based services and smartphone apps. Defendant wrongly states that "[t]he amended complaint does not . . . describe" the nine covered websites. Br.15. NetChoice specifi-cally described these websites in its complaint (ROA.642, 644-45), prelimi-nary injunction motion (ROA.728-29), and the Cleland Declaration (ROA.698-718).

disseminate "billions of posts or videos" that are their users' authored expression. *Moody*, 603 U.S. at 719, 734. Websites have an independent First Amendment right to disseminate these posts in "personalized," "customized," "curated," or "individualized" "compilations" reflecting each websites' editorial viewpoints. *Moody*, 603 U.S. at 716, 718, 734; *see* ROA.712-13.

### 2. These nine websites' content-moderation policies prioritize user safety.

Each of the nine websites develops and enforces its own rules, or "content moderation" policies, governing what speech it disseminates. *Moody*, 603 U.S. at 717; *see* ROA.699-709. These rules "limit[ the] publication of speech that NetChoice members consider harmful, objectionable, or simply not conducive to their communities." ROA.698.

Content moderation takes many forms. A website might remove content merely for being off-topic. *E.g.*, ROA.708-09. Websites also must contend with speech that is lawful yet considered objectionable by many, such as hate speech and graphic violence. *E.g.*, ROA.708. Content moderation also works to block material that is illegal, such as child sexual abuse material. *E.g.*, ROA.704. NetChoice's members have content-moderation policies disallowing broad categories of harmful or objectionable speech, including content regulated by the Act. ROA.699-709.

But content moderation is difficult. ROA.709-11. Scale is one reason. NetChoice members remove billions of pieces of content each year. ROA.710. Complexity and subjectivity are others. "Whether a given piece of

content violates a website's policies can turn on a complicated interaction between the intent of the user, the content itself, the social and cultural context, the context on the service, and the effect on the reader." ROA.710-11.

Successful content moderation also requires constant innovation, because "malicious actors always attempt to find ways to avoid moderation." ROA.711. Despite these hurdles, the record reflects that "companies are successfully prioritizing the safety of their users." ROA.699 (citation omitted).

### 3.    Parents have many options to oversee and control how their children use these nine websites and the internet.

The district court found that many tools are available to parents to control what content their children see, and for how long. ROA.934. Parents can control minors' access to *devices* by locking or limiting specific apps and websites, limiting content, and setting usage limits. ROA.696.

Parents can also control the *networks* that minors use. ROA.695. Wireless routers allow parents to manage which networks minors connect to and implement rules defining which websites minors can use (and when). ROA.696. Many internet service providers offer similar controls. ROA.695.

Parents can also control *software*. Web browsers offer parental controls, and third-party parental control software is available for many devices. ROA.696. In addition, many members have developed their own parental controls and other protections for minors on their websites. ROA.697.

### B. Mississippi House Bill 1126 is a content-based law that restricts access to fully protected speech and overrides websites' content-moderation efforts.

The Act "targets 'social media websites'" (Br.43) based on the content those services disseminate. The Act forces NetChoice members' covered websites to comply with onerous requirements—or stop disseminating speech in Mississippi, as some have. *Infra* p.53.

**1. The Act's scope. §3.**[3] The Act regulates only specific websites. It applies to any entity that (1) "[o]wns or operates a digital service"; and (2) "[d]etermines" both the "purpose" and "means" of "collecting and processing [users'] personal identifying information." §2(b)(i)-(iii). A "digital service" is "a website, an application, a program, or software that collects or processes personal identifying information." §2(a). But the Act regulates only a website that:

> (a) Connects users in a manner that allows users to *socially* interact with other users on the digital service;
>
> (b) Allows a user to create a public, semi-public or private profile for purposes of signing into and using the digital service; and
>
> (c) Allows a user to create or *post* content that can be viewed by *other users* of the digital service, including sharing content on:
>
>> (i) A *message board*;
>>
>> (ii) A *chat room*; or
>>
>> (iii) A *landing page*, video *channel* or main *feed* that presents to a user content created and posted by other users.

---

[3] All similar citations refer to Mississippi House Bill 1126. *See* ROA.70-82.

§ 3(1) (emphases added).

The Act also expressly excludes certain websites based on content, including a website that:

> (a) . . . processes or maintains user data in connection with . . . employment . . . ;

> (b) [provides] e-mail or direct messaging services, if the [website] facilitates only those services;

> (c) . . . (i) Primarily functions to provide a user with access to news, sports, commerce, online video games or content primarily generated or selected by the digital service provider; and (ii) Allows chat, comment or other interactive functionality that is incidental to the digital service; or

> (d) . . . primarily functions to provide a user with access to [certain] career development opportunities.

§ 3(2) (some line breaks deleted).

**2. Speech regulations.** The Act regulates NetChoice members' nine covered websites by burdening and restricting access to speech on those websites in three ways most relevant here.[4]

**a. Parental consent. § 4(2).** The Act requires covered websites to obtain express parental consent as a precondition for minors to create or maintain an account—and therefore to access protected speech on covered websites.

---

[4] The preliminary injunction correctly bars Defendant from enforcing any part of the Act as applied to the nine NetChoice member covered websites, because all the Act's speech restrictions depend on the Act's unconstitutionally content-based coverage definitions. *See* ROA.926 n.4, 928.

Covered websites "shall not permit an account holder who is a known minor to be an account holder unless the known minor has the express consent from a parent or guardian." § 4(2). The Act enumerates five "[a]cceptable methods of obtaining express consent," plus a sixth catch-all. § 4(2).

NetChoice members' nine covered websites do not currently require parents to affirmatively provide consent before allowing teenagers on their services. *See, e.g.*, ROA.128 (Veitch Decl. ¶ 36). So this provision forces teenagers to obtain parental consent to engage in and view protected expression.

**b. Age verification. § 4(1).** Covered websites "shall make commercially reasonable efforts to *verify* the age of the person creating an account . . . ." § 4(1) (emphasis added). Users must create accounts on members' websites to speak and access some or all of the websites' content. ROA.713. None of the nine websites require users to verify their ages using documentation or biometrics before creating an account. *See* ROA.715.

The uncontested record evidence demonstrates that age verification deters potential users from accessing covered websites. ROA.715. Various people explained this when they refused to provide age verification during Nextdoor's test of such a requirement:

- "What?? I am over 60. There must be another way I do not have to give my actual [personal] info to be hacked . . . . I'm 60 years old and I am not sending a copy of my driver's license to anyone."

- "I'm 57 years old and they're asking me for my government issued ID. This is totally insane. I put my age down to zero because I thought it was a scam."

- "I accidentally hit the wrong year and was told I couldn't have access anymore . . . . Since I can't access my account, I wish for it to be deleted."

ROA.140-43 (Pai Decl. ¶¶ 23-26) (minor punctuation altered).

**c. Monitoring-and-censorship provisions. § 6.** The Act also imposes monitoring-and-censorship provisions that target content-based and viewpoint-based categories of speech. Covered websites must "make commercially reasonable efforts to develop *and implement* a strategy to *prevent* or mitigate [a] known minor's *exposure* to harmful *material*[5] and other *content* that promotes or facilitates [certain] harms to minors" in enumerated categories of speech. § 6(1) (emphases added). Those categories are:

> (a) Consistent with evidence-informed medical information, the following: self-harm, eating disorders, substance use disorders, and suicidal behaviors;
>
> (b) Patterns of use that indicate or encourage substance abuse or use of illegal drugs;
>
> (c) Stalking, physical violence, online bullying, or harassment;
>
> (d) Grooming, trafficking, child pornography, or other sexual exploitation or abuse;
>
> (e) Incitement of violence; or
>
> (f) Any other illegal activity.

§ 6(1). The Act does not define these subjective terms or limit them to unprotected speech.

---

[5] The Act defines "[h]armful material," § 2(c), as obscenity for minors, by reference to Mississippi Code § 11-77-3(d).

These requirements do not preclude: "(a) Any minor from deliberately and independently searching for, or specifically requesting, content; or (b) . . . [a covered website] providing resources for the prevention or mitigation of the harms described [above]." § 6(2).

**3. Enforcement.** The Act designates violations as "unfair or deceptive trade practices" under State law. § 8(1). It gives Defendant enforcement authority to seek injunctive relief, civil monetary penalties of up to $10,000 per violation, and even criminal liability. Miss. Code §§ 75-24-9, -19, -20.

## C.  Procedural history.

*Initial facial challenge.* NetChoice's initial complaint raised only facial challenges, and NetChoice moved for a preliminary injunction. ROA.67. In a detailed decision issued the same day as *Moody*, the district court held that the Act was likely *facially* unconstitutional. ROA.427.

On appeal, this Court vacated that injunction without resolving any First Amendment merits issues. This Court first held that NetChoice had standing to raise both "the rights of its members" and "its members' users." *Fitch*, 134 F.4th at 804-07.[6] The Court then held that because the district court ruled on

---

[6] The Ninth Circuit's recent decision in *NetChoice, LLC v. Bonta*, 2025 WL 2600007 (9th Cir. Sept. 9, 2025), is thus irrelevant. *Bonta*'s associational-standing holding was incorrect, and this Court's prior opinion already held that NetChoice has associational standing. 134 F.4th at 807; *contra Bonta*, 2025 WL 2600007, at *5. Nor does this Mississippi Act's coverage depend on "personalized feeds," unlike the California law in *Bonta*, where the "prudential"

NetChoice's "facial challenge" the same day that "*Moody . . .* reframed the analysis for facial challenges," the district court "understandably did not conduct [*Moody*'s] analysis" for facial challenges. *Id.* at 803, 807-09. The Court thus vacated the district court's holding "that the Act is *facially* unconstitutional" and remanded for the district court to "resolve" a "factual inquiry" about the Act's entire coverage "for each [website]" possibly regulated—a holding pertinent to only a *facial* challenge. *Id.* at 809 (emphasis added).

*Added as-applied challenges.* On remand, NetChoice amended its complaint to add *as-applied* claims for the nine members' covered websites, ROA.683-84, and updated its explanations about why the Act covers and burdens those websites, ROA.691-718 (Cleland Decl.). NetChoice also heeded this Court's opinion holding that a facial challenge required more information about "whether the Act applies to [other websites]." *Fitch*, 134 F.4th at 808. For example, this court asked, "whether the Act applies to [websites] like Uber." *Id.* at 808-09. On remand, NetChoice asserted that the Act "does not regulate services such as 'Uber, Google Maps, Draft Kings, [or] Microsoft Teams," among others. ROA.727; *see* ROA.748.

After briefing, the district court again issued a detailed opinion, holding the Act "unconstitutional . . . *as-applied*" to nine specifically enumerated

---

standing holding relied on that key distinction. *Id.* at *7. Besides, Defendant's brief did not raise, and thus forfeited, any arguments about prudential standing. *See Jackson v. City of Houston*, 143 F.4th 640, 647 n.6 (5th Cir. 2025).

websites. ROA.944 (emphasis added). This Court stayed that injunction pending appeal in a one-sentence order. *See NetChoice, L.L.C. v. Fitch*, 2025 WL 2078435, at *1 (5th Cir. July 17, 2025). The Supreme Court declined to vacate that order. *Fitch*, 145 S. Ct. at 2658. Justice Kavanaugh concurred, explaining that although "the balance of harms and equities" did not favor NetChoice "at th[at] time," "the Mississippi law is likely unconstitutional." *Id.*

## SUMMARY OF THE ARGUMENT

I. NetChoice is likely to succeed on the merits of its as-applied challenges for nine members' covered websites.

**A.** The district court's as-applied merits ruling and injunction, on remand, did not violate this Court's prior decision. The district court properly found violations for—and granted relief to—only the nine specific websites identified in NetChoice's newly-added *as-applied* challenges. This Court's prior opinion did not resolve any First Amendment merits issues. Instead, the earlier decision found standing and then held that the district court "'did not address the *full range* of activities the law[] cover[s],' as required by *Moody*," under the first step of its *facial*-challenge framework. *Fitch*, 134 F.4th at 809 (quoting *Moody*, 603 U.S. at 724) (emphasis added)). This Court's prior decision did not bar NetChoice from amending its complaint to add as-applied claims or require (contrary to the usual rule) the district court to

address the facial challenge before it could rule on any new as-applied challenges.

**B.** The Act's central coverage definitions make content-based distinctions, triggering strict scrutiny for all the Act's speech restrictions. For example, this Act exempts websites that primarily disseminate "news" or "sports." § 3(2)(c)(i). And the Act's coverage fails strict scrutiny. The Act is overinclusive because it sweeps in vast amounts of fully protected speech. Yet parents already have robust tools to help minors avoid online harms, and Mississippi can support those tools and enforce criminal laws against bad actors' conduct. In addition, the nine websites at issue here continue to implement their content-moderation policies covering objectionable speech. The Act is also underinclusive by exempting favored subject areas and many websites that also allow users to interact. The Act's coverage definitions also are unconstitutionally vague.

**C.** The Act's three main speech restrictions independently trigger and fail strict scrutiny.

The parental-consent requirement violates the First Amendment because governments cannot enact laws restricting minors from speaking or accessing protected speech "*without their parents' prior consent.*" *Brown*, 564 U.S. at 795 n.3. Otherwise, any State could restrict minors' access to core political, artistic, and religious speech. The State has not shown a sufficient interest or narrow tailoring, because existing parental controls and content moderation are less restrictive and more effective than one-time consent.

16

The age-verification mandate independently violates the First Amendment under *FSC*. As *FSC* recognized, "submitting to age verification is a burden on the exercise of th[e] right" to access protected speech. 145 S. Ct. at 2309. Age-verification even for "pornography" websites (speech *unprotected* for minors) triggers "intermediate scrutiny." *Id.* at 2314-15. But this Act restricts both adults' and minors' right to view and engage in *fully protected* expression. *E.g.*, *Packingham*, 582 U.S. at 107-08. This "direct targeting of fully protected speech" triggers "strict scrutiny" under *FSC*. 145 S. Ct. at 2310.

The monitoring-and-censorship requirements independently violate the First Amendment and are preempted by 47 U.S.C. § 230. This unconstitutional prior restraint forces websites to pre-clear or block protected speech for minors. Even if that were not a prior restraint, the State cannot "deputize[] covered businesses into serving as censors for the State." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1118 (9th Cir. 2024); *see Vullo*, 602 U.S. at 190. These requirements are also content-based (by targeting, *e.g.*, "substance abuse disorders") and viewpoint-based (by forbidding, *e.g.*, "promot[ing]"). The requirement's vague terms (*e.g.*, "promotes") intensify the chilling effect on protected speech and create additional First Amendment problems. Separately, § 230 preempts these requirements, because they attempt to make websites liable for alleged "failure[s]" to "address certain harmful content." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418-20 (5th Cir. 2008) (citation omitted).

**D.** Defendant's remaining counterarguments fail. First, parental-consent, age-verification, and monitoring-and-censorship requirements restrict

access to speech—and do not merely regulate unprotected conduct. *E.g.*, *Packingham*, 582 U.S. at 107-08; *FSC*, 145 S. Ct. at 2309. Second, the Act's unconstitutionally vague "commercially reasonable" qualifiers do not cure its constitutional flaws. Websites' and users' First Amendment rights do not hinge on websites' potential ability to bear compliance costs. *E.g.*, *Minneapolis Star*, 460 U.S. at 591-92. Third, unlike the *FSC* law targeting "pornography" (speech protected for adults but *unprotected* for minors), this Act "direct[ly] target[s]" vast amounts of expression "fully protected" for both adults *and* minors. *FSC*, 145 S. Ct. at 2310.

**II.** The other preliminary-injunction factors favor NetChoice. The Act is already causing irreparable harm to NetChoice members and their minor and adult users. Multiple NetChoice members' websites, and other websites, have blocked or limited Mississippi users' access after this Court stayed the preliminary injunction. The remaining websites must either incur steep, irrecoverable compliance costs infringing their speech dissemination or risk potentially massive civil and criminal penalties. The balance of equities and the public interest favor an injunction protecting these nine websites' right to disseminate—and their minor and adult users' rights to access—fully protected speech free from government restriction.

## STANDARD OF REVIEW

This Court "review[s] the district court's grant of [a plaintiff's motion for] preliminary injunction for abuse of discretion, reviewing underlying

factual findings for clear error and legal conclusions de novo." *Book People, Inc. v. Wong*, 91 F.4th 318, 328 (5th Cir. 2024) (cleaned up).

**ARGUMENT**

NetChoice satisfies all four preliminary-injunction factors: (1) "likelihood of success on the merits," (2) "irreparable harm," (3) "balance of equities," and (4) the "public interest." *Id.* at 336 (cleaned up).

## I.  NetChoice is likely to succeed on the merits.

### A.  The district court's *as-applied* ruling and relief for nine websites obeyed this Court's prior decision, which focused on the first step of *Moody*'s *facial*-challenge framework.

**1.** The district court's "as applied" preliminary-injunction order did not violate this Court's prior opinion or mandate. ROA.911.

This prior opinion did not resolve the merits of any First Amendment issues. *See Fitch*, 134 F.4th at 803-09. Instead, this Court held that the district court "'did not address the full range of activities the law[] cover[s],' as required by *Moody*," under the first step of its *facial*-challenge framework. *Id.* at 808 (quoting *Moody*, 603 U.S. at 724). *Moody*'s "first step," *id.* at 807, requires courts to identify the "full range" of a law's applications (before then examining whether the "law's unconstitutional applications substantially outweigh its constitutional ones"), *id.* at 808. This Court recognized that the district court's first preliminary-injunction order "understandably" did not conduct the "factual inquiry" to determine the full extent of "to whom the

Act applies the activities it regulates," because that injunction issued the same day as *Moody*. *Id.* at 809.

NetChoice's added as-applied challenges did *not* require the district court to "march" to *Moody*'s "two-step music." *Id.* at 808. That is because an "as-applied challenge" allows NetChoice to raise claims about how "the law[] applie[s] only" to "the largest and most paradigmatic social-media platforms." *Moody*, 603 U.S. at 718. As the district court correctly recognized, "classifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated." ROA.922 (quoting *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019)). Unlike a facial challenge, these as-applied claims do not require examining "each [website]" possibly regulated by the Act or other websites like "Uber, Google Maps, DraftKings, [or] Microsoft Teams." *Fitch*, 134 F.4th 808-09.

Instead, courts just need to ask whether the law's speech restrictions are unconstitutional as applied to these nine websites. An "as applied" First Amendment challenge "first" asks just whether *the litigating parties'* "speech is constitutionally protected," "then" identifies the applicable level of "scrutiny," and "ultimately" resolves whether the law's speech restrictions as applied to these parties "satisfy the requisite standard." *Siders v. City of Brandon*, 123 F.4th 293, 301-02 (5th Cir. 2024). Thus, courts can freely issue as-applied relief based on a law's "First Amendment problems" as applied to specific websites like "Facebook[] and YouTube[]" without examining all the "law['s] other applications." *Moody*, 603 U.S. at 727.

The district court's ruling faithfully followed this analysis—and cabined its holdings by using the words "as applied" or "as-applied" over 30 times. The court first determined that the Act regulates protected speech disseminated by these nine websites, and it held that "strict scrutiny" applies for assessing whether the Act's content-based speech restrictions violate the First Amendment as applied to these nine websites. ROA.920-21, 924-30. It then ruled that the Act's speech restrictions failed strict scrutiny as applied to these nine websites. ROA.930-40.

Nor did the district court's "as applied" preliminary injunction defy this Court's prior mandate, which remanded "for further proceedings consistent with the Supreme Court's opinion in *Moody* and Fifth Circuit precedent in *NetChoice, LLC v. Paxton*." *Fitch*, 134 F.4th at 809. After NetChoice's amended complaint added as-applied claims, ROA.634, the proceedings on remand obeyed that command, because *Moody* held that facial and as-applied challenges differ. 603 U.S. at 717. Indeed, *Moody* held that a law can violate the First Amendment *as applied* to "Facebook and YouTube" even if a *facial* challenge requires further analysis. *Id.* at 739.

More fundamentally, the district court had authority to adjudicate the new as-applied challenges because "the mandate rule [does not] bar adjudication of an issue . . . previously unaddressed." *Franklin v. Regions Bank*, 125 F.4th 613, 630 (5th Cir. 2025). This Court's prior opinion said nothing about as-applied claims (which were not even pending at that time). Nor did it somehow lock NetChoice into only "facial" claims in this lawsuit for all time

by prohibiting NetChoice from seeking leave to amend to add new claims, or direct the district court to use *Moody*'s two-step facial-challenge standard even for subsequently added as-applied claims. Br.24. By seeking to import this Court's earlier opinion about *facial* challenges into the new *as-applied* challenges, Defendant's mandate-rule argument seeks far more than just "execution of the judgment it won on appeal." Br.23 (internal quotation marks omitted). Defendant's repeated accusations that the district court "defied the mandate" (Br.6) at NetChoice's "urg[ing]" (Br.53) therefore ring hollow.

**2.** Defendant also fundamentally mischaracterizes this Court's prior opinion and what occurred on remand, in at least three ways. Br.23-29.

First, no part of this Court's prior opinion prevented NetChoice from seeking leave to amend its complaint to add as-applied claims, nor did it require the district court to adjudicate the facial challenge first if NetChoice added successful as-applied claims on remand. *Cf.* Br.25-26. NetChoice's successful as-applied claims obviated any need for the district court to reach the broader facial challenge on remand. Indeed, the district court would have *violated* this Court's precedent if it had decided the facial challenge, which can be reached "'"only if it is determined that the statute would be valid as applied."'" ROA.942 (quoting *United States v. Jubert*, 139 F.4th 484, 489 (5th Cir. 2025), in turn quoting *Buchanan v. Alexander*, 919 F.3d 847, 854 (5th Cir. 2019)). "[C]ourts should address as-applied challenges before considering facial ones." *Allam*, 140 F.4th at 294. So the district court here

22

correctly "avoid[ed]" any broader, facial constitutional rulings about "'non-parties.'" ROA.943 (quoting *Nat'l Treasury*, 513 U.S. at 477-78).

Second, the district court's "as-applied" injunction, protecting the nine NetChoice members' covered websites, ROA.944-45, was not "facial relief." Br.24.[7] Defendant improperly recasts this as-applied injunction as "facial relief" because it "block[s] the Act in *all applications* to *all* covered members." Br.26-27. But the injunction applies only to nine specific websites, ROA.945, not "all" members. Br.27. And unlike facial relief, this injunction does not protect members who are covered by the Act but joined NetChoice after the district court's decision. The injunction here is also an as-applied remedy, even though it blocks the Act in "all applications" to these nine websites (Br.27), because it does not "reach beyond the particular circumstances of the plaintiffs." *Cath. Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 426 (5th Cir. 2014) (cleaned up). By contrast, "facial relief" (Br.24) occurs when a law is "struck down in its entirety," *Moody*, U.S. at 723, and "invalidated," *Iancu v. Brunetti*, 588 U.S. 388, 398 (2019)—even for "others not before the court," *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).[8]

---

[7] NetChoice's earlier notice of supplemental authority in the district court correctly stated that "facial relief" is appropriate for a "*facial challenge.*" ROA.430 (emphasis added), cited at Br.12, 54.

[8] The district court's first injunction protected "NetChoice, LLC and its members." ROA.428. Defendant incorrectly describes this as "facial relief." Br.3. The district court cannot be faulted for tailoring its initial, non-facial remedy

Third, Defendant wrongly insists that the Act's "commercially reasona-ble" statutory qualifiers required more factual development before the dis-trict court could resolve the First Amendment merits of NetChoice's as-ap-plied challenges for these nine specific websites. Br.24-25.

This Court's prior discussion of "'commercially reasonable efforts,' as used in the Act," addressed the *statute's* "full range" of applications—under the first step of *Moody*'s facial-challenge standard to "determine to whom the Act applies." *Fitch*, 134 F.4th 808-09. This Court did not hold that "commer-cially reasonable" speech restrictions satisfy the First Amendment *on the mer-its*—or that as applied challenges require examining each covered website's resources before deciding whether the Act violates the First Amendment. That makes sense, because governmental speech restrictions do not become constitutional even if a company can pay for them. *Infra* p.49.

Specifically, this Court's prior opinion explained two ways in which the district court's initial *facial*-challenge analysis "'did not address the full range of activities the law[] cover[s],' as required by *Moody*" under its first step. *Fitch*, 134 F.4th 808 (citation omitted). First, the district court "did not determine whether the Act applies to DSPs like Uber, Google Maps, DraftKings, [or] Microsoft Teams." *Id.* As explained above, *supra* p.20, this

---

"'to the plaintiffs,'" without entering "universal relief" for non-parties—which is "'not required or even the norm.'" *Texas v. United States*, 126 F.4th 392, 420-21 (5th Cir. 2025) (cleaned up).

inquiry determining whether these additional websites are *included* within the Act's coverage is unnecessary for the as-applied challenges for these nine specific websites. Second, the "district court also did not determine the 'commercially reasonable efforts,' as used in the Act, or the Act's requirements for each [website], requirements likely to be different with each [website] facing a unique regulatory burden." *Fitch*, 134 F.4th 809. Likewise, NetChoice's as-applied challenges do not require addressing the Act's full "'applications'" to "each individual [website]" covered—or determining whether the Act *excludes* those other websites' functions due to any potentially "unique regulatory burden" rendering the Act's requirements commercially *unreasonable* for them. *Id.* (quoting *Moody*, 603 U.S. at 725).

Even assuming for the sake of argument that further factual inquiry were required on remand to determine whether and how the Act burdened the nine websites in these as-applied challenges, NetChoice provided this evidence. *E.g.*, ROA.691-718 (Cleland Decl.). The district court credited this evidence, favorably citing and relying on the new Cleland declaration multiple times. ROA.912-13, 921, 923, 930, 932-35, 939. This unrebutted evidence confirms that the Act's parental-consent and age-verification requirements burden protected speech by demanding "extremely costly, time-consuming, and resource-intensive" new systems and "dissuad[ing] people from signing up" for these nine websites, among many other burdens. ROA.715 (Cleland Decl. ¶ 45); *see infra* pp.34, 38. Similarly, "NetChoice members would be irreparably harmed if they were required to comply with the Act's

burdensome requirements" for monitoring-and-censorship, which "will be difficult to comply with and will chill dissemination of speech." ROA.716-17 (Cleland Decl. ¶¶ 46-47); *see infra* pp.42-45 (describing additional burdens).

If there were any doubt about whether these nine websites are regulated and burdened by this Act, Defendant eliminates it by refusing to disavow enforcement of these provisions against these nine websites. To the contrary, she sought a stay pending appeal of the district court's injunction as applied to these nine websites. Dkt.8. That request would have been unnecessary if Defendant believed the Act's "commercially reasonable" statutory qualifiers exempted these nine websites from further compliance with the Act. The request for a stay confirms this Court's earlier conclusions that "the Act would increase regulatory requirements of NetChoice's members" and that Defendant is "credibly threatening" enforcement.[9] *Fitch*, 134 F.4th at 803-04.

Defendant's demand for more evidence on the "commercially reasonable" statutory qualifiers also creates an absurd result. These nine websites are "the object of the [Act]," as Defendant recognizes. *E.g.*, Br.15, 43. So they have standing. *Burnett Specialists v. Cowen*, 140 F.4th 686, 696 (5th Cir. 2025). In turn, NetChoice has "associational standing" to "vindicate the rights of

_____

[9] Defendant concedes that "[s]ome platforms" like "Instagram" "already verify age." Br.42. But Defendant does not say whether these efforts are commercially reasonable—leaving it unanswered what Defendant thinks this Act requires from Instagram. Instagram cannot answer either, because "commercially reasonable" is an inherently vague standard. *Infra* p.50.

its members," as this Court's prior opinion already held. *Fitch*, 134 F.4th at 804. But Defendant demands even more extensive factual proceedings to determine if these websites face such great burdens that the Act *exempts* them—and only if they are burdened, but not *too* burdened, can courts reach the First Amendment merits. This Goldilocks attempt at avoiding judicial review of the Act's unconstitutional speech restrictions fails. *FSC* involved a law with "commercially reasonable" statutory qualifiers, and the Supreme Court did not need an exhaustive analysis of each covered websites' resources to resolve the First Amendment merits issues. 145 S. Ct. at 2300. This Court does not need that analysis either.

## B. The Act's central coverage provisions make content-based distinctions, so all the Act's speech regulations trigger and fail strict scrutiny as applied to the nine NetChoice members' covered websites.

**1.** The Act's coverage provisions are content-based, so all its operative provisions are too. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011). Content-based speech regulations trigger "strict scrutiny." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015). This Act regulates websites that "allow[] users to socially interact with other users." § 3(1). Most glaringly, the Act excludes websites that "[p]rimarily function[] to provide a user with access to [1] news, [2] sports, [3] commerce, [4] online video games," and "[5] career development opportunities." § 3(2)(c)-(d).

These distinctions are based on "subject matter"—and thus "content." *Reed*, 576 U.S. at 163. If one of these nine websites were to disseminate speech "uniformly devoted to . . . sports," for example, then it "would be exempt." *Ark. Writers' Proj., Inc. v. Ragland*, 481 U.S. 221, 230 (1987). The exclusion for "news[]" is likewise "content based." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993). Multiple courts have held that similar exceptions render similar laws content-based. *E.g.*, *Carr*, 2025 WL 1768621, at *11-12; *CCIA*, 747 F. Supp. 3d at 1032; *Yost*, 778 F. Supp. 3d at 954; *Griffin*, 2025 WL 978607, at *9.

By "any commonsense understanding of the term," the Act "is [also] 'content based'" because it hinges on users "interacting socially" with each other. *Griffin*, 2025 WL 978607, at *9; *see Carr*, 2025 WL 1768621, at *12. The Act uses "socially" to describe a subset of regulated "interact[ions]." § 3(1)(a). Equating "socially" and "professionally," as Defendant does reads "socially" out of the Act. Br.35. Defendant also argues that "socially interact" distinguishes users' interactions with *each other* from users' interaction with *content*. Br.35. That distinction is illusory, because on these nine websites, interacting with content is how users interact with each other.[10]

---

[10] The Act's coverage provisions are speaker-based, too, because they "elevat[e] . . . . provider-generated content over user-generated content." *CCIA*, 747 F. Supp. 3d at 1032.

The Act's "aims" are immaterial, Br.42, because no amount of "benign motive, content-neutral justification, or lack of animus" can make a content-based law content-neutral, *Reed*, 576 U.S. at 165. Defendant cannot render this Act content-neutral by arguing that coverage "turns on where *harmful conduct* toward minors online is most likely." Br.34. That "argument is unpersuasive because the very basis for the regulation is the difference in content" that defines Act's scope. *City of Cincinnati*, 507 U.S. at 429; *see Boos v. Barry*, 485 U.S. 312, 321 (1988).

The "secondary effects" doctrine does not apply or allow Defendant to avoid strict scrutiny. *See* Br.32 (citing *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 43, 47-50 (1986)). That doctrine applies only to (1) physical "zoning ordinances" that (2) do not "substantially or disproportionately restrict[]] speech." *Ass'n of Club Execs. of Dallas v. City of Dallas*, 83 F.4th 958, 969 (5th Cir. 2023) (citation omitted). This Act is not a physical zoning ordinance, *id.*, or even analogous to one. *See Reno v. ACLU*, 521 U.S. 844, 867-68 (1997). States cannot "cyberzon[e]" the internet by imposing "restriction[s] on speech" unique to the internet. *Id.* at 868. Nor does this Act "leave the quantity and accessibility of the speech substantially undiminished." *Ass'n of Club Execs.*, 83 F.4th at 969 (citation omitted). It diminishes users' access to the "major social-media platforms" whose "billions of posts or videos" are a "distinctive expressive offering," *Moody*, 603 U.S. at 734, and a "principal source[]" of communication for untold users, *Packingham*, 582 U.S. at 99.

**2.** The central coverage definitions defining the scope of the Act's speech regulations cannot satisfy strict scrutiny—or any level of heightened First Amendment scrutiny. To satisfy "strict scrutiny," Defendant must show that the State has [1] has adopted "the least restrictive means" of [2] "achieving a compelling state interest." *FSC*, 145 S.Ct. at 2302. Even accepting "that safeguarding the physical and psychological wellbeing of minors online is a compelling interest," the district court correctly held that the Act's coverage definitions are not the least restrictive means of achieving it. ROA.931-32.

The State's "legitimate power to protect children from harm . . . . does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794. This Act imposes such restrictions by disfavoring protected speech on NetChoice member covered websites, falling outside the Act's content-based exclusions for websites primarily disseminating "[1] news, [2] sports, [3] commerce, [4] online video games," and "[5] career development opportunities." § 3(2)(c)-(d). Yet *Brown* clearly held that protected speech "'cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.'" 564 U.S. at 795 (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 213-214 (1975)).

The Act also fails strict scrutiny because its scope is overinclusive. It does not identify specific websites that are harmful to minors or even likely to be accessed by minors. Instead, it burdens users' access to *all* speech on these nine websites by restricting or deterring users from accessing those websites. It does so even though parents have ample other means to control their

30

children online, the State can publicize those means, and the nine specific websites here already moderate objectionable content. "It is no response that [these tools] require[] a consumer to take action, or may be inconvenient, or may not [work] perfectly." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 824 (2000). The Act's coverage is also overinclusive because Mississippi already directly regulates the harmful conduct of bad actors online. ROA.677 ¶ 191 (Amended Complaint collecting Mississippi laws). Mississippi enacted an entirely separate House Bill 1196 (2024) to criminalize the conduct ("sextortion") that spurred this Act. *See* Br.1. Such laws are the "normal method of deterring unlawful conduct." *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001).

The Act also fails strict scrutiny because it is "wildly underinclusive when judged against its asserted justification, which . . . is alone enough to defeat it." *Brown*, 564 U.S. at 802. For example, the Act regulates minors' ability to discuss sports on these nine websites but does not regulate *the same conversation* on websites "primarily" dedicated to "sports." § 3(2)(c)-(d).

Even under "intermediate scrutiny," Defendant still must show the law is "narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 105-06. Yet the Act's "restrictions are an extraordinarily blunt instrument for furthering" any governmental interest, and they are therefore unconstitutional. *Uthmeier*, 2025 WL 1570007, at *15. The Act restricts adult and minor users' access to billions of posts of fully protected expression on NetChoice members' covered websites. This unlawfully

"burden[s] substantially more speech than is necessary to further" any governmental interest. *Packingham*, 582 U.S. at 106 (citation omitted). The Act's access restrictions also fail intermediate scrutiny because, by targeting the websites that "for many are the principal sources for . . . speaking and listening," *id.* at 107, the restrictions do not leave open "alternative means of communication," *id.* at 103.

**3.** In all events, the Act's coverage definitions are, in multiple respects, unconstitutionally vague, which is an alternative basis to affirm. *See Griffin*, 2025 WL 978607, at *15.

For a First Amendment free-speech vagueness challenge, "rigorous adherence" to "precision" and fair notice are "necessary to ensure that ambiguity does not chill protected speech," *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012), or "encourage[] seriously discriminatory enforcement," *United States v. Williams*, 553 U.S. 285, 304 (2008) (citation omitted). Consequently, "void-for-vagueness challenges are successfully made when laws have the capacity 'to chill constitutionally protected'" speech. *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 546 (5th Cir. 2008) (citation omitted) (collecting cases).

The Act gives no guidance about when a website crosses either the "primary" or "incidental" thresholds that define its scope. §3(2)(c). So the Act is vague, just like the Act in *Griffin*. 2025 WL 978607, at *15. The coverage definitions also do not define what it means to "allow[] users to socially

interact." § 3(1)(a). That leaves websites guessing whether the Act applies to all interactions or merely to a subset the State dubs sufficiently "social."

Defendant responds that "[t]o be facially vague, a law must be 'impermissibly vague in all of its applications.'" Br.47 (quoting *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023)). But that is the standard outside the free-speech context. For speech, "stricter standards of permissible statutory vagueness" apply. *Smith v. California*, 361 U.S. 147, 151 (1959) (citation omitted). Therefore, "vagueness may be grounds for a pre-enforcement challenge insofar as [a law] chills protected speech under the First Amendment"—even if the law is not vague in every application. *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 & n.32 (5th Cir. 2024).

**C. The Act's parental-consent, age-verification, and monitoring-and-censorship requirements are each independently unlawful as applied to the nine NetChoice members' covered websites.**

For even more independent reasons, the Act's three main speech restrictions each trigger and fail strict scrutiny, or any form of heightened scrutiny, as applied to these nine websites. Because the State has "restrict[ed]" access to protected speech, it "bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted).

## 1. The parental-consent requirement violates the First Amendment as applied to these nine websites.

The Act violates the First Amendment by requiring minors to secure parental "consent" before becoming an account holder to access the enormous amount of protected speech on these nine covered websites. § 4(2).

Governments lack the "power to prevent children from hearing or saying anything *without their parents' prior consent,*" and minors have the "right to speak or be spoken to." *Brown*, 564 U.S. at 795 n.3. *Brown* invalidated a law prohibiting the sale or rental of "violent video games" to minors yet permitting minors to play such games with parental consent. *See id.* at 802. There is no "precedent for state control, uninvited by parents, over a child's speech." *Id.* at 795 n.3. After all, "minors are entitled to a significant measure of First Amendment protection." *Id.* at 794 (cleaned up). Therefore, conditioning minors' access to protected speech on parental consent is "a requirement that the Supreme Court has clearly explained the First Amendment does not countenance." *Uthmeier*, 2025 WL 1570007, at *15. That is true whether the speech is "political rall[ies]," "religious" services, or content on websites the State disfavors. *Brown*, 564 U.S. at 795 n.3.

This requirement is burdensome because "[d]esigning and maintaining" a parental-consent system on these nine websites is "extremely costly, time-consuming, and resource-intensive." ROA.715 (Cleland Decl. ¶ 45). Forbidding minors "from hearing or saying anything" on these nine websites "without their parents' prior consent" burdens their rights under *Brown*. 564

U.S. at 795 n.3. Adults face burdens too, because a "malicious[]" actor trying "to fool a website into closing a user's account [commonly] write[s] to the website and falsely claim[s] the user . . . does not have parental consent." ROA.166 (Paolucci Decl. ¶ 34). Separately, "cumbersome registration process[es] can dissuade people from signing up," burdening their rights to access "valuable speech" on these websites. ROA.104; *see* ROA.140-42 (Pai Decl. ¶ 23).

Courts therefore have consistently enjoined parental-consent requirements for minors to access NetChoice members' social media websites. *Griffin*, 2025 WL 978607, *13; *see Yost*, 778 F. Supp. 3d at 959; *Carr*, 2025 WL 1768621, at *13; *Uthmeier*, 2025 WL 1570007, *15; *Reyes*, 748 F. Supp. 3d at 1126 & n.135. This Act's materially identical parental-consent requirement violates the First Amendment for the same reasons: It unconstitutionally requires minors to secure parental consent before, *e.g.*, "shar[ing] vacation photos" on Facebook, finding a summer job on Nextdoor, or learning precalculus on YouTube. *Packingham*, 582 U.S. at 104.

Because the Act's parental-consent requirement "target[s] . . . fully protected speech" on these nine websites, it triggers "[s]trict scrutiny." *FSC*, 145 S. Ct. at 2310; *see Yost*, 778 F. Supp. 3d at 955. The Act's parental-consent requirement fails any form of heightened First Amendment scrutiny.

The State lacks a sufficient governmental interest in restricting minors' access to the vast amounts of fully protected speech on these nine websites. The Supreme Court has rejected a governmental interest "in aid of parental

authority" to restrict minors' access to protected speech unless parents first consent. *Brown*, 564 U.S. at 802. Accepting Defendant's contrary argument (Br.39) "would largely vitiate the rule that 'only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors].'" *Brown*, 564 U.S. at 802 (quoting *Erznoznik*, 422 U.S. at 212-13). The State also lacks a sufficient interest because not all minors "have parents who *care* whether" they access the nine websites that the district court's opinion addressed. *Id.* at 804.

Even if there were a sufficient governmental interest, the Act is not properly tailored to furthering it. The Act does not account for the difficulty of verifying a parent-child relationship. *See* ROA.168. For example, "covered websites will be required to obtain and store sensitive personal identifying information about minors and their parents or guardians," which is an independent burden that "will significantly amplify the risks of data security breaches." ROA.715. These difficulties are compounded because "the law does not account for situations in which a person's status as a parent (or guardian) is opaque or disputed"—such as in the context of foster families or divided custody. ROA.715. Defendant discounts these complexities because the Act "*deems* parental consent to be given by any of several easy means" and "[t]here is no need to verify the parental relationship." Br.40. But if minors can so easily defeat this requirement (*e.g.*, by impersonating a parent in an "email response," Br.40), the Act cannot "promot[e] parental oversight." *Contra* Br.39.

Nor is the parental-consent requirement the "least restrictive" way to accomplish any legitimate governmental ends. *FSC*, 145 S.Ct. at 2302 (citation omitted). As the district court found, parents already have many options to oversee their children on these nine websites. ROA.932; *see supra* p.8. Other federal courts agree. *See NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024); *Carr*, 2025 WL 1768621, at *18; *Uthmeier*, 2025 WL 1570007, at *18; *Yost*, 778 F. Supp. 3d at 956; *Griffin*, 2025 WL 978607, at *14. One alternative would be for Mississippi to give "parents the information needed to engage in active supervision" over internet access using these tools. *Playboy*, 529 U.S. at 826. Members' extensive, voluntary self-regulation is another less restrictive alternative. *Supra* p.7. These "voluntary" self-regulatory options make restrictive government intervention unnecessary. *Brown*, 564 U.S. at 803.

The State has not proffered *any* evidence justifying impeding minors' access to billions of pieces of fully protected speech across the nine NetChoice member websites here. The State also has not and cannot provide "a direct causal link between" access to this protected speech on these nine websites and harms to minors. *Brown*, 564 U.S. at 799. And even if some covered websites were genuinely "dangerous" for users of a certain age, it is unclear why the State would allow minors to access them "so long as one parent . . . says it's OK." *Id.* at 802. Nor does the Act "take into account juveniles' differing ages and levels of maturity." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 396 (1988). Instead, it unlawfully requires parental consent for all minors at every developmental stage—from websites' youngest users to 17-year-

olds—to access fully protected speech. *Id.* This Act's blunderbuss approach to regulating online speech is thus not "tailored" at all, let alone "narrowly" tailored. *Packingham*, 582 U.S. at 105-06 (citation omitted).

### 2. The age-verification requirement violates the First Amendment as applied to these nine websites.

The Act also violates the First Amendment by requiring all users—both adults and minors—to "verify" their "age[s]" to "create an account" and engage with a staggering amount of protected speech on these nine websites. § 4(1). Multiple courts have enjoined enforcement of similar requirements. *E.g.*, *Carr*, 2025 WL 1768621, at *13-14; *Griffin*, 2025 WL 978607, at *8-10; *Reyes*, 748 F. Supp. 3d at 1129 & n.169; *Uthmeier*, 2025 WL 1570007, at *21.

The Supreme Court in *FSC* squarely held that "submitting to age verification is a burden on the exercise of" the "right to access speech" protected by the First Amendment. 145 S. Ct. at 2309. The undisputed record evidence demonstrates that the burdens here are substantial for the nine websites and their users. For example, requiring users merely to *self-report* their birthdates deters some from accessing these websites. *See supra* p.11. And "[m]ost websites" lack "compliance mechanisms" "to . . . verify . . . age[s]." ROA.715 (Cleland Decl. ¶ 45.a). "Designing and maintaining" such "systems to comply with the Act w[ould] be extremely costly, time-consuming, and resource-intensive." *Id.* Moreover, to prove compliance with the Act, covered websites will "be required to obtain and store sensitive personal identifying

information about minors," thereby "necessitating even more investment in heightened cybersecurity measures." *Id.*

This Act's age-verification requirements thus "direct[ly] target[]" an immense amount of "fully protected speech" on NetChoice member websites, triggering "[s]trict scrutiny." *FSC*, 145 S. Ct. at 2310. Unlike the "pornography" websites in *FSC, id.* at 2312, the nine websites here are "the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham*, 582 U.S. at 107. Social media is a prime outlet for minors' political speech: "Minors, who cannot vote for the lawmakers that represent them, can use social media to make their voices heard on issues that affect them, like school shootings and school choice." *Griffin*, 2025 WL 978607, *13.

The Act's age-verification requirement as applied to these nine websites fails any form of heightened scrutiny. Age verification "would undoubtedly chill speech" that is fully protected, so it is overinclusive. *Carr*, 2025 WL 1768621, at *15 (citation omitted). Age-verification "burden[s]" "the right to access speech," *FSC*, 145 S.Ct. at 2309, and chills speech by deterring users from becoming account holders. *E.g.*, ROA.141 (Potential website users refusing to provide personal information: "App rep wants my personal info . . . . I think this is a scam now."; "Are you kidding me? You think I'm gonna send you my license or any personal ID"). Nothing in the record justifies these burdens to access fully protected speech. The age-verification requirement thus "burden[s] substantially more speech than is necessary to

further" any governmental interest. *Packingham*, 582 U.S. at 106 (citation omitted).

Beyond the burdens and the chilling effect just discussed, the age-verification requirement is also overinclusive because it would require adults and minors to give up anonymity to access fully protected speech. "There is no age verification system that is not also a deanonymization and identity verification system." ROA.152 (Paolucci Decl. ¶ 10). The Act would therefore "all but kill anonymous speech" on the nine member websites by "requir[ing] . . . website visitors [to] forgo the anonymity otherwise available on the internet." *Carr*, 2025 WL 1768621, at *15 (citation omitted). That would burden the First Amendment right of speakers to "remain anonymous." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995); *see Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003) (similar); *ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008) (similar).

### 3. The monitoring-and-censorship requirements are unlawful as applied to these nine websites.

The Act's requirement that websites must "make commercially reasonable efforts to develop *and implement* a strategy to *prevent* or mitigate [a] known minor's *exposure* to" vaguely defined categories of protected speech violates the First Amendment and the Due Process Clause. § 6(1) (emphases added). A similar Texas law, House Bill 18 (2023), contains virtually identical monitoring-and-censorship requirements, which have been preliminarily enjoined. *See CCIA*, 747 F. Supp. 3d at 1032. That preliminary injunction is

on appeal in this Court, and NetChoice has raised similar arguments in that case. *See* Br. for Plaintiffs-Appellees CCIA & NetChoice at 51-57, *Comput. & Commc'ns Indus. Ass'n v. Paxton*, No. 24-50721 (5th Cir. July 3, 2025) ("CCIA & NetChoice Br.").

**a.** This monitoring-and-censorship requirement creates an unconstitutional prior restraint by prohibiting websites from disseminating speech "in the future" unless they meet state-imposed requirements. *Alexander v. United States*, 509 U.S. 544, 553 (1993).[11] *Before* a website disseminates any speech, it must "implement" a strategy to actively "prevent . . . exposure" to certain speech. § 6. This necessarily entails monitoring and acting as "a pre-clearance censor" for all speech on the website. *Moore v. City of Kilgore*, 877 F.2d 364, 383 (5th Cir. 1989).

Mississippi argues that § 6 requires websites to only "mitigate" the effects of harmful content after the fact, not block content. Br.38. This ignores that § 6 requires platforms to "prevent or mitigate . . . *exposure* to harmful material," not just the harmful *effects* of that material. § 6 (emphasis added). The "prevention" mandate follows from the Act's text, because the exception to § 6 says websites *need not* "prevent or preclude" certain preferred "content." § 6(2). The obvious inference is that covered websites must "prevent

_____

[11] Statutes are properly invalidated when they impose prior restraints. *E.g., Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 723 (1931) (statute was an unconstitutional prior restraint where its "operation and effect" was to "impose[] a[] . . . restraint upon" speech).

or preclude" "harmful content," in addition to mitigating exposure to it. *Id.* Otherwise this exception would be unnecessary.

Defendant's proposed saving construction—a pure "mitigat[ion]" requirement (Br.38)—creates additional constitutional flaws. An amorphous obligation to "mitigate" a minor's "exposure to harmful material," § 6(1), will inevitably create "an unacceptable risk of the suppression of ideas," *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 764 n.9 (1988) (citation omitted). The nine websites here do not (and cannot) know what measures Defendant will decide sufficiently "mitigate" exposure to protected speech. Websites will thus have a strong incentive to over-censor content to avoid enforcement. That chill is unconstitutional. *Id.* The First Amendment also prohibits Mississippi from compelling private actors to speak by "alerting or connecting minors to resources." Br.38. The State can use "its own speech" to publicize these resources, *Sorrell*, 564 U.S. at 578, but it cannot "compel" private actors into serving as a mouthpiece for the State's "preferred messages," *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023).

**b.** Even if § 6 were not a prior restraint, it still triggers and fails strict scrutiny by restricting "a substantial amount of constitutionally protected speech" on these nine websites. *City of Houston v. Hill*, 482 U.S. 451, 466-67 (1987). No matter whether the Act is a prior restraint, the First Amendment still bars the State from commandeering websites into blocking or censoring protected speech. *See Vullo*, 602 U.S. at 190; *NetChoice v. Bonta*, 113 F.4th at 1118.

42

Section 6's prohibited categories encompass huge amounts of speech protected for adults and minors alike. *See* ROA.657 ¶ 80 (Amended Complaint collecting examples of the vast categories of protected speech § 6 regulates); CCIA & NetChoice Br. at 20-23 (same). As just one example, popular culture is replete with protected speech that could "promote[] or facilitate[] . . . substance abuse or use of illegal drugs." §6(1)(b). Section 6 thus burdens a wide array of protected works of art, literature, philosophy, and other speech that could be said to "promote[] or facilitate[]" certain social ills. *See id.* But "'mere advocacy' of illegal acts" is "speech falling within the First Amendment's core." *Counterman v. Colorado*, 600 U.S. 66, 76 (2023) (citation omitted). Even speech "promot[ing]," § 6, social ills is protected, and thus different from speech constituting a crime, *see Hess v. Indiana*, 414 U.S. 105, 108-09 (1973).

Statutory "[t]erms like 'promoting,' . . . 'substance abuse,' 'harassment,' and 'grooming' are undefined, despite their potential wide breadth and politically charged nature." *CCIA*, 747 F. Supp. 3d at 1036. The State cannot enforce such a "statute patently capable of many unconstitutional applications, threatening those who validly exercise their rights of free expression." *Smith*, 361 U.S. at 151. Nor may it "create a wholly new category of content-based regulation that is permissible only for speech directed at children." *Brown*, 564 U.S. at 794.

The Act's *exceptions* to § 6 raise even more questions. They permit: (1) minors to "deliberately and independently search[] for, or specifically

request[]" speech; and (2) websites to "provid[e] resources for the preven-
tion or mitigation of" exposure to the speech described above. § 6(2). It is
unclear how websites must prove that a minor deliberately sought out such
content, or whether content qualifies for these exceptions. *See id.* As a result,
the Act unconstitutionally forces these nine websites to align their content
moderation with the State's requirements. *See Moody*, 603 U.S. at 732-33;
*Vullo*, 602 U.S. at 190.

Section 6 also independently triggers strict scrutiny by directing web-
sites to block categories of speech "based on its communicative content."
*Reed*, 576 U.S. at 163-64. These categories are content-based even if the State
asserts an aim to regulate only the *effects* of speech. *Supra* p.29. These catego-
ries are also viewpoint-based, regulating speech that "promotes" social ills.
§ 6(1).[12] A law is "aimed at a particular viewpoint" if it forbids "promot[ing]"
that viewpoint. *Sorrell*, 564 U.S. at 565. The Act's restriction on content that
"promotes . . . illegal drugs" targets the (objectionable but protected) view-
point that illegal drugs are good. § 6(1)(b). The Act further triggers "strict
scrutiny" by "deputiz[ing] private actors into determining whether [this]
material is suitable for kids." *NetChoice v. Bonta*, 113 F.4th at 1118-19.

---

[12] Courts have held that laws using similar language, including "promote,"
violate the First Amendment by restricting protected speech. *E.g.*, *United
States v. Miselis*, 972 F.3d 518, 536 (4th Cir. 2020); *see* CCIA & NetChoice Br.
25.

Section 6 fails strict or intermediate scrutiny. Its requirements are over-inclusive and not the least restrictive means or narrowly tailored, as they are "superimposed upon the State's criminal regulation[s]." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 69 (1963). Mississippi law already addresses the unlawful conduct related to the prohibited categories. *Supra* p.31. Those existing criminal laws punishing bad actors' conduct make the Act's speech restrictions "largely unnecessary," *Bantam Books*, 372 U.S. at 69, and improper "prophylaxis-upon-prophylaxis," *Cruz*, 596 U.S. at 306 (citation omitted).

Furthermore, because many covered websites may not be able to "age-gate" content so that minors and adults see different content, *see* ROA.716, § 6's effects cannot be limited to minors. This is already playing out, as multiple NetChoice member websites (and other websites) have blocked or limited Mississippi users' access rather than risk incorrectly guessing what content the State thinks is "harmful." *Infra* p.53.

These requirements are also underinclusive. The Act targets these nine websites, but there are myriad unregulated websites—and physical locations—where minors can encounter content that § 6 prohibits.

Most egregiously, the exception allowing a minor to "deliberately and independently" seek out the otherwise regulated speech on covered websites completely undermines this monitoring-and-censorship requirement. § 6(2)(a). If this speech is so "dangerous," *Brown*, 564 U.S. at 802, allowing minors to expressly request it undermines the State's asserted "aims," Br.42.

**c.** Section 6 is also unconstitutionally vague, which is an alternative basis to affirm this part of the injunction, because § 6's requirements lack "sufficient definiteness" to ensure "that ordinary people can understand" what will give rise to liability. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). For example, a key consideration under the Act is whether content "promotes" certain social ills. § 6(1). The Supreme Court invalidated, "because of vagueness," a law hinging on the word "promote." *Baggett v. Bullitt*, 377 U.S. 360, 371 (1964). The "range of activities which are or might be deemed" to "promote" an idea "is very wide indeed" and provides no "ascertainable standard of conduct." *Id.* at 371-72; *see CCIA*, 747 F. Supp. 3d at 1040. The Act's parallel usage of "facilitates" is no better. § 6(1).

Defendant does not deny these specific standards are vague. She merely argues that "context" provides the "clarity" that is otherwise "lack[ing]." Br.49-50. But NetChoice has identified multiple examples of protected speech that the Act's monitoring-and-censorship categories threaten to encompass. ROA.657 (Amended Complaint ¶ 80). Defendant does not attempt to explain how "statutory 'context'" resolves those vague applications. Br.49.

**d.** The district court correctly enjoined enforcement of § 6's monitoring-and-censorship requirements as applied to these nine websites under the First Amendment. So it did not consider whether § 6 is preempted by 47 U.S.C. § 230. ROA.940 n.6. But § 230 preemption is an alternative basis to affirm the § 6 as-applied injunction. *See* CCIA & NetChoice Br. at 51-57.

In § 230, "Congress provided broad immunity . . . to Web-based service providers for all claims stemming from their *publication of information created by third parties*." *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 794 (5th Cir. 2024) (citation omitted). Congress did that by preempting laws, like § 6, that make websites liable for alleged "failure[s] to implement basic safety measures to protect minors" or to "address certain harmful content." *MySpace*, 528 F.3d at 419, 420. Requiring covered websites to "'implement a strategy to prevent [a] known minor's exposure to' certain third-party content . . . . impermissibly forces covered [websites] to 'address certain harmful content' on their services." *CCIA*, 747 F. Supp. 3d at 1042 (citations omitted). Section 230 "specifically proscribes liability" for "decisions relating to the monitoring, screening, and deletion of content." *MySpace*, 528 F.3d at 420 (citations omitted). So § 230 preempts § 6 as applied to these nine websites.

Defendant responds that § 6 "imposes liability for failing to adopt a strategy—not for harm from third-party content." Br.51. But this Court has held that imposing liability for a website's "failure to implement basic safety measures to protect minors" is "merely another way of" doing what § 230 preempts. *MySpace*, 528 F.3d at 419, 420. That is true whether the "measure[]" for addressing "objectionable content" is preventing *or* mitigating. *Id.* at 419.

### D. Defendant's counterarguments fail.

Defendant cannot escape the First Amendment by arguing that the Act targets only conduct, requires only commercially reasonable measures, or triggers only *FSC*'s holding for the unique speech category of pornography.

**1.** Defendant's argument that this Act regulates merely "non-expressive conduct," Br.33, violates this Court's prior opinion. This Court held that NetChoice members "seek to disseminate protected speech to minors and adults, which would be prohibited (at least in part) by the Act." *Fitch*, 134 F.4th at 804; *see Griffin*, 2025 WL 978607, at *8; *Yost*, 778 F. Supp. 3d at 949. No additional "factual development" can change that. Br.33.

Indeed, *Packingham* already held that heightened First Amendment scrutiny applies when States restrict "access" to social media websites. 582 U.S. at 108. This scrutiny applies both to governmental "burdens" and "bans" on protected speech.[13] *Playboy*, 529 U.S. at 812. *FSC* made that clear by subjecting age-verification requirements, even for pornography *"unprotected"* for minors, to heightened First Amendment scrutiny. *FSC*, 145 S. Ct. at 2309 (emphasis added).

---

[13] Many of the nine services here also have private-messaging features (*e.g.*, Facebook Messenger). The First Amendment protects against governmental *restrictions* on individual-to-individual communication just as equally as publicly-available speech. *E.g., Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126-31 (1989) (invalidating law restricting telephone messages).

Defendant's "conduct" argument also fails because States cannot "control or suppress speech" by isolating a "different point[] in the speech process" and calling it mere conduct. *Citizens United v. FEC*, 558 U.S. 310, 336 (2010). The law in *Brown* implicated the First Amendment even though it involved "the sale or rental of 'violent video games.'" 564 U.S. at 789. The "sale" of protected speech in *Brown* required conduct, *id.*, just like the physical and digital conduct that would be required to implement this Act's requirements for disseminating and accessing speech. No matter how Defendant labels them, the Act's requirements implicate the First Amendment because they burden speech dissemination and access. *Supra* pp.33, 38, 42.

Defendant pretends this Act's restrictions on disseminating and accessing billions of posts of protected speech are just "incidental" to "regulation of activity." Br.33. But *Brown* and *FSC* reject that argument, holding that heightened First Amendment scrutiny applies to parental-consent and age-verification requirements to access speech, respectively. *Supra* pp.34, 38. And the monitoring-and-censorship requirements infringe websites' protected "content choices," which means that "States [cannot] regulate them free of the First Amendment's restraints." *Moody*, 603 U.S. at 726-27.

Defendant's "conduct" theory proves far too much. Under this theory, there would be *no* First Amendment scrutiny for age-verification or parental-consent requirements for minors to buy books or join religious services—or for the State to require monitoring-and-censorship even for *adults*' access to the protected speech on these nine websites. *Brown* and *Moody* already

rejected those vast assertions of state power. 564 U.S. at 795 n.3; 603 U.S. at 726-27.

**2.** The Act's "commercially reasonable" qualifiers do not alleviate the First Amendment infirmities. Government speech restrictions do not become constitutional just because some companies disseminating speech might be able to afford the government's mandates. *E.g.*, *Minneapolis Star*, 460 U.S. at 592 (rejecting a law that placed a greater "burden on large publications" than on "smaller publications"); *Citizens United*, 558 U.S. at 350 (prohibiting speech restrictions "based on a speaker's wealth").

This is abundantly clear when assessing whether such speech restrictions infringe *users'* rights. *Any* form of state-mandated parental-consent violates minors' rights to access protected speech "*without the parents' prior consent.*" *Brown*, 564 U.S. at 795 n.3. *Brown* would not have come out differently had California asked for just "commercially reasonable" efforts to block minors from buying violent video games. *Id.* at 795 n.3, 802. Likewise, *any* form of "age verification" necessarily "burden[s]" users' "right" to access protected speech. *FSC*, 145 S. Ct. at 2309-10. In fact, the Texas pornography law in *FSC* had a "commercially reasonable" statutory qualifier, *id.* at 2300, and the Supreme Court applied First Amendment heightened scrutiny all the same. *Id.* at 2309. Nor would *Packingham* have come out differently had North Carolina asked for just "commercially reasonable" efforts to block certain users. 582 U.S. at 107-08.

In all events, this "amorphous requirement" is unconstitutionally vague. *Carr*, 2025 WL 1768621, at \*19; *see supra* p.45. Defendant appears to define "commercially reasonable" via a sliding scale, unique for each regulated website, asking whether a requirement is "cost-prohibitive" "based on a particular platform's resources." Br.53. That is not an "ascertainable standard of conduct." *Baggett*, 377 U.S. at 372. Defendant circularly surmises that "commercially reasonable" means "reasonable efforts that any responsible platform would already make." Br.53. Yet Defendant steadfastly refuses to concede that *any* of these nine websites' current extensive efforts to moderate objectionable content satisfy this Act—or disavow enforcement against these nine websites.

This subjective, "disparate enforcement plan" highlights the potential for arbitrary enforcement of the Act, which is a "a central and fatal source of vagueness." *Carr*, 2025 WL 1768621, at \*19. As one example, Defendant apparently argues that "facial recognition" may not be a commercially reasonable method of age-verification. Br.53. Other States take the opposite position. *See Carr*, 2025 WL 1768621, at \*19 (State defendant "suggesting facial recognition as a feasible alternative" for "commercially reasonable" "age verification").

**3.** *FSC*'s upholding of age-verification requirements for a law targeting pornography, after applying intermediate scrutiny, does not authorize this Act's restrictions on a staggering amount of "fully protected speech." 145

51

S. Ct. at 2310.[14] *FSC* held that adults could lack the First Amendment right to avoid age verification to access pornography, speech "obscene to minors" (in contrast to fully protected speech for adults and minors), because this unique speech category "is unprotected to the extent the State seeks only to verify age." *Id.* at 2309. This Act is far different from the "pornography" law in *FSC*, because this Act "direct[ly] target[s]" billions of posts of "*fully protected speech*"—for minors and adults alike. *Id.* at 2310, 2312 (emphasis added). As *FSC* acknowledged, laws targeting fully "protected speech," like this Act, "trigger strict scrutiny." *Id.* at 2309.

Even in the unique context of pornography, the speech restrictions in *FSC* still implicated the First Amendment and triggered heightened First Amendment scrutiny because they "burden[ed]" adults' rights. *Id. FSC* analogized to similar "longstanding requirements for brick-and-mortar stores" selling pornography to verify ages. *Id.* This Act's restrictions have no physical equivalent. Parental-consent, age-verification, and monitoring-and-censorship requirements for minors to access fully protected speech at a physical location are still unconstitutional, both before and after *FSC*. *See id.* at 2309-10. The same holds true for the nine covered NetChoice members here.

---

[14] Nor would the Act here pass even intermediate scrutiny, given its far broader and more onerous speech restrictions than the law at issue in *FSC*, which was sufficiently tailored to preventing minors from accessing speech *unprotected for minors*. 145 S. Ct. at 2309.

Quoting snippets of *FSC*, Defendant asserts that States' "power to protect minors 'necessarily includes the power' 'to employ the ordinary and appropriate means of' achieving that end," including, she argues, restrictions on fully protected speech. Br.30 (quoting 145 S. Ct. at 2306, 2307). But Defendant omitted *FSC*'s key words: The "traditional power" Defendant references is limited to "*prevent[ing] minors from accessing speech that is obscene from their perspective.*" 145 S. Ct. at 2036 (emphasis added). *FSC*'s holding on laws targeting "pornography," *id.* at 2312, does not justify the sweeping claim that States have "traditional power" to "adopt[] age-verification, parental-content, and harm-mitigation requirements" to prevent minors from *accessing speech fully protected* for minors and adults. Br.30. *FSC* in fact expressly rejected "a blanket prohibition" on content that is "'indecent' but not 'obscene.'" 145 S. Ct. at 2311.

## II. The other preliminary-injunction factors favor NetChoice.

NetChoice above has shown "arguably the most important factor: likelihood of success on the merits." *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1099 (5th Cir. 2023). NetChoice meets the other preliminary-injunction factors, too.

The Act is presently causing irreparable harm for NetChoice's members and their adult and minor users. After this Court stayed the district court's injunction, two NetChoice members blocked or limited Mississippi users' access. The Act's compliance costs are "far in excess of [the] available budget" for Dreamwidth. ROA.168 (Paolucci Decl. ¶ 37). So it was "forced

to block access to Dreamwidth from all IP addresses that geolocate to Mississippi."[15] On Nextdoor, minors "are not permitted to create an account . . . if they are residents of . . . . Mississippi."[16] Non-NetChoice-member websites such as Bluesky have similarly "made the difficult decision to block access from Mississippi IP addresses."[17] The harm is not confined to social media. For example, a website marketing itself as "the most advanced email group service on the Internet"[18] is also "geoblocking Mississippi" to avoid "compliance risk" and "collecting sensitive data."[19] This ongoing "loss of First Amendment freedoms" for websites, adults, and minors "unquestionably constitutes irreparable injury." *Roman Cath. Diocese*, 592 U.S. at 19 (citation omitted).

The seven NetChoice member websites presently accessible for Mississippi users are also suffering irreparable harm from facing the "Hobson's choice" of either potentially violating the Act and "expos[ing] themselves to potentially huge liability" or "suffer[ing] the injury of obeying the law."

---

[15] Dreamwidth, *Mississippi legal challenge: beginning 1 September, we will need to geoblock Mississippi IPs* (Aug. 26, 2025), https://perma.cc/G3E4-262C.

[16] Nextdoor, *Member Agreement* (Aug. 15, 2025), https://tinyurl.com/chn3ccaf.

[17] The Bluesky Team, *Our Response to Mississippi's Age Assurance Law*, Bluesky Blog (Aug. 22, 2025), https://perma.cc/GB33-YKLY.

[18] Groups.io, *About*, https://perma.cc/6WSU-VP2T.

[19] Groups.io, *Why access from Mississippi is currently blocked*, https://perma.cc/ZF8E-JS5D.

*Morales*, 504 U.S. at 381. The State also irreparably "harm[s]" websites and users by threatening significant monetary penalties and criminal "enforcement" for disseminating protected speech. *Am. Booksellers Ass'n*, 484 U.S. at 393. The Act's penalties for covered websites magnify these harms: $10,000 per violation and criminal liability. Nonrecoverable "compliance costs" are also "irreparable" harm. *Book People*, 91 F.4th at 341. Defendant concedes that covered websites will need to expend "resources" to comply. Br.53. Such compliance efforts are "extremely costly, time-consuming, and resource-intensive." ROA.715 (Cleland Decl. ¶ 45). Yet sovereign immunity prohibits websites from recovering these costs from Mississippi even if NetChoice prevails.

The final factors—"harm to the opposing party and weighing the public interest"—"merge" in lawsuits against the government. *Nken*, 556 U.S. at 435. "Injunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life*, 697 F.3d at 298 (cleaned up). Protecting the public's access to the "billions of posts or videos" on these nine websites also furthers the public interest. *Moody*, 603 U.S. at 734. That is especially true here, where the Act has already forced some websites to stop disseminating speech to Mississippi users. An injunction would serve the public interest by helping prevent the balkanization of the internet, where websites full of protected speech are not accessible in Mississippi because of this unconstitutional Act.

NetChoice has never argued that any court should "defy" this Court's prior mandate. Br.53; *see supra* p.21. Nor can the State unconstitutionally restrict speech to further "the State's efforts to protect minors." Br.52. Regardless, many other actors—including NetChoice members' websites—will continue to moderate potentially harmful content. *Supra* p.7. Parents can use existing private tools, which the State can support. *Supra* p.8. And Mississippi law enforcement can investigate and enforce other existing laws directly prohibiting the criminal conduct of bad actors, without infringing protected speech. *Supra* p.31.

Mississippi cannot restrict disseminating and accessing billions of online posts of fully protected speech without meeting its burden to satisfy strict First Amendment scrutiny. It cannot meet that significant burden as applied to these nine NetChoice member covered websites.

## CONCLUSION

This Court should immediately lift its stay of the preliminary injunction pending appeal and affirm the district court's judgment.

Dated: October 2, 2025

Respectfully submitted,

*/s/ Scott A. Keller*

Steven P. Lehotsky

Scott A. Keller

Jeremy Evan Maltz

  *Counsel of Record*

Jonathan DeWitt

Joshua P. Morrow

LEHOTSKY KELLER COHN LLP

LEHOTSKY KELLER COHN LLP

200 Massachusetts Avenue, NW

408 W. 11th Street, 5th Floor

Suite 700

Austin, TX 78701

Washington, DC 20001

(512) 693-8350

scott@lkcfirm.com

*Counsel for NetChoice, LLC*

## CERTIFICATE OF SERVICE

I certify that on October 2, 2025, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. No paper copies were filed in accordance with the COVID-19 changes ordered in General Docket No. 2020-3.

*/s/ Scott A. Keller*
Scott A. Keller

## CERTIFICATE OF COMPLIANCE

I certify that this brief: (1) complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,992 words, excluding the parts of the brief exempted by Rule 32(f); and (2) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

I further certify that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Scott A. Keller*
Scott A. Keller

58