No. 25-60348

IN THE

# United States Court of Appeals for the Fifth Circuit

NETCHOICE, LLC,

*Petitioner,*

v.

LYNN FITCH, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF MISSISSIPPI,

*Respondent.*

## BRIEF FOR *AMICUS CURIAE* PUBLIC KNOWLEDGE IN SUPPORT OF PETITIONER

John Bergmayer
Legal Director

PUBLIC KNOWLEDGE
1818 N St. NW Suite 410
Washington, DC 20036
(202) 861-0020
john@publicknowledge.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, *amicus curiae* Public Knowledge states that it has no parent corporation, and that no publicly held corporation holds 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................... i

TABLE OF CONTENTS ................................................................... ii

TABLE OF AUTHORITIES .............................................................. iv

INTEREST OF AMICUS CURIAE ...................................................... viii

SUMMARY OF ARGUMENT ............................................................ 1

I.    H.B. 1126 IS A CONTENT-BASED LAW THAT VIOLATES THE
      FIRST AMENDMENT .................................................................. 2

   A.    H.B. 1126 Unconstitutionally Burdens The Right To Access
         Speech ................................................................................ 4

   B.    H.B. 1126's Extraterritorial Application Chills Speech
         Nationwide .......................................................................... 9

   C.    H.B. 1126 Unconstitutionally Burdens Adults' Right to
         Anonymous Speech ............................................................. 12

II.   H.B. 1126 Violates the First Amendment Rights of Minors .......... 15

   A.    Minors Possess Significant First Amendment Rights That
         Mississippi's Law Violates .................................................. 16

   B.    The Statute's Content-Based and Vague Moderation Mandates
         Compound the Constitutional Violations ................................ 20

   C.    H.B. 1126's Content Moderation Standards for Minors Conflict
         with Federal Law ................................................................ 24

III.  AGE VERIFICATION MANDATES INTRODUCE UNTENABLE
      PRIVACY RISK FOR ALL USERS, AND PARTICULARLY
      BURDEN MARGINALIZED USERS ............................................. 25

   A.    No Reliable, Privacy-Protective Method to Verify Age Exists ..... 25

   B.    Age Verification Requirements Disproportionately Burden
         Marginalized Populations .................................................... 28

IV. State-by-State Age Verification Mandates Burden Interstate Commerce and Entrench Dominant Platforms ............................. 30

CONCLUSION .......................................................... 36

CERTIFICATE OF SERVICE ................................................ A

CERTIFICATE OF COMPLIANCE ....................................... B

# TABLE OF AUTHORITIES

## CASES

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ............................................... 8, 23

*Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983) ................... 7

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ............................ 9

*Butler v. Michigan*, 352 U.S. 380 (1957) ................................................ 7

*Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1926) ............................... 22

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) ....................... 17

*Free Speech Coalition v. Paxton*, 145 S. Ct. 2291 (2025) ........................ 8

*Ginsberg v. New York*, 390 U.S. 629 (1968) ...................................... 7, 16

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)................................ 22

*Hanson v. Denckla*, 357 U.S. 235 (1958) .............................................. 10

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ............................................. 24

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)................................. 9

*Kreimer v. Bureau of Police for the Town of Morristown*, 958 F.2d 1242
   (3d Cir. 1992) ....................................................................................... 5

*Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965)................................ 5, 6

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ..................... 13

*Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023)................... 12

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) ............................. 6

*Packingham v. North Carolina*, 582 U.S. 98 (2017) .................... 4, 16, 20

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015)........................................ 2

*Reno v. ACLU*, 521 U.S. 844 (1997)............................................. 6, 7, 8

*Sable Commc'ns v. FCC*, 492 U.S. 115 (1989) ........................................ 7

*Stanley v. Ga.*, 394 U.S. 557 (1969) .................................................. 3, 5

*Talley v. California*, 362 U.S. 60 (1960) .............................................. 13

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) ...... 16

*United States v. O'Brien*, 391 U.S. 367 (1968) ................................. 3, 15

*United States v. Playboy Entm't Grp.*, 529 U.S. 803 (2000) ............ 17, 23

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S.
   748 (1976) ......................................................................................... 3, 4

*Watchtower Bible & Tract Soc'y v. Vill. of Stratton*, 536 U.S. 150 (2002)
   ............................................................................................................ 6, 14

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) .......... 10

*Young v. New Haven Advocate*, 315 F.3d 256 (4th Cir. 2002)............... 10

*Zeran v. Am. Online*, 129 F.3d 327 (4th Cir. 1997)............................... 24

## STATUTES

47 U.S.C. § 230 ........................................................................... 24

Miss. Code Ann. § 75-24-19 (2024) ........................................... 10

Walker Montgomery Protecting Children Online Act, H.B. 1126 . passim

## OTHER AUTHORITIES

*Big Sad Forum News – Online Safety Act*, *The Hamster Forum* (Mar. 14, 2025), https://www.thehamsterforum.com/threads/big-sad-forum-news-online-safety-act.2091 ............................................... 34

*Bluesky, Our Response to Mississippi's Age Assurance Law* (Aug. 22, 2025), https://bsky.social/about/blog/08-22-2025-mississippi-hb1126 ................................................................................... 11, 31

*Engine, More Than Just a Number: How Determining User Age Impacts Startups* (Feb. 2024), https://static1.squarespace.com/static/571681753c44d835a440c8b5/t/65d8b6ab876bfd5b70f8795e/1708701355604/FINAL+-+2024+More+Than+Just+A+Number.pdf ........................................ 32

*Engine, Privacy Patchwork Problem: Costs, Burdens, and Barriers Encountered by Startups* (Mar. 2023), ................................................ 32

*Free Speech Coal., Age Verification Laws* (Oct. 7, 2025), https://action.freespeechcoalition.com/age-verification-resources/state-avs-laws ................................................................................... 33

*How to Complete Age Verification on Discord, Discord Support*, (Sept. 20, 2025), https://support.discord.com/hc/en-us/articles/30326565624343-How-to-Complete-Age-Verification-on-Discord .................................................................................. 28

Ivan Mehta, *Google Is Experimenting with Machine Learning-Powered Age-Estimation Tech in the U.S.*, *TechCrunch* (July 31, 2025), https://techcrunch.com/2025/07/31/google-is-experimenting-with-machine-learning-powered-age-estimation-tech-in-the-u-s ............... 35

James Titcomb, *Hamster Forum and Local Residents' Websites Shut Down by New Internet Laws*, *The Telegraph* (Mar. 18, 2025), https://www.telegraph.co.uk/business/2025/03/18/hamster-forum-local-residents-websites-shut-down-new-laws ..................................... 34

Jay Peters, *Discord Customer Service Data Breach Leaks User Info and Scanned Photo IDs*, The Verge (Oct. 3, 2025), https://www.theverge.com/news/792032/discord-customer-service-data-breach-hack; Update on a Security Incident Involving Third-

Party Customer Service, Discord Press Release (Oct. 3, 2025), https://discord.com/press-releases/update-on-security-incident-involving-third-party-customer-service ............................................... 27

Jillian Andres Rothschild et al., *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge* (Ctr. for Democracy & Civic Engagement, Univ. of Md. 2024) ......................... 28

L.S. Schenkel et al., *Child Maltreatment and Trauma Exposure Among Deaf and Hard of Hearing Young Adults*, 38 Child Abuse & Neglect 1581 (2014), https://doi.org/10.1016/j.chiabu.2014.04.010 .................. 18

Linzi Williamson, *Grooming for the Purposes of Exploitation and Abuse: A Literature Review* 4 (Sask. Prevention Inst. 2022), https://skprevention.ca/wp-content/uploads/2022/03/7-025_Grooming-for-the-Purposes-of-Exploitation-and-Abuse.pdf ....... 21

*Meta, Working with Parents and New Technology to Enroll More Teens into Accounts* (Apr. 21, 2025), https://about.fb.com/news/2025/04/meta-parents-new-technology-enroll-teens-teen-accounts .................................................... 35

Michael Goldberg, *Bluesky Blocks Access in Mississippi, Citing Free Speech and Privacy Concerns over Age Verification Law*, *Mississippi Today* (Aug. 25, 2025), https://mississippitoday.org/2025/08/25/bluesky-blocks-access-mississippi-free-speech-privacy-concerns ............................................. 31

Mindy Brooks, *Ensuring a Safer Online Experience for U.S. Kids and Teens*, *Google Blog* (July 30, 2025),https://blog.google/technology/safety-security/age-assurance-measures-safer-online-kids-teens-us. ................................................. 26

*Mississippi Free Press*, Bluesky (2025), https://bsky.app/profile/mississippifreepress.org/post/3lwzlus5lwb25 ................................................................................................... 11

*Natasha Lomas, Mississippi's Age Assurance Law Puts Decentralized Social Networks to the Test*, TechCrunch (Aug. 28, 2025), https://techcrunch.com/2025/08/28/mississippis-age-assurance-law-puts-decentralized-social-networks-to-the-test ................................... 11

Steven M. Bellovin, *Privacy-Preserving Age Verification—and Its Limitations* (Columbia Univ. Oct. 2025), https://www.cs.columbia.edu/~smb/papers/age-verify.pdf ................................................................. 26

The Trevor Project, *Online Experiences and Mental Health of LGBTQ+ Young People* (September 17, 2025),

https://www.thetrevorproject.org/research-briefs/online-experiences-
and-mental-health-of-lgbtq-young-people ........................................... 19

U.S. Comm'n on Civ. Rts., *The Civil Rights Implications of the Federal
Use of Facial Recognition Technology* 25 (2024),
https://www.usccr.gov/files/2024-09/civil-rights-implications-of-
frt_0.pdf. .............................................................................................. 29

## INTEREST OF AMICUS CURIAE*

Public Knowledge is a nonprofit organization that promotes freedom of expression, an open Internet, and access to knowledge. Founded in 2001, Public Knowledge defends free expression and an open Internet by promoting policies that let people create, access, and share knowledge in the digital age.

---

* No party's counsel authored any part of this brief. No one, apart from amicus Public Knowledge, contributed money intended to fund the brief's preparation or submission. Public Knowledge Policy Analyst Morgan Wilsmann contributed to this brief. All parties have consented to the submission of this brief.

## SUMMARY OF ARGUMENT

Mississippi's Walker Montgomery Protecting Children Online Act, H.B. 1126, is an overbroad, content-based speech restriction that conditions Internet use on identity disclosure and state-mandated moderation. By forcing age verification and dictating how platforms may display content, the statute suppresses protected expression on the theory that some speech might be inappropriate for children. The First Amendment forbids restricting lawful speech for all users to shield some from disfavored ideas.

The statute's vague moderation mandates invite arbitrary enforcement and chill protected expression. It compels services to block minors' exposure to content that "promotes, glorifies, or facilitates … any … illegal activity," H.B. 1126 § 6—a boundless category that can include news, art, and education. Facing liability, platforms will censor lawful speech. The law's extraterritorial reach worsens the harm, pressuring services with little connection to Mississippi to undergo significant expense or block Mississippi users.

The law's approach of requiring age verification creates new constitutional and practical harms. No method verifies age without collecting

sensitive data; burdens fall heaviest on marginalized users and smaller platforms. In practice, H.B. 1126 entrenches incumbents. The First Amendment does not permit a patchwork of state laws that make lawful speech contingent on identity disclosure or geography. The Court should hold H.B. 1126 unconstitutional.

## I.  H.B. 1126 IS A CONTENT-BASED LAW THAT VIOLATES THE FIRST AMENDMENT

Content-based restrictions on speech like Mississippi's must satisfy strict scrutiny.

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). The state bears the burden of proving that its restriction serves a compelling interest and is narrowly tailored to achieve that interest. *Id.* at 171. H.B. 1126 is content-based because it applies only to platforms hosting user-generated content and social interaction, while exempting platforms with different content and functions. *See* H.B. 1126, §§ 3(7), 4(2). The statute also triggers strict scrutiny because it burdens adults' First Amendment right to receive information and ideas without

government interference, a right the Supreme Court has recognized as central to the freedom of speech itself. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 756 (1976); *Stanley v. Ga.*, 394 U.S. 557, 564 (1969). By requiring adults to identify themselves and submit to age verification as a precondition to accessing or contributing constitutionally protected speech on covered platforms, Mississippi impermissibly burdens First Amendment rights. Even if the Court were to apply the less demanding intermediate scrutiny test articulated in *United States v. O'Brien*, 391 U.S. 367, 377 (1968), which requires that a regulation further an important governmental interest unrelated to the suppression of speech and burden no more speech than necessary, Mississippi's statute would fail. The law is not narrowly tailored because it applies the same requirements to all covered platforms regardless of the nature or quantity of potentially age-inappropriate content they host, and because less restrictive alternatives exist that would more precisely target the state's asserted interest while imposing less burden on adults' speech rights. The blanket approach of treating a platform where harmful-to-minors content constitutes a tiny fraction of overall material identically to a platform devoted primarily to such content cannot satisfy

intermediate scrutiny's requirement that the restriction burden no more speech than necessary.

## A.    H.B. 1126 Unconstitutionally Burdens The Right To Access Speech

Adults have a constitutional right to access and receive lawful speech. As the Supreme Court has repeatedly recognized, the First Amendment protects not only the right to speak but the reciprocal right of recipients to receive information and ideas. The Court stated in *Va. State Bd. of Pharmacy* that "freedom of speech presupposes a willing speaker. But where a speaker exists, as is the case here, the protection afforded is to the communication, to its source and to its recipients both." 425 U.S. 748, 756 (1976). This principle applies with full force to the digital public square, where the exchange of ideas and information has become central to participation in modern democratic society. *See Packingham v. North Carolina*, 582 U.S. 98, 107 (2017) (recognizing that social media platforms have become "the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge.").

The First Amendment protects people's right to access information of their choosing. In *Stanley v. Ga.*, the Supreme Court stated that "[i]f the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch." 394 U.S. 557, 565 (1969). This protection extends to "the right to receive information and ideas, regardless of their social worth[.]" *Id.* at 564. As the Third Circuit explained, the First Amendment protects not merely the right of speakers to disseminate information, but also "the right to receive information[.]" *Kreimer v. Bureau of Police for the Town of Morristown*, 958 F.2d 1242, 1253 (3d Cir. 1992). The Court affirmed this principle in *Lamont v. Postmaster Gen.*, holding unconstitutional a requirement that individuals register with the government to receive "communist political propaganda" by mail. 381 U.S. 301, 305-07 (1965). The Court held the registration requirement "is unconstitutional because it requires an official act (*viz.*, returning the reply card) as a limitation on the unfettered exercise of the addressee's First Amendment rights." *Id.* at 305.

Mississippi's age-verification mandate functions similarly to a prior restraint on adults' *access* to constitutionally protected speech, in addition to a prior restraint on their ability to contribute to covered platforms. But the same constitutional analysis should apply. The Supreme Court has long disfavored prior restraints as "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

Mississippi imposes precisely the type of identification and registration requirement that the Court condemned in *Watchtower Bible & Tract Soc'y v. Vill. of Stratton*, which struck down an ordinance requiring individuals to obtain a permit before engaging in door-to-door advocacy. 536 U.S. 150, 165-66, 170 (2002). The burden H.B. 1126 imposes on adults is functionally identical to the registration schemes struck down in *Watchtower* and *Lamont*: it conditions access to protected speech on an affirmative act that identifies the recipient and creates a record of their exercise of First Amendment rights.

Most fundamentally, the Supreme Court has made clear that government "may not reduce the adult population ... to reading only what is fit for children." *Reno v. ACLU*, 521 U.S. 844, 875 (1997) (quoting *Sable*

*Commc'ns v. FCC*, 492 U.S. 115, 128 (1989)).[1] In *Reno*, the Court struck down provisions of the Communications Decency Act that would have restricted indecent material on the internet, holding that the government's interest in protecting minors could not justify "suppress[ing] a large amount of speech that adults have a constitutional right to receive." *Id.* at 874. The Court explained that "[r]egardless of the strength of the government's interest" in shielding minors from inappropriate material, "the level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox." *Id.* at 875 (citing *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 74-75 (1983)). This principle applies with equal force here, where Mississippi's sweeping requirements apply to platforms hosting predominantly fully protected speech accessible to and intended for adult audiences.

Even assuming for the sake of argument that some subset of content on a given covered platform qualifies as "harmful to minors" under *Ginsberg v. New York*, 390 U.S. 629 (1968), Mississippi's law still fails

---

[1] Justice Frankfurter is the ultimate origin of this phrase in *Butler v. Michigan*, 352 U.S. 380 (1957) (striking down a state law that banned the distribution of books with obscene language).

constitutional scrutiny because it extends far beyond that narrow category. The Supreme Court's recent decision in *Free Speech Coalition v. Paxton* carefully cabined the permissible scope of age-verification requirements, upholding a law that imposed age verification requirements on websites whose content is at least one third "sexual material harmful to minors." 145 S. Ct. 2291, 2300 (2025). The *Paxton* Court held that age verification for accessing pornographic websites consisting primarily of material unprotected for minors represents a different constitutional question than cases like *Reno v. ACLU*, 521 U.S. 844 (1997) and *Ashcroft v. ACLU*, 542 U.S. 656 (2004) (Ashcroft II), which swept much more broadly.

Mississippi's statute sweeps far more broadly than *Paxton* permits. H.B. 1126 applies not to pornographic websites, but to general-purpose platforms where the vast majority of content is fully protected speech that meet the "obscene for minors" test articulated by that case. *Paxton*, 145 S. Ct. at 2304. These platforms host news, political commentary, educational resources, artistic expression, product reviews, professional networking, community organizing, and countless other forms of communication that adults have an indisputable constitutional right to access.

The statute makes no attempt to distinguish between platforms where harmful-to-minors content constitutes a tiny fraction of overall material and platforms devoted primarily to such content. The First Amendment does not permit Mississippi to deploy so blunt an instrument.

## B. H.B. 1126's Extraterritorial Application Chills Speech Nationwide

The practical effect of Mississippi's law extends far beyond the state's borders, chilling protected speech on a national and even global scale.

The constitutional limits on state regulatory authority are well established. A state may regulate out-of-state entities only if those entities have sufficient "minimum contacts" with the forum state such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). The minimum contacts doctrine ensures that defendants have "fair warning" that an activity may subject them to that state's jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). A defendant must have "purposefully directed" its activities toward the state, *id.*, and "avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits

and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). The Supreme Court has rejected the notion that a defendant's awareness that a product might reach the forum state suffices to establish jurisdiction. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295-96 (1980) (explaining that "foreseeability" that a product might reach a state "has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause."). And in a defamation case involving a website accessible in Virginia, the Fourth Circuit found that "a court in Virginia cannot constitutionally exercise jurisdiction over the Connecticut-based newspaper defendants because they did not manifest an intent to aim their websites or the posted articles at a Virginia audience." *Young v. New Haven Advocate*, 315 F. 3d 256, 258-59 (4th Cir. 2002).

Certainly, many major platforms meet *Int'l Shoe*'s minimum contacts requirement with Mississippi. Many smaller platforms may not—but litigation is expensive, and the risk of H.B. 1126's fines (up to $10,000 per violation[2]) is so onerous that the "safe" option is to assume that Mississippi has jurisdiction. Thus it is smaller platforms like Bluesky that have been most affected by H.B. 1126. Bluesky, a small, open protocol

---

[2] Miss. Code Ann. § 75-24-19 (2024).

social media platform that does not target ads or content to Mississippi users based on their location, may not be subject to H.B. 1126 under traditional principles of federalism. Yet, due to the overhang of fines for potential noncompliance, and because it lacks the technical ability to comply with Mississippi's law (unlike its larger rivals), it has chosen to block itself in Mississippi altogether.[3] This harms not only the expressive interests of Mississippi users, such as the Mississippi Free Press,[4] but also the expressive interests of users around the country and worldwide who can no longer reach a Mississippi audience. If allowed to stand, H.B.

---

[3] *Bluesky, Our Response to Mississippi's Age Assurance Law* (Aug. 22, 2025), https://bsky.social/about/blog/08-22-2025-mississippi-hb1126. It is also widely assumed that Mastodon, another decentralized, non-commercial social network, is subject to the law, with the biggest open questions being whether it is possible for Mastodon to comply with the law and what the consequences might be if it cannot. *Natasha Lomas, Mississippi's Age Assurance Law Puts Decentralized Social Networks to the Test*, TechCrunch (Aug. 28, 2025), https://techcrunch.com/2025/08/28/mississippis-age-assurance-law-puts-decentralized-social-networks-to-the-test. Mastodon is an open-source social networking software project that allows individuals and organizations to create their own self-governing "instances," which then exchange messages with each other. There is no centralized authority for user account creation or verification; this must be handled by the operator of a specific instance, which may be an individual or small organization.

[4] *Mississippi Free Press*, Bluesky (2025), https://bsky.app/profile/mississippifreepress.org/post/3lwzlus5lwb25.

1126 threatens to set a precedent where platforms across the country must follow the standards set by the most restrictive state.[5]

## C.    H.B. 1126 Unconstitutionally Burdens Adults' Right to Anonymous Speech

To the extent H.B. 1126 compels disclosure of identity beyond mere age confirmation, the statute runs afoul of the well-established constitutional protection for anonymous speech. Even if a site intends to keep its user information private and to use it for no other purpose than age verification, its identity records (in addition to being a "honeypot" for hackers[6]) may be subject to subpoena or accessed by the government—making them functionally similar to laws, struck down by the Supreme Court, that required people to register or apply for a permit before engaging in expressive activity.

---

[5] This is distinct from the dormant commerce clause issues raised in cases like *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023). There, pork sellers who were subject to California law under traditional principles of jurisdiction—pork was being sold in California, to California consumers—unsuccessfully argued that California's law unconstitutionally discriminated against out-of-state commerce. Here, even the initial hook for personal jurisdiction may be absent.

[6] *See infra* Sec. III.

Anonymity in public discourse serves vital First Amendment values. In *McIntyre v. Ohio Elections Comm'n*, the Court held that "an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." 514 U.S. 334, 342 (1995). The *McIntyre* Court explained that anonymous advocacy has played a central role in American political discourse since before the founding, noting that the Federalist Papers were published under the pseudonym "Publius" and that "[g]reat works of literature have frequently been produced by authors writing under assumed names." *Id.* at 341-43.

The constitutional protection for anonymity extends beyond the political context. In *Talley v. California*, the Court struck down an ordinance prohibiting the distribution of handbills that did not identify the person responsible for their production and distribution. 362 U.S. 60, 64 (1960). The Court recognized that throughout history, "[p]ersecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all." *Id.* at 64. This protection serves not only speakers with unpopular views,

but all speakers who wish to engage in public discourse without subjecting themselves to potential harassment, retaliation, or unwanted attention.

The Supreme Court also recognized in *Watchtower* that registration requirements burden anonymous advocacy even when the government's purpose is purportedly regulatory, rather than directed towards certain content. 536 U.S. 150, 166-67 (2002). The Court explained that even when the process is a "ministerial task that is performed promptly and at no cost," requiring that people register in order to speak "constitutes a dramatic departure from our national heritage and constitutional tradition." *Id.* at 166.

Mississippi's age-verification requirement operates similarly, foreclosing anonymous speech for all social media users in Mississippi.[7] It therefore must be struck down.

---

[7] As the Court also noted in *Watchtower*, some people might even "prefer silence" to complying with a law that requires them to register to speak, 536 U.S. at 167, even if they are not interested in anonymity.

## II.    H.B. 1126 Violates the First Amendment Rights of Minors

Like the provisions that burden adults, H.B. 1126's restrictions on minors' access to social media and its mandated content-moderation requirements are subject to strict scrutiny because they are content-based and target protected speech by subject matter. H.B. 1126 requires platforms to "implement a strategy to prevent the known minor's exposure" to content that "promotes, glorifies or facilitates … any … illegal activity." H.B. 1126 § 6. The statute also burdens minors' substantial First Amendment rights to access information and participate in public discourse—rights the Court has recognized as significant. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 794 (2011). Even considering only its effect on minors, the law fails even the more permissive intermediate-scrutiny standard of *O'Brien*, 391 U.S. at 377, because it restricts far more speech than necessary to serve the State's asserted interest in protecting minors from "harmful" material. It sweeps in vast amounts of fully protected speech—from political organizing to education and art—through categorical age-based bans rather than tailored measures that target genuinely harmful content. Less-restrictive alternatives such as parental controls, user-controlled filters, age-appropriate design features, or risk-based age

15

gates would advance the State's aims without foreclosing minors' partic-
ipation in the modern forums of democratic life or compelling platforms
to censor protected expression on vague and overbroad terms.

### A. Minors Possess Significant First Amendment Rights That Mississippi's Law Violates

The Supreme Court has consistently reaffirmed that minors are en-
titled to "a significant measure of First Amendment protection" and that
"[e]ven where the protection of children is the object, the constitutional
limits on governmental action apply." *Brown v. Ent. Merchs. Ass'n*, 564
U.S. 786, 794, 805-06 (2011). As the Court made clear in *Tinker v. Des
Moines Indep. Cmty. Sch. Dist.*, students retain "constitutional rights to
freedom of speech or expression," 393 U.S. 503, 506 (1969), and those
rights extend beyond the schoolhouse gate to include minors' ability to
access information and ideas in modern public forums. Today, those fo-
rums include online platforms that the Court has described as "the mod-
ern public square." *Packingham,* 582 U.S. at 107.

The constitutional protection for minors' speech rights is not abso-
lute, but it is substantial. Government may restrict access to material
that is obscene to minors, *see Ginsberg v. New York*, 390 U.S. 629 (1968),

16

but it may not bar minors from accessing protected speech merely because legislators deem it harmful or unsuitable. As the Court explained in *Erznoznik v. City of Jacksonville*, "speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." 422 U.S. 205, 213-14 (1975). Likewise, the Court has rejected any "free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 795 (internal citations omitted).

H.B. 1126 ignores these limits. It does not target obscenity or other unprotected speech. Instead, it categorically restricts minors' access to platforms regardless of the content they host. By conditioning access on parental consent, the law burdens an entire class of speakers from participating in the modern public square. *See United States v. Playboy Entm't Grp.*, 529 U.S. 803 (2000) (burdens on speech analyzed similarly to bans). A seventeen-year-old seeking to engage in political debate or community organizing faces the same barrier as a much younger child, regardless of maturity, purpose, or the speech involved.

17

The practical reality is that many minors cannot or will not obtain parental consent, particularly minors from households where parents are unavailable, unsupportive, or abusive. This creates serious barriers for disabled youth who benefit significantly from social media. For example, deaf children, especially those with hearing parents, often face pressure to assimilate into hearing culture through lip reading, wearing uncomfortable hearing aids, or risking ostracization from family and peers. With one study of college-aged deaf students indicating 76% having experienced maltreatment in childhood, access to social media can be a crucial protective factor for psychological wellbeing.[8]

Those who feel isolated in their homes and communities can use social media to connect with peers facing similar challenges and find deaf role models. However, if parental consent is required and parents are unwilling to allow their child access to the deaf resources, these children lose access to a vital resource for community, social inclusion, and support.

---

[8] L.S. Schenkel et al., *Child Maltreatment and Trauma Exposure Among Deaf and Hard of Hearing Young Adults*, 38 Child Abuse & Neglect 1581 (2014), https://doi.org/10.1016/j.chiabu.2014.04.010.

Similarly, LGBTQ youth whose parents do not accept their identity cannot access online communities that provide crucial support and connection. The vast majority of LGBTQ young people turn to online platforms specifically because they struggle to find meaningful connections in their daily lives. Nearly three-quarters of those surveyed by The Trevor Project—a national organization dedicated to crisis prevention services for LGBTQ youth—agreed they go online to connect with others because of a lack of opportunities for connection offline, believing they can be their more authentic selves in digital spaces.[9] Minors in dysfunctional families cannot access resources about mental health, domestic violence, or educational opportunities. Young people interested in political movements that their parents oppose cannot engage in activism or learn about alternative viewpoints. In each case, the minor is foreclosed from exercising core First Amendment rights—a right that should not be reserved only for adult users.

---

[9] The Trevor Project, *Online Experiences and Mental Health of LGBTQ+ Young People* (September 17, 2025), https://www.thetrevorproject.org/research-briefs/online-experiences-and-mental-health-of-lgbtq-young-people.

The Supreme Court has repeatedly struck down such broad restrictions. In *Brown*, it invalidated California's ban on violent video games for minors. 564 U.S. at 805. And in *Packingham*, the Court underscored that denying access to social media "is to prevent the user from engaging in the legitimate exercise of First Amendment rights." 582 U.S. at 107. Mississippi's law suffers from the same constitutional defect: it restricts minors' access to protected speech based on generalized fears rather than precise, narrowly tailored measures. The Constitution demands more respect for minors' First Amendment rights than H.B. 1126 provides.

### B.    The Statute's Content-Based and Vague Moderation Mandates Compound the Constitutional Violations

H.B. 1126's constitutional deficiencies extend beyond its access restrictions. The statute also compels covered platforms to "prevent" minors' exposure to broad categories of content.

Content depicting or discussing "illegal activity," for instance, must be prevented or mitigated even though such content might include historical discussions of civil disobedience, artistic works like *Les Misérables* or *The Godfather*, news coverage of protests and social movements, or academic analysis of criminal justice policy.

20

The categories of speech subject to mandated moderation are simultaneously overbroad and vague, sweeping in vast quantities of protected expression while providing no clear guidance to platforms about what must be restricted. A platform cannot determine with any confidence whether a news article about a robbery, a movie depicting a heist, a historical account of civil rights sit-ins, or a novel featuring an anti-hero "glorifies criminal activity." The inevitable result is self-censorship, as platforms restrict more speech than necessary to avoid potential liability.

The statute compounds these defects through its use of undefined and morally loaded terms such as "grooming," "trafficking," and "other sexual exploitation or abuse." These terms are not self-limiting, and their scope turns entirely on the subjective judgments of prosecutors or platforms seeking to avoid liability. "Grooming" in particular lacks a consistent legal definition[10] and has increasingly been invoked in political discourse to stigmatize constitutionally protected discussion of sexuality,

---

[10] Linzi Williamson, *Grooming for the Purposes of Exploitation and Abuse: A Literature Review* 4 (Sask. Prevention Inst. 2022), https://skprevention.ca/wp-content/uploads/2022/03/7-025_Grooming-for-the-Purposes-of-Exploitation-and-Abuse.pdf ("there is no single agreed upon definition of grooming among scholars").

gender identity, and LGBTQ issues. Likewise, the phrase "other sexual exploitation or abuse" sweeps far beyond unprotected categories of speech, inviting arbitrary enforcement and self-censorship of lawful material—including sexual education resources, survivor advocacy, and artistic or literary works that address sexual themes. The First Amendment does not permit states to delegate such boundless discretion to officials to decide, post hoc, what speech is permissible.[11]

This vagueness problem is constitutionally fatal. As the Supreme Court has long recognized, "a law that forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). In the First Amendment context, vagueness is particularly problematic because unclear standards inevitably chill protected speech. The Court explained in *Grayned v. City of Rockford* that laws regulating speech must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and must "provide explicit standards

---

[11] Equally, it would be unconstitutional for the state to target this kind of expression with exacting specificity.

for those who apply them" to prevent "arbitrary and discriminatory enforcement." 408 U.S. 104, 108-09 (1972).

Even assuming that Mississippi's interest in protecting minors from genuinely harmful content qualifies as compelling, the statute is not narrowly tailored to serve that interest. As the Court held in *United States v. Playboy Ent. Grp.*, "when the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions," and "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." 529 U.S. 803, 813 (2000). Less restrictive alternatives exist that would more precisely target harmful content without imposing categorical restrictions on vast quantities of protected speech. Parental controls, filtering software, and age-appropriate design features all offer means of addressing the state's concerns without government-compelled censorship of lawful expression.

The Supreme Court drove this point home in *Ashcroft v. Free Speech Coalition*, rejecting the government's argument that overbreadth was justified by enforcement difficulties. 535 U.S. 234, 255-56 (2002). The Court held that "[t]he Government may not suppress lawful speech as

the means to suppress unlawful speech" and that administrative convenience cannot justify restrictions that "abridge the freedom of speech protected by the First Amendment." *Id.* at 255. Mississippi's compelled moderation regime fails this test because it restricts vast amounts of protected speech that poses no legitimate threat to minors in order to capture a smaller subset of potentially harmful content.

## C. H.B. 1126's Content Moderation Standards for Minors Conflict with Federal Law

Mississippi's attempt to dictate how online platforms moderate minors' content directly conflicts with Section 230 of the Communications Decency Act. Section 230 bars treating an online service as "the publisher or speaker" of third-party content, 47 U.S.C. § 230 (c)(1), and expressly preempts any inconsistent state law. Id. § 230(e)(3). By requiring platforms to "prevent or mitigate" exposure to specified categories of content and penalizing noncompliance, H.B. 1126 effectively makes platforms liable for third-party speech. That is precisely what Section 230 forbids. *Zeran v. Am. Online*, 129 F.3d 327, 330 (4th Cir. 1997). Because the statute stands as an obstacle to Congress's purpose of shielding providers' editorial discretion and avoiding a patchwork of state rules, it is preempted. *See Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

## III.  AGE VERIFICATION MANDATES INTRODUCE UNTENABLE PRIVACY RISK FOR ALL USERS, AND PARTICULARLY BURDEN MARGINALIZED USERS

H.B. 1126 defines a "known minor" as someone under 18 and requires digital services to make "commercially reasonable efforts" to verify users' ages with a high degree of certainty, considering the associated risks. H.B. 1126 is broader than laws limiting children's access to "adult content," mandating that all digital services verify ages using methods such as biometric recognition, credit card uploads, or ID submissions. This broad requirement burdens *all* users and raises severe privacy concerns.

### A.  No Reliable, Privacy-Protective Method to Verify Age Exists

By imposing an age verification mandate in the absence of a comprehensive state or federal data privacy or security law, Mississippi puts the privacy of platform users at risk. The bill gestures towards data security by requiring the deletion of "government-issued identification of the known minor's parent or guardian," H.B. 1126, § 4(2)(d), when allowing accounts to be created by minors with parental consent. It does not address the other data security risks the bill creates, such as the security of information platforms must undertake "to verify the age of the person

25

creating an account," § 4(1), which applies to all users. As a result, both adult and child users are required to submit sensitive data to platforms with varying levels of data protection capabilities, putting their privacy at significant risk.

For one, no existing technology can reliably verify age without extensive data collection. Biometric systems fail near age boundaries with error rates that disproportionately affect minorities and gender non-conforming individuals. Behavioral analysis systems that *estimate* age, such as Google's machine learning approach,[12] cannot reliably distinguish between a 17-year-old and an 18-year-old. Credential-based systems, such as digital ID, require an identity verification infrastructure that does not currently exist in the United States.[13]

Age-verification systems based on government IDs expose far more personal data than necessary. A driver's license reveals a name, address,

---

[12] Mindy Brooks, *Ensuring a Safer Online Experience for U.S. Kids and Teens*, *Google Blog* (July 30, 2025),https://blog.google/technology/safety-security/age-assurance-measures-safer-online-kids-teens-us.

[13] Steven M. Bellovin, *Privacy-Preserving Age Verification—and Its Limitations* (Columbia Univ. Oct. 2025), https://www.cs.columbia.edu/~smb/papers/age-verify.pdf.

photograph, and identification number—information irrelevant to a simple age check. That violates the privacy principle of data minimization: collect only what is strictly required. Even so-called "privacy-preserving" methods share the same flaw. Credit-card checks reveal financial details, facial analysis captures biometric identifiers, and behavioral profiling tracks browsing and social activity. Each approach forces users to surrender sensitive information that should have no bearing on their ability to speak or listen online.

As more platforms implement these systems, large repositories of IDs, facial scans, and financial information will create irresistible targets for attackers, creating new avenues for identity theft and surveillance. Data breaches exposing sensitive personal information are all too common. Recently, Discord shared that it had discovered an "unauthorized party compromised one of Discord's third-party customer services providers."[14] Beyond accessing Discord users' emails and contract details, the

---

[14] Jay Peters, *Discord Customer Service Data Breach Leaks User Info and Scanned Photo IDs*, The Verge (Oct. 3, 2025), https://www.theverge.com/news/792032/discord-customer-service-data-breach-hack; Update on a Security Incident Involving Third-Party Customer Service, Discord Press Release (Oct. 3, 2025), https://discord.com/press-releases/update-on-security-incident-involving-third-party-customer-service.

"unauthorized party" managed to obtain government IDs from users who had appealed an age determination—an age determination Discord is obligated to conduct age assurance checks to comply with the United Kingdom's Online Safety Act[15] and other jurisdictions in which the law requires platforms to provide "age appropriate experiences" by determining a user's age. Affected users are now markedly more vulnerable to identity theft and financial fraud as a result.

### B.  Age Verification Requirements Disproportionately Burden Marginalized Populations

Age verification mandates that require uploading government-provided identification (for most, a driver's license) impose their heaviest burdens on precisely those populations already facing systemic barriers to full civic and economic participation. Eighteen percent of Black adults, fifteen percent of Hispanic adults, and thirteen percent of Asian or Pacific Islander adults possess no driver's license at all, compared to only five percent of white adults.[16] Economic status also plays a role, with twenty-

---

[15] *How to Complete Age Verification on Discord, Discord Support*, (Sept. 20, 2025), https://support.discord.com/hc/en-us/articles/30326565624343-How-to-Complete-Age-Verification-on-Discord.

[16] Jillian Andres Rothschild et al., *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge* (Ctr. for Democracy & Civic Engagement, Univ. of Md. 2024).

three percent of individuals with annual incomes below $30,000 possessing no license at all.[17] Furthermore, age verification measures exclude individuals who lack official documentation due to immigration status and/or language barriers.

Beyond the obstacles to obtaining identification documents, the technical implementation of age verification systems itself creates discriminatory effects. Biometric-based age estimation technologies, which major platforms are increasingly deploying as alternatives to document-based verification, have demonstrated significant accuracy disparities across demographic groups. These systems perform substantially worse for individuals with darker skin tones, those with certain medical conditions affecting physical appearance, and transgender or gender nonconforming individuals whose presentation may not align with binary gender markers in identification documents.[18] When age verification sys-

---

[17] Id.

[18] U.S. Comm'n on Civ. Rts., *The Civil Rights Implications of the Federal Use of Facial Recognition Technology* 25 (2024), https://www.usccr.gov/files/2024-09/civil-rights-implications-of-frt_0.pdf.

tems incorporate facial recognition or age estimation algorithms, they re-produce patterns of technological bias that systematically disadvantage non-white populations, disabled individuals, and gender minorities.

## IV.    State-by-State Age Verification Mandates Burden Interstate Commerce and Entrench Dominant Platforms

Mississippi H.B. 1126's age verification mandate creates insurmountable operational barriers for small platforms and new entrants, forcing them to choose between abandoning Mississippi users entirely or risking catastrophic financial penalties. Rather than achieving its purpose of protecting children while preserving legitimate speech, H.B. 1126 creates barriers to smaller platforms' ability to serve Mississippi residents.

The law's practical operation since the Supreme Court lifted the preliminary injunction on H.B. 1126 demonstrates these effects. Platforms have responded by blocking all Mississippi users rather than attempting compliance. Bluesky, a small community-focused platform that

prioritizes user safety and data privacy, has completely blocked Mississippi residents from accessing its services.[19] Bluesky cites that this decision is not just a business choice, but a response to a law that "creates challenges that go beyond its child safety goals, and creates significant barriers that limit free speech."[20] *See* supra Sec. I(B).

To meet H.B. 1126's age verification requirements, small platforms must purchase and integrate costly third-party verification systems—a financial barrier that diverts scarce resources from product development. These systems require ongoing maintenance, updates, and technical support, creating persistent operational costs that larger competitors can absorb but that threaten smaller platforms' viability.

Beyond the age verification costs, H.B. 1126 imposes costly data management obligations. Startups and large platforms alike must collect, process, store, and secure sensitive personal information, including

---

[19] Michael Goldberg, *Bluesky Blocks Access in Mississippi, Citing Free Speech and Privacy Concerns over Age Verification Law, Mississippi Today* (Aug. 25, 2025), https://mississippitoday.org/2025/08/25/bluesky-blocks-access-mississippi-free-speech-privacy-concerns.
[20] *Bluesky, Our Response to Mississippi's Age Assurance Law* (Aug. 22, 2025), https://bsky.social/about/blog/08-22-2025-mississippi-hb1126.

government-issued identification documents and geolocation data suffi-
cient to confirm residency in Mississippi. This expanded data collection
transforms platforms into high-value targets for malicious actors while
simultaneously creating existential legal risks around data security.[21] A
data breach involving users' driver's licenses or other government cre-
dentials could result in penalties, civil litigation, and reputational dam-
age sufficient to destroy a young, resource-constrained company.[22]

These technical and security burdens are compounded by a compet-
itive disadvantage in user acquisition. Users may hesitate to provide
such sensitive information such as government-issued ID to an unfamil-
iar entity, and may gravitate instead toward established platforms.

---

[21] *Engine, Privacy Patchwork Problem: Costs, Burdens, and Barriers
Encountered by Startups* (Mar. 2023),
https://www.engine.is/news/category/engine-releases-report-on-privacy-
patchwork-problem-costs-burdens-and-barriers-encountered-by-
startups.
[22] *Engine, More Than Just a Number: How Determining User Age Im-
pacts Startups* (Feb. 2024),
https://static1.squarespace.com/static/571681753c44d835a440c8b5/t/65
d8b6ab876bfd5b70f8795e/1708701355604/FINAL+-
+2024+More+Than+Just+A+Number.pdf.

With half the states in the U.S having enacted age verification laws,[23] each with varying requirements and enforcement mechanisms, small platforms face an impossible fragmentation problem that forces state-by-state decisions. Unlike dominant platforms that can better absorb compliance costs, resource-constrained startups must consider the cost of compliance (and the potential penalties for noncompliance) against the size of the market for each jurisdiction.

Some platforms rationally choose to operate only in states where a substantial user base justifies the investment. Smaller states, such as Mississippi, may be excluded from this calculus, not because platforms object to serving their residents, but because operating in Mississippi is economically untenable.

The United Kingdom's experience under the Online Safety Act (OSA) provides evidence of these dynamics. With OSA's implementation, major platforms, including Reddit, YouTube, and Spotify, deployed age verification measures while absorbing the associated costs. Meanwhile,

---

[23] *Free Speech Coal., Age Verification Laws* (Oct. 7, 2025), https://action.freespeechcoalition.com/age-verification-resources/state-avs-laws.

numerous smaller sites and community forums shut down entirely, unable to afford compliance expenses or unwilling to collect sensitive user data. The Hamster Forum, a specialized community platform dedicated to hamster care and enthusiast discussion, announced in March 2025 that it would close its message boards due to OSA requirements.[24] The forum directed users to migrate to Instagram, operated by Meta, one of the world's largest technology companies, with the acknowledgment that the corporate platform environment "will not be the same by any means."[25]

The law thus produces a perverse outcome by eliminating smaller, often safer platforms while strengthening the dominance of the largest platforms (and handing them yet more personal data). Users shifting from diverse, specialized communities to large corporate platforms exemplifies the First Amendment injury that H.B. 1126 inflicts on Mississippi residents. The law's practical effect is not to constrain large technology

---

[24] James Titcomb, *Hamster Forum and Local Residents' Websites Shut Down by New Internet Laws*, *The Telegraph* (Mar. 18, 2025), https://www.telegraph.co.uk/business/2025/03/18/hamster-forum-local-residents-websites-shut-down-new-laws.

[25] *Big Sad Forum News—Online Safety Act*, *The Hamster Forum* (Mar. 14, 2025), https://www.thehamsterforum.com/threads/big-sad-forum-news-online-safety-act.2091.

companies but to entrench their dominance. Companies like Google and Meta are able to develop proprietary age verification systems, absorb compliance costs, and weather the user acquisition challenges that verification requirements create. Indeed, these corporations are experimenting with facial recognition and other age-estimation technologies that turn age verification from a burden into a competitive moat.[26] For these dominant platforms, H.B. 1126's requirements protect them from new competition.

The internet's value lies in its capacity to host myriad voices, perspectives, and communities. Age verification mandates like H.B. 1126 diminish this diversity while concentrating both users and market power in the hands of the very large companies whose practices spurred the law's passage.

---

[26] *Meta, Working with Parents and New Technology to Enroll More Teens into Accounts* (Apr. 21, 2025), https://about.fb.com/news/2025/04/meta-parents-new-technology-enroll-teens-teen-accounts; Ivan Mehta, *Google Is Experimenting with Machine Learning-Powered Age-Estimation Tech in the U.S.*, *TechCrunch* (July 31, 2025), https://techcrunch.com/2025/07/31/google-is-experimenting-with-machine-learning-powered-age-estimation-tech-in-the-u-s.

## CONCLUSION

H.B. 1126 violates the First Amendment and should be struck down.

Dated: October 9, 2025

s/*John Bergmayer*
JOHN BERGMAYER
PUBLIC KNOWLEDGE
1818 N Street NW, Suite 410
Washington, DC 20036
(202) 861-0020
john@publicknowledge.org

*Counsel for amicus curiae*

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the Brief of Public Knowledge as Amicus Curiae in support of petitioner with the Clerk of the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on October 9, 2025. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: October 9, 2025

s/*John Bergmayer*
John Bergmayer
*Counsel for amicus curiae*

A

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 29(a)(5) because it contains 6,375 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).

Dated: October 9, 2025

s/*John Bergmayer*
John Bergmayer
*Counsel for amicus curiae*

B