No. 25-60348

# United States Court of Appeals for the Fifth Circuit

———————

NetChoice, L.L.C.,

*Plaintiff-Appellee,*

v.

Lynn Fitch,

in her official capacity as Attorney General of Mississippi,

*Defendant-Appellant.*

———————

On Appeal from the United States District Court
for the Southern District of Mississippi, No. 1:24-cv-170
Hon. Halil S. Ozerden, Chief Judge

———————

**BRIEF OF TECHNET, CHAMBER OF PROGRESS, COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, ENGINE ADVOCACY, INTERNET WORKS, AND SOFTWARE & INFORMATION INDUSTRY ASSOCIATION AS *AMICI CURIAE* IN SUPPORT OF APPELLEE**

———————

Jamie Dycus
Rachel E. Craft
KING & SPALDING LLP
1290 Avenue of the Americas
14th Floor
New York, NY 10104
(212) 556-2100

Paul Alessio Mezzina
 *Counsel of Record*
Nema Milaninia
KING & SPALDING LLP
1700 Pennsylvania Ave. NW
Washington, DC 20006
(202) 737-0500
pmezzina@kslaw.com

*Counsel for Amici Curiae*

October 9, 2025

## CERTIFICATE OF INTERESTED PERSONS

Under Fifth Circuit Rule 29.2, the undersigned counsel of record for *amici curiae* certifies that the following listed persons and entities, in addition to those identified in the parties' Certificates of Interested Persons, have an interest in this *amicus* brief. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

***Amici:*** TechNet, Chamber of Progress, Computer & Communications Industry Association (CCIA), Engine Advocacy, Internet Works, and the Software & Information Industry Association (SIIA) are nonprofit, tax-exempt organizations organized under the laws of the District of Columbia (TechNet, Engine Advocacy, Internet Works, and SIIA) and Virginia (Chamber of Progress and CCIA). No *amicus* has a parent company, and no publicly held company has 10% or greater ownership in any of the *amici*.

***Counsel for Amicus:*** Paul Alessio Mezzina, Jamie Dycus, Nema Milaninia, and Rachel E. Craft of King & Spalding LLP.

Date: October 9, 2025

/s/ Paul Alessio Mezzina
Paul Alessio Mezzina

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS..........................................i

TABLE OF AUTHORITIES...................................................................ii

STATEMENT OF INTEREST ................................................................1

SUMMARY OF THE ARGUMENT ........................................................5

ARGUMENT ..........................................................................................7

I.    The Act Is a Content-Based Speech Regulation Triggering
      Strict Scrutiny ...........................................................................7

II.   The Act Imposes Technical and Financial Burdens That
      Suppress Protected Speech and Disproportionately Impact
      Smaller Companies ...................................................................12

III.  The Act's Vagueness and Overbreadth Compel Censorship of
      Lawful Speech .........................................................................16

IV.   Non-Uniform State Laws Restricting Online Speech Stifle
      National Commerce and Innovation ..........................................19

CONCLUSION .....................................................................................23

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) ................................................................. 15

*Ashcroft v. ACLU*,
535 U.S. 564 (2002) ................................................................... 9

*Bolger v. Youngs Drug Prods. Corp.*,
463 U.S. 60 (1983) ..................................................................... 9

*Comput. & Commc'ns Indus. Ass'n v. Paxton*,
747 F. Supp. 3d 1011 (W.D. Tex. 2024) ........................... 10, 20

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier*,
--- F. Supp. 3d ---,
2025 WL 1570007 (N.D. Fla. June 3, 2025) ......................... 20

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975) ................................................................. 10

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ................................................................. 19

*Free Speech Coal., Inc. v. Paxton*,
145 S. Ct. 2291 (2025) ............................................................ 11

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ................................................................. 19

*Interstate Cir., Inc. v. City of Dallas*,
390 U.S. 676 (1968) ................................................................. 10

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ........................................................... 12, 15

*NetChoice v. Carr*,
--- F. Supp. 3d ---,
2025 WL 1768621 (N.D. Ga. June 26, 2025) ................... 10, 20

*NetChoice v. Skrmetti,*
2025 WL 1710228 (M.D. Tenn. June 18, 2025) .................................. 20

*NetChoice, L.L.C. v. Fitch,*
134 F.4th 799 (5th Cir. 2025) ................................................... 11

*NetChoice, LLC v. Bonta,*
761 F. Supp. 3d 1202 (N.D. Cal. 2024)................................... 20

*NetChoice, LLC v. Fitch,*
606 U.S. ---,
2025 WL 2350189 (U.S. Aug. 14, 2025) ............................... 12

*NetChoice, LLC v. Griffin,*
2025 WL 978607 (W.D. Ark. Mar. 31, 2025)................................ 10, 20

*NetChoice, LLC v. Reyes,*
748 F. Supp. 3d 1105 (D. Utah 2024)........................................ 10, 20

*NetChoice, LLC v. Yost,*
778 F. Supp. 3d 923 (S.D. Ohio 2025) ....................................... 10, 20

*NRA v. Vullo,*
602 U.S. 175 (2024) ............................................................. 11

*Ohio v. EPA,*
603 U.S. 279 (2024) ............................................................. 15

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) ............................................................... 9

*Smith v. California,*
361 U.S. 147 (1959) ............................................................... 9

*Turner Broad. Sys., Inc. v. FCC,*
512 U.S. 622 (1994) ............................................................... 9

*Wages & White Lion Invs., L.L.C. v. FDA,*
16 F.4th 1130 (5th Cir. 2021) ................................................. 15

**Statutes**

Ark. Code Ann. § 4-88-1401(8)(B) ............................................................ 20

Fla. Stat. Ann. § 501.1736(1)(e) .............................................................. 20

Ga. Code Ann. § 39-6-1(6) .................................................................. 20, 21

La. Stat. Ann. § 51:1751(12)(b) ............................................................... 21

Miss. Code Ann. § 75-24-9 ....................................................................... 8

Miss. Code Ann. § 75-24-19 ..................................................................... 8

Miss. Code Ann. § 75-24-20 ..................................................................... 8

Ohio Rev. Code Ann. § 1349.09(N)(1) ...................................................... 20

Tenn. Code Ann. § 47-18-5702(9) ............................................................ 20

**Other Authorities**

Bluesky Team,
   *Our Response to Mississippi's Age Assurance Law*
   (Aug. 22, 2025), https://bsky.social/about/blog/
   08-22-2025-mississippi-hb1126 ........................................................... 19

Complaint,
   *NetChoice v. Murrill*,
   No. 3:25-cv-231 (M.D. La. filed Mar. 18, 2025) ................................... 20

Emergency Stay Application Appendix,
   *NetChoice, LLC v. Fitch*,
   606 U.S. ---, 2025 WL 2350189
   (U.S. Aug. 14, 2025) (No. 25A97) ............................................. 13, 14, 18

Engine, More Than Just a Number:
   How Determining User Age Impacts Startups (Feb. 2024),
   *available at* https://tinyurl.com/mpfh2ffp .......................................... 15

H.B. 1126, 2024 Reg. Sess. (Miss.) .................................................. *passim*

*Lake Middle School*,
   Facebook, https://www.facebook.com/
   groups/1462819790635781/ ............................................................. 18

Miss. Dep't of Educ.,
   Mississippi College and Career Readiness Standards for
   English Language Arts Scaffolding Document: Ninth Grade
   (Sept. 2016), *available at* https://tinyurl.com/mvn8t96v ................... 18

*West Harrison Middle School*,
   Facebook, https://www.facebook.com/whmshurricanes/ ................... 18

## STATEMENT OF INTEREST[1]

*Amici* are non-profit organizations committed to a digitally interconnected society in which all people benefit from technology and the opportunities for speech that are afforded by a safe and open internet. *Amici* have a strong interest in protecting the expressive freedom and due process rights of digital service providers and their users and in encouraging rational, harmonized regulatory frameworks that promote child safety, privacy, and innovation—rather than an unworkable assemblage of conflicting state mandates.

**TechNet** is a national, bipartisan network of technology CEOs and senior executives advocating a targeted policy agenda at the federal and state levels. Its membership spans more than 100 American companies ranging from startups to the world's largest technology companies. Those companies employ more than five million employees and countless customers across information technology, artificial intelligence, social media, e-commerce, the sharing and gig economies, advanced energy,

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amici curiae*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

cybersecurity, venture capital, and finance. TechNet has particular expertise regarding how companies of all sizes manage compliance with state laws governing the internet and the unique harms that Mississippi's Act would cause.[2]

**Chamber of Progress** is a tech-industry coalition devoted to a progressive society, economy, workforce, and consumer climate. It seeks to protect internet freedom and free speech, promote innovation and economic growth, and empower technology customers and users. Chamber of Progress believes that allowing a diverse range of websites and philosophies to flourish will benefit all corporate and natural persons. Its work is supported by its corporate partners that neither sit on its board of directors nor have a vote on, or veto over, its positions. Chamber of Progress does not speak for individual partner companies.[3]

**The Computer & Communications Industry Association ("CCIA")** is an international, not-for-profit association representing a broad cross-section of communications, technology, and internet industry

---

[2] A list of TechNet members is available at *Members* (2025), https://www.technet.org/our-story/members/.

[3] A list of Chamber of Progress partners is available at *Partners* (2025), https://progresschamber.org/partners/.

firms that collectively employ more than 1.6 million workers, invest over $100 billion in research and development, and contribute trillions of dollars in productivity to the global economy. For more than 50 years, CCIA has promoted open markets, open systems, and open networks and has opposed governmental attempts to coerce or restrict access to speech.[4]

**Engine Advocacy ("Engine")** is a non-profit technology policy, research, and advocacy organization dedicated to bridging the gap between startups and policymakers. Engine works with government officials and thousands of high-technology, growth-oriented startups nationwide to support innovation and entrepreneurship through research, policy analysis, and advocacy. Its community includes small- and medium-sized companies that host user-generated content, engage in content moderation, and serve a wide range of users.

**Internet Works** is a 501(c)(6) trade association of 23 diverse "Middle Tech" companies working together to right-size regulatory technology policy to foster trust and promote online safety so the internet

---

[4] A list of CCIA members is available at *Members* (2025), https://ccianet.org/about/members/.

remains a place of limitless possibility and innovation. Since 2023, Internet Works has advocated for policies that drive economic growth while protecting user safety and free expression and expanding consumer choice.[5]

**The Software & Information Industry Association ("SIIA")** is the principal trade association for those in the business of information. Its nearly 400 members—software companies, platforms, data and analytics firms, and digital publishers—serve business, education, government, healthcare, and consumers. SIIA protects the rights of its members to use software as a tool for the dissemination of information and has a strong interest in predictable, robust First Amendment protections. A significant cross-section of SIIA's membership creates tools for young people, and SIIA believes kids deserve access to information and the virtual tools critical in keeping them connected and engaged in their communities without fear of being exploited.[6]

---

[5] A list of Internet Works members is available at *Who We Are* (2025), https://theinternet.works/.

[6] A list of SIIA members is available at *SIIA Member Companies* (2021), https://www.siia.net/about-us/member-companies/.

## SUMMARY OF THE ARGUMENT

While protecting children online is an important goal, laws pursuing that aim must not erode the First Amendment rights of minors, parents, or other users. Mississippi's H.B. 1126 (the "Act") crosses that line. The Act imposes sweeping, content-based restrictions on online social media websites,[7] including intrusive age-verification, parental-consent, and content-monitoring mandates. These requirements violate the First Amendment and threaten irreparable harm to both digital service providers and users. The Act will force many of *amici*'s member companies and similarly situated companies to curtail operations, reduce engagement, or alter or suspend features that enable user speech. Such chilling of speech and disruption of expressive activity are precisely the harms the First Amendment forbids. The equities strongly favor affirming and restoring the district court's preliminary injunction while litigation proceeds.

---

[7] H.B. 1126 targets "[d]igital service[s]," defined as "a website, an application, a program, or software that collects or processes personal identifying information with Internet connectivity." § 2(a), 2024 Reg. Sess. (Miss.). For simplicity, *amici* refer to this collection of services as "websites."

*First*, the Act is a classic content-based speech regulation that burdens digital service providers. It compels digital service providers to collect and store detailed personal information about users, including identities and relationships; verify users' ages; obtain parental consent; and screen for broad categories of protected content, effectively requiring digital service providers to act as the State's censors. By forcing online services to censor lawful speech, the Act violates users' First Amendment rights and chills protected expression. Because the Act targets speech based on its content and compels editorial choices, strict scrutiny applies. The Act cannot satisfy that standard.

*Second*, the Act imposes onerous technical and financial burdens, with existential consequences for smaller and emerging firms. Building or licensing robust age-verification and parent-child relationship systems and redesigning moderation and compliance workflows will drain engineering and legal resources, forcing companies to scale back expressive functionality and/or exit markets, and deterring innovation. These burdens are neither necessary nor narrowly tailored to advance the Act's stated goals.

*Third*, the Act is unconstitutionally vague and overbroad. It relies on undefined and malleable terms like "primarily," "socially interact," "incidental," and "facilitate," leaving providers to guess whether they are covered and what compliance requires, on pain of stiff penalties. Faced with such uncertainty, digital service providers will be forced to over-remove lawful content, eliminate valid user accounts, and shut down features, chilling protected expression.

*Fourth*, the Act aggravates an already fragmented state-by-state medley of laws, forcing national providers to navigate divergent definitions and obligations. The predictable result is a balkanized internet where only well-resourced incumbents can achieve compliance and avoid sanction—reducing competition, innovation, and speech.

For these reasons, this Court should affirm the district court's conclusion that the Act is likely unconstitutional and restore the preliminary injunction.

## ARGUMENT

### I. The Act Is a Content-Based Speech Regulation Triggering Strict Scrutiny.

Protecting children online is an urgent and important goal, and Mississippi's efforts reflect an understandable desire to respond to real

concerns. But even well-intentioned laws must strike the right balance: They must protect children without eroding the First Amendment rights of minors and their parents. When legislation suppresses lawful speech or compels self-censorship, it does more harm than good and violates the First Amendment. The Act crosses that line.

The Act's mandates are sweeping. For digital service providers, it requires them to verify the age of *every user* "with a level of certainty appropriate to the risks that arise from [the website's] information management practices." H.B. 1126 § 4(1). For users, it prohibits minors from holding accounts without "express consent from a parent or guardian." *Id.* § 4(2). It further compels covered services to "make commercially reasonable efforts to develop and implement a strategy" to "prevent or mitigate" minors' exposure to broad categories of content, including any material that "promotes or facilitates" "self-harm," "substance use disorders," "eating disorders," "[i]ncitement of violence," or "*[a]ny other illegal activity.*" *Id.* § 6(1) (emphasis added). These requirements are enforceable through civil penalties of up to $10,000 per violation, injunctive relief, and criminal sanctions. *Id.* § 8(1); *see also* Miss. Code Ann. §§ 75-24-9, -19 to -20.

Critically, for the First Amendment analysis, these provisions are not applicable universally but instead are content-based. The Act singles out—based on their content—a subset of services that host user-generated speech, exempting services that are focused on certain topics the State favors, such as sports. And it restricts access to content on disfavored sites not because the content itself is constitutionally unprotected, but because the State deems it inappropriate for minors. As the Supreme Court has made clear, "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). That is plainly the case here. It is a "statute patently capable of many unconstitutional applications, threatening those who validly exercise their rights of free expression." *Smith v. California*, 361 U.S. 147, 151 (1959).

Because the Act "restrict[s] expression because of its message, its ideas, its subject matter, or its content," it is subject to strict scrutiny. *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65 (1983)); *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). Acts that suppress lawful speech

to protect minors are not exempt from this scrutiny. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975) ("Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young."); *Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676, 689 (1968) ("The permissible extent of vagueness is not directly proportional to . . . the extent of the power to regulate or control expression with respect to children.").

Time and again, federal courts have struck such burdens on speech as inconsistent with the First Amendment. *E.g., Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1043–44 (W.D. Tex. 2024), *appeal docketed*, No. 24-50721 (5th Cir. Sept. 13, 2024); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 959 (S.D. Ohio 2025), *appeal docketed*, No. 25-3371 (6th Cir. May 13, 2025); *NetChoice, LLC v. Griffin*, 2025 WL 978607, at *17 (W.D. Ark. Mar. 31, 2025), *appeal docketed*, No. 25-1889 (8th Cir. May 2, 2025); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1131 (D. Utah 2024), *appeal docketed sub nom. NetChoice v. Brown*, No. 24-4100 (10th Cir. Oct. 11, 2024); *NetChoice v. Carr*, --- F. Supp. 3d ---, 2025 WL 1768621, at *22 (N.D. Ga. June 26, 2025), *appeal docketed sub nom. Att'y Gen., Georgia*, No. 25-12436 (11th Cir. July 16, 2025).

*Free Speech Coalition, Inc. v. Paxton*, 145 S. Ct. 2291 (2025), does not counsel otherwise. There, the Supreme Court evaluated a Texas statute narrowly focused on material deemed "obscene to minors." *Id.* at 2306. Because that statute focused exclusively on speech that falls outside the First Amendment's protection, the Court applied only intermediate scrutiny. *Id.* at 2309. Notably, *Free Speech Coalition* reaffirmed the principle that content- or viewpoint-based restrictions on protected expression must be evaluated under strict scrutiny. *See id.* at 2302.

Here, by contrast, the Act is not limited to unprotected obscenity. It restricts access for users and imposes monitoring requirements for digital service providers' fully protected speech, such as works of art and literature that might, in the eyes of the State, "promote[] or facilitate[]" various behaviors. H.B. 1126 § 6(1). This Court has recognized that the Act regulates "protected speech." *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 804 (5th Cir. 2025). The Supreme Court has made clear that the government cannot coerce private parties to suppress protected speech, *NRA v. Vullo*, 602 U.S. 175, 190 (2024), and that the First Amendment protects websites' editorial discretion over whether and how to

11

disseminate protected speech by their users, *Moody v. NetChoice, LLC*, 603 U.S. 707, 718 (2024). The Act not only burdens that discretion, it supplants it with state-imposed content standards. For these reasons, the Act is subject to strict, not intermediate, scrutiny.

The Act cannot survive strict scrutiny because it is not narrowly tailored, does not rely on evidence-based distinctions, and burdens substantially more speech than necessary to achieve any compelling governmental interest. *See* Part III, *infra*. As Justice Kavanaugh recognized, "the Mississippi law is likely unconstitutional." *NetChoice, LLC v. Fitch*, 606 U.S. ---, 2025 WL 2350189, at *1 (U.S. Aug. 14, 2025) (Kavanaugh, J., concurring in denial of application to vacate stay). The district court's analysis was correct; this Court should affirm and restore the preliminary injunction.

## II.  The Act Imposes Technical and Financial Burdens That Suppress Protected Speech and Disproportionately Impact Smaller Companies.

Compliance with the Act would require sweeping changes to how digital service providers operate, with especially severe consequences for startups and emerging firms. While the district court only addressed the parameters of NetChoice's as-applied challenge, its reasoning shows that

the Act is also unconstitutional as applied to the many other companies
that offer similar opportunities for user speech.

Implementing age verification at scale raises serious privacy and
security issues.[8] As one NetChoice member explained, "there is no
technology—much less any technology available to a site with [our]
limited resources—that can identify users who are under the age of 18."[9]
Parental consent obligations, moreover, entail verifying familial
relationships—an inherently difficult task with no generally accepted
solution. The Act will thus force companies to build identity-checking
systems or license novel third-party tools at significant cost.[10]

---

[8] *See, e.g.*, Emergency Stay Application Appendix 208a ¶ 4, *NetChoice,*
2025 WL 2350189 (No. 25A97) *("NetChoice* Emergency Stay App.")
("Dreamwidth.org has approximately 4 million registered accounts, and
has approximately 2 million unique visitors annually. We operate on an
extremely limited budget, and are staffed by myself and the company's
other co-owner, two part-time employees, and approximately 200
volunteers.").

[9] *NetChoice* Emergency Stay App. 211a ¶ 10.

[10] *See, e.g.*, *NetChoice* Emergency Stay App. 211a ¶ 9 ("We cannot
comply with the Act without making significant, sweeping changes to the
site that we do not have the resources to make and without collecting
additional personally identifying data about each account that we do not
currently collect. . . . The changes the Act would require us to make to
the software that runs our site would take months, if not years, of work
at our current development capacity. The ongoing support burden the Act
would impose upon us would also be impossible for us to meet at our

These are not ordinary course of business expenditures. Redesigning authentication and moderation systems, building new compliance infrastructure, and hiring legal and trust and safety staff to interpret and apply the Act's mandates will divert limited resources from speech-enabling features. As the district court found, the Act's compliance costs will require some NetChoice members "to spend money far in excess of [their] available budget." Emergency Stay Application Appendix 227a ¶ 37, *NetChoice,* 2025 WL 2350189 (No. 25A97) *("NetChoice* Emergency Stay App."). For example, "[d]isputes about the identity of an account holder, their age, or the legal relationship between them and the person claiming to be their parent are complex, time-consuming, costly . . . , and unfortunately common." *NetChoice* Emergency Stay App. 226a–27a ¶ 36. One industry estimate shows that, for a Midwest startup with five full-time employees and 300,000 users, the cost of integrating third-party age verification would roughly equal an entire year's payroll. And that does not include the additional costs of

current level of staffing, and we do not have the financial capabilities to add more staff.").

establishing parent or guardian relationships and implementing content filtering.[11]

The Supreme Court has recognized that nonrecoverable compliance costs can constitute irreparable harm. *See Ohio v. EPA*, 603 U.S. 279, 292 (2024); *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021) (per curiam); *see also Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) (granting stay of FDA order pending appeal). And such harms are particularly grave when they interfere with the dissemination of expressive content. *See NetChoice*, 603 U.S. at 734 ("The government may not, in supposed pursuit of better expressive balance, alter a private speaker's own editorial choices about the mix of speech it wants to convey.").

These burdens are not narrowly, or even reasonably, tailored to the Act's stated goals. They are not limited to content intended for minors, but fall with equal force on speech displayed to and accessed by adults. They penalize lawful expression by making it cost-prohibitive to host or facilitate speech, chilling smaller services most of all.

---

[11] *See* Engine, More Than Just a Number: How Determining User Age Impacts Startups 2 (Feb. 2024), *available at* https://tinyurl.com/mpfh2ffp.

## III.   The Act's Vagueness and Overbreadth Compel Censorship of Lawful Speech.

The Act's vagueness and overbreadth aggravate the constitutional deficiencies discussed above. The Act relies on expansive, ambiguous terminology to determine which services are subject to its sweeping obligations. It regulates digital services that "allow[] users to socially interact" and "create or post content," while exempting those that "*[p]rimarily* function[] to provide . . . access to news, sports, commerce, online video games or content primarily generated or selected by the digital service provider"—but only if the "interactive functionality . . . is *incidental* to the digital service." H.B. 1126 §§ 3(1)–(2) (emphases added). The Act offers no meaningful guidance on how these terms apply to the diverse, evolving landscape of digital services.

That uncertainty forces every digital service provider—even those whose primary purpose lies outside traditional "social media"—to choose between costly preemptive redesign, abandoning planned features that might trigger coverage, and risking steep penalties based on noncompliance with vague statutory language.

Consider a fitness app such as MyFitnessPal, which lets users share runs, compete in challenges, and comment on workouts. Does its

core purpose as a sports application exempt it from the Act, or do its social and community-building features bring it within the Act's reach? The same ambiguities impact a wide range of digital service providers and applications known for fitness trackers but also for hosting workout logs and group sharing. Similar issues apply to GitHub, where the primary function is for developers to collaborate on developing code and commenting is arguably incidental to that function, and the YouVersion Bible App (a/k/a Bible.com), where users can interface with the Bible in various ways (such as through translations and audio features) and can also share devotionals and reflections and comment on friends' activities. Are these forms of community-building and exchange covered "social interaction" that triggers the Act's mandates, or do their primary purposes—fitness, coding, and scripture—exclude them? The answers are not to be found in the Act.

The Act's ambiguity also pervades the content-filtering mandate, which applies to content that might "promote[]" concepts such as "self-harm," "suicidal behaviors" "substance abuse," or "[i]ncitement of violence." *See* Appellee Br. 12 (quoting H.B. 1126 § 6(1)). Major works of art and literature regularly address themes that the State might deem to

run afoul of these purported guardrails. For example, Shakespeare's *Romeo and Juliet*[12]—which Mississippi's own Department of Education recommends for ninth graders—arguably promotes several of these themes. Yet the Act provides no meaningful guidance for digital service providers to determine how to treat such content when posted by or for students.[13]

The Act's deep and pervasive ambiguity will force digital service providers to choose between over-compliance, under-compliance, and withdrawal. Many will suppress lawful, speech-enhancing features simply to avoid liability.[14] Others may exit the Mississippi market

---

[12] *See* Miss. Dep't of Educ., Mississippi College and Career Readiness Standards for English Language Arts Scaffolding Document: Ninth Grade 6 (Sept. 2016), *available at* https://tinyurl.com/mvn8t96v.

[13] *See, e.g.*, *Lake Middle School*, Facebook, https://www.facebook.com/groups/1462819790635781/; *West Harrison Middle School*, Facebook, https://www.facebook.com/whmshurricanes/.

[14] *See, e.g.*, *NetChoice* Emergency Stay App. 255a ¶ 46(b) ("My understanding is that not all covered websites have the ability to 'age-gate,' meaning that they are unable to separate the content available on adults' accounts from content available on minors' accounts. Therefore, for these websites, the restrictions on what content they may disseminate to minors will apply equally to adults.").

entirely.[15] The Supreme Court has warned that laws that leave companies guessing about whether and how they are subject to regulation—especially on pain of severe penalties—violate the First Amendment. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).

As the district court and Justice Kavanaugh correctly recognized, these defects make NetChoice's as-applied challenge highly likely to succeed. The preliminary injunction therefore should be upheld and restored while the case proceeds.

## IV. Non-Uniform State Laws Restricting Online Speech Stifle National Commerce and Innovation.

The Act does not operate in isolation. It is part of a growing thicket of state-level regulations—putatively addressing issues such as child safety, privacy, and AI—that impose divergent and sometimes conflicting speech-related obligations on national websites. Indeed, the Act is one of at least ten similar (but non-uniform) state laws aimed at restricting minors' access to online content that are currently the subject of federal

---

[15] Bluesky Team, *Our Response to Mississippi's Age Assurance Law* (Aug. 22, 2025), https://bsky.social/about/blog/08-22-2025-mississippi-hb1126.

court challenges. Such challenges are ongoing in Arkansas, California, Georgia, Florida, Louisiana, Ohio, Tennessee, Texas, and Utah.[16]

These laws vary in their definitions of key terms like "social media platform," "harmful material," and "interactive service," and in the breadth of exemptions. *See, e.g.*, Fla. Stat. Ann. § 501.1736(1)(e) (exempting only email and direct messaging services); Ga. Code Ann. § 39-6-1(6) (twenty-two exemptions); Ark. Code Ann. § 4-88-1401(8)(B) (thirteen exemptions); Ohio Rev. Code Ann. § 1349.09(N)(1) (exempting only three kinds of services); Tenn. Code Ann. § 47-18-5702(9) (exempting eight different kinds of services from definition of "social media platform"). Many also fail to specify clearly which services fall within their scope. *See, e.g.*, Tenn. Code Ann. § 47-18-5702(9) (defining "social media platform" as a "website or internet application that . . .

---

[16] *See Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025); *NetChoice, LLC v. Bonta*, 761 F. Supp. 3d 1202 (N.D. Cal. 2024), *reversed in part*, --- F.4th ---, 2025 WL 2600007 (9th Cir. Sept. 9, 2025); *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, --- F. Supp. 3d ---, 2025 WL 1570007 (N.D. Fla. June 3, 2025); *Carr*, 2025 WL 1768621 (N.D. Ga. June 26, 2025); Complaint, *NetChoice v. Murrill*, No. 3:25-cv-231 (M.D. La. filed Mar. 18, 2025); *Yost*, 778 F. Supp. 3d 923 (S.D. Ohio Apr. 16, 2025); *NetChoice v. Skrmetti*, 2025 WL 1710228 (M.D. Tenn. June 18, 2025); *Comput. & Commc'ns Indus. Ass'n*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024); *NetChoice*, 748 F. Supp. 3d 1105 (D. Utah 2024).

[a]llows a person to create an account" and "[e]nables an account holder to communicate with other account holders and users through posts," subject to eight exemptions). Others resemble the Act in creating expressly content-based exemptions, regulating digital services that host user-generated discussion while exempting those that offer "sports," "news," or "career development" content. *See, e.g.*, Ga. Code Ann. § 39-6-1(6); La. Stat. Ann. § 51:1751(12)(b). Services with similar functionality may thus face divergent obligations based purely on the content of the speech they facilitate.

For companies that operate nationwide, such variegated mandates impose untenable compliance costs. A startup building a social networking website must now contend with whether its messaging function might subject it to regulation in Mississippi while simultaneously avoiding violations of materially different standards in at least nine other states. The costs of tailoring age-verification systems, parental-consent workflows, and content-filtering mechanisms to the requirements of each state are high enough to deter small companies from launching or scaling new services at all. While larger firms with more resources may be able to absorb the Act's costs (at least to the extent

that compliance with its requirements is technically possible), smaller services may be forced to shut down, exit the Mississippi market, or delay innovation indefinitely. Those outcomes undermine the economic dynamism of the internet, harm both users and digital service providers, and fly in the face of the First Amendment.

Forcing nationwide speech fora to tailor their services to comply with a state-by-state panoply of speech restrictions stifles the development of new speech-enabling features and undermines the ability of startups to compete and, ultimately, survive. The result would be an environment in which only large, established companies with significant compliance infrastructure can operate effectively, while smaller firms are marginalized or excluded. In any event, the online ecosystem would be irreparably and unjustifiably damaged.

# CONCLUSION

This Court should affirm the order below and restore the preliminary injunction.

Respectfully submitted,

/s/ *Paul Alessio Mezzina*

Jamie Dycus
Rachel E. Craft
KING & SPALDING LLP
1290 Avenue of the Americas
14th Floor
New York, NY 10104
(212) 556-2100

Paul Alessio Mezzina
*Counsel of Record*
Nema Milaninia
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
pmezzina@kslaw.com

*Counsel for Amici Curiae*

October 9, 2025

**CERTIFICATE OF SERVICE**

I certify that on October 9, 2025, I caused the foregoing *amicus* brief to be filed with the Court electronically using the CM/ECF system. All counsel will receive service through the CM/ECF system.

*/s/ Paul Alessio Mezzina*
Paul Alessio Mezzina

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5), because it contains 4,153 words, as counted by Microsoft Word, excluding the parts of the brief excluded by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared using Microsoft Word in Century Schoolbook 14-point font.

I further certify that (1) required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission, when ordered by the Court, will be an exact copy of the paper document, 5th Cir. R. 25.2.1; and (3) the document has been scanned with the most recent version of Microsoft Defender and is free of viruses.

Date: October 9, 2025

*/s/ Paul Alessio Mezzina*
Paul Alessio Mezzina

*Counsel for Amici Curiae*