No. 25-60348

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

NETCHOICE, L.L.C.,
*Plaintiff-Appellee*,

*v.*

LYNN FITCH, IN HER OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF MISSISSIPPI,
*Defendant-Appellant.*

**On Appeal from the United States District Court
for the Southern District of Mississippi, Southern Division**
Civil Action No. 1:24-cv-00170-HSO-BWR

## BRIEF OF *AMICI CURIAE* WIKIMEDIA FOUNDATION AND ORGANIZATION FOR TRANSFORMATIVE WORKS IN SUPPORT OF PLAINTIFF-APPELLEE

Wendy Chu
Harvard Cyberlaw Clinic
1557 Massachusetts Avenue, 4th Floor
Cambridge, MA 02138
(617) 495-0575
wchu@law.harvard.edu

*Counsel for Amici Curiae*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that—in addition to the persons and entities listed in the Plaintiff-Appellee's Certificate of Interested Persons—the following listed persons and entities, as described in the fourth sentence of Rule 28.2.i, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

***Amicus Curiae***
Organization for Transformative Works
Wikimedia Foundation

***Attorney for Amicus Curiae***
Wendy Chu
Harvard Cyberlaw Clinic

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici* Wikimedia Foundation and the Organization for Transformative Works do not have parent corporations, and no publicly held corporation owns ten percent or more of any of *amici's* stock.

Date: October 9, 2025

Respectfully submitted,
/s/ Wendy Chu
Wendy Chu

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

TABLE OF CONTENTS ............................................................................... ii

TABLE OF AUTHORITIES ........................................................................... iii

STATEMENT OF INTEREST ........................................................................... I

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................... 3

ARGUMENT ................................................................................................ 5

   I.   The Act Violates Digital Service Providers' First Amendment Right to Exercise Editorial Freedom ................................................................. 5

      A.   The First Amendment Protects Online Platforms' Editorial Freedom ........ 5

      B.   The Act Infringes Upon Covered Entities' Editorial Freedom ................... 7

   II.   The Act's Unconstitutionally Vague and Overbroad Language Risks Sweeping in Mission-Driven Entities and Creating a Chilling Effect ................. 11

      A.   The Act is Unconstitutionally Vague .......................................... 11

      B.   The Act is Unconstitutionally Overbroad and Underinclusive ................. 16

      C.   The Act Results in a Chilling Effect on Constitutionally Protected Speech That Would Profoundly Affect Digital Service Providers ............................... 18

   III.   The Act Impermissibly Expands the Categories of Unprotected Speech .. 19

CONCLUSION ............................................................................................ 22

CERTIFICATE OF COMPLIANCE .................................................................... 23

CERTIFICATE OF SERVICE ........................................................................... 24

STATEMENT OF COMPLIANCE WITH RULE 29 ............................................... 25

# TABLE OF AUTHORITIES

## Cases

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973) ............................................................ 19

*Brown v. Entm't Merchs. Ass'n*,
  564 U.S. 786 (2011) .................................................... passim

*Free Speech Coal., Inc. v. Paxton*,
  606 U.S. 461 (2025) ............................................ 8, 9, 19, 24

*Hill v. Colorado*,
  530 U.S. 703 (2000) ............................................................ 14

*Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Bos.*,
  515 U.S. 557 (1995) ...................................................... 7, 12

*Mia. Herald Pub. Co., Div. of Knight Newspapers, Inc. v. Tornillo*,
  418 U.S. 241 (1974) .................................................. 6, 7, 13

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024). ................................................... passim

*NetChoice, LLC v. Bonta*,
  113 F.4th 1101 (9th Cir. 2024) ........................................... 25

*Pac. Gas & Elec. Co. v. Pub. Utils. Com.*,
  475 U.S. 1 (1986) ................................................................. 6

*R.A.V. v. St. Paul*,
  505 U.S. 377 (1992) ........................................................... 24

*Reno v. American Civil Liberties Union*,
  521 U. S. 844 (1997). ......................................................... 19

*Turner Broad. Sys. v. FCC*,
  509 U.S. 952 (1993) ............................................................. 7

*U.S. v. Hansen*,
  599 U.S. 762 (2023) ............................................... 11, 21, 22

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
   455 U.S. 489 (1982) ............................................................................. 14

*Virginia v. Hicks*,
   539 U.S. 113 (2003) ........................................................................ 18, 21

*Wyo. Gun Owners v. Gray*,
   83 F.4th 1224 (10th Cir. 2023) ........................................................ 14, 18

## Statutes

H.B. 1126 ............................................................................... passim

## Other Authorities

Betsy Rosenblatt & Rebecca Tushnet, *Transformative Works: Young Women's Voices on Fandom and Fair Use, in EGirls, ECitizens: Putting Technology Theory, Policy and Education into Dialogue With Girls' And Young Women's Voices* (University of Ottawa Press, Jane Bailey & Valerie Steeves eds., 2015) .. 10

James Grimmelmann, *The Platform is The Message*, 2 Geo. L. Tech. Rev. 217, 221-22 (2018) (footnotes omitted) .............................................................. 16

*Monthly Overview,* Wikimedia Statistics,
   https://stats.wikimedia.org/#/en.wikipedia.org/reading/total-page-views/normal|bar|2-year|~total|monthly (last visited Sept. 30, 2025) .................... 2

*More Than Just A Number: How Determining User Age Impacts Startups,* ........... 22

*Open the Knowledge*, Wikimedia Foundation,
   https://wikimediafoundation.org/what-we-do/open-the-knowledge/ (last visited Sept. 30, 2025) .............................................................................. 1

*Our Work*, Wikimedia Foundation, https://wikimediafoundation.org/what-we-do/ (last visited Sept. 30, 2025). .................................................................. 1

*Tags*, Archive of Our Own, https://archiveofourown.org/tags (last visited Oct. 8, 2025) ....................................................................................... 12

Taylor Drake, *Disordered Eating, Disordered Reading: Wintergirls and the Fannish Practices of Pro-ana*, 46 Transformative Works & Cultures (2025), https://journal.transformativeworks.org/index.php/twc/article/view/2687/3293 .. 17

*Unregistered User*, Wikipedia, https://meta.wikimedia.org/wiki/Unregistered_user (last visited Oct. 9, 2025). ..................................................................... 19

Vijender Singh, *Mental Health Prevention and Promotion—A Narrative Review*, Front Psychiatry (2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC9360426/ ... 24

*Warning Tags,* Archive of Our Own, https://archiveofourown.org/help/warning-help.html (last visited Oct. 9, 2025) ......................................................... 11

*Wikimedia Foundation Privacy Policy*, Wikimedia Foundation, https://foundation.wikimedia.org/wiki/Policy:Privacy_policy (last visited Oct 6, 2025) ................................................................................................... 3

*Wikimedia Projects*, Wikimedia Foundation, https://wikimediafoundation.org/what-we-do/wikimedia-projects/ (last visited Sept. 30. 2025) ......................................... 1

*Wikipedia: About*, Wikipedia, https://en.wikipedia.org/wiki/Wikipedia:About (last visited Sept. 30, 2025). ............................................................................. 2

*Wikipedia:Editing policy*, Wikipedia, https://en.wikipedia.org/wiki/Wikipedia:Editing_policy (last visited Oct. 6, 2025) ................................................................................................... 2

*Wikipedia:Size of Wikipedia*, Wikipedia, https://en.wikipedia.org/wiki/Wikipedia:Size_of_Wikipedia (last visited Sept. 28, 2025) ................................................................................................... 11

*Wikipedia:Talk Page Guidelines*, Wikipedia, https://en.wikipedia.org/wiki/Wikipedia:Talk_page_guidelines (last visited Sept. 28, 2025). ............................................................................... 13

## STATEMENT OF INTEREST

Wikimedia is a non-profit charitable foundation based in San Francisco, California on a mission to "keep knowledge free."[1] Key to that mission is an initiative called "Open the Knowledge," which aims to "promote radical knowledge equity, creating a living record of history, stories, and contexts for and by all people."[2] It accomplishes that goal through advocacy work and by hosting thirteen free-knowledge platforms known as the Wikimedia Projects.[3] Wikipedia is Wikimedia's most well-known platform, serving as a free online encyclopedia that allows users to write and edit content collaboratively.[4] The Wikimedia Projects host factual and educational content that is created, edited, and moderated by over 260,000 volunteer contributors per month worldwide.[5] Wikipedia is viewed more

---

[1] *Our Work*, Wikimedia Foundation, https://wikimediafoundation.org/what-we-do/ (last visited Sept. 30, 2025).

[2] *Open the Knowledge*, Wikimedia Foundation, https://wikimediafoundation.org/what-we-do/open-the-knowledge/ (last visited Sept. 30, 2025).

[3] The Wikimedia Projects include Wikipedia, Wikibooks, Wiktionary, Wikiquote, Wikimedia Commons, Wikisource, Wikiversity, Wikispecies, Wikidata, Wikifunctions, MediaWiki, Wikivoyage, and Wikinews. *See Wikimedia Projects*, Wikimedia Foundation, https://wikimediafoundation.org/what-we-do/wikimedia-projects/ (last visited Sept. 30. 2025).

[4] *Wikipedia: About*, Wikipedia, https://en.wikipedia.org/wiki/Wikipedia:About (last visited Sept. 30, 2025).

[5] As of January 2025.

than 15 billion times every month.[6] To provide free and accurate information to such a wide audience, the Wikipedia project relies on the assistance of volunteers who work collaboratively. As an invaluable part of the fabric of Wikipedia, volunteer editors determine whether a topic is notable enough to deserve its own page, confirm that content remains accurate, and ensure that pages are notable, neutral, and cited by reliable sources.[7] Wikimedia protects the privacy of its contributors through an extensive privacy policy and an editorial process that allows users to maintain a degree of anonymity regardless of whether they register an account.[8]

The Organization for Transformative Works ("OTW") is a non-profit established to protect and defend fans and fanworks from commercial exploitation and legal challenge. Its members make and share stories commenting on and transforming existing works—from reworking a film from the perspective of the villain to using storytelling to explore racial and gender dynamics in media. The Archive of Our Own ("AO3"), OTW's free, volunteer-operated website, has over 8 million registered users and hosts over 15 million unique works. The OTW's users

---

[6] *Monthly Overview,* Wikimedia Statistics, https://stats.wikimedia.org/#/en.wikipedia.org/reading/total-page-views/normal|bar|2-year|~total|monthly (last visited Sept. 30, 2025).

[7] *See Wikipedia:Editing policy*, Wikipedia, https://en.wikipedia.org/wiki/Wikipedia:Editing_policy (last visited Oct. 6, 2025).

[8] *Wikimedia Foundation Privacy Policy*, Wikimedia Foundation, https://foundation.wikimedia.org/wiki/Policy:Privacy_policy (last visited Oct 6, 2025).

often seek anonymity to write about sensitive topics. Despite the fact that it is one of the top-visited sites in the U.S., and a Library of Congress heritage site, AO3 operates on a budget of well under $500,000 annually and the OTW has no paid employees, only volunteers. The OTW minimizes the collection of data as the best way to protect user privacy.

*Amici* are concerned that Mississippi House Bill 1126 ("H.B. 1126" or the "Act") threatens platforms' ability to distribute free knowledge. Though H.B. 1126 is oriented toward the sometimes "prurient" "harmful material" found on big tech platforms, the Act's vague, overbroad language threatens to sweep mission-driven platforms into its ambit, posing a threat to their ability to share free knowledge with the world, encroaching on their editorial models, and infringing on their free speech rights. H.B. 1126, §6(1). In the interest of promoting access to community and free knowledge, *amici* urge the Court to lift its stay of the preliminary injunction pending appeal and affirm the district court's judgment.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Act unjustifiably infringes on covered entities' First Amendment right to exercise editorial freedom. When platforms compile content created by users, they exercise their First Amendment right to make editorial decisions serving an expressive purpose. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 731-32 (2024). The

Act, as applied, imposes specific editorial decisions upon mission-driven platforms such as *amici*, and requires that they scrub the entire body of their content to filter out "harmful material" and "other content that promotes or facilitates" additional harms for minors who hold an account. H.B. 1126, §6(1). This form of government interference with privately compiled speech product violates the First Amendment. *Moody*, 603 U.S. at 729-732.

The Act's vague language makes it unclear whether entities such as Wikimedia and OTW fall within the definition of "digital service provider," imposes vague obligations on covered entities, and creates ambiguity in determining which pages contain "harmful material." H.B. 1126 §6(1). Enforcement authorities thus have broad discretion to decide when, how, and against whom to enforce the Act's provisions. The Act is also unconstitutionally overbroad, as it encompasses a wide array of digital services and digital service providers, many of which do not pose the types of harm the Act aims to address. As a result of the vague and overbroad language, the Act creates a chilling effect on constitutionally protected speech for platforms such as Wikipedia and AO3. See *U.S. v. Hansen*, 599 U.S. 762, 770 (2023) (quoting *Hicks*, 539 U.S. at 119); *Graynet v. City of Rockford*, 408 U.S. 104, 109 (1972).

The Act was passed "for the purpose of protecting minor children from online harmful material and access to such material." H.B. 1126. Although the legislature's concern for minors' welfare is legitimate, the Act goes far beyond the traditional category of obscenity (for minors) and unconstitutionally attempts to establish new categories of unprotected speech. *See* H.B. 1126, §6(1); *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786 (2011). But even if it were constitutional to bar minors from accessing content that is not obscene as to them, the Act would not survive First Amendment scrutiny.

The Court should lift its stay of the preliminary injunction pending appeal and affirm the district court's judgment.

## ARGUMENT

## I. The Act Violates Digital Service Providers' First Amendment Right to Exercise Editorial Freedom

### A. The First Amendment Protects Online Platforms' Editorial Freedom

The First Amendment protects editorial decisions: decisions about expression made for an expressive purpose. *See Mia. Herald Pub. Co., Div. of Knight Newspapers, Inc. v. Tornillo*, 418 U.S. 241 (1974); *Pac. Gas & Elec. Co. v. Pub. Utils. Com.*, 475 U.S. 1 (1986); *Turner Broad. Sys. v. FCC*, 509 U.S. 952 (1993); *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group of Bos.*, 515 U.S. 557 (1995). For

example, in *Hurley*, the Supreme Court reasoned that, because "every participating unit affects the message conveyed by [a parade's] organizers," a state could not compel the organizers to include particular groups in the parade. 515 U.S. at 572. Similarly, the Supreme Court has held that newspapers have editorial freedom about what content to select and to omit. *Tornillo*, 418 U.S. at 257.

In *Moody*, the Supreme Court affirmed that these First Amendment protections extend to social media companies' editorial freedom in selecting the content displayed on their platforms. When an online platform presents a "curated compilation of speech originally created by others," it is making an editorial decision that serves an expressive purpose, thus making it protected speech. *Moody*, 603 U.S. at 728. The Supreme Court emphasized that when platforms decide what third-party speech will be "included in [...] a compilation" and then "organiz[e] and presen[t] the included items," it is engaging in protected, "expressive activity." *Id*. at 731. And, when the government interferes with a "private party's collection of third-party content into a single speech product" or "interferes with [...] editorial choices—say, by ordering the excluded to be included," it "overrid[es] a private party's expressive choices," "creates a different opinion page or parade, bearing a different message," and "confronts the First Amendment." *Id.* at 729-32.

More recently in *Paxton*, the Supreme Court did not limit the principle established in *Moody* that platforms possess editorial choices in how they curate, organize, and present content. *See Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461 (2025) . The law at issue in *Paxton* targeted only commercial websites whose content was more than one-third "sexual material harmful to minors," that is, obscene as to minors. *Id*. at 467. This is not the case with H.B. 1126, which covers platforms that have any amount of targeted content, even a single post, arguably covers noncommercial entities, and attempts to create broad "new categories" of unprotected speech for minors. H.B. 1126, §6(1); *Brown*, 564 U.S. at 791. *Paxton* relied on the limited scope of the law—its continuity with traditional requirements for buying pornography in a store—to apply intermediate scrutiny. *Paxton*, 606 U.S. at 477. Given the significantly more expansive scope of the Act in covered entities and content, strict scrutiny remains appropriate here (and the Act would fail even intermediate scrutiny, for the same reasons it fails strict scrutiny).

### B. The Act Infringes Upon Covered Entities' Editorial Freedom

The Act violates covered entities' editorial freedom to display content in its original, naturally curated form. H.B. 1126 requires that covered platforms "prevent or mitigate [minors'] exposure to harmful material and other content that promotes or facilitates [additional] harms." H.B. 1126, §6(1). The breadth of this requirement threatens Wikipedia's distinctively decentralized editorial model, which relies on

users of all ages to collaboratively determine what content should be published. Wikipedia faces a forced choice: either to (1) adopt age verification protocols and ban minors from creating accounts in order to avoid having to continuously assess whether its always-evolving pages "promote[]" or "facilitate[]" banned content or (2) adopt age verification protocols, allow minors to register accounts with the platform, and implement extensive content monitoring to "prevent" minors from accessing banned content. *Id*. The first option forces Wikipedia to reject minor contributors—speakers—on every topic, even those unrelated to the banned topics. The second option would force Wikipedia to abandon its current approach of community-driven decision-making, deterring this form of producing knowledge. Either path represents a fundamental interference with Wikipedia's expressive editorial choice to use a community-based curation system. Likewise, AO3 would be forced to exclude minors, who often benefit the most from writing fan fiction, as it provides them with an enthusiastic community of readers who help them improve their craft,[9] or to fundamentally change its content moderation policies, which do not assess the viewpoints of authors or their works. Both possibilities substantially curtail AO3's own editorial freedom.

---

[9] *See* Betsy Rosenblatt & Rebecca Tushnet, *Transformative Works: Young Women's Voices on Fandom and Fair Use, in EGirls, ECitizens: Putting Technology Theory, Policy and Education into Dialogue With Girls' And Young Women's Voices* (University of Ottawa Press, Jane Bailey & Valerie Steeves eds., 2015).

Platforms like *amici* that might attempt to allow minor participation while complying with content restrictions would need to engage in a full-scale scrubbing exercise to find and censor multiple types of content woven deeply into the fabric of their platforms. Unlike the dominant social media platforms, which often prioritize recent, time-dependent posts, content repositories like Wikipedia and AO3 maintain non-expiring knowledge (Wikipedia) or stories (Ao3) waiting for whoever seeks them. In the case of *amici*'s platforms, users are actively searching for and coming across a wide variety of their total material. This would make it doubly harder to comply with the Act's content restrictions. Users on AO3 currently can rate their own works but they may also "choose not to warn;" the platform does not currently require any classification for most of the topics prohibited by the Act.[10] Similarly, Wikipedia does not currently classify its pages using any form of content suitability scale. Thus, in order to comply with the Act, Wikipedia would need to either ban minors from creating accounts completely, barring them from contributing to the platform and forcing "would-be speakers" to "remain silent," *Hansen*, 599 U.S. at 770, or devote its limited budget and the time of its volunteer contributors and staff

---

[10] *See Warning Tags,* Archive of Our Own, https://archiveofourown.org/help/warning-help.html (last visited Oct. 9, 2025).

to scrub the more than 64 million pages and counting that make up the site.[11] Investing in such a project would constrain *amici*'s ability to share new content broadly with both minors and their wider user base.

In the event that a minor cannot access key parts of platforms due to H.B. 1126's censorship requirements, the overall message would be altered by government mandate. *Hurley*, 515 U.S. at 572. Like the individual parade floats in *Hurley*, each individual page on a covered entity's platform contributes to the overall "message conveyed" by the platform's editors; this complete "message" is a "curated compilation," and thus, a "single speech product." *Id*; *Moody*, 603 U.S. at 728-30. This is particularly true for platforms like Wikipedia and AO3, where users navigate through the site by searching and by following links on the pages they find. Wikipedia organizes knowledge; AO3 organizes stories, using fandoms and themes (expressed as "tags").[12] But the version of Wikipedia available to minors with accounts under the Act would become an encyclopedia with whole entries torn out; AO3 would be an anthology in tatters. The result would be an "intrusion into the

---

[11] *Wikipedia:Size of Wikipedia*, Wikipedia, https://en.wikipedia.org/wiki/Wikipedia:Size_of_Wikipedia (last visited Sept. 28, 2025).

[12] *Tags*, Archive of Our Own, https://archiveofourown.org/tags (last visited Oct. 8, 2025).

function of editors" and a substitution of "governmental regulation" for the "crucial process" of editorial choice. *Tornillo*, at 258.

The Act's restrictions could also block access to collaborative editorial features that are essential to platforms' expressive models. For example, Wikipedia's "talk pages" are essential spaces for users to receive feedback on their edits, discuss the merits of adding or deleting pages, and verify facts.[13] Because this medium might include conversations that fall under the ambiguous language of the Act, their existence could be in jeopardy for minors on Wikipedia. Talk pages also serve a critical expressive function and embody the type of editorial freedom that courts have recognized as First Amendment speech activity. Forcing platforms to restrict these collaborative editorial spaces constitutes another interference with protected editorial choices.

## II. The Act's Unconstitutionally Vague and Overbroad Language Risks Sweeping in Mission-Driven Entities and Creating a Chilling Effect

### A. The Act is Unconstitutionally Vague

A statute is unconstitutionally vague if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or

---

[13] *Wikipedia:Talk Page Guidelines*,
Wikipedia, https://en.wikipedia.org/wiki/Wikipedia:Talk_page_guidelines (last visited Sept. 28, 2025).

"authorizes or even encourages arbitrary and discriminatory enforcement." *Wyo.*
*Gun Owners v. Gray*, 83 F.4th 1224, 1233 (10th Cir. 2023) (citing *Hill v. Colorado*, 530
U.S. 703 (2000)). When a statute "interferes with the right of free speech or of
association, a more stringent vagueness test should apply." *Wyo. Gun Owners*, 83
F.4th at 1233 (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,* 455 U.S.
489, 498 (1982)).

The Act fails this test for several reasons. First, the Act fails this test because
it is unclear whether entities such as Wikimedia and OTW fall within the definition
of "digital service provider." The Act "applies only to a digital service provider who
provides a digital service" that "allows users to socially interact with other users"
and "[a]llows a user to create or post content that can be viewed by other users …
including sharing content on ... (i) [a] message board ... or (iii) [a] landing page."
H.B. 1126, §3. The definition does not explain the level or type of interaction between
users that qualifies as "social" or how this would be determined. For example, the
Act does not clarify whether collaborative efforts, such as users contributing to a
shared platform like Wikipedia for the purpose of crowdsourcing educational
material, constitute "social interaction." Likewise, AO3 allows users to post
fanworks and to comment on those specific works, in the nature of reviews of those
works, but does not have "social" features such as recommendations, follower lists,

or messaging. As such, entities such as Wikimedia and OTW are unable to reasonably foresee whether they are subject to the Act and its obligations.

Second, the Act imposes vague obligations on digital service providers. H.B. 1126 requires digital service providers to "make commercially reasonable efforts" to "verify the age of the person creating an account with a level of certainty appropriate to the risks that arise from the information management practices of the digital service provider." H.B. 1126, §4(1). But they provide no guidance as to what amounts to "commercially reasonable efforts" or how this would be determined or by whom. The Act is silent on whether the "commercially reasonable efforts" standard should take into account, for instance, a service's size, user base demographics, or resources (technological or financial), especially in the context of nonprofits like Wikimedia and OTW.

Third, the administrators of digital service providers would face difficulty in determining which pages implicate the content prohibited by the Act.  For instance, at what point does page content "promote or facilitate [certain] harms?" H.B. 1126, §6. Current political discourse makes clear that, especially with the sensitive topics covered by the Act, one person's "factual description" is another's "promotion" or "facilitation." "Promote" and "facilitate" are impossibly vague especially in the

context of online speech, where hyperbole and invective are common. As James

Grimmelmann explained in the context of the "Tide Pod" social media controversy,

> Online culture is awash in layers of irony; there is a sense in which there is no such thing as a pure exemplar of eating a Tide Pod unironically or a critique of the practice that is not also, in part, an advertisement for it. …
>
> The difficulty of distinguishing between a practice, a parody of the practice, and a commentary on the practice is bad news for any legal doctrines that try to distinguish among them and for any moderation guidelines or ethical principles that try to draw similar distinctions.

James Grimmelmann, *The Platform is The Message*, 2 Geo. L. Tech. Rev. 217, 221-

22 (2018) (footnotes omitted).

The problems are even more severe in the context of platforms like AO3,

which contain fiction. A story about *Frozen*'s Elsa living with an eating disorder can

seem like promotion to some, while others perceive it as realistic or even supportive

of recovery.[14] When the categories of disfavored content are so broad, the absence

of clear definitions for "promote" and "facilitate" adds to the chilling effect.

Because it is so easy to be accused of "promoting" or "facilitating" activities

by describing them, platforms are likely to over-correct in their attempt to comply

---

[14] *See* Taylor Drake, *Disordered Eating, Disordered Reading: Wintergirls and the Fannish Practices of Pro-ana*, 46 Transformative Works & Cultures (2025), https://journal.transformativeworks.org/index.php/twc/article/view/2687/3293 (explaining this dynamic).

with the Act's extensive definition of "harmful material," censoring content that could never constitutionally be targeted by the legislature.

Together, the Act's imprecise language and ambiguous standards grant enforcement authorities broad discretion to decide when, how, and against whom to enforce its provisions. This opens the door to arbitrary and discriminatory enforcement, particularly against mission-driven platforms such as Wikipedia and AO3. Because the Act fails to clearly define who qualifies as "digital service provider," what constitutes "social interaction," or what content "promotes or facilitates harms to minors," enforcement authorities may selectively target platforms based not on objective criteria, but on subjective interpretations, political motivations, or public controversy. Such risk is exacerbated by the fact that the Act fails to establish uniform benchmarks or guidelines for what constitutes "commercially reasonable efforts" and enforcement decisions could therefore vary depending on the authorities' views on a platform's size or purpose, none of which are addressed by the Act. A large for-profit platform and a small non-profit platform could be held to the same unclear standard, regardless of their vastly different financial and organizational resources. These risks of arbitrary and viewpoint-based enforcement decisions are precisely why the First Amendment vagueness doctrine demands clarity from legislatures. *See Wyo. Gun Owners*, 83 F.4th at 1233.

## B. The Act is Unconstitutionally Overbroad and Underinclusive

A statute is unconstitutionally overbroad if it "punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep.'" *Virginia v. Hicks*, 539 U.S. 113, 118 (2003) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601 (1973)).

Although the aim of protecting minors from harmful materials is a theoretically legitimate one,[15] the Act is unconstitutionally overbroad because its reach extends far beyond what is necessary to address this concern. The Act captures a vast range of digital services and digital service providers, many of which are entirely unrelated to the harms it seeks to mitigate. Specifically, it encompasses platforms with common features found in most widely used websites, such as account creation, social interaction, and content sharing, and its limited exceptions protect shopping sites and cloud storage, not mission-driven institutions. This includes platforms as diverse as educational platforms and non-commercial websites. But the Legislature focused on the harms of large, commercial, algorithm-driven sites, without establishing that all (or even most) of the sites meeting its definitions caused the same harms.

---

[15] *Free Speech Coal., Inc. v. Paxton* 606 U.S. ____ (2025) at p 32 (IV.A.); *see also Reno v. American Civil Liberties Union*, 521 U. S. 844 , 869 (1997).

Additionally, many platforms that may be swept into the Act's coverage due to its overbroad language have user bases largely *not* made up of account holders. Wikipedia, for instance, has many unregistered users who are able to edit pages which are not protected or semi-protected.[16] Similarly, AO3 receives billions of pageviews from non-account holders every month; an account is required to post stories, but not to read them. Therefore, even assuming structural changes to account for the potential minor account holders on their platforms, these platforms will largely not be shielding the large number of other minors without accounts from seeing harmful material.[17] *See City of Cincinnati v Discovery Network*s, 507 U.S. 410 (1993) (over-and under-inclusiveness meant that speech regulation failed even intermediate scrutiny). If the Act is aiming to protect minors from harmful material, requiring such censorship on platforms that minors predominantly access without accounts is ineffective and misaligned with that purpose, and Mississippi has not demonstrated that it has carefully calculated the costs and benefits of the Act.[18]

---

[16] *See Unregistered User*, Wikipedia, https://meta.wikimedia.org/wiki/Unregistered_user (last visited Oct. 9, 2025).

[17] Of course, the expense of managing such a segregation regime will plausibly lead many services to simply ban any risky content, destroying adults' access to it as well. But suppressing speech to adults is not a constitutionally permissible way to protect minors.

[18] The underbreadth of the law is further confirmed by its failure to regulate promotion of the forbidden topics on traditional media, where shows like Netflix's top-watched series You glamorize a stalker and glorification of violence is everywhere.

### C.    The Act Results in a Chilling Effect on Constitutionally Protected Speech That Would Profoundly Affect Digital Service Providers

Together, the Act's vagueness, overbreadth, and underinclusivity chills constitutionally protected speech. Overbroad laws "'may deter and chill constitutionally protected speech,' and if would-be speakers remain silent, society will lose their contributions to the 'marketplace of ideas'." *U.S. v. Hansen*, 599 U.S. 762, 770 (2023) (quoting *Hicks*, 539 U.S. at 119). Similarly, vague laws cause a chilling effect because "uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone' ... than if the boundaries of the forbidden areas were clearly marked." *Graynet v. City of Rockford*, 408 U.S. 104, 109 (1972). The extent of the Act's potential burdens on sites such as Wikipedia and AO3—alone, two of the largest sites in the world[cites]—and on all other sites that lack the algorithmic amplification that concerned the legislature, justifies invalidating the Act on its face. See, e.g., *Moody*, 603 U.S. at 723; *Hansen*, 599 U.S. at 770 (holding that for facial invalidation, "a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep").

The Act's vague and overbroad requirements also impose crushing operational burdens that functionally chill protected speech. The vague "commercially reasonable efforts" standard, along with the Act's overbroad

requirements, force low-risk and low-budget platforms to implement expensive age verification systems. These systems can exceed the budgets that platforms have spent building their actual services[19]— a costly expectation would be impracticable for nonprofits such as Wikipedia and AO3. In the alternative, to avoid age verification, a service might ban any discussion of the disfavored topics, or it might avoid providing service to the State's citizens entirely. Each of these consequences suppresses fully First-Amendment protected speech.

## III. The Act Impermissibly Expands the Categories of Unprotected Speech

The Act fundamentally expands the categories of unprotected speech beyond constitutional limits. In *Brown*, the Supreme Court struck down California Assembly Bill 1179, which prohibited the "sale or rental of violent video games" to minors, stating that under "our Constitution, esthetic and moral judgments about art and literature are for the individual to make, not for the Government to decree." *Brown*,

---

[19] Although AO3 operates on a budget of well under $500,000 annually, a report indicates that age verification systems can cost millions, not accounting for ongoing maintenance costs. *See More Than Just A Number: How Determining User Age Impacts Startups, Engine*, https://static1.squarespace.com/static/571681753c44d835a440c8b5/t/66ad1ff867b7 114cc6f16b00/1722621944736/More+Than+Just+A+Number+- +Updated+August+2024.pdf (Feb. 2024) at 2.

564 U.S. at 789-90 (internal quotations omitted). Though the First Amendment does permit restrictions on limited categories of speech, such as obscenity, "new categories of unprotected speech may not be added … by a legislature that concludes certain speech is too harmful to be tolerated." *Id*. at 791 (internal quotations omitted). To create a novel content restriction, the legislature must put forth "persuasive evidence that [the] novel restriction on content" like the one created by the Mississippi legislature "is part of a long ... tradition of proscription..." *Id*. at 792 (internal quotations omitted).

The Act cannot satisfy this demanding standard. While *Paxton* recently upheld Texas's age-verification law for commercial websites whose content was more than one-third "sexual material harmful to minors," *Paxton* at 467, that decision is inapplicable here. H.B. 1126 covers far more than obscenity. In fact, H.B. 1126's restrictions proscribe constitutionally "protected speech" for minors, covering fifteen novel categories including content that (in the view of regulators) promotes or facilitates self-harm, eating disorders, and online bullying. The Act does nothing to distance itself from the invalid California law in *Brown*; almost exactly like California Assembly Bill 1179, one of H.B. 1126's proscribed categories is a prohibition on content that promotes or facilitates "physical violence." H.B. 1126. Because the Act does not merely prohibit recognized categorial exceptions to the First Amendment like obscenity, but rather "imposes a restriction on the content of

protected speech" it is "invalid unless" the Legislature can "demonstrate that it passes strict scrutiny." *Brown*, 564 U.S. at 799; *R.A.V. v. St. Paul*, 505 U.S. 377, 395 (1992).

To pass strict scrutiny, the legislature would need to show a "direct causal link between" the categories listed and actual "harm to minors—" any "ambiguous proof will not suffice." *Brown,* 546 U.S. at 799-800. The State has not presented clear evidence that links minors' access to such categories of content with any tangible harm. To the contrary, educational content on certain of these topics might be helpful to minors. In the context of Wikipedia, for instance, educational content on the youth mental health crisis can provide critical medical information, support resources, and public health education that can aid early intervention and awareness.[20] Similarly, content addressing topics like self-harm or bullying may function as preventative or therapeutic tools, helping minors understand and process their experiences rather than exacerbating harm. *See NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024).

The Act's broad categorical approach is particularly harmful to mission-driven platforms that provide educational resources and community support—and forces them to choose between abandoning their missions or risking enforcement.

---

[20] See Vijender Singh, *Mental Health Prevention and Promotion—A Narrative Review*, Front Psychiatry (2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC9360426/.

This represents exactly the type of content-based restriction that *Brown* forbids: allowing the government to make "esthetic and moral judgments" about which topics are too dangerous for discussion, rather than leaving those judgments to individuals and families. *Brown* at 790.

## CONCLUSION

This Court should immediately lift its stay of the preliminary injunction pending appeal and affirm the district court's judgment.

DATED: October 9, 2025

Respectfully submitted,

/s/ Wendy Chu
Wendy Chu
Harvard Cyberlaw Clinic
1557 Massachusetts Avenue, 4th Floor
Cambridge, MA 02138
(617) 495-0575
wchu@law.harvard.edu

*Counsel for Amici Curiae*[21]

---

[21] *Amici* thank fall 2025 Harvard Cyberlaw Clinic students for their valuable contributions to this brief.

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Fed. R. App. P. 29(a)(5), because, excluding the items listed under Fed. R. App. P. 32(f), it contains 4,654 words according to the word-count function of Microsoft Office Word.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface in 14-point Times New Roman font using Microsoft Word.

Date: October 9, 2025

Respectfully submitted,

/s/ Wendy Chu
Wendy Chu

*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Date: October 9, 2025

Respectfully submitted,

 /s/ Wendy Chu
Wendy Chu

*Counsel for Amici Curiae*

## STATEMENT OF COMPLIANCE WITH RULE 29

Pursuant to the Federal Rule of Appellate Procedure 29(a)(2), all parties have consented to the filing of this brief.

Pursuant to the Federal Rule of Appellate Procedure 29(a)(4)(E), no party's counsel authored this brief in whole or in part; no party or a party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting this brief.

Date: October 9, 2025

Respectfully submitted,

 /s/ Wendy Chu
Wendy Chu

*Counsel for Amici Curiae*