No. 25-60348

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————————

NETCHOICE, L.L.C.,

*Plaintiff-Appellee,*

*v.*

LYNN FITCH, IN HER OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF MISSISSIPPI,

*Defendant-Appellant.*

———————————

On Appeal from the United States District Court
for the Southern District of Mississippi, Southern Division
No. 1:24-cv-00170-HSO-BWR

## BRIEF OF *AMICI CURIAE*
## FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
## AND TECHFREEDOM IN SUPPORT OF APPELLEE

Robert Corn-Revere
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@thefire.org

Counsel for *Amici Curiae*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel of record certifies that the following listed persons and entities as described in Local Rule 29.2 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Person or Entity | Connection to Case |
|---|---|
| Foundation for Individual Rights and Expression (FIRE) | *Amicus curiae* |
| TechFreedom | *Amicus curiae* |
| Robert Corn-Revere | Counsel for *amici* FIRE and TechFreedom |

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici* certifies that (1) *amici* do not have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in *amici*.

/s/ *Robert Corn-Revere*
Robert Corn-Revere
October 9, 2025

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS  AND
CORPORATE DISCLOSURE STATEMENT ............................................ i

TABLE OF AUTHORITIES .................................................................... iii

INTEREST OF *AMICI CURIAE* .......................................................... 1

SUMMARY OF ARGUMENT ................................................................. 3

ARGUMENT ........................................................................................... 6

I.    THE   ACT   IS   A   CONTENT-BASED   SPEECH
      REGULATION   THAT   CANNOT   SATISFY   STRICT
      SCRUTINY ...................................................................................... 7

      A.    The Act Is Content-Based Both in Its Overall Coverage
            and in the Speech It Restricts .................................................. 8

      B.    The Act Fails Strict Scrutiny Because It is Not Narrowly
            Tailored to Serve a Compelling Interest ............................... 15

            1.    Mississippi has not demonstrated a compelling
                  interest ......................................................................... 16

            2.    Mississippi has not shown the Act is narrowly
                  tailored ......................................................................... 17

II.   *FREE SPEECH COALITION v. PAXTON* DOES NOT
      PERMIT BARRING MINORS' ACCESS TO EXPRESSION
      THEY HAVE A FIRST AMENDMENT RIGHT TO ACCESS ..... 26

III.  THE ACT'S VAGUE TERMS FAIL TO GIVE FAIR NOTICE
      OF WHAT SPEECH VIOLATES THE LAW ............................... 27

CONCLUSION ...................................................................................... 31

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Mukasey,*
  534 F.3d 181 (3d Cir. 2008) ................................................................... 21

*Ashcroft v. ACLU,*
  542 U.S. 656 (2004) .............................................................................. 12

*Ashcroft v. Free Speech Coalition,*
  535 U.S. 234 (2002) ........................................................................ 14, 23

*Boos v. Barry,*
  485 U.S. 312 (1988) ........................................................................ 11, 14

*Brown v. Entertainment Merchants Ass'n,*
  564 U.S. 786 (2011) ..................................................................... passim

*City of Dallas v. Stanglin,*
  490 U.S. 19 (1989) ................................................................................ 13

*City of Renton v. Playtime Theatres, Inc.,*
  475 U.S. 41 (1986) ................................................................................ 14

*Computer & Commc'ns Indus. Ass'n v. Paxton,*
  747 F. Supp. 3d 1011 (W.D. Tex. 2024) .............................. 9, 12, 25, 30

*Erznoznik v. City of Jacksonville,*
  422 U.S. 205 (1975)............................................................................... 15

*Free Speech Coalition v. Paxton,*
  606 U.S. 461 (2025) ..................................................................... passim

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) .............................................................................. 28

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010) .................................................................................. 28

*Interstate Circuit, Inc. v. City of Dallas,*
  390 U.S. 676 (1968) .............................................................................. 28

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024). ................................................................ 4

*Nat. Institutes of Health v. Am. Public Health Ass'n,*
145 S. Ct. 2658 (2025) ........................................................... 32

*NetChoice, LLC v. Bonta,*
113 F.4th 1101, *preliminary injunction reaffirmed on remand,*
770 F. Supp. 3d 1164 (N.D. Cal. 2025) ................................. 8, 11, 12, 24

*NetChoice, LLC v. Carr,*
No. 1:25-cv-2422-AT, 2025 WL 1768621 (N.D. Ga. June 26, 2025) ...... 8

*NetChoice, LLC v. Fitch,*
145 S. Ct. 2658 (2025) ........................................................... 32

*NetChoice, LLC v. Fitch,*
738 F. Supp. 3d 753 (S.D. Miss. 2024) (*vacated and remanded,*
134 F.4th 799 (5th Cir. 2025)) .................................... 6, 27, 29

*NetChoice, LLC v. Griffin,*
No. 5:23-CV-05105, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023)..... 13

*NetChoice, LLC v. Griffin,*
No. 5:23-CV-5105, 2025 WL 978607 (W.D. Ark. Mar. 31,
2025) ........................................................................ 9, 12, 25

*NetChoice, LLC v. Reyes,*
748 F. Supp. 3d 1105 (D. Utah 2024) ................................. 9, 12, 17, 25

*NetChoice, LLC v. Yost,*
778 F. Supp. 3d 923 (S.D. Ohio 2025) ................................. 9, 12, 25, 30

*Packingham v. North Carolina,*
582 U.S. 98 (2017) ................................................................ 4, 12, 13

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015)................................................................ 9, 11

*Reno v. ACLU,*
521 U.S. 844 (1997) ..................................................... passim

iv

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994) ................................................................. 19

*United States v. Miselis*,
  972 F.3d 518 (4th Cir. 2020) ............................................... 23

*United States v. Playboy Ent. Grp., Inc.*,
  529 U.S. 803 (2000) ....................................................... passim

*United States v. Stevens*,
  559 U.S. 460 (2010) ............................................... 21, 22, 30

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976) .................................................................. 6

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
  455 U.S. 489 (1982) ................................................................ 28

*Word v. Rock Against Racism*,
  491 U.S. 781 (1989) ................................................................ 12

## Statutes

H.B. 1126 ........................................................................... passim

## Other Authorities

Buzzfeed, Videos, https:/perma.cc/6JHM-H2M4 ...................... 24

## INTEREST OF *AMICI CURIAE*[1]

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended individual rights without regard to speakers' views through public advocacy, strategic litigation, and participation as *amicus curiae* in cases that implicate expressive rights.

FIRE's work includes litigating to protect expressive rights in the digital realm—ensuring courts apply First Amendment protections consistently, and that they are not subverted or weakened based on misunderstandings or fears about emerging technologies. *See, e.g.*, *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024); *Volokh v. James*, (2d Cir. 2025), *certification accepted*, No. 124, 2025 WL 2646981 (N.Y. Sept. 16, 2025); *Students Engaged in Advancing Texas v. Paxton (SEAT)*, 765 F. Supp. 3d 575 (W.D. Tex. 2025), *appeal docketed* No. 25-50096 (5th Cir. Feb. 11, 2025); *see also* Brief of FIRE et al. as *Amicus Curiae* in Support of Petitioners, *TikTok Inc. v. Garland*, 604 U.S. 56

---

[1] No counsel for a party authored this brief in whole or part. Further, no person, other than *amici*, their members, or their counsel contributed money intended to fund preparing or submitting this brief. All parties have consented to filing of this brief.

(2025); Brief of FIRE as *Amicus Curiae* in Support of Respondents, *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). FIRE has also participated as *amicus* and counsel for parties in significant First Amendment litigation in this Court. *See, e.g., Villarreal v. City of Laredo, Tx.*, No. 20-40359 (5th Cir. 2024); *Rogers v. Smith*, No. 22-30352 (5th Cir. 2023); Brief of FIRE as *Amicus Curiae* in Support of Plaintiffs-Appellees, *Little v. Llano Cnty.*, No. 23-50224 (5th Cir. filed Sept. 20, 2024).

Particularly relevant here, FIRE opposes unconstitutional governmental efforts to restrict speech on social media. FIRE attorneys represented NetChoice in challenging California's Age-Appropriate Design Code Act (*NetChoice v. Bonta*, No. 5:22-cv-08861-BLF (N.D. Cal.)), and individual social media users in challenging Utah's Minor Protection in Social Media Act. *Zoulek v. Hass*, No. 2:24-cv-00031-RJS-CMR (D. Utah). FIRE is especially concerned with attempts to disguise content-based restrictions as regulations of conduct subject to intermediate or lesser scrutiny. See, e.g., Br. *Amicus Curiae* FIRE Supp. Pls.-Appellants, *Alario v. Knudsen*, No. 24-34 (9th Cir. 2024). With decades of experience combating censorship, including that of minors' speech in digital environments, FIRE is well-acquainted with the negative consequences

of governmental overreach and well-positioned as *amicus curiae* in this matter.

TechFreedom is a nonprofit, nonpartisan think tank based in Washington, D.C. dedicated to promoting technological progress that improves the human condition. TechFreedom opposes government efforts to control online speech, including laws that mandate online age verification. As TechFreedom's experts have explained in extensive expert commentary, online age-verification laws sacrifice privacy, free speech, and parental authority on the altar of good intentions. *See, e.g.*, Corbin K. Barthold, *Age-Verification Laws are a Verified Mistake*, Law & Liberty (Jan. 9, 2025), tinyurl.com/2avh8w48.

## SUMMARY OF ARGUMENT

The First Amendment protects Americans of all ages, as the Supreme Court has consistently affirmed. *See, e.g., Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 794 (2011) ("[M]inors are entitled to a significant measure of First Amendment protection.") (cleaned up). The government must therefore meet a high bar when regulating minors' access to speech fully protected for them. *See id.* at 795 ("Speech that is neither obscene as to youths nor subject to some

other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.") (internal quotation marks omitted). But Mississippi enacted a law that restricts access to social media based on the user's age, imposing an impermissible bar for minors and a significant burden on adults seeking to engage with protected expression online.

Mississippi's H.B. 1126 ("the Act") is the latest in a series of well-intentioned but fundamentally flawed efforts to protect minors from speech online. As with the Communications Decency Act (CDA) and the Child Online Protection Act at the federal level, and numerous laws passed by various states, Mississippi's law fails to confront the constitutional rule that "[e]ven where the protection of children is the object, the constitutional limits on governmental action apply." *Brown*, 564 U.S. at 804–05. As the Supreme Court recently reaffirmed, the First Amendment "does not go on leave when social media are involved." *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024).

The Act is content-based regulation that burdens the right to engage in social discourse in one of "the most important places … for the exchange views," *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017),

by conditioning it on age verification—forcing social media users to sacrifice anonymity and risk their sensitive personal information. And it infringes minors' First Amendment rights by forcing platforms to limit minors' access to expression they are constitutionally entitled to receive.

Such regulations must satisfy strict scrutiny, as courts have repeatedly reaffirmed. Mississippi's insistence that *Free Speech Coalition v. Paxton*, 606 U.S. 461 (2025) (*FSC*), endorses reduced scrutiny is incorrect. *FSC* involved only speech constitutionally unprotected for minors—namely, sexually explicit obscene-to-minors content—such that lesser scrutiny and the underlying rationale for it apply only in that context. In contrast, the Act restricts access to a breathtaking array of expression, the vast majority of which is constitutionally protected for adults and minors alike.

The Act is also impermissibly vague in both its coverage definition and substantive mandate by requiring online services to "mitigate" or "prevent" minors' access to "harmful" speech. The district court correctly held NetChoice is likely to succeed on its claim that the Act is unconstitutionally vague for failing to clearly define what services the Act reaches. *NetChoice, LLC v. Fitch*, 738 F. Supp. 3d 753, 777–78 (S.D.

Miss. 2024) (*vacated and remanded*, 134 F.4th 799 (5th Cir. 2025)).

Although the court stopped there, the Act's substantive requirements are

also impermissibly vague, because they fail to precisely identify the

restricted "harmful content" or what measures are "commercially

reasonable." The Act's vague requirements provide no guidance either to

those who will enforce the law or to the services that must comply, thus

inviting arbitrary enforcement.

## ARGUMENT

Even with Mississippi's undisputed interest in minors' well-being,

it must pursue that interest within constitutional bounds. *Brown*, 564

U.S. at 804–05. The First Amendment protects the creation,

dissemination, and right to access ideas and expression. *Brown*, 564 U.S.

at 792 & n.1; *see Va. State Bd. of Pharmacy v. Va. Citizens Consumer

Council, Inc.*, 425 U.S. 748, 756–57 & 757 n.15 (1976). These protections

apply without qualification to the internet, *Reno v. ACLU*, 521 U.S. 844,

852–53 (1997), including social media. *See Moody*, 603 U.S. at 716–19.

They also apply to minors, who "are entitled to a significant measure of

First Amendment protection," and whose free speech rights "cannot be

suppressed solely to protect [them] from ideas or images that a legislative

body thinks unsuitable for them." *Brown*, 564 U.S. at 794–95 (citation omitted). And they prohibit the government from restricting adults' speech in the name of shielding children. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000).

"[E]ven where speech is indecent and enters the home, the objective of shielding children does not suffice to support a blanket ban if the protection can be accomplished by a less restrictive alternative." *Id*. at 814. "Regardless of the strength of the government's interest in protecting children, the level of discourse … simply cannot be limited to that which would be suitable for a sandbox." *Reno*, 521 U.S. at 875 (cleaned up and citation omitted). The Act at issue here restricts the First Amendment rights of both providers and users of social media platforms, and fails to satisfy any level of constitutional review.

## I.   THE ACT IS A CONTENT-BASED SPEECH REGULATION THAT CANNOT SATISFY STRICT SCRUTINY

Laws like the Act that regulate protected speech based on content "are presumptively unconstitutional and may be justified only if they satisfy strict scrutiny." *FSC*, 606 U.S. at 471 (internal quotation marks omitted). Notwithstanding the State's claim that it isn't regulating speech at all, the Act singles out speech based on content in multiple

ways. And Mississippi cannot satisfy any element of constitutional scrutiny.

## A.    The Act Is Content-Based Both in Its Overall Coverage and in the Speech It Restricts

The Act violates basic First Amendment principles and erodes the right to participate in social discourse critical to a democratic republic. The law is content-based: it singles out service providers that offer social communications and their users, while excepting providers that offer news, sports, professional development, commercial communications, or content the service provider primarily generates or selects itself. H.B. 1126, § 3(1)–(2). It requires age verification before anyone may open a social media account, thereby impermissibly chilling participation in online discussion and burdening the right to receive information. *Id.* 1126, § 4(1); *see Reno,* 521 U.S. at 856–57. And it requires service providers to identify "harmful" content based on fifteen specified categories and take steps to limit minors' access to that information.

Such content-based social media regulations must satisfy strict scrutiny, as six other courts recently confirmed.[2] The district court

---

[2] *Bonta*, 113 F.4th 1101, *preliminary injunction reaffirmed on remand*, 770 F. Supp. 3d 1164 (N.D. Cal. 2025); *NetChoice, LLC v. Carr*, No. 1:25-cv-2422-AT, 2025 WL 1768621 (N.D. Ga. June 26, 2025); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923

correctly held here that the Act is unlikely to withstand strict scrutiny because Mississippi cannot show its speech restrictions are necessary or the least restrictive alternatives for advancing asserted interests in protecting children online. And its age verification requirements, which also fail strict scrutiny, impose excessive burdens on access to protected speech.

"Government regulation of speech is content based" and subject to strict scrutiny "if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). The instant Act is content-based twice-over. It regulates service providers only if they provide specific online content, and requires those providers to restrict speech accessible to minors in certain specified areas (such self-harm, eating disorders, bullying, or harassment). As another court observed in enjoining a similar Texas law regulating social media, this "is as content based as it gets." *CCIA*, 747 F. Supp. 3d at 1036.

---

(S.D. Ohio 2025); *NetChoice, LLC v. Griffin*, No. 5:23-CV-5105, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024); *Computer & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024).

The Act defines a "digital service provider" to mean any person who owns or operates an Internet-connected service, including any website, application, program, or software that collects or processes personal identifying information. H.B. 1126, § 2(b). However, it covers only services that facilitate social interactions; allow users to create public, semi-public or private profiles; or allow users to post content viewable by others, including by sharing information in chat rooms or on message boards, landing pages, video channels, or main feeds. *Id*. § 3(1)(a)–(c).

The Act expressly exempts other digital service providers based on the type of information offered. For example, it does not apply to services that provide e-mail or direct messaging. It also exempts those primarily providing access to news, sports, commerce, online video games, or content primarily generated or selected by the service provider, and that allow chat, comment or other interactive functionality incidental to the service. And it does not cover services that primarily provide users access to career development opportunities (*e.g.*, professional networking, job skills, learning certifications, job postings, or application services). *Id*. § 3(2)(b)–(d). The Act thus singles out social communications for regulation while exempting providers of other speech. *Id*. § 3(2)(c)(ii).

Beyond its definitional scope, the Act imposes a wide variety of content-based restrictions for communications available to minors. It requires service providers to "prevent or mitigate" minors' exposure to "harmful material and other content" in fifteen broadly framed content categories.[3] This is content-based by definition because it literally restricts speech "because of the topic discussed" and "particular subject matter." *Reed*, 576 U.S. at 163; *see Bonta*, 113 F.4th at 1119–21 (applying strict scrutiny to law requiring mitigation of minors' exposure to "harmful content online").

This part of the Act "focuses *only* on the content of the speech and [its] direct impact … on its" audience. *Playboy*, 529 U.S. at 811–12 (quoting *Boos v. Barry*, 485 U.S. 312, 321 (1988) (opinion of O'Connor, J.)). It regulates speech based on "its function or purpose," *Reed*, 576 U.S. at 163, and cannot be justified without reference to the asserted impact on listeners. *Boos*, 485 U.S. at 321. This is "the essence of content-based regulation." *Playboy*, 529 U.S. at 811–12.

---

[3] These include self-harm, eating disorders, substance abuse, suicidal behaviors, stalking, physical violence, online bullying, harassment, "grooming," trafficking, child pornography, other sexual exploitation or abuse, incitement of violence, or "any other illegal activity." H.B. 1126, § 6.

The district court correctly held the Act is content-based and subject to strict scrutiny. ROA.930. Mississippi asks this Court to reverse, variously describing the provision of online forums as "non-expressive conduct," and any burden on the right to access speech as "'an incidental effect.'" Appellant's Br. at 31–33 (quoting *Word v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). One might take these claims more seriously if Mississippi had analyzed *any* of the numerous cases holding that trying to restrict, age-gate, or otherwise impede access to online forums is content-based and subject to strict scrutiny. *E.g.*, *Packingham*, 582 U.S. at 110; *Ashcroft v. ACLU*, 542 U.S. 656, 670 (2004); *Reno*, 521 U.S. at 874. The district court was right to reject Mississippi's claim that the Act regulates only "non-expressive conduct," and should be affirmed. ROA.929–930, consistent with *all* other recent decisions enjoining similar regulations.[4]

---

[4] *See Bonta*, 113 F.4th at 119–21; *CCIA*, 747 F. Supp. 3d at 1032–1034 (materially identical provisions of Texas's H.B. 18 constitute content-based regulation of speech); *Reyes*, 748 F. Supp. 3d at 1120–1123 (Utah's Minor Protection in Social Media Act regulating services that allow users to create profiles and to interact socially, is content-based and subject to strict scrutiny); *Yost*, 778 F. Supp. 3d at 955 ("[L]aws that require parental consent for children to access constitutionally-protected non-obscene content are subject to strict scrutiny."); *see also Griffin*, 2025 WL 978607, at *10 (social media restrictions are content-based regulations and subject to strict scrutiny); *NetChoice, LLC v. Griffin*, No. 5:23-CV-05105, 2023 WL 5660155, at *16,

The district court correctly distinguished *City of Dallas v. Stanglin*, 490 U.S. 19 (1989), involving regulation of teen dance halls, ROA.929–930, which Mississippi relies on while virtually ignoring all cases regarding internet regulation—*or any kind of speech*. Appellant's Br. 33. As the Supreme Court observed in *Stanglin*, 490 U.S. at 24–25, patrons who gather for recreational dancing do not "take positions on public questions" or partake of "expressive association that the First Amendment has been held to protect." By sharp contrast, the Court has recognized "the 'vast democratic forums of the Internet' in general … and social media in particular" are places where people "can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 582 U.S. at 104 (quoting *Reno*, 521 U.S. at 868). It thus held a "fundamental principle of the First Amendment is that all persons have access" to such fora, so courts "must exercise extreme caution before suggesting that the First Amendment provides scant protection for access to vast networks in that medium." *Id*. at 104, 105.

---

21 (W.D. Ark. Aug. 31, 2023) (agreeing that social media restrictions are subject to strict scrutiny but invalidating law under intermediate scrutiny).

Mississippi also recycles tropes the Supreme Court rejected long ago. It tries to characterize the Act's restrictions as regulating only "secondary effects," like those in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986). Appellant's Br. at 32–33. But the effect of social media on listeners—demonstrably the Act's target—is not secondary. *Boos*, 485 U.S. at 321. The Court made this clear in several cases the State overlooks, holding *Renton* is "irrelevant" and "has no application to content-based regulations targeting the primary effects of protected speech." *Playboy*, 529 U.S. at 815; *Reno*, 517 U.S. at 867–68 ("the purpose of the CDA is to protect children from the primary effects of 'indecent' and 'patently offensive' speech, rather than any 'secondary' effect").

Finally, Mississippi asserts it is not really regulating content because it seeks to restrict only "bad" speech. Appellant's Br. 34 ("Coverage turns on where *harmful conduct* toward minors online is most likely: … social-media platforms that allow predators to interact with … children."). This tacitly admits the Act regulates speech but incorrectly assumes the government may restrict *all* social interactions because *some* may be problematic. *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253–54 (2002) ("[T]he Government may not prohibit speech on

14

the ground that it may encourage pedophiles to engage in illegal conduct.").

Mississippi ignores the Supreme Court's recognition that the First Amendment denies states the power "to prevent children from hearing or saying anything *without their parents' prior consent*." *Brown*, 564 U.S. at 795 n.3. Rather, "minors are entitled to a significant measure of First Amendment protection … and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212–13 (1975). A blunderbuss attack on speech is not among those circumstances. ROA.939.

## B. The Act Fails Strict Scrutiny Because It is Not Narrowly Tailored to Serve a Compelling Interest

Under strict scrutiny, the Act bears a presumption of invalidity which it cannot overcome because Mississippi cannot show the law is necessary to achieve a compelling interest and uses the least restrictive means. *Playboy*, 529 U.S. at 813. This "is a demanding standard" and it is "rare that a regulation restricting speech because of its content will ever be permissible." *Brown*, 564 U.S. at 799 (cleaned up); *see also FSC*, 606 U.S. at 484–85 (strict scrutiny can protect speech "if and only if, as a

practical matter, it is fatal in fact absent truly extraordinary circumstances"). Mississippi must identify an "'actual problem' in need of solving" and "curtailment of free speech must be actually necessary to the solution." *Brown*, 564 U.S. at 799. Here, Mississippi cannot satisfy either prong of the analysis.

### 1. Mississippi has not demonstrated a compelling interest

Mississippi has made almost no effort to identify social media's specific harms that the Act seeks to address. It does assert generalized interests in protecting minors—which no one disputes—and litters its brief with warnings of online "predators," Appellant's Br. 1, 7–8, 31, 33–34, 38–39, 41–42, but it must provide more. *Playboy*, 529 U.S. at 820–22. It must "show a direct causal link between [social media] and harm to minors." *Brown*, 564 U.S. at 799.

But Mississippi offers nothing but anecdote and supposition. It cites a news account about one tragic episode involving a sixteen-year-old Mississippian and, without describing the relevant facts, notes the "Legislature was moved by the case" to pass the Act. Appellant's Br. 7–8. This is precisely the kind of anecdotal showing the Supreme Court has rejected. *Playboy*, 529 U.S. at 820–21. And its paucity of proof is not

bolstered by its abbreviated nod toward the Surgeon General's Advisory on Social Media, Appellant's Br. at 7 (citing Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory 9 (2023)), which Mississippi fails to mention reached far more nuanced conclusions that cannot support this regulation.

It found, for example, that social media positively affects many young people and has varied effects that cannot be generalized—let alone causally linked—to adverse outcomes overall. *See id*. 4, 6, 11. The court in *Reyes* rejected that same data as support for Utah's similar law. 748 F. Supp. 3d at 1125 (the "Advisory suggests social media can benefit minors by 'providing … connection with others who share identities, abilities, and interest,'" and "'access to important information" and by "creat[ing] a space for self-expression,' 'promoting help-seeking behaviors[,] and serving as a gateway to initiating mental health care'"). Such mixed findings do not support broad speech restrictions.

### 2. Mississippi has not shown the Act is narrowly tailored

Even if Mississippi could demonstrate minors' access to social media is an "actual problem," the Act is not narrowly tailored and is both

over- and underinclusive, as the district court correctly held. ROA.934–939.

***First***, Mississippi has not attempted to show the Act is the least restrictive means of addressing concerns about minor' use of social media. "If a less restrictive alternative would serve the Government's purpose, [it] must use that alternative." *Playboy,* 529 U.S. at 813. For online networks—and social media in particular—less restrictive alternatives include numerous existing technologies that permit parents to supervise and control their children's online activities. *See id.* at 821–22; *Brown,* 564 U.S. at 803 (voluntary tools that enable parents to tailor access to the individual household are inherently less restrictive than blanket state mandates). Those include means that allow parents to block access to specific websites, limit the amount of time children can spend online, filter content to remove objectionable materials, and monitor children's online activities, such as logging which websites they visit. The district court thus properly held Mississippi could not meet its burden to prove such less-restrictive alternatives would fail to protect children from potential online harms. ROA.934 (holding NetChoice "carried its burden

of demonstrating … a number of supervisory technologies available for parents … that the State could publicize.").

Mississippi also fails to carry its burden to offer anything that suggest the Act's restrictions would actually address social media's asserted harms. *See Brown*, 564 U.S. at 799; *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662–64 (1994) (opinion of Kennedy, J.) (government must show speech restrictions will "in fact" further its interests in a "direct and material way"). Yet even for the tragic example Mississippi claims drove the Act's passage—where a teen reportedly was threatened with being "outed" by an online predator—it offers no explanation how the Act would have made any difference there—or in any other case, for that matter. Appellant's Br. 7-8.

Mississippi asserts it does not directly regulate speech but rather simply requires platforms to make "'commercially reasonable' efforts to verify age, obtain parental consent, and adopt a harm-mitigation strategy." Appellant's Br. 31. True, the law does not prevent "[a]ny minor from deliberately and independently searching for, or specifically requesting, content." H.B. 1126, § 6(2)(a). But Mississippi but does not

explain how "harm-mitigation strategies" will achieve the law's ultimate ends, despite offering a few examples. Appellant's Br. 38.

**Second**, the Act is both overinclusive and underinclusive. It requires all users to comply with age verification irrespective of age or maturity, and that platforms mitigate or eliminate minors' access to protected speech. Yet at the same time, its selective coverage leaves minors exposed to the same type of online communications Mississippi claims is harmful.

The age verification requirement is vastly overinclusive because it will prevent numerous adults from creating social media accounts if they will not or cannot verify their identity and age with the service provider, H.B. 1126, § 4(1), whether for lack of state-issued ID, exercise of the right to anonymous communication, or other reasons. *See* ROA.934. This violates the well-established rule that the government cannot "suppress[] a large amount of speech that adults have a constitutional right to receive" in order "to deny minors access to potentially harmful speech."

*Reno*, 521 U.S. at 874; *ACLU v. Mukasey*, 534 F.3d 181, 196 (3d Cir. 2008) (age verification would deter access to protected speech).[5]

The age verification and content mitigation are also overinclusive as related to minors in three ways. First, barring everyone under 18 from having social media accounts absent parental consent is an obvious violation of minors' First Amendment rights. *Brown*, 564 U.S. at 795 n.3 (observing the state could not make it criminal to admit persons under 18 to a political rally or religious meeting without parental consent).

Second, the Act flunks tailoring in treating minors monolithically, regulating toddlers the same as teens on the cusp of adulthood. *Reno*, 521 U.S. at 878 ("the strength of the Government's interest in protecting minors is not equally strong" to the extent it applies equally to older teens and younger children); *Mukasey*, 534 F.3d at 205 ("[M]aterials that could have 'serious literary, artistic, political, or scientific value' for a 16-year-

---

[5] Mississippi abandons its prior argument that the Act requires not "age verification" but only "commercially reasonable efforts to verify age," which "may mean no more than asking someone's age" for some platforms. Appellant's Br., 2024 WL 4093160, at 35. Wisely so, as the Act's potential criminal penalties make it doubtful many service providers will forgo age verification in hopes Mississippi will agree doing so was "commercially reasonable," *see United States v. Stevens*, 559 U.S. 460, 480 (2010) ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."), and conversely, if compliance is essentially "voluntary," it is hard to see the law directly and materially achieving its asserted interests.

old would not necessarily have the same value for a three-year-old."). As the district court correctly noted, requiring "all minors … regardless of age and level of maturity[] to secure parental consent" to engage in speech across "a broad range of covered websites … represents a one-size-fits-all approach." ROA.935.

Third, the Act seeks to create "a wholly new category of content-based regulation that is permissible only for speech directed at children," something the Supreme Court has flatly rejected. *Brown*, 564 U.S. at 794. Instead, the Court has steadfastly resisted efforts to increase or expand the unprotected categories as "startling and dangerous" and rejected any "freewheeling authority to declare new categories." *Stevens*, 559 U.S. at 470, 472. This is no less so simply because minors are involved. *See also infra* § II. Mississippi may believe it has "a free-floating power to restrict the ideas to which children may be exposed," but the Supreme Court regularly holds otherwise. *Brown*, 564 U.S. at 794–95.

The Act requires service providers to "prevent or mitigate" minors' exposure to "harmful material and other content" in fifteen broadly framed content categories, only some of which even relate to illegal activity. For example, it requires "prevention" or "mitigation" of speech

that *relates to* harassment, "grooming," trafficking, sexual exploitation or abuse, incitement of violence, or "any other illegal activity." H.B. 1126, § 6. In other words, the Act is not confined to restricting *actual* illegal conduct but speech *about* it, something the First Amendment disallows. *Free Speech Coalition*, 535 U.S. at 255 (arguing "protected speech may be banned as a means to ban unprotected speech … turns the First Amendment upside down").[6] Beyond that, the Act requires "mitigation" of speech about self-harm, eating disorders, substance abuse, suicidal behaviors, stalking, physical violence, and online bullying, none of which fall into any of the "relatively narrow and well-defined circumstances [where] government [may] bar public dissemination of protected materials to [minors]." *Brown*, 564 U.S. at 794 (citation omitted).

Not to worry, Mississippi responds, claiming the Act does not actually ban any speech. Appellant's Br. at 31 (asserting the law does not directly regulate speech but rather "predatory conduct online" by

---

[6] Mississippi tries to equate these broad categories with speech integral to criminality, Appellant's Br. at 33, 36, but the Act's plain language is to the contrary. *See* H.B. 1126, § 6(1) (covering "harmful material … that promotes or facilitates … harms"); *see also United States v. Miselis*, 972 F.3d 518, 530, 535 (4th Cir. 2020) (verbs "encourage" and "promote" reached protected speech). Here, "if the state had intended to proscribe only speech 'integral to unlawful conduct,' it could have explicitly stated so." *CCIA*, 747 F. Supp. 3d at 1041.

requiring "'commercially reasonable' efforts to verify age, obtain parental consent, and adopt a harm-mitigation strategy"). But it "is of no moment that the statute does not impose a complete prohibition" on the speech it targets. *Playboy,* 529 U.S. at 812. "The distinction between laws burdening and laws banning speech is but a matter of degree" and "content-based burdens must satisfy the same rigorous scrutiny as … content-based bans." *Id*. For that reason, the Ninth Circuit recently upheld the preliminary injunction of a similar California law that "falls well short of satisfying strict First Amendment scrutiny" by requiring online platforms to assess their products, services, and features for potentially "harmful content" and to create "timed plans" to mitigate any exposure to minors. *Bonta*, 113 F.4th at 1121–22.

Finally, the Act is underinclusive because it expressly exempts from its coverage numerous categories of online services that include social interaction. Its covered services definition excludes news and entertainment websites commonly used by teenagers, such as Buzzfeed or Netflix. *See* Buzzfeed, Videos, https:/perma.cc/6JHM-H2M4. Likewise, a minor could open an account on a sports website without age verification or parental consent and exchange unsupervised social

communications such as posts, comments, and direct messages with other users , while the Act would bar the same child from engaging in precisely the same conduct on a social media platform like Snapchat or Facebook.

Such exclusions render the Act "wildly underinclusive when judged against its asserted justification, which … is alone enough to defeat it." *Brown*, 564 U.S. at 802. "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Id.* This flaw is a common feature of various state social media laws, which is another reason courts have routinely enjoined them.[7] Here, the district court reached the same conclusion and should be affirmed. ROA.936–937.

---

[7] *See, e.g.*, *Yost*, 778 F. Supp. 3d at 956 (law is "a breathtakingly blunt instrument for reducing social media's harm to children") (internal citation omitted); *Griffin*, 2025 WL 978607, at *11 ("at least some exempt platforms are ones that adult sexual predators commonly use to communicate with children," such as interactive gaming"); *CCIA*, 747 F. Supp. 3d at 1037 ("A teenager can read Peter Singer advocate for physician-assisted suicide in *Practical Ethics* on Google Books but cannot watch his lectures on YouTube or potentially even review the same book on Goodreads."); *Reyes*, 748 F. Supp. 3d at 1128.

## II. *FREE SPEECH COALITION v. PAXTON* DOES NOT PERMIT BARRING MINORS' ACCESS TO EXPRESSION THEY HAVE A FIRST AMENDMENT RIGHT TO ACCESS

This Court's recent decision in *Free Speech Coalition v. Paxton*, 606 U.S. 461, provides no support for the proposition that Mississippi may impose content-based regulations on any and all speech involving minors on a showing of anything less than strict scrutiny. Quite the opposite. *FSC* addressed a Texas law that regulates only content obscene as to minors, and therefore constitutionally unprotected for them, by requiring age verification before granting access. *Id.* at 466, 474, 481–82 & n.7. In contrast, the Act here burdens a vast swath of speech on numerous topics—none of which the First Amendment allows the government to categorically restrict for minors.

Even where minors' access to sexually oriented speech may face legitimate restriction, the Court emphasized the narrowness of its holding in *FSC*. It made clear that content-based laws in all instances other than speech entirely unprotected for minors must satisfy strict scrutiny, and reaffirmed *Brown*'s rule that speech "neither obscene as to youths nor subject to some other legitimate proscription cannot be sup-

pressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." 564 U.S. at 795.

Far from supporting the Fifth Circuit's stay, *FSC* therefore *reinforced* that the "'basic principles of freedom of speech … do not vary' when a new and different medium for communication appears," 606 U.S. at 481 (quoting *Brown*, 564 U. S. at 790), that strict scrutiny "is the standard for reviewing the direct targeting of fully protected speech," *id.* at 486, and that reviewing courts do not defer to a legislature's view of "competing psychological studies" when applying strict scrutiny to a law restricting minors' access to otherwise protected speech, *id.* at 485 (quoting *Brown*, 564 U.S. at 799–800). Expanding *FSC's* narrow application of intermediate scrutiny to Mississippi's social media ban would imperil a vast amount of expression that is fully protected for both adults and minors.

## III.  THE ACT'S VAGUE TERMS FAIL TO GIVE FAIR NOTICE OF WHAT SPEECH VIOLATES THE LAW

In its initial preliminary-injunction order, the district court correctly held the Act's coverage definition is unconstitutionally vague, making the law "impermissibly vague in all of its applications." *Fitch*, 738 F. Supp. 3d at 777. Although the district court confined its analysis

to the central coverage definition, the same conclusion follows from the Act's substantive requirements as well.

Any law that fails to provide ordinary persons with fair notice of the proscribed conduct violates due process. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982). Vagueness in a law that regulates expression "raise[s] special First Amendment concerns because of its obvious chilling effect on free speech," *Brown*, 564 U.S. at 807 (Alito, J., concurring in the judgment) (quoting *Reno*, 521 U.S. at 871–72), requiring a "more stringent" test, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010) (citation omitted); *see Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972). "It is essential that legislation aimed at protecting children from allegedly harmful expression—no less than legislation enacted with respect to adults—be clearly drawn and that the standards adopted be reasonably precise so that those who are governed by the law and those that administer it will understand its meaning and application." *Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 689 (1968) (citation omitted).

The district court correctly observed that the Act does not provide guidance about crucial provisions. The Act's central coverage provision

provides no guidance about how a company can determine what constitutes "socially interacting" behavior or what distinguishes it from other interactions among users on a website. *Fitch*, 738 F. Supp. 3d at 778. Nor does it explain how a person may determine whether a digital service "primarily functions" to provide access to news, sports, commerce, online video games, or content primarily generated or selected by the digital service provider. *Id*. Digital service providers are left to guess whether they are covered by or exempted from the Act's requirements. Worse, the vague terms of the Act fail to provide the authorities with standards to restrict their subjective whims when it comes to enforcement of the Act's civil and criminal penalties.

Although the district court found it unnecessary to go further, the same problem infects the Act's substantive requirement that digital service providers use "commercially reasonable efforts" to verify their users' ages and to "prevent or mitigate" minors' exposure to "harmful material." The Act lists fifteen content categories to be restricted, including such broad and opaque subject areas as "self harm," "eating disorders," "substance abuse disorders," "suicidal behaviors," "stalking,"

"bullying," "harassment," "grooming," or "any other illegal activity." None of these terms are defined in the Act.

Such provisions are vague "because both the verbs (promotes, glorifies, and facilitates) and the objects of those verbs (e.g., stalking, bullying, substance abuse, and grooming) are broad and undefined. Especially when put together, the provisions are unconstitutionally vague." *CCIA*, 747 F. Supp. 3d at 1040. Such ambiguous mandates "will result in wide-ranging censorship of speech" because they require service providers "to guess which broad categories of speech, likely constituting billions of posts, must be filtered from view." *Id.*

Mississippi claims the Act will not result in censorship because service providers need only do what is "commercially reasonable." Appellant's Br. 31, 38. But this facile statement ignores how laws like this operate. Such vague restrictions on social media content "practically invite[] arbitrary application of the law," *Yost*, 778 F. Supp. 3d at 958, and in practice will mean the platforms must do what they imagine Mississippi believes is "commercially reasonable." But "the First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*." *Stevens*, 559 U.S. at 480.

For these reasons, this Court should affirm the District Court's order preliminarily enjoining enforcement of the Act.

## CONCLUSION

Mississippi's attempt to protect minors from social media is well-intentioned but fatally flawed. The idea that *some* types of social network use by *some* minors under certain conditions can adversely affect *some* segment of this cohort is no basis for imposing state restrictions on *all* social network use by *all* minors—just as Mississippi does not (and cannot) keep all books under lock and key because some may be inappropriate for some children.

Such overreach typifies how lawmakers historically have sought to regulate new media forms in the name of protecting the young. Whether dime novels or "penny dreadfuls" in the nineteenth century, moving pictures in the early twentieth century, comic books in the 1950s, or video games at the dawn of the twenty-first century, the response to these successive moral panics has been largely the same: legislatures pass vague and broadly worded speech restrictions that infringe basic First Amendment rights. *See Brown*, 564 U.S. at 797–98. The principles forged

in the cases cited throughout this brief constitute the core First Amendment rules that compel affirming the district court in this case.[8]

Dated: October 9, 2025

/s/ *Robert Corn-Revere*

Robert Corn-Revere
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@thefire.org

Counsel for *Amici Curiae*

---

[8] As Justice Kavanaugh observed, the Act conflicts with the Supreme Court's First Amendment jurisprudence, which the district court was duty-bound to follow in enjoining the Act's enforcement. *See NetChoice, LLC v. Fitch*, 145 S. Ct. 2658 (2025) (mem.) (Kavanaugh, J., concurring in the denial of application to vacate stay of preliminary injunction) ("NetChoice has, in my view, demonstrated that it is likely to succeed on the merits—namely, that enforcement of the Mississippi law would likely violate its members' First Amendment rights under this Court's precedents. Given those precedents, it is no surprise that the District Court in this case enjoined enforcement of the Mississippi law and that seven other Federal District Courts have likewise enjoined enforcement of similar state laws. … [U]nder this Court's case law as it currently stands, the Mississippi law is likely unconstitutional.") (citations omitted); *Nat. Institutes of Health v. Am. Public Health Ass'n*, 145 S. Ct. 2658, 2663–64 (2025) (Gorsuch, J., concurring in part and dissenting in part) ("Lower court judges may sometimes disagree with this Court's decisions, but they are never free to defy them. … [W]hen this Court issues a decision, it constitutes a precedent that commands respect in lower courts.").

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,482 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font, with Century Schoolbook 12-point font for footnotes.

Dated: October 9, 2025

/s/ *Robert Corn-Revere*

Robert Corn-Revere
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 9, 2025, an electronic copy of the Brief of *Amici Curiae* Foundation for Individual Rights and Expression and TechFreedom was filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users, and that service of the brief will be accomplished by the CM/ECF system.

/s/ *Robert Corn-Revere*

Robert Corn-Revere
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION