No. 25-60348

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

NETCHOICE, L.L.C.,
*Plaintiff-Appellee,*

*v.*

LYNN FITCH, IN HER OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF MISSISSIPPI,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Mississippi
No. 1:24-cv-170-HSO-BWR

## DEFENDANT-APPELLANT'S REPLY BRIEF

LYNN FITCH
  *Attorney General*
SCOTT G. STEWART
  *Solicitor General*
JUSTIN L. MATHENY
ANTHONY M. SHULTS
  *Deputy Solicitors General*
WILSON D. MINOR
  *Special Assistant Attorney General*
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
Email: scott.stewart@ago.ms.gov

*Counsel for Defendant-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ............................................................................... 1

ARGUMENT ..................................................................................... 2

I.    This Court Should Reverse The Preliminary-Injunction Order Because It Rests On Serious Errors Of Law ................................... 2

    A.    The Injunction Defies This Court's Mandate In The State's Successful First Appeal In This Case .................................... 2

    B.    The Injunction Rests On A Profoundly Flawed First Amendment Ruling ............................................................... 7

        1.    The Act Triggers At Most Intermediate Scrutiny ......... 7

        2.    The Act Satisfies Intermediate Scrutiny ..................... 20

    C.    NetChoice's Other Claims Cannot Save The Injunction ...... 23

        1.    NetChoice's Vagueness Claims Fail ........................... 23

        2.    NetChoice's Preemption Claim Fails ........................... 24

II.    The Remaining Factors Strongly Support Rejecting The Preliminary-Injunction Order ...................................................... 25

CONCLUSION ................................................................................ 28

CERTIFICATE OF SERVICE ............................................................ 29

CERTIFICATE OF COMPLIANCE .................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baggett v. Bullitt*,
    377 U.S. 360 (1964) ............................................................... 24

*Brown v. Entertainment Merchants Ass'n*,
    564 U.S. 786 (2011) ................................................. 11, 16, 17

*CCIA v. Paxton*,
    747 F. Supp. 3d 1011 (W.D. Tex. 2024) ......................... 15-16

*Citizens United v. FEC*,
    558 U.S. 310 (2010) .................................................... 16, 17

*Cole v. General Motors Corp.*,
    484 F.3d 717 (5th Cir. 2007) ............................................ 16

*Doe I v. Landry*,
    909 F.3d 99 (5th Cir. 2018) ................................................ 9

*Doe v. MySpace, Inc.*,
    528 F.3d 413 (5th Cir. 2008) ............................................ 25

*Free Speech Coalition, Inc. v. Paxton*,
    95 F.4th 263 (5th Cir. 2024) ....................................... 24, 25

*Free Speech Coalition, Inc. v. Paxton*,
    145 S. Ct. 2291 (2025) .................... 6, 7, 9, 10, 16-19, 21, 24

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ...................................................... 3, 16

*National Press Photographers Ass'n v. McCraw*,
    90 F.4th 770 (5th Cir. 2024) ............................................ 23

*NetChoice, LLC v. Fitch,*
    134 F.4th 799 (5th Cir. 2025) .......................................... 1-6, 16, 17, 28

*NetChoice, LLC v. Fitch,*
    145 S. Ct. 2658 (2025)........................................................................ 28

*Packingham v. North Carolina,*
    582 U.S. 98 (2017)............................................................ 16, 17, 18

*Reno v. ACLU,*
    521 U.S. 844 (1997).................................................................... 9

*Smith v. California,*
    361 U.S. 147 (1959).................................................................. 23

## Constitutional Provision

U.S. Const. amend. I ....................................... 1, 3-7, 9, 14, 16, 17, 19, 27

## Statutes

47 U.S.C. § 230 ................................................................. 24, 25

2024 H.B. 1126 ................................................................. 1-27

## Other Authorities

Black's Law Dictionary (12th ed. 2024).................................... 13

Dreamwidth,
    Mississippi legal challenge: beginning 1 September,
    we will need to geoblock Mississippi IPs (Aug. 26, 2025) ................. 26

Facebook,
    How video selfie age verification works on Facebook Dating............ 21

Groups.io,
    Why access from Mississippi is currently blocked............................ 27

Instagram,
   How does video selfie age verification work on Instagram? ......... 20-21

The Bluesky Team,
   Our Response to Mississippi's Age Assurance Law,
   Bluesky Blog (Aug. 22, 2025) ............................................................. 27

Webster's Third New International Dictionary (1981) ......................... 13

## INTRODUCTION

This Court should reject the preliminary injunction.

NetChoice insists that the injunction comports with *NetChoice, LLC v. Fitch*, 134 F.4th 799 (5th Cir. 2025). NetChoice Br. 19-27. But the district court granted the same facial relief that *Fitch* vacated—an injunction blocking the Act in all applications to all covered NetChoice members—without conducting the facial analysis that *Fitch* required. That alone dooms the injunction. State Br. 23-29.

NetChoice claims that the Act triggers and fails strict scrutiny. NetChoice Br. 27-32, 33-45, 48-53. But the Act does not directly regulate protected speech. It regulates certain websites to protect children from predators, and it advances that interest while imposing at most modest burdens on speech. So the Act comports with the First Amendment. State Br. 29-46.

Nothing else that NetChoice says supports the injunction. On vagueness and preemption it just makes arguments (NetChoice Br. 32-33, 46-47) that the State has refuted. State Br. 47-52. And the equities favor letting the Act protect Mississippi children. *Id.* at 52-55. NetChoice does not even dispute that it has engaged in "a yearslong pattern of defiance" of court orders. *Id.* at 55. The equities against NetChoice are so strong that they alone require rejecting the injunction.

## ARGUMENT

This Court was right to stay the injunction. It should now reverse.

## I.     This Court Should Reverse The Preliminary-Injunction Order Because It Rests On Serious Errors Of Law.

The district court erred on the merits. State Br. 23-52.

### A.     The Injunction Defies This Court's Mandate In The State's Successful First Appeal In This Case.

The injunction defies the mandate in *Fitch*. State Br. 23-29.

NetChoice insists otherwise, NetChoice Br. 19-27, but it cannot overcome the dispositive point: The district court granted the same facial relief that *Fitch* vacated—an injunction blocking the Act in all applications to all covered NetChoice members—without conducting the facial analysis that *Fitch* required. State Br. 24-26. NetChoice's account of *Fitch* and of the preliminary-injunction order (NetChoice Br. 19-21) ignores that point. NetChoice then devotes much space to points that do not matter. It says that *Fitch* did not "lock NetChoice into only 'facial' claims," did not "prevent[ ] NetChoice from seeking leave to amend its complaint to add as-applied claims," did not "require the district court to adjudicate the facial challenge first if NetChoice added successful as-applied claims on remand," and did not strip the district court of "authority to adjudicate" newly added as-applied claims. *Id.* at 21, 22; *see id.* at 21-23. All true—and all irrelevant. The problem for NetChoice is not about the ability to add or credit as-applied claims. The problem is that the district court granted the same facial relief that *Fitch* vacated—

2

without doing what *Fitch* ordered. That remains true no matter the label the district court attached to that relief or how feverishly NetChoice italicizes the words "as applied." *Contra*, *e.g.*, NetChoice Br. 21 (suggesting that the district court granted as-applied relief because it repeatedly used the words "as applied").

NetChoice claims that the injunction is not "facial relief" because it "applies only to nine specific websites." NetChoice Br. 23. That view defies *Fitch* and *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), which show that an injunction blocking a law in all applications to all of a plaintiff's members is facial relief. State Br. 26-27. An injunction thus need not grant relief to "others not before the court" to be facial. *Contra* NetChoice Br. 23. NetChoice exposes the flaw in its view when it insists that the district court's first injunction was not "facial relief." *Id.* at 23 n.8. If that injunction had not granted facial relief then this Court would not have vacated it for failing to conduct the facial analysis. Yet that is what *Fitch* did. State Br. 24-25.

NetChoice contends that the State "wrongly insists that the Act's 'commercially reasonable' statutory qualifiers required more factual development before the district court could resolve" NetChoice's as-applied First Amendment claim. NetChoice Br. 24; *see id.* at 24-25. According to NetChoice, *Fitch* deemed the issue of "commercially reasonable efforts" relevant only to the "facial-challenge standard." *Id.* at 24. This argument again disregards that the district court granted facial

3

relief, not as-applied relief. And NetChoice is wrong that determining "commercially reasonable efforts" applies only to a facial challenge. That issue is central to any First Amendment challenge to the Act—facial or as-applied—because it determines what the Act requires each platform to do and thus how (if at all) the Act will affect speech rights on the platform. State Br. 27-28. Because NetChoice wanted relief blocking the Act in every application to every covered member, it had to show what those applications are and how each one burdens speech. Even if NetChoice wanted only relief blocking the Act in particular applications to covered members, it still had to show what *those* applications are and how each one burdens speech. Either showing requires a "factual analysis"—and thus a "factual" presentation by NetChoice. *Fitch*, 134 F.4th at 809. Yet NetChoice refused to make that showing for even one platform. That barred *any* First Amendment relief—and certainly barred the sweeping facial relief the district court granted. State Br. 27-28.

NetChoice insists that, if "further factual inquiry were required on remand," it "provided this evidence." NetChoice Br. 25; *see id.* at 6 n.2, 25-26. Nonsense. NetChoice has never presented evidence showing what would constitute "commercially reasonable" actions to verify age, obtain parental consent, or adopt a harm-mitigation strategy for any member. State Br. 27, 28. NetChoice touts its declarations—error-riddled though they are, *e.g.*, State Br. 52-53—but it does not dispute that none makes

that showing. NetChoice Br. 25-26. Only one of those declarations even post-dates *Fitch*—and it does not do what *Fitch* required. State Br. 28.

NetChoice says that, by "refusing to disavow enforcement" against covered NetChoice platforms and seeking a stay pending appeal, the State "eliminate[d]" "any doubt about whether these nine websites are regulated and burdened by th[e] Act." NetChoice Br. 26. How this is supposed to help NetChoice is a mystery. The dispute at this stage is not over whether the Act imposes "regulat[ory]" "burden[s]" on those platforms. It is over whether any "burden[s]" the Act imposes on those platforms likely violate the First Amendment and whether NetChoice's showing justified the injunction. (There is no right to be free of regulatory burdens; there is a right to be free of burdens that violate the First Amendment.) Although NetChoice showed that the Act covers and regulates certain platforms, it refused to show what those platforms must in fact do under the Act—a failure that barred any relief, let alone facial relief. (NetChoice points to Instagram, *id.* at 26 n.9, but NetChoice refused to present facts—as was its burden—about how the age-verification provision burdens speech on Instagram when Instagram already verifies age. State Br. 24-25, 27.)

NetChoice claims that requiring more evidence on "commercially reasonable" efforts is "absurd" because it demands "even more extensive factual proceedings to determine if these websites face such great burdens that the Act *exempts* them—and only if they are burdened, but

not *too* burdened, can courts reach the First Amendment merits." NetChoice Br. 26-27. All that is wrong. The Act does not "exempt[ ]" a covered platform if it is "too burdened" or apply only to platforms that are "not too burdened." If a platform falls within the Act's coverage definition, the Act covers it—period. The platform must then make "commercially reasonable" efforts on age verification, parental consent, and harm mitigation—which means it must act reasonably, not cost-prohibitively. State Br. 40, 53. So if (for example) one age-verification method is not "commercially reasonable" for a particular covered platform, that does not mean that the platform is "exempt[ed]" from the age-verification provision. It means that the Act does not require that platform to use *that method*. The platform must still make "commercially reasonable" efforts to verify age. The question of what constitutes "commercially reasonable" efforts is fact-dependent and platform-specific. *Fitch*, 134 F.4th at 809. So, to be granted injunctive relief, NetChoice must present facts on what those efforts are for each covered member platform and how those efforts would burden speech on each platform. *Ibid.* There is nothing "absurd" about requiring a platform to act reasonably to protect minors or requiring NetChoice to show—as a matter of fact—that complying with the Act burdens speech on each covered member platform.

Last, NetChoice says that *Free Speech Coalition, Inc. v. Paxton*, 145 S. Ct. 2291 (2025), "involved a law with 'commercially reasonable' statutory qualifiers" yet "the Supreme Court did not need an exhaustive

analysis of each covered website['s] resources to resolve the First Amendment merits issues." NetChoice Br. 27. But *FSC rejected* a facial claim and so did not require an exhaustive factual analysis. State Br. 29. *Crediting* a facial claim does require an exhaustive showing—which NetChoice refused to provide. *Ibid.*

## B. The Injunction Rests On A Profoundly Flawed First Amendment Ruling.

The district court erred in ruling that the Act likely violates the First Amendment. State Br. 29-46.

### 1. The Act Triggers At Most Intermediate Scrutiny.

The Act triggers no more than intermediate scrutiny. State Br. 30-38. NetChoice argues that strict scrutiny applies. NetChoice Br. 27-29, 34-35, 38-39, 40-44, 48-53. Its arguments fail.

a. Start with NetChoice's arguments that the Act's coverage definition is a content-based regulation of speech and so strict scrutiny applies to the entire Act. NetChoice Br. 27-29.

First, NetChoice claims that by covering platforms that allow users to "socially interact with other[s]," § 3(1)(a), the Act regulates "a subset" of interactions based on their "content." NetChoice Br. 28; *see id.* at 27-29. The State already refuted this argument. State Br. 35-36. The phrase *socially interact* does not make the coverage definition content-based. That phrase means communication between two or more "users on [a] digital service." § 3(1)(a). It does not distinguish social from professional

7

interactions—just as NetChoice members' status as *social*-media platforms does not mean that they allow only non-professional interactions. State Br. 35-36. That understanding does not "read 'socially' out of the Act." NetChoice Br. 28. The word *socially* ensures that the Act distinguishes interactions between users (covered) from interactions with content (not covered). State Br. 35-36. That distinction is important: it focuses the Act on interactive platforms because of the predatory harms that they present to minors. *Id.* at 36. NetChoice claims that the "distinction is illusory" because on its covered member platforms "interacting with content is how users interact with each other." NetChoice Br. 28. The distinction is real: it means that coverage turns on whether a platform primarily functions to allow "users [to] interact with each other," *ibid.*—not on the content of those interactions.

Second, NetChoice claims that by excluding platforms that "[p]rimarily function[ ] to provide ... access to news, sports, commerce, online video games," or "career development opportunities," § 3(2)(c), (d), the Act regulates "based on subject matter—and thus content." NetChoice Br. 28 (cleaned up); *see id.* at 27-29. The Act does not regulate based on subject matter. Covered platforms and non-covered platforms alike can provide (or allow interaction about) news, sports, commerce, games, or career development. Coverage turns on the interactive features that endanger minors—platforms are covered when they are "primarily," rather than "incidental[ly]," interactive, § 3(2)(c), (d)—not on a judgment

8

favoring certain speech. (A platform that is primarily interactive would not "be exempt" even if it were "uniformly devoted to sports." *Contra* NetChoice Br. 28 (cleaned up).) For like reasons, the coverage definition also is not "speaker-based." *Id.* at 28 n.10. It does not favor "provider-generated content over user-generated content." *Ibid.* It targets interactive platforms because they present special dangers to minors.

Last, NetChoice disputes that the secondary-effects doctrine confirms that (at most) intermediate scrutiny applies. NetChoice Br. 29. That doctrine, NetChoice claims, applies "only" to "physical 'zoning ordinances.'" *Ibid.* That is not so. *See Doe I v. Landry*, 909 F.3d 99, 107, 109-10, 113 (5th Cir. 2018) (applying that doctrine to laws barring erotic dancing by performers under age 21 in businesses that serve alcohol). And that doctrine shows that even regulations of speech do not trigger strict scrutiny when they do not aim at the content of speech but instead at secondary effects. State Br. 32. In arguing otherwise, NetChoice focuses on cases faulting laws that targeted or regulated "the primary effects" of "speech," not "any 'secondary' effect of ... speech." *E.g.*, *Reno v. ACLU*, 521 U.S. 844, 868 (1997) (cited at NetChoice Br. 29). The Act here does not target or regulate speech or its primary effects. State Br. 31-33.

b. Next, the age-verification provision. NetChoice Br. 38-39.

NetChoice emphasizes that *FSC* recognized that "'submitting to age verification is a burden on the exercise of' the 'right to access speech' protected by the First Amendment." NetChoice Br. 38 (quoting 145 S. Ct.

at 2309). But even with that recognition, *FSC* applied intermediate scrutiny—not strict scrutiny—to the age-verification law before it. 145 S. Ct. at 2309, 2317-19. NetChoice suggests that *FSC* did that because that law applied only to "pornography websites" rather than to websites that (like its covered member platforms, NetChoice claims) host "an immense amount of fully protected speech." NetChoice Br. 39 (cleaned up). But *FSC* applied intermediate scrutiny because Texas's law (like the Act here) addressed platforms that host both protected speech and unprotected speech or conduct—and targeted what is unprotected. State Br. 36-37. And that was so even though Texas's law covered websites that host "an immense amount of fully protected speech." To fall within that law's coverage, only "more than one-third" of the material that a platform distributed needed to be "sexual material harmful to minors." 145 S. Ct. at 2300. So that law could apply—and, on NetChoice's view, restrict access to—huge amounts of material that is fully protected for adults and minors alike. That NetChoice's members may host much fully protected speech thus does not force strict scrutiny on the Act.

NetChoice also contends that "[t]he undisputed record evidence demonstrates that the burdens" that age verification imposes on speech "are substantial for the nine websites and their users." NetChoice Br. 38; *see id.* at 38-39. That is not so. NetChoice claims that "requiring users merely to *self-report* their birthdates deters some from accessing these websites." *Id.* at 38; *see id.* at 11-12 (relying on Pai Dec. ¶¶ 23-26

10

(ROA.140-143)). But its cited declaration supports only the view that some prefer not to provide that information—not that such a requirement deters access. Pai Dec. ¶¶ 20-21, 23a (ROA.140-141). And that declaration focuses on Nextdoor's clumsy effort to obtain and verify government IDs. *Id.* ¶¶ 23b-26 (ROA.141-143); *see* NetChoice Br. 11-12 (quoting only user reactions to the government-ID request). The Act does not require obtaining government IDs or even a birthdate—and age can be verified without them. *See infra* pp. 20-21 (describing age verification using a video selfie, hand gestures, or voice). And NetChoice's claims about the costs of age verification rely on assertions that defy the reality that the Act requires only "commercially reasonable" efforts to verify age. NetChoice Br. 38-39 (relying on Cleland Dec. ¶ 45a (ROA.715)). Nor does NetChoice account for the fact that some of its covered members already verify age. State Br. 27. NetChoice says that its members will be required to "obtain and store sensitive personal identifying information about minors." NetChoice Br. 38-39. The Act does not require that. In fact, the Act limits the collection and use of such information, § 5—a restriction that NetChoice still wants enjoined, NetChoice Br. 10 n.4.

c. NetChoice claims that the parental-consent provision triggers strict scrutiny under *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011). NetChoice Br. 34-35. But *Brown* applied strict scrutiny to a law because it directly targeted and regulated lawful, protected speech—video games that were violent. State Br. 37. The parental-

consent provision here does not target or regulate protected speech: it does not target "sharing vacation photos on Facebook," "finding a summer job on Nextdoor," or "learning precalculus on YouTube." *Contra* NetChoice Br. 35 (cleaned up). It targets illegal and unprotected conduct that States may regulate. State Br. 37. NetChoice suggests that the provision imposes "burdens" that trigger strict scrutiny. NetChoice Br. 34-35. But the Act imposes at most an incidental burden and does not directly target or regulate protected speech, so strict scrutiny does not apply. State Br. 31-33. And again, NetChoice's account of the Act's burdens defies the Act's terms and is not credible. *E.g.*, *id.* at 52-53.

d. Now, the strategy provision. NetChoice Br. 40-44.

NetChoice claims that the strategy provision triggers strict scrutiny because it is a "prior restraint" (NetChoice Br. 41-42) and "restrict[s]" platforms' choices about the speech they host (*id.* at 42-44). That is wrong. State Br. 37-38. The strategy provision requires platforms to "make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate" a known minor's "exposure to harmful material and other content that promotes or facilitates" certain "harms to minors." § 6(1). Nothing in that text requires platforms to "monitor[ ]," "censor," "block," not "disseminate[ ]," or "restrict[ ]" speech. NetChoice Br. 40, 41, 42, 44. That text does not require platforms to alter their "content moderation" policies. *Id.* at 44. The provision allows many strategies that could "prevent" or "mitigate" minors' exposure to listed

harms without restricting or regulating any speech. State Br. 38 (giving examples).

In claiming that the strategy provision requires platforms to block content, NetChoice emphasizes that the provision refers to "prevent[ing]" exposure to listed harms. NetChoice Br. 41-42. But preventing exposure does not require blocking content. A platform could have a strategy of repairing its website's flaws that enable predators. Such a strategy could prevent exposure to listed harms without restricting or regulating any speech. State Br. 38. Anyway, the strategy provision allows a platform to "prevent *or mitigate*" exposure to listed harms. § 6(1) (emphasis added). NetChoice suggests that mitigating exposure cannot refer to "after the fact" efforts to mitigate "harmful effects." NetChoice Br. 41 (cleaned up). But that view does violence to the ordinary meaning of "mitigate." *See Mitigate*, Black's Law Dictionary (12th ed. 2024) ("[t]o make less severe or intense"; "<the fired employee mitigated her damages for wrongful termination by accepting a new job>"); *Mitigate*, Webster's Third New International Dictionary 1447 (1981) ("alleviate") (formatting altered); *cf. Mitigation*, *ibid.* ("abatement or diminution of something painful, harsh, severe, afflictive, or calamitous").

NetChoice claims that the "exception" to the strategy provision "says [that] websites *need not* 'prevent or preclude' certain preferred 'content,'" and that the "obvious inference is that" under the strategy provision "covered websites must 'prevent or preclude' 'harmful content,'

in addition to mitigating exposure to it." NetChoice Br. 41-42 (quoting § 6(2)). That reads the words "or mitigate" out of the Act. The strategy provision allows platforms to "prevent *or* mitigate" listed harms—it does not require them to "prevent *and* mitigate" those harms. (That is not a "saving construction." *Id.* at 42. It is literally what the Act says.) And NetChoice misreads section 6(2). Section 6(2) does not announce an "exception" to the strategy provision. It provides a rule of construction. It says that "[n]othing in" section 6(1) "shall be construed to require" a covered platform "to prevent or preclude" "[a]ny minor from deliberately and independently searching for, or specifically requesting, content." § 6(2). That provision makes doubly clear what the strategy provision does not require and reaffirms the provision's focus on interactive encounters, not content. *Contra*, *e.g.*, NetChoice Br. 43-44.

NetChoice contends that "[a]n amorphous obligation to 'mitigate' a minor's 'exposure to harmful material' will inevitably create an unacceptable risk of the suppression of ideas." NetChoice Br. 42 (cleaned up). That is not so. The State has identified several possible strategies that do not restrict or regulate any speech. State Br. 38. NetChoice ignores most of these. It faults one: it says that the First Amendment "prohibits Mississippi from compelling private actors to speak by 'alerting or connecting minors to resources.'" NetChoice Br. 42 (quoting State Br. 38). But connecting minors with aid to address the harms predictably inflicted on the users of covered platforms does not force

14

anyone to "serv[e] as a mouthpiece for the State's preferred messages." *Ibid.* (cleaned up).

NetChoice claims uncertainty as to what the strategy provision covers. NetChoice Br. 43-44. It cites the words "promotes," "substance abuse," "harassment," and "grooming." *Id.* at 43. And it says that section 6(2) leaves "unclear how websites must prove that a minor deliberately sought out [certain] content, or whether content qualifies for [section 6(2)'s] exceptions." *Id.* at 43-44. Even if some words in the provision had uncertainty around the margins (an unavoidable feature of language), that would not prevent a platform from making "commercially reasonable efforts" to adopt a strategy to address the listed harms. Adopting a reasonable strategy does not require neurosurgery levels of precision: it requires reasonable efforts. NetChoice also claims that the strategy provision regulates speech based on "viewpoint." *Id.* at 44. It does not. It regulates platforms' non-expressive conduct to address harms. State Br. 31-34. And sex trafficking and sexual abuse (for example) are not viewpoints.

Last, NetChoice suggests that *CCIA v. Paxton*, No. 24-50721 (5th Cir.) (oral arg. Nov. 3, 2025), concerns an injunction against a Texas law that imposes requirements that are "virtually identical" to those of the strategy provision. NetChoice Br. 40-41. But Texas's law expressly requires "blocking," "monitoring," and "filtering" content. *CCIA v. Paxton*,

747 F. Supp. 3d 1011, 1023, 1036-38 (W.D. Tex. 2024) (quoting statute). The strategy provision does not and so is materially different.

e. NetChoice's remaining arguments fail too. NetChoice Br. 48-53.

*First*, NetChoice disputes that the challenged provisions regulate non-expressive conduct. NetChoice Br. 48-50. The State already refuted most points NetChoice raises. State Br. 33-34 (Act regulates non-expressive conduct), 31 & 33 (*Moody*), 31-33 (*FSC*), 37 (*Brown*), 42 (*Packingham v. North Carolina*, 582 U.S. 98 (2017)). (Even if the Court disagreed with the State on its arguments for rational-basis review, at most intermediate scrutiny would apply. *Id.* at 30-34.) NetChoice claims that the State's view "violates this Court's prior opinion" in *Fitch*. NetChoice Br. 48. That is quite a claim from a party that insists—four times—that *Fitch* "did not resolve any First Amendment merits issues." *Id.* at 2-3; *see id.* at 13, 15, 19. And NetChoice quotes only *Fitch*'s ruling on Article III *standing*, 134 F.4th at 804—a determination made on the assumption that a plaintiff's merits view is sound. *Cole v. General Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007) ("[W]hen considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim."). NetChoice says that the Act impermissibly "'control[s] or suppress[es] speech' by isolating a 'different point[ ] in the speech process' and calling it mere conduct." NetChoice Br. 49 (quoting *Citizens United v. FEC*, 558 U.S. 310, 336 (2010)). But the Act does not restrict any point in the "speech process." It does not, for

example, "requir[e] a permit" before speaking or "subject[ ] [a] speaker to criminal penalties" for speaking. *Citizens United*, 558 U.S. at 336-37. Requiring commercially reasonable efforts to verify age, obtain parental consent, and adopt a harm-mitigation strategy does not restrict any point in the speech process.

*Second*, NetChoice says that "[t]he Act's 'commercially reasonable' qualifiers do not alleviate the First Amendment infirmities." NetChoice Br. 50; *see id.* at 50-51. It says: "Government speech restrictions do not become constitutional just because some companies disseminating speech might be able to afford the government's mandates." *Id.* at 50. Any such rule is irrelevant because the Act does not impose "speech restrictions." The Act on its face does no such thing. The Act's "commercially reasonable" limitations would be vital to any such showing because those limitations define what covered platforms must do under the Act and thus dictate how (if at all) the Act affects speech. *Fitch*, 134 F.4th at 809. NetChoice has refused to make such a showing.

NetChoice seeks help from *Brown*, *FSC*, and *Packingham*, but none has any to offer. NetChoice Br. 50. The reason why "*Brown* would not have come out differently had California asked for just 'commercially reasonable' efforts to block minors from buying violent video games" (*ibid.*) is that California's law directly targeted and regulated speech based on its content. *That* is why the law triggered strict scrutiny. State Br. 37. NetChoice says that the law in *FSC* "had a 'commercially

17

reasonable' statutory qualifier." NetChoice Br. 50. But *FSC* applied intermediate scrutiny—not the strict scrutiny that NetChoice claims is required. And *Packingham* involved a flat ban on accessing speech— which is not true of the Act here. *Contra ibid.*

NetChoice argues that the Act's "commercially reasonable" limitations are "unconstitutionally vague." NetChoice Br. 51. That argument is meritless. The State has identified several possible strategies. State Br. 38. NetChoice ignores those and faults the State for not "conced[ing]" that any covered NetChoice member platform satisfies the Act and for not "disavow[ing] enforcement" against those platforms. NetChoice Br. 51. But NetChoice chose to bring a pre-enforcement challenge. It must come forward with evidence supporting that challenge and showing likely merits success. The State does not need to bless NetChoice members' conduct—or disavow enforcement—based on declarations that are plagued by obvious errors. *E.g.*, State Br. 52-53. (NetChoice also attributes to the State the argument "that 'facial recognition' may not be a commercially reasonable method of age-verification." NetChoice Br. 51. The State actually said that the age-verification provision does not "require using facial recognition and demanding government IDs": platforms can use *any* commercially reasonable method to satisfy that provision. State Br. 53.)

*Third*, NetChoice claims that *FSC* does not support applying intermediate scrutiny here. NetChoice Br. 51-53. NetChoice mainly

argues that *FSC* is limited to pornography. *Id.* at 51-52, 53. The State addressed that argument, State Br. 36-37, along with most of NetChoice's other arguments, *id.* at 30-34. NetChoice insists that in upholding age-verification requirements for pornographic websites, *FSC* "analogized to similar longstanding requirements for brick-and-mortar stores selling pornography to verify ages," and that the Act's restrictions "have no physical equivalent." NetChoice Br. 52 (cleaned up). They do have physical equivalents. State Br. 31 (giving examples). Consider alcohol establishments. Bars host fully protected First Amendment speech. That does not mean that laws requiring bars to verify age trigger strict scrutiny. Granted, bars also host conduct that is not fully protected speech and that is dangerous to minors. But the same is true of interactive platforms covered by the Act. Those platforms may host some speech—but they also host vast amounts of unprotected and even illegal conduct. The State is entitled to regulate that conduct.

According to NetChoice, the State argues that it has "'power'" to impose "'restrictions on fully protected speech.'" NetChoice Br. 53 (quoting State Br. 30). The State actually said that "States have 'traditional power' to protect minors from predators and the harms that they inflict—including by adopting age-verification, parental-consent, and harm-mitigation requirements." State Br. 30. The State then supported that argument, with examples and ample reference to *FSC*. *Id.* at 30-31. To the State's actual argument, NetChoice has no answer.

## 2.    The Act Satisfies Intermediate Scrutiny.

The Act satisfies intermediate scrutiny (State Br. 38-44) and the injunction could not stand even if strict scrutiny applied (*id.* at 44-46). NetChoice's responses, NetChoice Br. 30-32, 35-38, 39-40, 45, fail.

NetChoice argues that the Act fails strict scrutiny. NetChoice Br. 30-31, 35-38, 39-40, 45. But because strict scrutiny does not apply, the Act does not need to meet overinclusiveness, underinclusiveness, or least-restrictive-means requirements. State Br. 43-44. NetChoice makes spotty suggestions that the Act fails intermediate scrutiny (NetChoice Br. 30, 31-32, 35-36, 39-40, 45, 52 n.14), but nothing it says overcomes the State's arguments. State Br. 38-44.

Errors pervade NetChoice's tailoring analysis anyway, so even if strict scrutiny applied the injunction could not stand. State Br. 44-45.

Start with the age-verification provision. NetChoice Br. 39-40. NetChoice says that this provision "burdens the right to access speech." *Id.* at 39 (cleaned up). But NetChoice relies only on its declaration reporting Nextdoor's bungling effort to obtain and verify government IDs. Pai Dec. ¶¶ 23b-26 (ROA.141-143). The Act does not require obtaining government IDs. NetChoice also claims that the age-verification provision will "require adults and minors to give up anonymity to access fully protected speech." NetChoice Br. 40. NetChoice knows that is not so. It represents covered platforms that already verify age without requiring documentation or forgoing anonymity. *See* Instagram, How

does video selfie age verification work on Instagram?, https://bit.ly/4jclTYB (video-selfie age-verification option that uses technology that "can't identify specific people," takes "minutes," and "delete[s] the image"); Facebook, How video selfie age verification works on Facebook Dating, https://bit.ly/43j4mIa (same). Other modern methods rely on hand gestures or voice. Age Verification Providers Association Br. 6-7, *Free Speech Coalition, Inc. v. Paxton*, S. Ct. 23-1122.

Next, the parental-consent provision. NetChoice Br. 35-38. NetChoice says that this provision "does not account for the difficulty of verifying a parent-child relationship." *Id.* at 36. But the Act does not require verifying that relationship. State Br. 40. NetChoice suggests that this means that the provision "cannot promote parental oversight." NetChoice Br. 36 (cleaned up). But it just means that the Act may not successfully involve parents in every case. That was a reasonable compromise between involving parents to avert harms while "allowing" users to access covered platforms after only "modest burden[s]." *FSC*, 145 S. Ct. at 2317. NetChoice also disputes that the State has "a sufficient governmental interest," NetChoice Br. 35-36—a view that even the district court did not adopt—but the State has a compelling interest in protecting children from predators. State Br. 38-39. NetChoice says that "if some covered websites were genuinely dangerous for users of a certain age, it is unclear why the State would allow minors to access them so long as one parent says it's OK." NetChoice Br. 37 (cleaned up). But the

21

danger the Act addresses is predatory interactions—a danger that, the Legislature believed, could be managed and mitigated with parental oversight.

Now, the strategy provision. NetChoice Br. 45. NetChoice faults that provision for not regulating websites "where minors can encounter content that [the strategy provision] prohibits." *Ibid.*; *cf. id.* at 31 (similar argument). But the fact that minors can encounter the same content on non-covered platforms confirms that the Act does not prohibit or target content: it targets predators. NetChoice says that the provision's "exception" allowing a minor to search for "otherwise regulated speech" "completely undermines" the provision. *Id.* at 45. Again, that the Act allows minors to search for content confirms that it does not regulate content or speech but instead regulates to obstruct predators.

Last: NetChoice claims that the injunction "correctly bars" the State "from enforcing any part of the Act as applied to" covered NetChoice platforms "because all the Act's speech restrictions depend on the Act's unconstitutionally content-based coverage definitions." NetChoice Br. 10 n.4. But NetChoice gives no basis—and there is none—for blocking the sections that are not enforcement provisions (§§ 1, 2, 3), that limit the use and collection of minors' sensitive information (§ 5), and that authorize private enforcement (§ 7). State Br. 46. None of those sections imposes a "speech restriction[ ]." *Contra* NetChoice Br. 10 n.4.

**C.    NetChoice's Other Claims Cannot Save The Injunction.**

NetChoice presses vagueness and preemption claims that the district court did not credit. NetChoice Br. 32-33, 46-47. These claims cannot support the injunction (State Br. 46) and fail (*id.* at 47-52).

### 1.    NetChoice's Vagueness Claims Fail.

a. One uncontested point alone dooms NetChoice's claim that the Act's coverage definition is unduly vague: NetChoice has conceded that, based on that definition, it knows whether the Act applies to each of its members. State Br. 48-49. NetChoice does not dispute this point. NetChoice Br. 32-33. Instead it says that terms in the definition—*primarily*, *incidental*, and *socially interact*—"leave[ ] websites guessing" at what the Act covers. NetChoice Br. 32-33. That is wrong (State Br. 47-49) and defies NetChoice's admission that none of its members must guess at whether it is covered. NetChoice says that because its vagueness claim arises in "the free-speech context," it need not show that the law is "impermissibly vague in all of its applications." NetChoice Br. 33. Neither case it cites says that. *Smith v. California*, 361 U.S. 147, 151 (1959) (discussing vagueness but not facial vagueness standard); *National Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 & n.32 (5th Cir. 2024) (noting that, for some speech-related vagueness claims, pre-enforcement *standing* is easier to establish). And a lighter facial standard would not help NetChoice: its concessions doom its claim. State Br. 48-49.

b. In urging that the strategy provision is vague because it uses the words "promotes" and "facilitates," NetChoice says that the Supreme Court invalidated a law using the word *promote* in *Baggett v. Bullitt*, 377 U.S. 360 (1964), and that the word *facilitates* "is no better." NetChoice Br. 46. The State already refuted these points. State Br. 49-50. NetChoice claims that the State "does not deny" that the provision's "specific standards are vague" and just argues that "context provides the clarity that is otherwise lacking." NetChoice Br. 46 (cleaned up). The State of course "den[ies]" that point. And the point is nonsensical: words are read in context. NetChoice says that it has cited "examples of protected speech" that the strategy provision "threaten[s] to encompass." *Ibid.* But its "examples" wrench the words *promotes* and *facilitates* from their context. *See* Amended Complaint ¶ 80 (ROA.657-658). Context shows that the strategy provision ties those words to specific harms that flow from targeted, interactive acts perpetrated online. State Br. 49-50. And again: the provision requires a harm-mitigation strategy—not blocking content. *Contra* Amended Complaint ¶ 80 (ROA.657-658).

### 2.    NetChoice's Preemption Claim Fails.

This Court has held that 47 U.S.C. § 230 does not immunize platforms from liability that is imposed "independently of whether the third-party speech that [platforms] host harms anybody." *Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263, 285 (5th Cir. 2024), *aff'd*, 145 S. Ct. 2291 (2025). That holding dooms NetChoice's preemption claim

because the strategy provision imposes liability based on whether a platform "compl[ies] with" the Act by making commercially reasonable efforts to adopt a harm-mitigation strategy—not based on whether third-party content "harms anybody." *Ibid.*; *see* State Br. 50-52. NetChoice ignores this Court's decision in *Free Speech Coalition* and rehashes arguments that the decision forecloses. NetChoice Br. 46-47. It claims that section 230 preempts laws that hold platforms "liable for alleged 'failure[s] to implement basic safety measures to protect minors' or to 'address certain harmful content.'" *Id.* at 47 (quoting *Doe v. MySpace, Inc.*, 528 F.3d 413, 419, 420 (5th Cir. 2008)). That is not so. Section 230 bars holding platforms liable "for *harm* caused by unremoved speech on their website[s]." 95 F.4th at 285 (emphasis added); *see id.* at 285-86 (discussing *MySpace*). The strategy provision does not hold platforms liable for such harm. Nor does it impose liability for "'decisions relating to the monitoring, screening, and deletion of content.'" NetChoice Br. 47 (quoting *MySpace*, 528 F.3d at 420). It does not require platforms to monitor, screen, or delete content. State Br. 51. It requires "commercially reasonable efforts" to adopt a harm-mitigation *strategy*. § 6(1).

## II.  The Remaining Factors Strongly Support Rejecting The Preliminary-Injunction Order.

The equities alone require rejecting the injunction. State Br. 52-55.

In claiming irreparable harm, NetChoice cites some platforms' recent decisions to "block[ ] or limit[ ] Mississippi users' access." NetChoice Br. 53; *see id.* at 53-54, 55. Nothing it says holds up.

NetChoice says that Dreamwidth has "block[ed] access" because "the Act's compliance costs are 'far in excess of [the] available budget.'" NetChoice Br. 53-54 (quoting Paolucci Dec. ¶ 37 (ROA.168)). But—as the State explained in refuting the declaration that NetChoice cites—the Act requires only commercially reasonable efforts, not cost-prohibitive ones. State Br. 53. So Dreamwidth has acted based on a misreading of the Act—or in a bare effort to seek litigation advantage. That is confirmed by Dreamwidth's explanation of its approach: it proclaims that the Act requires "deanonymiz[ing]" all users, "collecting identity documents," and storing "highly personal and sensitive information"—all wrong. Dreamwidth, Mississippi legal challenge: beginning 1 September, we will need to geoblock Mississippi IPs (Aug. 26, 2025), https://perma.cc/G3E4-262C. Dreamwidth also says: "as everyone who follows the legal system knows, the Fifth Circuit is gonna do what it's gonna do, whether or not what they want to do has any relationship to the actual law." *Ibid.*

NetChoice cites Nextdoor, NetChoice Br. 54, but Nextdoor has barred only minors (*ibid.*), admits that it has relatively few minor users (Pai Dec. ¶¶ 16-19 (ROA.139-140)), and has never submitted factual material showing what actions the Act requires it to take and whether those actions impose the costs that NetChoice now claims. NetChoice

cites the "email group service" Groups.io. NetChoice Br. 54. Groups.io claims, without basis, that the Act requires "collecting sensitive data" and "significant engineering and operational overhead." Groups.io, Why access from Mississippi is currently blocked, https://perma.cc/ZF8E-JS5D. That leaves Bluesky. NetChoice Br. 54. It erroneously claims that the Act requires "hand[ing] over sensitive personal information" and imposes "overwhelm[ing]" costs on "smaller" platforms. The Bluesky Team, Our Response to Mississippi's Age Assurance Law, Bluesky Blog (Aug. 22, 2025), https://perma.cc/GB33-YKLY. Anyway, Groups.io and Bluesky are not NetChoice members and so have never benefited from an injunction in this case. NetChoice offers nothing to suggest that their withdrawals from Mississippi are anything but performative. The actions of these few platforms—unsupported by the record and on their face based on clear errors—do not help NetChoice.

NetChoice says that "compliance costs" and the risk of enforcement inflict irreparable harm. NetChoice Br. 54-55. NetChoice's compliance-cost claims rest on clear errors about what the Act requires. State Br. 52-53. And its complaints about enforcement fall with its merits arguments, *see id.* at 52, as do its arguments that the "loss of First Amendment freedoms" inflicts irreparable harm and that protecting First Amendment freedoms is "in the public interest," NetChoice Br. 54, 55.

NetChoice does not dispute that it has engaged in "a yearslong pattern of defiance" of court orders. State Br. 55; *see id.* at 53-55. It says

only that it "has never argued that any court should 'defy' this Court's prior mandate" in *Fitch*. NetChoice Br. 56. The facts show otherwise. State Br. 15-16, 25, 28. As was true when the Supreme Court refused to disturb this Court's stay, "the balance of harms and equities" do not "favor[ ]" NetChoice. *NetChoice, LLC v. Fitch*, 145 S. Ct. 2658, 2658 (2025) (Kavanaugh, J., concurring in denial of vacatur).

## CONCLUSION

This Court should reject the injunction. This Court should not lift its stay order.

Respectfully submitted,

LYNN FITCH
  *Attorney General*

*s/ Scott G. Stewart*

SCOTT G. STEWART
  *Solicitor General*
JUSTIN L. MATHENY
ANTHONY M. SHULTS
  *Deputy Solicitors General*
WILSON D. MINOR
  *Special Assistant Attorney General*
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
Email: scott.stewart@ago.ms.gov

*Counsel for Defendant-Appellant*

October 23, 2025

28

## CERTIFICATE OF SERVICE

I, Scott G. Stewart, hereby certify that this brief has been filed with the Clerk of Court using the Court's electronic filing system, which sent notification of such filing to all counsel of record.

Dated: October 23, 2025

*s/ Scott G. Stewart*
Scott G. Stewart
*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 6494 words, excluding parts exempted by Fed. R. App. P. 32. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because its text has been prepared in proportionally spaced typeface, including serifs, using Microsoft Word 2016, in Century Schoolbook 14-point font.

Dated: October 23, 2025

*s/ Scott G. Stewart*
Scott G. Stewart
*Counsel for Defendant-Appellant*